MILLER, PITT, FELDMAN & McANALLY, P.C.
Stanley G. Feldman, SBN 000838
Peter Timoleon Limperis, SBN 019175
Timothy P. Stackhouse, SBN 030609
One S. Church Ave., Ste. 900
Tucson, AZ 85701-1620
(520) 792-3836
sfeldman@mpflaw.com
plimperis@mpflaw.com
tstackhouse@mpflaw.com
me@mpflaw.com

THE LEADER LAW FIRM, P.C.
John P. Leader, SBN 012511
405 W. Cool Dr. Ste. 107
Tucson, AZ 85705
Phone (520) 575-9040
Fax (520) 575-9340
john@leaderlawaz.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Louis Taylor, a single man,<br><br>       Plaintiff,<br><br>vs.<br><br>Pima County, a body politic; The City of Tucson, a body politic,<br><br><br>       Defendants. | No. CV-15-00152-TUC-RM<br><br>**THIRD AMENDED COMPLAINT**<br><br>**42 U.S.C.A. §1983**<br><br>**(The Hon. Rosemary Marquez)** |

Plaintiff, for his Complaint against the Defendants, alleges as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

1. This is an action for monetary damages and Declaratory Judgment under 42 U.S.C.§1983 against Pima County and the City of Tucson local governing bodies within this District. This action arises under the laws of the United States and this court has jurisdiction pursuant to 42 U.S.C.§1331.

2. Defendants are liable to Plaintiff under 42 U.S.C. §1983 for monetary relief and Declaratory Judgment because, as discussed in more detail below, officers of each local governing body took unconstitutional actions pursuant to and in execution of customs and policies of these local governing bodies. *Silverwing at Sandpoint v. Bonner County* (D. Idaho 11-21-2014) No.2:12-CV-00287-EJL-LMB ("F.Supp" citation unavailable), citing *Jackson v. Barnes*, 749 F.3d 755, 762-63 (9th Cir. 2014), *Monell v.Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690 (1978 ) ("[I]t is when execution of a [local] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 693); *Board of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403 (1997) ("[W]e have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."); *See also, Lytle v. Carl*, 382 F.3d 978, 981 (9th Cir. 2004); *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).  Under *Shipp v. Todd*, 568 F.2d 133 (9th Cir. 1978), *Maurer v. Individually and as Members of Los Angeles County Sheriff's Dept.*, 691 F.2d 434, 437 (9th Cir. 1982), U.S. v. G., 774 F.2d 1392 (9th Cir. 1985), *U.S. v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991), *USA v. Sumner*, 226 F.3d 1005, 1012 (9th

2

Cir. 2000), and *Fazaga v. Fed. Bureau of Investigation,* 916 F.3d 1202, 1239 n. 32 (9th Cir. 2019), 42 U.S.C. §1983 is an appropriate vehicle to challenge the validity of a state court conviction and to seek Declaratory Judgment Relief under the Declaratory Judgment Act, 28 U.S.C.A. § 2201 for said violations

3.  Both defendants, as of December, 1970, had official policies, customs or practices, created either by action or inaction, which amounted to longstanding practice having the force of law.

4.  Plaintiff Taylor was arrested by officers of the Tucson Police Department on or about December 20, 1970 in connection with a fire that occurred at the Pioneer Hotel in Tucson (hereafter, "the fire").

5.  Plaintiff Taylor is of African-American descent and was arrested based on his race.

6.  Taylor was arrested before any investigation had been commenced to determine whether the fire was even arson.

7.  There is no adequate or scientifically reliable evidence proving that the fire was arson, and thus, that any crime was committed with respect to this fire by anyone, let alone by "the black boy."

8.  As of December, 1970, there had been three (3) recent other fires at the Pioneer Hotel, which were believed to be arson. A white man by the name of Donald Anthony was the suspect in all three (3) prior fires. Anthony, who should have been the primary suspect in the Pioneer Hotel fire, was never questioned and there is no record that the possibility of his involvement in the fire was ever investigated.

9.     After his arrest, Taylor, then 16 years of age, was interrogated by at least eight different officers of the Tucson Police Department, in violation of his constitutional rights, over the course of several hours in the early morning hours of December 20, 1970. Near the conclusion of this interrogation, Taylor requested and was given a polygraph, during which he denied starting the fire. The polygraph did not indicate deception by Taylor.

10.     Taylor was initially charged with trespassing and arson, but the arson charged was dropped almost immediately. The Deputy County Attorney did not believe that there was enough evidence to charge Taylor with any other crimes. Trespass carried a maximum sentence of five days and a fine of $25.

11.     Paul Charters, the Pima County Juvenile Court Center director, demanded Taylor be charged as an adult. Charters also claimed that he had the authority to file charges against Taylor, which the Deputy County Attorney disputed. Charters threatened to resign if he was not allowed to file charges against Taylor. At a hearing to determine if Taylor should be charged as an adult, Charters testified that Taylor was a "sociopath" and was incapable of being rehabilitated. There is no record of any competent professional testimony or evidence supporting this diagnosis.

12.     Paul Charters was outspoken about the need to arrest and prosecute more delinquents.

13.     Taylor was charged as an adult with twenty-eight (28) counts of murder before any investigation had been commenced to determine whether the fire was arson, despite the known polygraph results, and despite the existence of a known arson suspect in other recent prior fires.

14.    In the weeks and/or months following the fire, the Tucson Fire Department, an agency of Defendant City of Tucson, conducted an investigation(s) into the fire and thereafter jointly worked with the Tucson Police Department and the Pima County Attorney's Office in Mr. Taylor's prosecution.

15.    Taylor was convicted by an all-white jury of twenty-eight counts of murder on March 21, 1972.

16.    Before, during and after trial, the above named Defendants subjected Plaintiff Louis Taylor to a deprivation of his federal constitutional rights, or caused Taylor to be subjected to such a deprivation; said constitutional rights were clearly established prior to December, 1970.

17.    The deputy Pima County attorney assigned to the Taylor prosecution was Horton Weiss. By the time of Mr. Taylor's trial, Weiss was well known to the Arizona judiciary as an over-zealous and unethical prosecutor who habitually practiced on the edge of, and often beyond, what was ethically and constitutionally proper. *See e.g.*, *State v. Lanahan*, 12 Ariz.App. 446, 448, 471 P.2d 748, 750 (1970) (Weiss reprimanded twice "for making insinuating comments and trying to take over the courtroom."); *State v. Mercer*, 13 Ariz.App. 1, 4, 473 P.2d 803, 806 (1970) ("The over-zealous tactics of Mr. Weiss are well known to this court and have been the subject of other appeals."); *State v. Moore*, 108 Ariz. 215, 222, 495 P.2d 445, 452 (1972) ("The record herein indicates that Mr. Horton Weiss was guilty of the most unprofessional and immature conduct which impeded the orderly reception of evidence, restricted the right of cross-examination by the defendant, and measurably extended the time it took to try the case . . . In the instant case, the conduct of Mr. Weiss was so outrageous and

improper that this court is required to reverse and remand the matter for new trial."); *State v. Thomas*, 110 Ariz. 120, 134, 515 P.2d 865, 879 (1973) (Weiss's "interruptions were frequent, baseless in most cases, and a hindrance to the defense. There can be no justification for such conduct."); *State v. Skinner*, 110 Ariz. 135, 147, 515 P.2d 880, 892 (1973) (discussing alleged *Brady* and *Giglio* violations involving both Weiss and Rex Angeley and noting that Weiss's trial conduct was also "short of exemplary"); *State v. Moore*, 110 Ariz. 404, 406, 519 P.2d 1145, 1147 (1974) (allegations of unprofessional and improper conduct are "not a new or novel question for this court as it has been raised in numerous cases which have been prosecuted by Mr. Weiss.").

18. The above described prior misconduct by Weiss necessarily involved violating or potentially violating the constitutional rights of Pima County criminal defendants, including but not limited to African American defendants.

19. At the time Weiss prosecuted Mr. Taylor, he (Weiss) was simultaneously defending himself against five contempt of court charges related to his conduct in a 1970 trial, for which he ultimately served 15 days in jail (*See Weiss v. Superior Court of Pima County*, 12 Ariz.App. 527, 472 P.2d 950 (1971); *Weiss v. Superior Court of Pima County*, 106 Ariz. 577, 480 P.2d 3 (1971); *Weiss v. Burr*, 327 F.Supp. 1306 (1971); *Weiss v. Burr*, 484 F.2d 973 (1973); *Weiss v. Burr,* 414 U.S. 1161, 94 S.Ct. 924 (1974) (*cert denied*).

20. Horton Weiss and other employees of Pima County and the County Attorney's Office prosecuted cases against African Americans with a presumption of guilt and frequently elicited testimony they knew to be unreliable from jailhouse

snitches and informants. On at least one occasion prior to the Taylor trial Weiss referred to a white lawyer representing a black criminal defendant as a "nigger lover."

21.     Horton Weiss was known to train other county attorneys that jailhouse snitches should only be used as a matter of last resort when there was otherwise insufficient evidence to convict the defendant, because they were inherently unreliable.

22.     Because of Weiss's reputation, the then County Attorney was asked to use her administrative authority to remove Weiss from Taylor's case. She refused to do so. Upon information and belief, the County Attorney was under pressure to ensure that Taylor was convicted due to the high profile nature of the Pioneer Hotel fire, and knew that if he was given a fair trial there was not enough evidence to convict him.

23.     Prior to trial, the defendants received and possessed a written report, known as the "Truesdail" report, from a consulting expert, concluding that no evidence of "accelerants" was discovered during post fire inspections.

24.     This report was exculpatory evidence that Plaintiff Taylor was entitled to have in his defense, under *Brady v. Maryland*, 373 U.S. 83 (1963).

25.     The defendants, and each of them, knowingly and wrongfully withheld this report from Plaintiff Taylor and his criminal defense lawyer.

26.     During trial, police officers of Defendant City of Tucson procured testimony from two jailhouse "snitches,"[1] testimony that the defendants knew or should have known was false.

---

[1] Bruce Wallmark and Robert Jackson

7

27.    One of these witnesses, Robert Jackson, falsely testified that Plaintiff Taylor admitted starting the fire and using an accelerant (lighter fluid) to do so. This testimony was inconsistent with the findings of the undisclosed "Truesdail" report.

28.    With actual or constructive knowledge that Jackson's testimony was false, and knowing that Jackson's testimony was contradicted by the undisclosed "Truesdail" (no accelerant) report, the defendants nonetheless called Jackson to testify near the end of the prosecution's case in chief. As such and as the defendants knew or should have known, Jackson's testimony would have a greater effect upon the jury given its timing (at the end of the prosecution's case).

29.    The Defendants hired an expert who believed that Taylor was guilty of arson because Taylor was a "black boy," and "black boys" are more likely to start fires.

30.    The Defendants' conduct in withholding the "Truesdail" report, offering expert opinion based on race, calling Jackson as a witness, and doing so at the end of the prosecution's case, was a calculated, deliberate, and intentional violation of Plaintiff Taylor's constitutional rights, including but not limited to his due process rights and his rights to a fair trial. Taylor was railroaded.

31.    Before, during, and after trial, the above named defendants and/or employees of the above named defendants, and other unnamed coconspirators, engaged in a civil conspiracy, that is, a combination of two or more persons who, by concerted action, intended to accomplish some unlawful objective for the purpose of harming Plaintiff Taylor which in fact resulted in damage to Taylor.

32.    The above mentioned co-conspirators reached a unity of purpose, a common design and understanding or a meeting of the minds in an unlawful

arrangement - to arrest, charge and convict Plaintiff Taylor, knowing that the fire may not have been arson, knowing that if it was arson, another person was a more likely suspect, deliberately withholding the exculpatory "Truesdail" report, offering expert opinion based on race, and recruiting and then calling as a trial witness a person whose testimony was obviously false and whose testimony directly contradicted the wrongfully withheld "Truesdail" report, all in violation of Plaintiff Taylor's constitutional rights. Each participant in the conspiracy shared the common objective of the conspiracy - arresting, charging, and convicting Taylor, in violation of Taylor's constitutional rights.

33.    Actions taken pursuant to this conspiracy included, but were not limited to withholding of the "Truesdail" report, and procuring testimony that the defendant/co-conspirators knew or should have known was false.

34.    But for the unconstitutional municipal policies set forth above and below, the conspiracy described above likely would not have been created and carried out.

35.    On October 23, 2012, Plaintiff Taylor filed a Petition for Post-Conviction Relief pursuant to the Arizona Rules of Criminal Procedure.

36.    In this Petition, Taylor included findings and conclusions of the "Arson Review Committee," a panel of renowned fire experts who, shortly before Taylor filed his Petition for Post-Conviction Relief, reviewed all evidence in this case and concluded that the Pioneer hotel fire cannot be classified as arson.

37.    In a Pima County Attorney Memorandum filed April 1, 2013 in Pima County Superior Court, it was stipulated that if "a review of the original evidence using

new advances and techniques in fire investigation is legally 'newly discovered evidence' … the State would be unable to proceed with a retrial, and the convictions would not stand."  Declaratory Judgment invalidating Taylor's 2013 convictions is warranted and appropriate.

38.     On that same date, April 1, 2013, the Pima County Attorney's Office stipulated to Taylor's request for post-conviction relief, on the condition that Taylor enter a "no contest" plea.

39.     On April 2, 2013, Plaintiff Taylor's March 1972 convictions(s) were vacated.

40.     On or about that same date, although maintaining his innocence, Plaintiff Taylor pled "no contest" to charges related to the fire, on the condition that he serve no time in prison related to these new charges.

41.     On that same date, April 2, 2013, Plaintiff Taylor was released from his incarceration for the unconstitutional 1972 convictions, having spent approximately 42 years in prison.

42.     A §1983 cause of action for damages attributable to an unconstitutional conviction(s) does not accrue until the conviction or sentence has been invalidated. *Heck v. Humphrey*, 512 U.S. 477, 489 (1994), *Jackson v. Barnes*, 749 F.3d 755, 761 (9th Cir. 2014).

43.     The §1983 claims asserted in this action thus accrued April 2, 2013, when Taylor's original, 1972 conviction(s) were vacated. The statute of limitations for §1983 claims is the general personal injury statute of limitations for the State where the events in question occurred, in this case, Arizona. *Wallace v. Kato*, 549 U.S. 384,

387 (2007), *Madden-Tyler v. Maricopa County*, 189 Ariz. 462 (App. 1997). Arizona's general personal injury statute of limitations is two years. A.R.S. §12- 542. Therefore, this action is timely.

## COUNT ONE

(42 U.S.C.A. §1983 – Defendant City of Tucson; Custom of Impermissible Racial Discrimination)

44.     Plaintiff incorporates all the above factual allegations as though set forth herein.

45.     Under *Monell v. N.Y.C. Dep't of Soc. Servc.*, 436 U.S. 658 (1978), Defendant City of Tucson is liable for action or inaction that "unconstitutionally implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where the action is made "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Id.* at 690–91.

46.     Under *Monell*, a local government body is liable under §1983 for policies of inaction as well as policies of action. *Gibson v. Cnty. Of Washoe*, 290 F.3d 1175, 1185–86 (9th Cir. 2002). A policy of inaction is based on a government body's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012).

47.     Prior to and at all times relevant to Plaintiff Taylor's arrest and prosecution, Defendant City of Tucson, through its Police Department, had a pervasive long-standing custom/practice of racial discrimination against African Americans, a practice that amounted to the force of law, that included but was not limited to a failure

to implement procedural safeguards to prevent constitutional violations, including racially related safeguards.

48. Because of that policy, only seven out of seven hundred officers in the Tucson Police Department were African Americans as of 1972. This was after the Tucson Police Department received federal funds to recruit more African Americans to the department in 1970. In 1971, only one African American was enrolled at the start of the first police academy class. Part of the reason the recruitment effort failed was the department used entrance exams it knew, or should have known, were racially biased against African Americans. This resulted in only seven out of 50 African Americans recruited from college campuses scoring high enough to apply. The efforts further failed because, due to the department's longstanding policy of discrimination, African Americans did not trust the Police Department. Ken White, a recruitment officer for the Police Department, believed that it was because African Americans in Tucson were related to or friends with nearly every other African American. It was inevitable, White believed, that an African American would have to arrest another African American, who was sure to be a relative or friend.

49. Those African Americans Tucson Police Department did hire had to overcome stereotypes engrained in the Tucson Police Department and within the city. On at least one instance, an African American officer was turned away by the person who had requested police assistance because the person wanted a white officer.

50. On or about June 11, 1972 the arrest of John W. Young, an African American man, for loitering in Mansfield Park led to protest against the Tucson Police Department. The people living near Mansfield Park believed the arrest was the result

of harassment and discrimination. When police returned to the area later that evening on an unrelated call, approximately 50 residents of the Mansfield Park area protested against the Tucson Police Department.

51. The discriminatory policy had been endorsed and/or directed by the Tucson City Council and Mayor. In 1965, the Council and Mayor held a hearing for the Congress on Racial Equality. The Council and Mayor acted unprofessional and angrily dismissed the concerns raised by the Congress on Racial Equality. The Council responded to one of the Congress's complaints—that the Police Department was invading the privacy and harassing their members—by saying that it authorized the invasions of privacy. The City Council and Mayor dismissed the Congress's request to establish a citizen's advisory committee to provide a means for minorities to have complaints against the Police Department independently investigated. In 1990, such a committee was adopted.

52. The Tucson Police Department's discriminatory policies were widespread in 1970. It resulted in the arrest of Melvin Dixon, an African American woman, on or about July 9, 1970 arising out of a traffic citation for illegally backing-up. The Tucson Police Department officer issuing the citation marked an "N" for negro in the box for "origins" on the citation, prompting Ms. Dixon to refuse to sign the citation. Ms. Dixon was then arrested.

53. On or about January 8, 1970, the Tucson Police Department sent 10 plain clothes police officers to a protest organized by the NAACP and University of Arizona Black Student Union against the Church of Latter Day Saints' and Brigham Young University's discriminatory polices, which took place during a basketball game

between the University of Arizona and BYU. The police presence resulted in disorder at the protest and the arrest of several protestors. The Tucson Police Department signed a riot complaint against those arrested. They arrested a Mexican-American rights advocate the following day as well, despite the lack of any evidence that he was even at the protest. The actions of the Police Department and University during the protest were widely condemned.

54. The Tucson Human Relations Commission requested that the Tucson Police Department release their reports related to the incident, and were met with resistance from the Tucson Police Department. Chief of Police William Gilkinson dismissed the requests stating that it was not the business of the commission "any time a police officer has a confrontation with a militant black on the street."

55. During the summer of 1970, racial tensions were increasing in the City of Tucson, particularly in the area of Mansfield Park, a predominately African American neighborhood. The City of Tucson Mayor was warned that if promised improvements to Mansfield Park were not made, there could be "trouble." Upon information and belief, this prompted the Mayor to reaffirm the practice of arresting African Americans without probable cause on the basis of their race, and for the Tucson Police Department to continue to assist Pima County in the prosecution of African Americans by, among other things, providing jailhouse snitches to fabricate testimony.

56. On or about August 31, 1970, an altercation between African American and Anglo youths at the Fox Theater in downtown Tucson led to property damage to nearby business. At least 29 African Americans were arrested. Despite there being

witnesses stating that Anglo youths were involved and may have instigated the incident, every person arrested was African American. The City of Tucson Mayor was prepared to personally take control of the Tucson Police Department and call in the National Guard in order to control what was being called a "race riot." Some of those arrested were abused while in custody. The incidents described above are examples of the discriminatory practices and customs of the Tucson Police Department in effect. Said policies include, but are not limited to, arresting African Americans without probable cause solely because of their race while ignoring credible evidence that indicated white suspects, and ignoring the constitutional rights of the accused.

57. Said policies resulted in the deprivation of Plaintiff's constitutional rights.

58. That the aforementioned policies amounted to deliberate indifference to the well-established constitutional rights of Plaintiff Louis Taylor, who is African-American, and others.

59. Prior to December, 1970, Defendant City of Tucson, acting pursuant to and under color of state law, and pursuant to long-standing custom and practice, devised, implemented and applied customs, policies and practices amounting to deliberate indifference, that directly resulted in the deprivation of Plaintiff Louis Taylor's clearly established constitutional rights, of which a reasonable person would have known, including but not limited to Plaintiff's 5th and 14th Amendment Due Process rights.

60. As a direct result of the above-described conduct, Plaintiff Louis Taylor experienced a profound deprivation of his civil rights and liberties, by being wrongly

charged in December 1970 with multiple counts of homicide related to arson, by later being wrongly convicted of those crimes, and by later serving the vast majority of his adult life, 42 years, in prison.

61.     The violation of Plaintiff's constitutional rights could have been prevented had appropriate customs and policies been in place.

**COUNT TWO**

<u>(42 U.S.C.A. §1983 – Defendant Pima County; Custom of Impermissible Racial Discrimination)</u>

62.     Plaintiff incorporates all of the above factual allegations as though set forth herein.

63.     Under *Monell v. N.Y.C. Dep't of Soc. Servc.*, 436 U.S. 658 (1978), Defendant Pima County is liable for action or inaction that "unconstitutionally implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where the action is made "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Id.* at 690–91.

64.     Under *Monell*, a local government body is liable under §1983 for policies of inaction as well as policies of action. *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185–86 (9th Cir. 2002). A policy of inaction is based on a government body's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012).

65.     Prior to and at all times relevant to Plaintiff Taylor's arrest and prosecution, Defendant Pima County, through its County Attorney's Office, had a pervasive long-standing custom/practice of racial discrimination against African

Americans, a practice that amounted to the force of law, that included but was not limited to a failure to implement procedural administrative hiring and training safeguards, to prevent constitutional violations, including but not limited to racially related safeguards.

66. The above incidents are examples of the discriminatory policies in effect.

67. Said policies resulted in the deprivation of Plaintiff's constitutional rights.

68. That the aforementioned policies amounted to deliberate indifference to the well-established constitutional rights of Plaintiff Louis Taylor, who is African-American, and others.

69. Prior to December, 1970, Defendant Pima County, acting pursuant to and under color of state law, and pursuant to long-standing custom and practice, devised, implemented and applied customs, policies and practices amounting to deliberate indifference, that directly resulted in the deprivation of Plaintiff Louis Taylor's clearly established constitutional rights, of which a reasonable person would have known, including but not limited to Plaintiff's 5th and 14th Amendment Due Process rights.

70. As a direct result of the above-described conduct, Plaintiff Louis Taylor experienced a profound deprivation of his civil rights and liberties, by being wrongly charged in December, 1970 with multiple counts of homicide related to arson, by later being wrongly convicted of those crimes, and by later serving the vast majority of his adult life, 42 years, in prison.

71.     The violation of Plaintiff's constitutional rights could have prevented had appropriate customs and policies been in place.

## COUNT THREE

(42 U.S.C.A. §1983 – Defendant Pima County; Failure to Train/Supervise)

72.     Plaintiff Taylor incorporates by reference all previous allegations.

73.     Pursuant to *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), a municipality is liable under 42 U.S.C.A. §1983 for failing to train and or supervise its employees if the need to train or better supervise was obvious and the failure to do so made a violation of constitutional rights likely. Prior to December 1970, defendant Pima County failed to train and or supervise its employees, such that the County was deliberately indifferent to the constitutional rights of criminal defendants.

74.     At all times relevant to this matter, the Defendant had policies of inaction, that is, failure to supervise/and or train Deputy County attorneys, and thus, to implement procedural safeguards to prevent constitutional violations.

75.     The ethical and constitutional violations committed by Horton Weiss were obvious to Pima County. Pima County was deliberately indifferent to those violations because Horton Weiss was effective in securing convictions, even when the defendant was innocent. Because of his success in securing convictions through ethical and constitutional violations when there was insufficient evidence, the County Attorney did not remove Weiss from Taylor's case (despite a specific request that he be removed) due to the high-profile nature of the Pioneer Hotel fire.

76.     That the aforementioned policies amounted to deliberate indifference to the constitutional rights of Plaintiff Louis Taylor and others.

77.     Defendant Pima County Attorney was on actual or constructive notice that its omission would likely result in a constitutional violation.

78.     As a direct result of the conduct described above in this count, Plaintiff Louis Taylor experienced a profound deprivation of his civil rights and liberties, by being wrongly charged in December 1970 with multiple counts of homicide related to arson, by later being wrongly convicted of those crimes, and by later serving the vast majority of his adult life, 42 years, in prison.

**COUNT FOUR**

(42 U.S.C.A. §1983 – Defendant Pima County; Custom of Deliberate Indifference to Prosecutorial Misconduct)

79.     Plaintiff incorporates all of the above factual allegations as though set forth herein.

80.     General hiring and firing decisions by County officials, including a County prosecutor and/or his staff are not protected by immunity. *Lacey v. Maricopa County*, 693 F.3d 896, 930-31, 942 (9th Cir. 2012), citing *Forrester v. White*, 484 U.S. 219, 229 (1988), *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009), and *Imbler v. Pachtman*, 424 U.S. 409, 425-26 (1976).

81.     Prior to Plaintiff Taylor's original criminal trial, deputy Pima County Attorney Horton Weiss had demonstrated a continuing pattern of violating the constitutional rights of criminal defendants; Weiss was well known to the Arizona judiciary as an over-zealous and unethical prosecutor who habitually practiced on the edge of, and often beyond, what was ethically and constitutionally proper.

82.     Defendant Pima County, by failing to terminate Weiss' employment prior to Plaintiff's criminal trial, was deliberately indifferent to the constitutional rights of Pima County criminal defendants, including plaintiff Taylor.

83.     Had defendant Pima County not acted with the deliberate difference described above in this count, Plaintiff Taylor's constitutional rights would not have been violated.

84.     The above-described unconstitutional administrative training, hiring and firing policies also directly resulted in foreseeable unethical, unconstitutional prosecutorial misconduct by Horton Weiss before, during, and after Taylor's trial.

85.     These policies continued through County Attorney Peasley, who was hired after the prosecution of Louis Taylor. Peasley continued in Weiss tradition of being an overzealous and unethical prosecutor. In 1997, Peasley convicted Khalil Rushdan, a black man, for first degree murder. Rushdan challenged his conviction and was granted relief on the grounds of vindictive prosecution. The District Court held that "by playing fast and loose with the truth and a man's constitutional rights, Peasley lost his star witness and Sandford [the real killer] walked out a free man.

86.     As a direct result of the conduct described above in this count, Plaintiff Louis Taylor experienced a profound deprivation of his civil rights and liberties, by being wrongly charged in December 1970 with multiple counts of homicide related to arson, by later being wrongly convicted of those crimes, and by later serving the vast majority of his adult life, 42 years, in prison.

# COUNT FIVE

### (Civil Conspiracy - 42 U.S.C.A. §1983,
### Defendants Pima County and City of Tucson)

87.    Plaintiff incorporates all of the above factual allegations as though set forth herein.

88.    Defendants are liable under 42 U.S.C.A. §1983 if and when they conspire to violate a person's constitutional rights. *Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999).

89.    Based in part, and as a direct result of the discriminatory acts and practices alleged in the preceding counts of this Complaint, certain employees of both the City of Tucson and Pima County unlawfully conspired and mutually agreed to violate Plaintiff Taylor's constitutional rights.

90.    The unlawful conspiratorial conduct directly resulted from unconstitutional, racially discriminatory policies or customs (including those described above), and deliberate indifference to prosecutorial misconduct, of Defendants City of Tucson and Pima County.

91.    Before, during, and after trial, employees of the above-named defendants, and other co-conspirator engaged in a civil conspiracy, that is, a combination of two or more persons who, by some concerted action, intended to accomplish some unlawful objective for the purpose of harming Plaintiff Taylor (by unconstitutionally charging and convicting him), which in fact resulted in damage to Taylor.

92.    Defendant City of Tucson's motivation for joining in the conspiracy was in part to detract public attention from the fact that 29 people died in the Pioneer hotel

fire because he City did not have equipment to rescue people from the upper stories of a nine story building, despite the fact that there were at the time at least three buildings in Tucson of that or greater height and two of them had been built more than forty years before. The fire department had requested such equipment earlier in the year, but it was removed from the budget.

93.     The above-mentioned co-conspirators reached a unity of purpose, a common design and understanding or a meeting of the minds in an unlawful arrangement - to convict Plaintiff Taylor, in violation of his constitutional rights. Each participant in the conspiracy shared the common objective of the conspiracy.

94.     The aforementioned civil conspiracy, included, but was not limited to improperly arresting charging and prosecuting Taylor, deliberately withholding of material "exculpatory" evidence (the "Truesdail" report) and then calling a witness whose testimony was obviously false, and whose testimony directly contradicted the undisclosed "Truesdail" report.

95.     By the time of Mr. Taylor's trial, prosecutor Horton Weiss was well known to the Arizona judiciary as an over-zealous prosecutor who habitually practiced on the edge of, and often beyond, what was ethically and constitutionally proper.

96.     Prior to and/or during trial, Horton Weiss became aware of a report (referenced above) prepared by Dr. C.A. Crutchfield, the Technical Director of Truesdail Laboratories.

97.     The "Truesdail" report documents that, after a thorough investigation to identify "accelerants" that may have been used to intentionally start a fire at the Pioneer hotel on December 19-20, 1970, no evidence of accelerants was found.

98.     Upon information and belief, in addition to Horton Weiss, others, including employees of the Tucson Fire Department, knew of and/or were in possession of the "Truesdail" report.

99.     Under well-established principles of American constitutional law, Horton Weiss had a legal and ethical obligation to provide this report to Mr. Taylor and his attorney. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). His failure to disclose this report was, by itself, a significant deprivation of Mr. Taylor's constitutional rights that occurred as a direct result of the conduct alleged in counts one through four of this Complaint (including administrative failures to train, hire and fire).

100.    A second objective of the aforementioned conspiracy was to produce testimony from jailhouse informants to incriminate plaintiff Taylor, which each co-conspirator or knew or should have known was false.

101.    During Mr. Taylor's criminal trial, which took place in early 1972, detectives from the Tucson Police Department went to the jail, intending to induce one or more inmates to incriminate Mr. Taylor, regardless of whether this incriminating testimony was truthful or not.

102.    The detectives did so at the direction of Horton Weiss, or, at a minimum, with Weiss' knowledge and consent.

103.    The detectives then produced two witnesses, Bruce Wallmark and Robert Jackson, who were willing to give and in fact gave false but incriminating testimony against Mr. Taylor, in violation of Taylor's constitutional due process rights.

104.     One witness, Jackson, falsely testified that Taylor admitted starting the fire and that he used an accelerant to do so.

105.     At the time Jackson gave this testimony, the defendants were in possession of Dr. Crutchfield's "Truesdail" report, which concluded that no accelerants were used, in direct contradiction to Jackson's testimony.

106.     Based on events occurring before Mr. Taylor's trial, Defendant Pima County was on notice of the deficiencies related to its training and supervision of Deputy County attorneys, including but not limited to Deputy County Attorney Horton Weiss.

107.     Had the Defendant acted appropriately and not had a policy amounting to deliberate indifference to the constitutional rights of Plaintiff Louis Taylor and others, had Defendant terminated Weiss from the its employment or properly trained or properly supervised him, or had Pima County agreed to the request to remove Weiss from the case, the violations of Plaintiff's constitutional rights would have been avoided.

108.     By December, 1970 an accused's 5th Amendment right to a fair trial and 14th Amendment right to be free of racial discrimination were clearly established, meaning the Defendant has no qualified immunity.

109.     As a direct result of the deliberate indifference described in the preceding paragraph, Plaintiff Louis Taylor experienced a profound deprivation of his civil rights and liberties, by being wrongly charged in December 1970 with multiple counts of homicide related to arson, by later being wrongly convicted of those crimes, and by later serving the vast majority of his adult life, 42 years, in prison.

**COUNT SIX**

(Negligent and Grossly Negligent Investigation – Defendant City of Tucson)

110.    Plaintiff incorporates all of the above factual allegations as though set forth herein.

111.    Defendant City of Tucson acted negligently and grossly negligently in investigating the Pioneer Hotel Fire and Louis Taylor's involvement of in the Fire.

112.    Defendant City of Tucson did not investigate the cause of the fire, arrested Taylor before making any determination that the fire was arson, did not investigate a known arsonist as a suspect, and arrested Taylor without probable cause.

113.    As a result of City of Tucson's negligent and grossly negligent investigation, Taylor was arrested, convicted of 28 counts of murder, and then served forty-two (42) years in prison before the conviction was vacated.

**COUNT SEVEN**

(Wrongful Arrest – Defendant City of Tucson)

114.    Plaintiff incorporates all of the above factual allegations as though set forth herein.

115.    Plaintiff Louis Taylor was arrested and detained by the City of Tucson, directly restraining his liberty of personal movement and locomotion, without his consent.

116.    Defendant City of Tucson arrested Taylor without probable cause or reasonable suspicion, and without conducting any investigation.

117.    Defendant City of Tucson arrested Taylor on the basis of race.

118.   Defendant City of Tucson acted with negligence or gross negligence in arresting Taylor on the basis of race without probable cause or reasonable suspicion before conducting any investigation.

WHEREFORE, Plaintiff respectfully requests that this Court grant him judgment against the Defendants as follows:

a.  Fair and reasonable compensatory damages, including general, special, economic and non-economic damages;

b.  For Declaratory Judgment, pursuant to 28 U.S.C.A. § 2201, expunging Taylor's April 2013 "no contest" pleas and convictions as unconstitutional and thus, invalid

c.  Costs incurred herein;

d.  Attorney's fees (42 U.S.C. §1988), and

e.  Such other relief as the Court deems appropriate.

DATED February 24, 2021

MILLER, PITT, FELDMAN & McANALLY, P.C.

/s/ Peter Timoleon Limperis
Stanley G. Feldman
Peter Timoleon Limperis
Timothy P. Stackhouse

THE LEADER LAW FIRM, P.C.

/s/ John P. Leader
John P. Leader

I hereby certify that on February 24, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECR System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECR registrants:

Daniel P. Struck
Nicholas D. Acedo
Jacob B. Lee
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Phone: (480) 420-1600
dstruck@strucklove.com
nacedo@strucklove.com
jlee@strucklove.com
*Attorneys for Defendant Pima County*

Pima County Attorney's Office
[no attorney currently assigned]
Pima County Attorney's Office, Civil Division
32 North Stone Avenue Suite 2100
Tucson, Arizona 85701
*Attorneys for Defendant Pima County*

Michelle Saavedra
Dennis McLaughlin
Principal Assistant City Attorneys for
Michael G. Rankin
CITY OF TUCSON
PO Box 27210
Tucson, AZ 85726-7210
*Attorneys for Defendant City of Tucson*


*/s/Kim Flaherty*