Michelle R. Saavedra
Dennis P. McLaughlin
Principal Assistant City Attorneys for
Michael G. Rankin
CITY ATTORNEY
P.O. Box 27210
Tucson, AZ 85726-7210
Telephone: (520) 791-4221
Fax: (520) 791-4188
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
Dennis.McLaughlin@tucsonaz.gov
State Bar No. 09197
*Attorneys for Defendant City of Tucson*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Louis Taylor, a single man, | 4:15-cv-00152-RM |
| Plaintiff, | **DEFENDANT CITY OF TUCSON'S STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| Pima County, a body politic; The City of Tucson, a body politic, | (Honorable Rosemary Marquez) |
| Defendants. | |

Defendant City of Tucson (hereinafter "the City"), pursuant to Fed. R. Civ. P. 56(a), hereby submits its Separate Statement of Facts (hereafter "DSOF") in support of its Motion for Summary Judgment filed contemporaneously with this pleading.

**Taylor's 1972 convictions:**

**DSOF 1**

On March 21, 1972, the jury returned its verdict finding Taylor "guilty of 28 counts of murder in the first degree and set the penalty at life imprisonment." (COTMSJ0001-0006, at COTMSJ0003:1-10)

**Taylor's Appeals and Petitions for Post-Conviction Relief:**

**DSOF 2**

Taylor's Petition for Post-Conviction Relief, dated October 23, 2012, lists the following as actions he took to try to secure relief from his 1972 convictions up to that date:

Direct Appeals:

*State v. Taylor*, 112 Ariz. 68, 537 P.2d 938 (1975)(conviction affirmed) (conviction affirmed), *cert denied, Taylor v. Arizona,* 424 U.S. 921 (1976)

Previous Rule 32 Proceedings:

*State v. Taylor,* No. CR-69983 (Maricopa County Superior Court, filed Dec. 31, 1984) (petition denied)

Habeas Corpus or Other Petitions in Federal Court:

*Taylor v. Cardwell,* No. CIV 76-734 PHX (D. Ariz., filed October 8, 1976) (petition denied)

*Taylor v. Cardwell*, 579 F.2d 1380 (9th Cir. 1978) (convictions vacated, remanded to district court for evidentiary hearing on voluntariness of statements to police) *Taylor v. Cardwell,* No. CIV 78-277. TUC (D. Ariz., on remand from 579 F.2d 1380) (petition denied)

*Taylor v. Cardwell,* --- Fed.Appx. --- (9th Cir. 1982) (convictions reversed)

*Cardwell* v. *Taylor,* 461 U.S. 571 (1983) (Ninth Circuit decision reversed, convictions affirmed), *rehearing denied, Cardwell v. Taylor,* 463 U.S. 1236 (1983) (COTMSJ0007-0068, COTMSJ0009:1-5, 9-15)

**DSOF 3**

On December 27, 1972, Taylor filed an Appellate Opening Brief, which was an appeal of the Maricopa County Superior Court's denial of his Motion for New Trial after he was convicted of 28 counts of murder. (COTMSJ0069-0170)

**DSOF 4**

Taylor's Opening Brief included the following question to be determined on appeal:

"7. (a) Was there sufficient probable cause for the magistrate to hold Appellant to answer the charges in the Felony Complaint?"

(c) Was it error to deny Appellant's Motion for New Trial dated March 23, 1972?"

(*Id.* at COTMSJ0082)

**DSOF 5**

In support of his argument for No. 7(a), above, Taylor did not challenge whether the fire was caused by arson. Instead, he stated the following:

> "Although there may have been probable cause to believe that arson was the cause of the hotel fire, there was no evidence to show any criminal agency by Appellant." (*Id.* at COTMSJ0129)

**DSOF 6**

In support of his argument for No.7(c), above, Taylor presented the following argument:

> "In denying the motion, the Court erroneously felt that he '… cannot weigh the credibility of the witnesses and can't decide whether someone is lying or telling the truth or is correct or incorrect.' (RT 24/80). If the trial court thought the testimony of Bruce Wallmark (and later Robert Jackson) to be incredible, he had the power to grant a directed verdict in the absence of other sufficient credible evidence." (*Id.* at COTMSJ0543)

**DSOF 7**

Taylor's Opening Brief also included the following question for the appellate court:

> "11. Was it error to allow evidence of Appellant 's statements to police officers?" (*Id.* at COTMSJ0083)

**DSOF 8**

In support of his argument for No. 11, above, Taylor conceded that the appellate court had previously considered (and ruled on) "one-phase of the issue of the voluntariness statements Appellant made to the police in the early morning hours of December 20, 1970 at the Tucson Police Department." *citing State v. Hardy*, 107 Ariz. 583, 491 P.2d 17 (1971). (*Id.* at COTMSJ0147)

**DSOF 9**

In support of his argument for No. 11, above, Taylor urged the appellate court to review the "1,065 pages of transcript of pretrial hearings on this issue dated October 15, 1971 and

January 10-11, 1972" and argued that the court should find that Taylor's statements were involuntary and should have been excluded. (*Id.* at COTMSJ0147-0148)

**DSOF 10**

Taylor's Opening Brief also included the following question for the appellate court:

> "13. Was it error to permit the State to re-open its case in chief and introduce the testimony of Robert Jackson?" (*Id.* at COTMSJ0083)

**DSOF 11**

In support of his argument for No. 13, above, Taylor raised arguments related to the trial court's ruling to allow the prosecution to reopen its case to call Robert Jackson as a witness and Robert Jackson's testimony. (*See Id.* at COTMSJ0155-0158)

**DSOF 12**

Taylor's Opening Brief also included the following question for the appellate court:

> "18. Was it error to deny Appellant's Motion for New Trial dated April 21, 1972 (filed in Supreme Court) based on newly discovered evidence?" (*Id.* at COTMSJ0084)

**DSOF 13**

In support of his argument for No. 18, above, Taylor presented Robert Jackson's post-trial affidavit to the appellate court and argued that both Bruce Wallmark and Robert Jackson lied to the jury. (*Id.* at COTMSJ0167-0168)

**DSOF 14**

Also, in support of his argument for No. 18, above, Taylor alleged that "more undue influence and misconduct by Mr. Weiss and Mr. Angeley was exerted against defense witnesses resulting in intimidation and subornation of further perjury." (*Id.*)

**DSOF 15**

On May 1, 1985, Maricopa County Superior Court denies Taylor's Petition for Post-Conviction Relief ruling as follows:

> "That, in light of the action taken by the United States Supreme Court in this matter, the findings of the Ninth Circuit Court of Appeals are not a binding determination by a higher court;

That the factual findings previously made by the Superior Court and appellate courts; in this matter under the Fifth Amendment effectively resolve the issue of "detention" under the Fourth Amendment; and

That, therefore, this Court is bound by these previous findings even though they predate *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed 2d 824 (1979. *See also*, *Hayes v. Florida*, __ U .S.__ (53 LW 4382, March 20, 1985).

Accordingly, IT IS ORDERED denying Petition for Post-Conviction Relief." (COTMSJ0171)

**DSOF 16**

On June 26, 1985, the Maricopa County Superior Court denied Taylor's Motion for Rehearing on the court's May 1, 1985, decision and ruled, in part, as follows:

"That the sole determination made by the Court in its Order of May 1, 1985 related to the *Dunaway* factual issue having been subsumed by the previous factual findings that the Defendant was a witness and not in custody when taken from the hotel to the police station." (COTMSJ0172-0173)

**DSOF 17**

On October 4, 1985, Taylor's Petition for Review of the Court's denial of his Petition for Post-Conviction Relief was denied. (COTMSJ0174)

**Factual basis for Taylor's no-contest plea and outstanding 2013 convictions:**

**DSOF 18**

Taylor agreed to the factual basis for his plea in 2013, as set forth in the State's "Memorandum in Support of Stipulated Finding on Post-Conviction Relief and Plea Agreement" (hereafter "Memorandum"), filed on April 1, 2013. (COTMSJ0175-0184; *see also* Change of Plea Transcript, COTMSJ0185-0210; *see also* Plea Agreement dated April 2, 2013, COTMSJ0211-0219)

**DSOF 19**

There is an entire section in the Memorandum that addresses the Tucson Police Department's ("TPD") officers' contact with Taylor at the hotel on the night of the subject

fire, and later at the police station, and statements Taylor made to them. (COTMSJ0175-0184, at COTMSJ0178-0180)

**DSOF 20**

A fact included in the Memorandum was:

> "At trial both the State and the defense called experts who testified the fire was arson." (*Id.* at COTMSJ0180)

**DSOF 21**

Another fact included in the Memorandum was:

> "For some reason ARC all but ignored the expert called by the defense who had also testified at trial that the fire was intentionally set. ARC erroneously stated that the defendant was interrogated by the police for 30 hours (defendant was in police custody for 6 hours before being booked into juvenile) and then failed to explain any connection between defendant's questioning by the police and the two experts finding of arson." (*Id.* at COTMSJ0182)

**DSOF 22**

The following was agreed to in the Memorandum:

> "The legal question presented to the court today is whether a review of the original evidence using new advances and techniques in fire investigation is legally 'newly discovered evidence.' Although this question hasn't been addressed in Arizona, and it appears no Arizona court has ruled on the legal question of new arson techniques being 'newly discovered evidence,' at least one jurisdiction has determined that such advances in fire investigation techniques would constitute 'newly discovered evidence.' If that were the result in the instant case, the state of the evidence is such that the State would be unable to proceed with a retrial, and the convictions would not stand.

> Pursuant to Rule 32 of the Rules of Criminal Procedure, the State concedes, in agreement with the conclusions of the ARC and TFD reports, and solely under the

singular and unique facts of this particular case, that advances in fire science investigation constitute newly discovered evidence." (*Id.* at COTMSJ0183)

**The Truesdail lab report and the evidence in the record:**

**DSOF 23**

Taylor's Fifteenth Supplemental Disclosure Statement, dated December 10, 2021, alleges, in pertinent part, the following regarding Howard Kashman[1]:

> "h. Howard A. Kashman
>
> Mr. Kashman was Louis Taylor's lawyer for the original criminal prosecution, including the 1972 trial. He is expected to testify that at the time of trial, he was unaware of the "Truesdail" no accelerant report, which he has now seen. He is further expected to testify that in his opinion, the result of the trial would probably have been different had the Truesdail report been disclosed, in part because this report would have significantly impugned the credibility of witness Robert Jackson." (COTMSJ0220-0285, at COTMSJ0223:4:20-5:3)

**DSOF 24**

On December 21, 1970, Marshall Smyth was hired by Home Insurance Company (insurer of the Pioneer Hotel), through the General Adjustment Bureau, to investigate the Pioneer Hotel Fire. (COTMSJ0296, 0298, 0290-0292)

**DSOF 25**

Smyth testified about how he became involved in investigating the Pioneer Hotel fire at Taylor's criminal trial, and the insurance adjuster for the hotel contacted him on December 21, 1970, and he went to the hotel that same day. (COTMSJ0321:4-0322:21; *see also* COTMSJ0314:15-0315:4)

---

[1] Defendants do not waive their right to move to preclude untimely disclosure under the Rules, but for purposes of this dispositive motion and statement of facts the City refers to Plaintiff's Fifteenth Supplemental Disclosure Statement, which was disclosed on December 10, 2021. Plaintiff has since provided several additional supplemental disclosure statements, but none appear to alter the facts used herein.

**DSOF 26**

Smyth testified that he spent 4 hours at the hotel on December 21, 1970. (COTMSJ 0323:14-16)

**DSOF 27**

Smyth testified that he returned to the hotel the next day on December 22, 1970. (COTMSJ0324:19-0325:2)

**DSOF 28**

Smyth testified about the samples he took from the hotel, and he said that these items were still preserved in storage. (COTMSJ0327:5-0328:23)

**DSOF 29**

Smyth removed carpeting from the hotel on the first or second week of January, 1971. (COTMSJ0329:3-6; *see also* COTMSJ0330:10-15)

**DSOF 30**

Smyth testified that he spent sixty-eight hours inspecting and sifting through the debris of the fourth-floor hallway. (COTMSJ0333:2-8)

**DSOF 31**

In Answers to Interrogatories in *Simon v. Pioneer Hotel Co.*, Pima County Civil Case No. 125881, received by the Co-Defendant City's Attorney [William Kimble of Lesher and Scruggs] on December 13, 1971 (COTMSJ0336-0385), the Pioneer Hotel admitted:

1. That Pioneer Hotel's attorney [Leonard Everett of Everett and Bury, PC] retained Glenn [sic] Miller and Marshall Smyth to investigate the Pioneer Hotel fire [COTMSJ0354];

2. That any reports by Smyth or Miller went to Leonard Everett [COTMSJ0359, 0378-0379], and

3. There is also a listing of specific reports sent to Everett by Smyth and Miller at COTMSJ0360.

**DSOF 32**

Smyth knew December 31, 1970, that Len Everett was the attorney for Home Insurance Company, and that all reports, communications, and bills were to go to Everett. (COTMSJ0299, 0292)

**DSOF 33**

Smyth knew that Glen Miller was also investigating the Pioneer Hotel fire. In a letter to Leonard Everett dated January 15, 1971 ("Progress Report #1"), Smyth states the following on page 1 regarding his activities on December 22, 1970:

> Discussions were held with Captain Gilmore and Assistant Chief Slagel of the Tucson Fire Department, and with Mr. Glen Miller of California. It was agreed that it would be best that our investigations be conducted separately insofar as possible to insure a maximum of independent thought in arriving at conclusions.
>
> (COTMSJ0300, 0293)

**DSOF 34**

Smyth's January 15, 1971 letter to Everett also states that on December 22, 1970 "[a] search was made for containers that could have been used for flammable liquids, but none were found." (*Id*.)

**DSOF 35**

Smyth was aware that on December 23, 1970, (TFD Captain) Lyn Gilmore and Glen Miller had removed floor debris samples from the Pioneer Hotel (Smyth's Chronology entries in parentheses indicate actions by someone else). (COTMSJ0299, 0292)

**DSOF 36**

Taylor's 2012 Petition for Post-Conviction Relief, at text page 20, specifically admits:

On December 23, 1970, TFD Captain Gilmore, assisted by Glen Miller, a private mechanical engineer, removed six samples of debris from the Pioneer Hotel (*See* Truesdail Report at 1). These samples were sent to Truesdail Laboratories for testing to determine whether an accelerant had been used to start the fire. (COTMSJ0007-0068, at COTMSJ0031)

**DSOF 37**

Smyth knew at the time that Truesdail Laboratories was testing debris for accelerants. Smyth had begun to "[s]earch for lab to analyze residue" on the morning of December 28, 1970, just a week after the fire, and he had a "Telephone conversation to Truesdale [sic—misspelled by Smyth] lab" that same afternoon. (Chronology entries not in parentheses indicate actions by Marshall Smyth himself). (COTMSJ0299, 0292)

**DSOF 38**

On January 15, 1971, Smyth confirmed to Everett that "initial contacts had been made with material testing laboratories on the west coast"—clearly referring to his contact with Truesdail Laboratories. (COTMSJ0301, 0293)

**DSOF 39**

On February 8, 1971, Smyth's preliminary report to Everett referred, under the specific heading "Tests for Accelerants," to "tests currently being conducted on samples from other floor areas." Again, this was the Truesdail accelerant testing:

> A sample of the carpet and pad ashes from a point directly over the center of the #1 charred spot previously mentioned has been retained. If tests currently being conducted on samples from other floor areas prove negative, it will be advisable to have this particular sample tested as a last resort in the effort to identify a specific accelerant. (COTMSJ0310, Pima County 002742, 0294)

**DSOF 40**

On February 9, 1971, Kashman knew that "materials from the areas of origin" that "were collected by another investigator" "might have been submitted to a laboratory." (COTMSJ0389:10-16)

**DSOF 41**

On February 16, 1971, the Truesdail Report was issued, showing the results of analysis of floor debris samples collected by Gilmore and Miller on December 23, 1970, with C.A. Crutchfield, Truesdail's Technical Director, as maker and Glenn Miller, who is also

investigating the fire for Home Insurance along with Smyth, as recipient. No accelerant is found in the samples tested. (COTMSJ0392-0393)

**DSOF 42**

On February 19, 1971, the Truesdail report was stamped received by RJM Associates, Glen Miller's firm. (*Id.*)

**DSOF 43**

Kashman hired Smyth to assist with Taylor's defense after Taylor's preliminary hearing. (COTMSJ0395, text pp. 139:21-140:3)

**DSOF 44**

Taylor's nine-day preliminary hearing concluded on July 8, 1971. (*See* COTMSJ0397-0400)

**DSOF 45**

Kashman called Glen Miller, seeking a copy of Miller's report before the criminal trial. Miller "told [Kashman] that I would be happy to send him a copy of my report on instructions from Mr. Everett or why didn't he just go and talk to Mr. Everett. And I didn't hear anymore from anybody." (COTMSJ0401-0406, at COTMSJ0404-0405)

**DSOF 46**

Kashman contacted Len Everett and knew about the testing Home Insurance's expert did on an area of the hotel before Taylor's criminal trial, as well as about expert reports in Len Everett's possession. This is evident because Kashman described that contact and his related knowledge at a hearing on September 7, 1971:

> It is my understanding that at least four different experts, arson investigators, examined the scene at the Pioneer Hotel within 10 or 11 days after the fire…. I will avow that I have contacted the attorney for the insurance company for the hotel and it was not allowed, and I think he is probably justified, but I was not permitted to have access to or copies of the experts [sic] that were called in at their request. I don't know whether those reports have been furnished the [sic] police department or Mr. Weiss or not, but if they have, I would like them. I do know that the attorney handling the case for the Home Insurance Company said that there was one expert who found

11

one area, and although he concluded it was arson, it nonetheless differed from the Home report. If those are available, I would like them. (COTMSJ0408:9-COTMSJ0409:11)

**DSOF 47**

On or about September 23, 1971, Horton Weiss provided Kashman a list of witnesses that included Glen Miller, the named recipient of the Truesdail Report. (COTMSJ0412-0415, at COTMSJ0414)

**DSOF 48**

On or about September 30, 1971, Horton Weiss provided Kashman a list of witnesses that included both: (1) C.A. Crutchfield, the author of the Truesdail Report (and his Truesdail Laboratories business address: 4101 N. Figueroa, Los Angeles, California); and (2) Glen Miller, the named recipient of the Truesdail Report (with the address San Diego, California). (COTMSJ0416-0422, at COTMSJ0421)

**DSOF 49**

On February 8, 1971, in his "Fire Investigation Report—Preliminary" (Report No. 36-1), page 1, under "Basic Cause of the Fire," Section 3.2, Smyth states the following:

> The basic cause of the fire is attributed to the ignition of a liquid fuel or accelerant saturating portions of the floor carpeting. (COTMSJ0304, 0294)

**Cyrillis Holmes's probable cause testimony regarding accelerant:**

**DSOF 50**

Kashman also cross-examined Holmes about his conclusion that no accelerant was used. (*See* COTMSJ0426:22-COTMSJ0431:15)

**DSOF 51**

Kashman made it clear that there were several tests for determining accelerants, which Holmes did not perform, and Holmes testified during the probable cause hearing that he did not do the tests when he was investigating the fire because of the passage of the ten days since the fire (*See Id.*, at COTMSJ0428:21-COTMSJ0429:3)

**Marshall Smyth's criminal trial testimony relating to accelerants:**

**DSOF 52**

Smyth testified that the fire did not originate from the vertical carpeting on the walls, and then Kashman specially asked him:

"Would that opinion be the same if someone had spread the accelerant on the vertical carpet and then ignited it?" (COTMSJ0331:20-COTMSJ0332:5)

**DSOF 53**

Smyth's response was that it would and then he proceeded to explain why. (*Id*. at COTMSJ0332:6-20)

**DSOF 54**

Smyth was asked if he had "performed any tests on the carpet materials from the hotel in an effort to determine the manner in which the fire was or would have had to have been ignited" to which Smyth responded, "Well, I've run tests to determine the manner in which that carpet can be ignited." (COTMSJ0437:6-11)

**DSOF 55**

Smyth testified that "the nature of these tests was to get some insight into what it took to get the floor carpet burning, and I made a series of different tests actually with this -- at this one point." (*Id*. at COTMSJ0438:18-23)

**DSOF 56**

Kashman argued that Symth's testimony about "[t]he spread of the fire is significant in that without an accelerant this fire will just stop after it burns to about twelve or sixteen inches." (*Id*. at COTMSJ0436:2-11)

**DSOF 57**

Kashman asked Smyth:

> "From your tests and observations, do you have an opinion as to whether the fire in the area of origin as you've described it in the fourth floor was started without additional fuels other than carpet material?" (COTMSJ0439:10-14)

**DSOF 58**

Smyth responded to the question posed above as follows:

> "My opinion is that additional materials were required to ignite the carpet in this case." (*Id.*, line 21)

**DSOF 59**

Smyth elaborated on the answer above after Kashman asked him to, and Smyth also told the jury about the specific flammable liquids he used, which included lighter fluid, and how he assimilated similar conditions and performed the testing with the various accelerants at his home. (*See* COTMSJ0439:23-COTMSJ0447:6)

**DSOF 60**

Included in Smyth's testimony referenced in the above DSOF was the following statement:

> "when an accelerant, such as gasoline or lighter fluid, is spread on it the character of it-- the response is entirely different and the carpet starts to burn very violently and flames on a three foot sample like that will jump to three and four feet high." (*Id.* at COTMSJ0446:8-13)

**DSOF 61**

When Weiss asked Smyth "can you give us the distance from the north wall to the northerly edge of this area of origin you talked about," Smyth responded as follows:

> "My best estimate is that it extended to within about four feet of the end of that hall. Now, I'm talking about the presence of the accelerant when I say the origin. In other words, the extent of the accelerant I feel was ended, if you will, at a point approximately four feet from the end of the hall." (COTMSJ0450:2-14)

**DSOF 62**

Smyth referred to "how far the accelerant extended," "the extent of the accelerant," and "that accelerant could have extended even beyond the archway" in his testimony to the jury. (*Id.* at COTMSJ0450:23-COTMSJ0451:13)

**DSOF 63**

Smyth also testified as follows:

1  "well, in my opinion the original -- the accelerant in that area could have been as

2  large as we've described, from the four foot mark to the end of the hall -- or the end

3  of the archway, or it could have been in a much more confined space within that

4  envelope…It could -- it did not require complete saturation, if you will, of that area

5  to produce these effects." (*Id*. at COTMSJ0452:9-18)

6  **DSOF 64**

7  Weiss asked Smyth about his opinion regarding a point of origin and Smyth responded as

8  follows:

9  "Let me put it in this context. In my opinion the outstanding physical evidence tells

10  me that the north end of that fourth floor was subjected to an accelerant. Now, that

11  accelerant in that area could have been ignited in a number of different ways and from

12  a number of different locations, so there are a large number of possibilities as to how

13  that accelerant in the north end got going." (COTMSJ0456:4-18)

14  **DSOF 65**

15  Smyth provided additional testimony to the jury about his tests with lighter fluid on the

16  carpeting, which included the following testimony regarding the amount to time it took to

17  ignite:

18  "Well, it's -- it's very rapid. It's just a matter of a few seconds. The lighter fluid ignites

19  immediately when the match touches it, and then the carpet is ignited just a few

20  seconds later." (*Id*. at COTMSJ0457:21-COTMSJ0458:12)

21  **DSOF 66**

22  On redirect Smyth testified as follows in response to Kashman's question:

23  "Q BY MR. KASHMAN: You have established there was an accelerant fire in the

24  north end of the fourth floor?

25  A Yes." (COTMSJ0463:7-10)

26  **DSOF 67**

27  Smyth also told the jury the following during his testimony:

28

"All right. The physical evidence that I found in the hotel identified for me very clearly that an accelerant had been used in the north end in the dead end of the north end of the north-south hallway." (*Id.* at COTMSJ0464:13-17)

**DSOF 68**

Smyth continued his answer to provide that "any number of ways in which that accelerant in that area could have been ignited," which included "a trail of accelerant" or "matches thrown into the area [of the accelerant]," and he said "I found no specific evidence as to the specific manner in which ignition actually occurred." (*See Id.* at COTMSJ0464:17-COTMSJ0465:7)

**Cyrillis Holmes's criminal trial testimony regarding accelerant:**

**DSOF 69**

Judge Hardy questioned Holmes, outside the presence of the jury, about flammable liquids and the fact that the fire would consume the liquid and its odor. (COTMSJ0471:9-COTMSJ0472:2)

**DSOF 70**

Kashman asked Holmes about an indicator of accelerant, and Holmes says, "But the other indicators that were surrounding this indicator did not support that there in fact was a flammable liquid there." (COTMSJ0477:4-21)

**DSOF 71**

Kashman asked Holmes about liquid accelerant and runners, and Holmes testified that there was no evidence of these. (COTMSJ0494:13-COTMSJ0496:9; *see also* COTMSJ0483:3-COTMSJ0484:21)

**DSOF 72**

Kashman asked Holmes whether he tested for petroleum products, cleaning solvents, insecticides, or testing of the cleaning solvents found in a closet for flammability, and whether he took "testing equipment such as a hydrocarbon detector" with him during his investigations, and Holmes testified in the negative to all these questions. (*See* COTMSJ0500:16-COTMSJ0502:2)

**DSOF 73**

Kashman then asked Holmes to explain to the jury how a hydrocarbon detector works, and over Weiss' objection, Holmes explained how this equipment is used to determine whether flammable vapors are present and how much. (*See* COTMSJ0502:3-COTMSJ0503:2)

**DSOF 74**

Holmes explained the factors that could affect the testing using the equipment, which included an explanation that flammable materials can dissipate and when odor cannot be detected the equipment does not usually detect it either. (*See* COTMSJ0503:3-COTMSJ0504:19)

**DSOF 75**

As part of his questioning regarding hydrocarbon detectors, Kashman specifically asked Holmes if "this…piece of equipment would…have any validity used 10 days after a fire," and Holmes stated that "[i]t would depend on the circumstances surrounding the fire origin….on the amount of flammable liquids present at the time the fire was ignited…on the amount of heat and burning as to whether the flammable liquids had been consumed…after the fire was extinguished...on whether these vapors were protected and kept in the area or whether they were allowed to dissipate and dissipate away from the area." (*See* COTMSJ0503:3-5, 10-19)

**DSOF 76**

Kashman asked Holmes whether he would have used this equipment for testing if he arrived sooner to investigate, and Weiss objected because "the evidence is that the people at the time of the fire didn't detect any indication [of flammable liquids]," Weiss' objection was sustained. (*See* COTMSJ0504:20-COTMSJ0505:13)

**DSOF 77**

Kashman specifically asked Holmes, "Did you find any evidence of liquid fuel or accelerant in any of these three places?" to which Holmes responded, "No sir, there was no evidence of a liquid accelerant." (COTMSJ0506:18-21)

**DSOF 78**

Kashman asked Holmes if an alcoholic beverage could be used as an accelerant, and during argument as to the relevancy of that question, Kashman stated the following in front of the jury:

"We also have evidence that a small amount of accelerant would have been consumed in the fire and not have been found by Mr. Holmes." (COTMSJ0492:23-COTMSJ0493:18)

**TFD R.B. Slagel and TFD's inspections and correspondences records relating to the Pioneer Hotel:**

**DSOF 79**

Taylor disclosed TPD's inspection records and correspondences relating to the Pioneer Hotel in this civil lawsuit as Exhibit No. 55, titled "Tucson Fire Dept Pioneer Hotel letter dated October 9, 1970" (COTMSJ0509-0514), Exhibit No. 56, titled "Evidence of other fires set at Pioneer Hotel dated October 6, 1970" (COTMSJ0515-0516), and No. 541, titled "Taylor-Tucson Fire Dept.-Pioneer priors" (COTMSJ0517-0524). Theses exhibits are duplicates. (COTMSJ0220-0285, at 22:12-13, 22:14-15, and 41:2)

**DSOF 80**

Taylor's Fifteenth Supplemental Disclosure Statement, dated December 10, 2021, alleges the following regarding TFD Chief Robert B. Slagel:

> "k. R.B. Slagel
>
> If still alive, Mr. Slagel is expected to testify regarding his knowledge of prior recent arson fires in Tucson, including prior recent arson fires at the Pioneer Hotel, and that Donald Anthony (not Louis Taylor) was a suspect in these other fires." (*Id*. at 7:1-4)

**DSOF 81**

TFD Chief Robert B. (aka "R.B.") Slagel (hereafter "Chief Slagel") testified at Taylor's probable cause hearing in his criminal case. (COTMSJ0525, 0526-0538)

**DSOF 82**

Taylor's criminal defense attorney, Howard Kashman (hereafter "Kashman"), knew about TFD's inspections and correspondences records relating to the Pioneer Hotel, and the

October 9, 1970 letter, no later than at this hearing, which is evidenced in his questions to Chief Slagel during the probable cause hearing. (*See Id.* at COTMSJ0526-0553)

**DSOF 83**

Chief Slagel testified that there was nothing in TFD's records that reflected that the other fires in September or October were the result of arson. (*Id.* at COTMSJ0536:7-10)

**DSOF 84**

Kashman, called Richard (aka "Dick") Darling, who worked at the Pioneer Hotel, to testify at Taylor's criminal trial, and Kashman brought up the October correspondences with that witness. (COTMSJ0540, 0542:4-0563:26)

**DSOF 85**

The prosecutor, Horton Weiss (hereafter "Weiss"), objected to Kashman's line of questioning during his examination of Darling because Weiss said, "I think he is going into correspondence between Mr. Darling and the fire department" to which Kashman responded, "That's correct." (*Id.* at COTMSJ0541:2-6)

**DSOF 86**

Judge Hardy had not yet seen the correspondences that the parties were referencing. (*See Id.* at lines 16-17)

**DSOF 87**

Kashman specifically asked, "In October of 1970, did you have any communications with Chief Robert Slagel of the Tucson Fire Department?" (*Id*. at COTMSJ0542:10-12)

**DSOF 88**

Weiss objected and Judge Hardy recessed the jury while the parties argued their positions on the issue. (*See* COTMSJ0542:13-COTMSJ0563:26)

**DSOF 89**

Kashman stated that Darling had "contacted Chief Robert Slagel of the, I believe, fire prevention department of the Tucson Fire Department regarding three small fires that were suspected arsons." (*Id.* at COTMSJ0544:11-17)

**DSOF 90**

Weiss objected "to the suspected arsons" to which Judge Hardy responded, "There's no jury here." (*Id.* at lines 18-20)

**DSOF 91**

Kashman stated the following to Judge Hardy:

> "It's my desire through these documents and testimony of Mr. Darling to establish that at a time when Louis Taylor was out of Pima County that the Pioneer Hotel had had three arson attempts, that the fire department was aware of these things and had communicated with the hotel regarding them, establishing that this was their belief based on their own investigation. This is very material and relevant to the case involving murder as a result of alleged arson within sixty days of that time, that there had been other attempts at a time when Louis Taylor couldn't possibly have been at fault. These are business records from the files of the hotel." (*Id.* at COTMSJ0546:1-14)

**DSOF 92**

The parties argued their positions on these letters and whether they or the information contained therein should be admissible, and Judge Hardy ruled that the letters and information in them was not admissible at this point of the trial. (*Id.* at COTMSJ0546:15-COTMSJ0563:26)

**DSOF 93**

Kashman's argument included the following statement to Judge Hardy:

> "Your Honor, I've got Chief Slagel subpoenaed and Captain Gilmore – fire inspectors -- and perhaps it should be done out of the presence of the jury first to see whether I can establish that those fires were intentional because the communications certainly indicate that the fire department thought they were intentional." (*Id.* at COTMSJ0554:8-14).

**DSOF 94**

On March 4, 1972, during Taylor's criminal trial, Chief Slagel was called to testify, outside the presence of the jury, about the prior fires at the Pioneer Hotel and the communications TFD had with the Pioneer Hotel prior to the subject fire. (*See* COTMSJ0567- 0572)

**DSOF 95**

Before Chief Slagel provided any testimony, Judge Hardy informed him as follows:

> "…what the court is interested in, Chief Slagel, is what knowledge or how the Tucson Fire Department gained knowledge of some fires which apparently were set or occurred in, say, around the Pioneer Hotel in October of 1970. Do you know what I'm talking about?" (*Id.* at COTMSJ0567:15-20)

**DSOF 96**

Chief Slagel testified that two prior fires were considered to be "natural or accidental fires." (*Id.* at lines 16-25)

**DSOF 97**

Kashman asked Chief Slagel about actions "taken by the fire department as far as investigating the possible arson that the hotel had reported," and over Weiss' objections Judge Hardy permitted him to answer. (*Id.* at COTMSJ0569:6-22)

**DSOF 98**

R.B. Slagel responded to Kashman as follows:

> "We talked to several of the employees in the hotel in an attempt to determine what had happened, if anything. These stories were very vague. They did identify or describe one suspicious person who had been around the hotel and had been seen two or three times. There was no information on which any further action could be taken."
> (*Id.* at COTMSJ0569:23-COTMSJ0570:4)

**DSOF 99**

Kashman acknowledged while Chief Slagel was on the stand that Judge Hardy had already ruled that the letters between TFD or Chief Slagel and the Pioneer Hotel "will not be admissible." (*Id.* at COTMSJ0572:3-13)

**DSOF 100**

At the conclusion of Chief Slagel's testimony, Judge Hardy told Kashman:

> "I really don't believe there is anything to gain going any further with this Mr. Kashman," to which Kashman responded "I will accept Chief Slagel's statement under oath that nothing further is." (*Id.* at lines 21-24)

**Taylor's factual allegations relating to his claims that he was arrested before an investigation commenced and based on his race, and the evidence in the record:**

**DSOF 101**

The City's submitted non-uniform interrogatory to Taylor requesting the following:

> "Please identify the Tucson Police Department ("TPD") police officer or officers you claim arrested you because of your race, as alleged under paragraph 5 of your Supplemental Third Amended Complaint ("STAC") and identify what documents or evidence you intend to present at trial to prove this allegation." (*See* COTMSJ0575-0586)

**DSOF 102**

Taylor's response to the City's NUI No. 1, was as follows:

> "Plaintiff Taylor relies on the claim/admission of officer Klaus (sic) Bergman that he (Taylor) was arrested because of his race. See Plaintiff's prior disclosures related to Bergman. The investigation had focused on Taylor and Taylor was not free to leave and thus in the custody Ofc. Lewis Adams no later than 2:41 AM on December 20, 1970. See Taylor's other disclosures." (*Id.*).

**DSOF 103**

The excerpt from "Tape No. 1087 transcript," which is described therein as "covering the fire at the Pioneer Hotel (recorded 20 December 1970 from 0001 to 0300 hours)" shows Ofc. [Lewis] Adams was "en route to the station with a subject we need a statement from" at around 2:41 a.m. (COTMSJ0587-0588)

**DSOF 104**

The record in Taylor's criminal case reflects that Taylor had two transfer hearings. (*See* Motion for Transfer Hearing, December 31, 1970, COTMSJ0589-0625; Juvenile Transfer Hearing, January 28, 1971, COTMSJ0626-0746; *See also* December 21, 1971, hearing, COTMSJ0747, COTMSJ0748:21-COTMSJ0749:17, COTMSJ0750)

**DSOF 105**

The record reflects Taylor's charges at his first transfer hearing were trespass and curfew violations. (*See* COTMSJ0589-0625)

**DSOF 106**

At this first transfer hearing, Kashman conceded to the transfer and conceded for the purposes of moving for the transfer that Taylor had committed the crimes of trespass and curfew violations. (*See* COTMSJ0590:24-COTMSJ0591:6; COTMSJ0593:4-COTMSJ0595:7)

**DSOF 107**

At the second transfer hearing Taylor was facing arson and 28 counts of murder charges. (*See* COTMSJ0626-0746)

**DSOF 108**

Detective Thom Hacker's police report shows that on "January 13, 1971, LEWIS (sic) TAYLOR was charged with ARSON of the PIONEER HOTEL and 28 counts of homicide resulting from that fire" and that the case was reclassified "to ARSON and HOMICIDE, from Underdetermined." (COTMSJ0751)

**DSOF 109**

On January 13, 1971, Taylor had a hearing on the State's Petition to Amend Charges. (*See* COTMSJ0752-0767)

**DSOF 110**

At the Petition to Amend Charges hearing, the parties discussed whether a transfer hearing was appropriate because Taylor was still in custody at the Pima County Juvenile Center, and at that time the Judge said that hearing would include a determination of whether there was

probable cause to charge Taylor with arson and 28 counts of murder. (*See* COTMSJ0752-0767, at COTMSJ0755:10-15)

**DSOF 111**

At the same hearing mentioned above, Fred Belman, Deputy County Attorney, stated, "Without exaggeration, I would say thousands of hours have been put into the investigation in regard to this matter." (*Id.* at lines 21-23)

**DSOF 112**

Fred Belman then requested that the hearing be set four to six weeks out to allow two Pima County Deputies adequate time to "assimilate all the reports" and "interview witnesses" to be prepared "adequately" for the hearing on transfer and probable cause. (*Id.* at COTMSJ0755:10-COTMSJ0756:6)

**DSOF 113**

Officer Claus Bergman responded to the Pioneer Hotel fire and his police report narratives set forth his actions, observations, and personal knowledge and account of his involvement with the Pioneer Hotel fire on December 19-20, 1970. (COTMSJ0768-0774)

**DSOF 114**

Kashman called Officer Claus Bergman to testify at Taylor's probable cause hearing, and his testimony was consistent with his police reports. (COTMSJ0775-0804)

**DSOF 115**

Kashman also called Officer Claus Bergman to testify at Taylor's criminal trial, and his testimony was consistent with his police reports. (COTMSJ0805-0855)

**DSOF 116**

The record reflects that Officer Claus Bergman did not testify at Taylor's transfer hearings. (*See* COTMSJ0589-0625 and 0626-0628, 0746)

**DSOF 117**

Officer Lewis Adams responded to the Pioneer Hotel fire and his police report narratives set forth his actions, observations, and personal knowledge and account of his involvement with the Pioneer Hotel fire on December 19-20, 1970. (COTMSJ0856-0857)

**DSOF 118**

The prosecutor, David Dingeldine, called Officer Lewis Adams to testify at Taylor's probable cause hearing and he provided testimony about his involvement with investigating the fire and Taylor. (COTMSJ0858-0906, 0907-0930)

**DSOF 119**

Officer Lewis Adams also testified at Taylor's preliminary hearing about his involvement with the criminal investigation. (COTMSJ0931-0979)

**DSOF 120**

Det. Henry Gassaway responded to the Pioneer Hotel fire and his police report narrative sets forth his actions, observations, and personal knowledge and account of his involvement with the Pioneer Hotel fire on December 19-20, 1970. (COTMSJ0980-0983)

**DSOF 121**

The prosecutor, David Dingeldine, called Detective Henry Gassaway to testify at Taylor's probable cause hearing. (COTMSJ0985-1006, 1009-1034)

**DSOF 122**

Detective Henry Gassaway testified at Taylor's preliminary hearing. (COTMSJ1036-1062)

**DSOF 123**

Detective Milan Murchek was with Detective Gassaway at the police station with Taylor. (*See* COTMSJ0980-0981)

**DSOF 124**

Howard Kashman, Taylor's criminal defense attorney, called Detective Milan Murchek to testify at Taylor's probale cause hearing. (COTMSJ1064-1080)

**DSOF 125**

Detective Milan Murchek testified at Taylor's preliminary hearing. (COTMSJ1081-1094)

**DSOF 126**

The prosecutor, David Dingeldine, called Detective David N. Smith to testify at Taylor's probable cause hearing. (COTMSJ1096-1127, 1130-1147)

**DSOF 127**

Detective David N. Smith testified at Taylor's preliminary hearing. (COTMSJ1148-1159)

**DSOF 128**

Sergeant Eugene Rossetti spoke with Taylor at the police station and his police report narrative includes details from that conversation. (COTMSJ1160)

**DSOF 129**

Kashman called Sergeant Eugene Rossetti to testify at Taylor's probable cause hearing (COTMSJ1163-1171) and David Dingeldine, the prosecutor, recalled him at that hearing. (COTMSJ1175-1189)

**DSOF 130**

Sergeant Eugene Rossetti testified at Taylor's preliminary hearing. (COTMSJ1190-1208)

**DSOF 131**

Sergeant Patrick McGuire's narrative police report sets forth why, after speaking with Det. Murchek and Det. Scoopmire, he believed there was "reasonable grounds" to believe that Taylor was involved with the fire. (COTMSJ1209-1210)

**DSOF 132**

Kashman called Sergeant Patrick McGuire to testify at Taylor's probable cause hearing (COTMSJ1213-1221)

**Facts related to witnesses Bruce Wallmark and Robert Jackson:**

**DSOF 133**

Bruce Wallmark (hereafter "Wallmark") was listed as a witness for Taylor's criminal trial in "Additional Witnesses' Addresses" dated September 24, 1971. (COTMSJ1222-1226, at COTMSJ1223)

**DSOF 134**

Taylor conceded long ago that Wallmark was known to him as a potential witness prior to trial, and that he knew Wallmark was in the Marines, when he made the following statement in his Appellate Opening Brief dated December 27, 1972:

"It is curious that his close friend, Wallmark had been listed though Wallmark used an alias to enlist in the Marines. The Court inquired into this (RT 26/23), but no satisfactory explanation was given." (*See* COTMSJ0156)

**DSOF 135**

TPD Detective Lawrence Hust "was sent to Ft. Grant Industrial School for Boys by Sgt. Jack Moore reference interview of people who were in the same living quarters with LOUIS TAYLOR" in August 1971. (*See* COTMSJ1227-1228)

**DSOF 136**

Detective Lawrence Hust's police report narrative provides details about who he interviewed, and his report notes that Bruce Wallmark (hereafter "Wallmark") was one person interviewed. Det. Hust's report also references Wallmark's signed statement. (*Id.* at COTMSJ1228)

**DSOF 137**

Wallmark signed a typed question and answer statement, which details Det. Hust's questions and Wallmark's responses. (COTMSJ1229-1230)

**DSOF 138**

Wallmark's signature indicates that he provided the answers voluntarily and "without promise of reward, threat, or duress so that the true facts of this case may be known." (*Id.* at COTMSJ1230)

**DSOF 139**

Weiss, called Bruce Wallmark to testify at Taylor's criminal trial and Kashman cross-examined him. (COTMSJ1242-1292; COTMSJ1231-1241)

**DSOF 140**

Wallmark testified that he was at the Pima County Juvenile Court Center from approximately January 1971 to March, 15, 1971, and that he came into contact with Louis Taylor while living there. (*Id.* at COTMSJ1244:1-14)

**DSOF 141**

Wallmark testified that he and Taylor had several conversations pertaining to the Pioneer Hotel fire while in the living unit of the Pima County Juvenile Court Center. (*Id.* at COTMSJ1244:19-COTMSJ1245:9, COTMSJ1245:21-COTMSJ1246:10)

**DSOF 142**

Wallmark testified about what Taylor told Wallmark during these conversations. (*See* COTMSJ1254:3-COTMSJ1261)

**DSOF 143**

Wallmark was asked to testify about what Taylor told him during these conversations and the following are excerpts from that testimony:

"As I remember, him and his two friends were on the fourth floor stealing wallets— stealing wallets out of rooms or trying to and a janitor or a maintenance man almost caught them so they – or they got run out, one or the other. I can't remember. His two friends started running down the stairs and that's when he said the fire started on the fourth floor." (COTMSJ1255:16-23)

"He went and – he went back inside helping people." (COTMSJ1257:17-18)

**DSOF 144**

Wallmark was asked, "What did he tell you about the fire starting – about starting the fire?" to which he responded:

"He said it was either started by a lit book of matches burning, dropped on a carpet or a lit lighter – as best I can remember it was a lit both of matches." (COTMSJ1260:22-COTMSJ1261:1)

**DSOF 145**

Wallmark was then asked, "Did he indicate what floor this occurred on?", to which Wallmark responded: "The Fourth." (COTMSJ12614535:2-4)

**DSOF 146**

Wallmark authenticated his August 1971 signed statement during his direct examination testimony at Taylor's criminal trial, and it was marked as Exhibit 144. (COTMSJ1247:11-18; COTMSJ1248:12-20)

**DSOF 147**

Wallmark's signed statement was admitted into evidence, and then read verbatim to the jury, in its entirety, over Kashman's objection. (COTMSJ1266:2-1270:25)

**DSOF 148**

On cross-examination, Kashman specifically asked Wallmark about his conversation with the police officers on August 11, 1971, and he asked Wallmark about another occasion when Wallmark accompanied Det. Hust and Sgt. Moore to Ft. Grant to talk to other witnesses. (COTMSJ1275:20-COTMSJ1279:24; *see also* COTMSJ1281:7-COTMSJ1285:6)

**DSOF 149**

Kashman asked Wallmark if he had "been in contact with any members of the Tucson Police Department since [he] left the State of Arizona." He responded, "No, I wasn't." (COTMSJ1288:20-23)

**DSOF 150**

Kashman continued his cross-examination of Wallmark the following Monday and questioned him in more detail about his conversations with police and his August 11, 1971, signed statement. (COTMSJ1235:2-COTMSJ1236:4)

**DSOF 151**

Taylor's Fifteenth Supplemental Disclosure Statement, dated December 10, 2021, alleges the following regarding TPD Detective Lawrence Hust:

"q. Detective Lawrence Hust

Mr. Hust was a Tucson detective who, upon information and belief, recruited, coerced and otherwise improperly influenced Robert Jackson to testify against Taylor at trial. He will testify regarding how and when he decided to approach Jackson about

1 testifying, and the role Horton Weiss played in that process." (COTMSJ0220-0285,

2 at 8:4-9)

3 **DSOF 152**

4 On February 26 and 27, 1972, TPD Det. R. Sulzbach was "assigned to try to locate friends

5 of BRUCE WALLMARK in an attempt to locate him as he left Phoenix without permission

6 during the LOUIS TAYLOR trial." (COTMSJ1293-1294)

7 **DSOF 153**

8 Det. Sulzbach's narrative police report sets forth his personal account of his contact with

9 Robert Jackson and the statement Jackson provided to the detective during that initial

10 contact. (*Id.*).

11 **DSOF 154**

12 Robert Jackson participated in a polygraph examination, which was administered to

13 determine whether he was telling the truth about his conversation with Taylor.

14 (COTMSJ1295)

15 **DSOF 155**

16 The questions posed to Robert Jackson during the polygraph examination are listed on the

17 "Report of Polygraph Examination" document. (*Id.*)

18 **DSOF 156**

19 The polygrapher noted the following: "No reactions indicative of deception were noted in

20 response to the above questions, leading the examiner to the conclusion that JACKSON was

21 truthful in his answers to the above questions." (*Id.*)

22 **DSOF 157**

23 On February 27, 1972, Robert Jackson provided a statement to TPD Detective R. Sulzbach,

24 and Robert Jackson signed that statement. (COTMSJ1296-1297)

25 **DSOF 158**

26 On March 1, 1972, Weiss moved to reopen the State's case-in-chief during Taylor's criminal

27 trial on March 1, 1972, to call the witness Robert Jackson. (*See* COTMSJ1298-1328)

28

**DSOF 159**

Horton Weiss informed the Court that "Mr. Jackson came to the attention of the State as a witness on the 27th of February, which was Sunday evening…through the Tucson City Police Department…" (COTMSJ1299-1300)

**DSOF 160**

Judge Hardy asked to hear from Jackson before the court made its decision on whether to allow the State to reopen and call him to testify. (*See* COTMSJ1302:11-12)

**DSOF 161**

Robert Jackson was sworn in and then Judge Hardy questioned him about his contact with TPD. (*See* COTMSJ1303-COTMSJ1309:23)

**DSOF 162**

Judge Hardy also questioned Jackson about when he was at the juvenile center. (COTMSJ1317:25-1319:9)

**DSOF 163**

After hearing the parties' arguments, Judge Hardy ruled as follows:

> "All I'm doing now is denying your motion to reopen. You may again make your motion and then I'll have to make another determination at that time." (COTMSJ1324:22-25)

**DSOF 164**

Judge Hardy brought Mr. Jackson back in court and instructed him that he was still under subpoena, he was not to talk to anyone except the lawyers or their investigators if he desired. (COTMSJ1325:10-COTMSJ1326:22)

**DSOF 165**

On March 15, 1972, Judge Hardy ruled that the State would be allowed to re-open its case and call Robert Jackson to testify. (COTMSJ1330:22-26, COTMSJ1331:4-11)

**DSOF 166**

Robert Jackson testified at Taylor's criminal trial and Kashman cross-examined him. (COTMSJ1332-1378)

**DSOF 167**

Robert Jackson testified that he was not coerced, promised anything, forced, or pressured to give the statement to the police about what Taylor told him while in the juvenile detention center, nor was he in custody or under arrest at the time. (COTMSJ1344:9-COTMSJ1345:9)

**DSOF 168**

Jackson's testimony reflects that while at Pima County Juvenile Court Center he had a conversation with Taylor in the bathroom of living unit regarding the Pioneer Hotel fire. (COTMSJ1334:20-1335:17)

**DSOF 169**

Jackson identified the signed statement that he provided to the police on February 27, 1972 during his testimony at Taylor's criminal trial. (COTMSJ1338:26-COTMSJ1339:23; COTMSJ1342:1-COTMSJ1343:2)

**DSOF 170**

Jackson was asked, "Would you relate (sic) the conversation that you had with him as you recall it at this time?" to which Jackson responded:

> "Well, Taylor told me he had found a can of lighter fluid in the hotel. Told me he was squirting lighter fluid on the wall and putting it out with his hand." (COTMSJ1339:24-COTMSJ1349:4)

**DSOF 171**

Jackson also told the jury the following in response to Weiss' questions:

> Q. BY MR. WEISS: What was he doing? Did he tell you what he was doing after he put the lighter fluid on the wall?
>
> A. Yes, he said he was lighting it with the
>
> Q. All right. Continue.
>
> A. Then he said he squirted it -- an extra amount of lighter fluid on the wall, put a couple of dots in it and lit it, then he said he saw or he heard a man coming, so he started to take off. By the time he -- he said it wasn't the man. He wasn't coming, but that he had heard someone coming, but he didn't come, but by the time that -- he told

me by the time that it was too late. He said he was running, took off to the party or wherever he was. (COTMSJ1340:17-COTMSJ1341:6)

**DSOF 172**

Jackson also testified that Taylor told Jackson: "[Taylor] didn't mean to burn the hotel down, but the fire got out of control." (COTMSJ1346:19-23)

**DSOF 173**

Kashman's cross-examination can be found on the following pages of Jackson's Trial Testimony Transcript: COTMSJ1347:1-1368:12.

**DSOF 174**

Kashman cross-examined Jackson about how his conversation with Taylor at the Pima County Juvenile Center started and whether Taylor shared more information during this conversation. (*See* COTMSJ1347:19-COTMSJ1349:15)

**DSOF 175**

Kashman asked Jackson if he knew other individuals named David Salas or Solas and Bruce Wallmark, and Kashman elicited that Bruce Wallmark was Jackson's friend. (*See* COTMSJ1349:16-1350:3)

**DSOF 176**

Kashman crossed examined Jackson about the statement he provided the police officers on February 27, 1972, and about whether he had spoken to the police before, and Jackson said he "[h]ad no reason" to talk to police before. (*See* COTMSJ1350:4-17)

**DSOF 177**

Kashman asked Jackson "[h]ow did Taylor say he ignited this fire?" and asked him other details about what Taylor told him about starting the fire. (*See* COTMSJ1350:20-COTMSJ1351:16)

**DSOF 178**

Kashman was provided a copy of Det. Sulzbach's police report while Jackson was on the stand, and Kashman asked questioned based on that report. (*See* COTMSJ1352:22-1354:5)

**DSOF 179**

Kashman continued to cross-examine Jackson about the details of his contact with police and how he came about providing a statement to the police. (COMSJ1355:4-COTMSJ1367:2)

**DSOF 180**

Kashman was allowed to inquire about Jackson's friendship with Bruce Wallmark, and Kashman specifically confronted Jackson with the question of whether he volunteered to provide his statement "to take Wallmark's place so he wouldn't get rearrested and that [he'd] testify against Taylor." (COTMSJ1363:9-19)

**DSOF 181**

On September 18, 1972, Kashman filed a Motion for New Trial where he argued, in part, the following:

> "that new and material evidence which if introduced at the trial would probably have changed the verdict has been discovered which the Appellant, defendant below, could not with reasonable diligence have discovered and produced upon the trial." (COTMSJ1379-1384)

**DSOF 182**

Kashman included Albert Jackson's affidavit(s) in support of his Motion for New Trial. (*Id.* at COTMSJ1382-1384)

**DSOF 183**

On May 18, 1972, the trial court had a hearing on Taylor's Motion for New Trial and the veracity and truthfulness of Robert Jackson's trial testimony was addressed. (COTMSJ1385-1390)

**DSOF 184**

Robert Jackson was placed under oath and testified that his trial testimony was true and that he would testify the same if called again. (*Id.* at COTMSJ1388:7-12; COTMSJ1390:3-17)

**DSOF 185**

The Court denied Taylor's Motion for New Trial that same day. (COTMSJ1391-1395)

**Facts related to the Arson Review Committee and TFD's 2012/2013 reviews and reports:**

**DSOF 186**

Taylor disclosed the authors of the Arson Review Committee report, which was prepared and submitted in support of his Petition for Post-Conviction Relief in 2012, and alleged that these individuals would testifying "regarding the contents and conclusions of the report, including but not limited to the conclusion that the Pioneer Hotel Fire should not be classified as arson." (COTMSJ0220-0285, at 2:20-4:10)

**DSOF 187**

The Arson Review Committee's review and report (hereafter "ARC report") relies on and references the National Fire Protection Association (NFPA) 921, Guide for Fire and Explosions Investigations, 2008 edition, numerous times. (*See* COTMSJ1396-1403)

**DSOF 188**

The ARC report includes an article titled, "The State of the Art in Fire Investigation Prior to 1992" wherein the development of fire science is discussed. That article ends by stating that:

> "A modern investigator, who keeps up with developments in the field, gains the fundamental knowledge required to understand compartment fire dynamics, and who follows the guidance of NFPA 921 is more likely to reach a technically valid determination of the origin and cause of a fire than in the past." (COTMSJ1404-1406)

**DSOF 189**

Wayne Cummings' or TFD's review and report was based on guidelines provided in a publication titled, National Fire Protection Association (NFPA) 921, Guide for Fire and Explosions Investigations, 2011 edition. (COTMSJ1407-1448)

**DSOF 190**

The first edition of this publication was not even published until 1992. (*Id.* at COTMSJ1415)

**DSOF 191**

TFD Wayne Cummings concluded the following regarding his review of the Pioneer Hotel in 2012/2013:

"Due to the lack of an exact point of origin determination and the lack of elimination of all accidental fire causes, a fire cause determination is not possible reviewing the material provided to me. This is complicated by the full room involvement (or flashover) conditions experienced, the lack of the actual fire scene to physically examine, and the attempted interpretation of post-fire fire patterns from inconsistent photographs." (COTMSJ1448)

**Taylor's other allegations that there were "other suspects":**

**DSOF 192**

The City disclosed copies of all police reports related to the Pioneer Hotel fire investigation in its possession in response to Plaintiff's Requests for Production. (*See* COTMSJ1449-1455)

**DSOF 193**

Taylor disclosed documents as Exhibit No. 309 titled, "Report of other arson suspects" (COTMSJ1456-1461) and Exhibit No. 664 titled, "Taylor Critical-Report of other arson suspects" (C0TMSJ1462-1467). These are duplicates. (COTMSJ0220-0285, at 29:17 and 46:19-20, respectively)

**DSOF 194**

The documents disclosed as TAYLOR009480-9485 (COTMSJ1456-1461) and TAYLOR012999-13004 (COTMSJ1462-1467) are excerpts, consisting of 5 pages, from the hundreds of pages of police reports and interviews that TPD officers authored while investigating the Pioneer Hotel fire in 1970. (*Id*.)

**DSOF 195**

Taylor disclosed a photograph of Mario Corral, and several TPD police reports, which relate to TPD's investigation into whether Mario Corral was involved in the Pioneer Hotel fire, as Exhibit No. 312 and titled it "Suspect Mario Corral." (COTMSJ1468-1479; COT0220-0285, at 29:20)

**Taylor's allegations relating to Donald Anthony and Joseph Collins, and the evidence in the record:**

**DSOF 196**

Taylor submitted a Request for Production No. 2 to the City, which stated as follows:

> "Please produce all documents in your possession or documents to which you have reasonable access (including but not limited to documents in storage) pertaining to Donald Anthony." (COTMSJ1449-1455)

**DSOF 197**

In response to RFP No. 2, TPD performed multiple searches for all documents or records related to a "Donald Anthony" in May 2020, and no records were located. (COTMSJ1480-1481, ¶¶ 4-6)

**DSOF 198**

In Taylor's Fifteenth Supplemental Disclosure Statement, dated December 10, 2021, Taylor alleges the following regarding Joseph Collins:

> "p. Joseph Collins
>
> Mr. Collins was a juvenile who was also arrested the night of the fire as a suspect. He may be deceased. If alive and available, he will testify regarding his arrest and interactions with the Tucson Police." (COTMSJ0220-0285, at 7:24-8:3)

**DSOF 199**

TPD also performed searches to attempt to find records relating a Joseph Collins who would have been a teenager in December 1970. (COTMSJ1480-1481, ¶¶ 7-9)

**DSOF 200**

Taylor attempted to find the Donald Anthony he alleges was a suspect and his attorneys discovered that he is now deceased. (COTMSJ1482-1486)

**DSOF 201**

The few records found for that name (Joseph Collins), without knowing his date of birth, did not appear to be related to the person Taylor alleges was a suspect in the Pioneer Hotel fire investigation. (COTMSJ1480-1481, ¶¶ 7-9)

**Additional facts related to the State's expert Cyrillis Holmes:**

**DSOF 202**

Taylor disclosed that his prior criminal defense attorney Ed Novak "will testify (excluding privileged communications) about work he did for Mr. Taylor, including taking the November 1, 2012, deposition of Cyrillis Holmes." (COTMSJ0220-0285, at 12:9-13)

**DSOF 203**

The State's fire expert, Cyrillis Holmes, testified at Taylor's probable cause hearing on February 1, 1971 and February 2, 1971, and those transcripts were disclosed in their entirety as documents bates-stamped as Pima County 50337-50622.[2]

**DSOF 204**

The State's fire expert, Cyrillis Holmes, testified at Taylor's criminal trial on February 15th, February 16th, February 17th, February 18th, February 19th, February 21st, and February 22, 1972, and his testimony was disclosed in its entirety as TAYLOR2057-2956. (COTMSJ0220-0285, at 25)

**DSOF 205**

R.B. Slagel first contacted Cyrillis Holmes on December 23, 1970, "apprising [him] of the fire and asking assistance as to who might be able to assist in the investigation as to the origin and cause." (COTMSJ1498:3-10; *see also* COTMSJ1489:3-11)

**DSOF 206**

R.B. Slagel called Holmes again on December 25, 1970, asking him if he "could assist to come to Arizona and assist the city in determining the origin and cause of that particular fire." (COTMSJ1498:15-24; *see also* COTMSJ1490:5-9)

---

[2] The pages of transcripts for Cyrillis Holmes's testimonies at Taylor's probable cause hearing and criminal trial are well over a thousand pages. The City notes where those transcripts can be found in DSOF 203 and DSOF 204, but the City only includes copies of the excerpts it specifically relies on in support of its DSOFs to reduce the volume of exhibits submitted in support of its facts.

**DSOF 207**

Holmes arrived early in the morning on December 30, 1970, and he met with Chief Slagel and then went to the hotel to start his investigation. (See COTMSJ1499:8-COTMSJ1513:5; *see also* COTMSJ1490:14-24)

**DSOF 208**

The individuals that were with Holmes while he did his physical inspections of the hotel were Chief Slagel, Capt. Gilmore, Sgt. Moore, and Inspector Bill Martin. (*See* COTMSJ1513:6-20; COTMSJ1514:21-COTMSJ1515:5; COTMSJ1516:12-20; *see also* COTMSJ1520:19-1522:8)

**DSOF 209**

Holmes was hired to determine the origin and cause of the fire. (COTMSJ1491:5-24)

**DSOF 210**

Holmes did not discuss "where they thought the origin would be or what they thought the cause of the fire had been" and "[t]here had been an agreement between [them] that this would be a completely …" (COTMSJ1513:14-26; *see also* COTMSJ1492:14-1493:7; *see also* COTMSJ1522:9-COTMSJ1523:12)

**DSOF 211**

Holmes learned more details about what happened during the fire after he completed his investigation and after he already came to his conclusions and opinions about the origin and cause of the fire. (*See Id*.).

**DSOF 212**

Kashman asked Holmes about modus operandi for man-made fires at Taylor's probable cause hearing, and Holmes testified about three types of modus operandi; race is never mentioned. (COTMSJ1528:16-COTMSJ1536:17)

**DSOF 213**

Kashman asked Holmes about motives for man-made fires at Taylor's probable cause hearing, and Holmes provided several examples; race is not mentioned. (COTMSJ1536:18-COTMSJ1542:6)

**DSOF 214**

Thirty years later, Taylor's expert, Marshall Smyth, is asked about his understanding of what Holmes based his opinions about the cause of the fire and Smyth does not mention race. (*See* COTMSJ1544-1546, at COTMSJ1545, text pp. 74:13-20)

**Taylor's factual allegations relating to the City of Tucson Police Department's policies, customs, or practices and the evidence in the record:**

**DSOF 215**

Taylor submitted a Request for Production, No. 3, which requested the following:

> "Please produce a complete copy of all policies, procedures, "best practices," training materials and reference materials, by whatever name then known, available for the training and use of employees and Officers of the Tucson Police Department regarding the avoidance or deterrence of racial discrimination directed toward African-American suspects, arrestees, etc., that were in effect between December 1, 1970 and March 31, 1972. Response to this request shall include, but is not limited to, all documents referring to, pertaining to, or otherwise relating to racial training, administration of polygraph examinations, and exculpatory evidence." (COTMSJ1449-1455, at COTMSJ1452, No. 3)

**DSOF 216**

The City responded to RFP No. 3, as follows:

> RESPONSE: The search for what you are requesting resulted in nothing being found. See Tucson Police Department Analysis Division, Policy and Practice Research Unit, Project Scope and Executive Summary (bates-stamped as 15-074COT3342- 15-074COT3344 (sent via Drop Box)." (COTMSJ1547-1549).

**DSOF 217**

TPD concluded the following from its search:

> "The earliest records found pertaining to General Orders, then referred to as Policies and Procedures, began in 1998. The only documentation particular to racial profiling was a command directive (CD-2000-04) issued by Chief Richard Miranda in March

2000 after President Clinton's Initiative on race in 1997 with a subsequent directive in 1999 on the investigation of racial profiling by law enforcement agencies. Nothing for the timeframe for 12/1/1970 through 3/31/1972 was discovered." (*Id.* at COTMSJ1548).

**DSOF 218**

Taylor's Fifteenth Supplemental Disclosure Statement, dated December 10, 2021, alleges the following regarding Rubin Salter, Jr.:

"z. Rubin Salter, Jr.

Mr. Salter is an African American criminal defense lawyer who worked at the County Attorney's Office in the late 1960s with Horton Weiss. He spent most of his career thereafter doing criminal defense and will testify that the City Police Department had policies of racial discrimination against Blacks." (COTMSJ0220-0285, at 10:10-15)

DATED February 10, 2022.

MICHAEL G. RANKIN,
City Attorney

By: /s/ Michelle R. Saavedra
Michelle R. Saavedra
Dennis P. McLaughlin
Principal Assistant City Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants.

John P. Leader
The Leader Law Firm, P.C.
405 West Cool Drive, Suite 107
Tucson, Arizona 85704
    *Attorney for Plaintiff*

Stanley G. Feldman
Peter T. Limperis
Timothy P. Stackhouse
Miller, Pitt, Feldman & McAnally, PC
One South Church Avenue, Suite 900
Tucson, Arizona 85701-1620
    *Co-Counsel for Plaintiff*

Daniel P. Struck
Nicholas D. Acedo
Jacob B. Lee
Struck Love Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
    *Attorneys for Defendant Pima County*

By: /s/ E. Acosta