No.  CV-15-00152-TUC-RM

**Plaintiff's Supplemental Statement of Facts**

**In Support of Supplemental Summary Judgment Brief**

**Re: Depositions of Jack Chin and Laura Conover**

**Exhibit 3 –State's Motion to Vacate Conviction Pursuant to Ariz. Crim P. 24.2(e)(2)**

**LAURA CONOVER**     5/30/2022
PIMA COUNTY ATTORNEY
Law Firm No. 69000
State Bar No. 024080/ PAN 65887
32 North Stone Ave., 20th floor
Tucson, AZ 85701
(520) 724-5600
csiu@pcao.pima.gov
Attorney for the State

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF PIMA**

| | |
|---|---|
| STATE OF ARIZONA, | Case No. A019672 |
| Plaintiff, | **STATE'S MOTION TO VACATE CONVICTION PURSUANT TO ARIZ. R. CRIM. P. 24.2(e)(2).** |
| vs. | |
| LOUIS CUEN TAYLOR, | Hon. Casey F. McGinley |
| Defendant. | Division 18 |

The State of Arizona, by and through Pima County Attorney LAURA CONOVER, moves to vacate the convictions in this case pursuant to Ariz. R. Crim. P. 24.2(e)(2) and dismiss the indictment with prejudice under Ariz. R. Crim P. 16.4.

<u>Introduction</u>

The convictions in this case are based on a 2013 no-contest plea which settled a 2012 Petition for Post-Conviction Relief challenging a 1972 jury verdict. On April 2, 2013, Mr. Taylor pleaded no contest to 28 counts of murder and was sentenced by Judge Richard Fields to time served. Mr. Taylor had served approximately 42 years in prison and became immediately eligible for release. Based on a request by counsel for Mr. Louis

1

**TAYLOR  016356**

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

1  Cuen Taylor, the Defendant, this Office has been reviewing this case for more than a

2  year.

3      After careful evaluation, this Office has concluded that the judgment in this unique

4  case must be vacated and the case dismissed because "the conviction was based on an

5  erroneous application of the law." Ariz. R. Crim. P. 24.2(e)(2).  The reason for that is

6  twofold. In 2013, this Office made clear that "the state of the evidence is such that the

7  State would be unable to proceed with a retrial." *Memorandum of Stipulated Finding on*

8  *Post-Conviction Relief and Settlement Agreement*, Apr. 1, 2013 at 7. (Memorandum) This

9  Office continues to believe this conclusion is correct.

10     However, this Office stated that the reason for the no-contest plea was that there

11 is some question of whether there was newly discovered evidence:

12     if it went to a post-conviction hearing, and, in short, if the Court did, in fact, find
       that this was, in fact, legally, newly discovered evidence, the State would be
13     unable to proceed to a new trial given the passage of time, the destruction of
       evidence, and the death of many of the witnesses who testified.

14     Likewise, if it went to hearing and the Court found this was not newly discovered
15     evidence, then Mr. Taylor would be given no relief, and he would continue to
       serve this life sentence. I think that's the essence of the entering of a no contest
16     plea.

17 Plea Transcript, Apr. 1, 2013, at 21. This Office noted that "[t]he legal question presented

18 to the court today is whether a review of the original evidence using new advances and

19 techniques in fire investigation is legally "newly discovered evidence," and asserted "this

20 question hasn't been addressed in Arizona, and it appears no Arizona court has ruled on

21 the legal question of new arson techniques being 'newly discovered evidence.'" (Mem. at

22 9).

2

TAYLOR  016357

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

This Office insisting on a no-contest plea was improper for two reasons.  First, under the circumstances of this case, there was clearly newly discovered evidence. They included:

- The State's key witness, Mr. Cyrillis Holmes, a claimed arson expert, had theories of arson which were not only erroneous for a number of methodological flaws, but were based on race, suggesting that a young Black male suspect committed the crime.

- The case was prosecuted by Mr. Horton Weiss, a prosecutor with a long record of litigation misconduct, who committed serious acts of misconduct in this case, including improper contact with the judge and the jury.

In addition, this Office, inadvertently, no doubt, but seriously misrepresented the evidence to Judge Fields, depriving him of his opportunity to determine whether to accept or reject the plea under Ariz. R. Crim P. 17.4(d).  The most serious misrepresentation was failing to mention Mr. Holmes' racial theories of arson.  They were not part of the original PCR, having been discovered only in a deposition after filing.  A reasonable judge well have concluded that under the circumstances, particularly in the conceded absence of proof of guilt beyond a reasonable doubt, that an expert's reliance on race called for application of the principle that "[s]ome toxins can be deadly in small doses." As did the U.S. Supreme Court in *Buck v. Davis*, 137 S. Ct. 759, 777 (2017).  If the judge viewed conviction based on a racial theory of arson as a "grave constitutional trespass" (*Vasquez v. Hillery*, 474 U.S. 254, 262 (1986) (discrimination in selection of grand jurors)), a reasonable judge, the State now submits, should have accepted the State's concession

TAYLOR  016358

that the case could not be retried, but found the evidence newly discovered, and granted the PCR unconditionally.

The analysis of this Office does not represent criticism of the criminal justice system in Pima County in 1972 or at any other time. To the contrary, this case is an outlier; it represents an extreme and unusual departure from the high standards of justice prevailing in this County and State. That departure imposes the duty on this Office to act. Our Supreme Court has recognized that:

> [a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate," and has the duty to "see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons.

*Matter of Martinez*, 248 Ariz. 458, 463 ¶8 (2020). The Court has more than once "emphasize[d] that the responsibilities of a prosecutor go beyond the duty to convict defendants. Pursuant to its role of 'minister of justice,' the prosecution has a duty to see that defendants receive a fair trial." *State v. Hughes*, 193 Ariz. 72, 80 ¶33 (1998) (*quoting State v. Rodriguez,* 192 Ariz. 58, 64 ¶33 (1998); Ariz. R. Sup. Ct. 42, E.R. 3.8, comment; *State v. Cornell,* 179 Ariz. 314, 331 (1994)).

Under the circumstances, this case should have been dismissed in 2013. The State now moves this Court to achieve justice and uphold the integrity of convictions in Arizona by ordering that result.

### I. Facts and Procedural Background

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

4

TAYLOR  016359

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

This case involves the fire at the Pioneer Hotel which occurred on the morning of December 20, 1970. Ultimately, 29 people perished. In 1972, the defendant in this case, Louis Cuen Taylor, was tried in Maricopa County for 28 counts of murder, based on the theory that he had set the fire. The State's key witness Mr. Cyrillis Holmes, an arson expert, testified that the fire was the result of arson. Mr. Taylor was convicted and sentenced to life imprisonment.

*The PCR Petition and the Evidence of Arson*. On October 23, 2012, defense counsel filed a motion for post-conviction relief pursuant to Ariz. R. Crim P. 32. The motion argued, inter alia, that there was newly discovered evidence in the form of the opinion of the Arson Review Committee (ARC), a group of highly regarded arson experts who, at Taylor's request, issued a report concluding both that it was not possible to determine that the fire was caused by arson and that the methods used by Mr. Holmes were unreliable.   The State then arranged for an independent analysis by Wayne Cummings, a fire investigator for the City of Tucson Fire Department and Certified Fire Investigator (CFI through International Association of Arson Investigators.). (Attachment ***) Based on the available evidence, Mr. Cummings was unable to determine that the cire was caused by arson, or by any other circumstance.

Mr. Cummings reviewed audio, video, electronic, and paper-based documentation obtained from the archived records of the Tucson Fire Department, Tucson Police Department, and the Pima County Attorney's Office. Mr. Cummings findings were based on the 2011 edition of the National Fire Protection Association (NFPA) 921, Guide for Fire and Explosion Investigations. (TFD Report at 2). Mr. Cummings concluded:

TAYLOR  016360

1   Due to the lack of an exact point of origin determination and the lack of

2   elimination of all accidental fire causes, a fire cause determination is not possible

3   reviewing the material provided to me. This is complicated by the full room

4   involvement (or flashover) conditions experienced, the lack of the actual fire scene

5   to physically examine, and the attempted interpretation of post-fire fire patterns

6   from inconsistent photographs.

7   (TFD Report at 42)

8   <u>Origin of Fire</u>

9   Mr. Cummings explained in his report, "the end goal of every fire investigation is

10  to determine where the fire was first ignited (the origin of the fire) and then what caused

11  the fire." (TFD Report at 12) In determining the origin of fire, Mr. Cummings examined

12  witness testimony and used the systematic scientific process of developing and proving

13  or disproving possible hypotheses. (TFD Report at 12-13). Mr. Cumming was unable to

14  locate "any documentation of a witness account describing the point of origin (or the

15  cause) of the fire" and explained the extensiveness of the fire over floors 4-11

16  complicated the issue but, "[t]he earliest description of the fire conditions place[d] the

17  lowest location of fire conditions on the north end of the north-south 4th floor hallway."

18  (TFD Report at 14)

19  Using the scientific process, Mr. Cumming looked at the pictures and reports of

20  hotel. Mr. Cumming addressed serious complications in reviewing compartment fires,

21  such as the one here, where Flashover and Full Room Involvement have occurred. (TPD

22  report at 32, 34-5, 42) Flashover happens when every combustible surface exposed to

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

6

TAYLOR 016361

thermal radiation in a compartment or enclosed space rapidly and simultaneously ignites. (NFPA 921 at 3.3.78; 5.10.2.6) Full room involvement occurs when the entire compartment is involved in fire. (NFPA 921 at 3.3.78) Mr. Cummings explained these phenomena did occur and the "purposely ignited field test burns (including one using the unburned east end of the east-west 4th floor hallway), produced flashover and full room involvement scenarios." (*Id*. At 35) This occurrence significantly complicated the ability of experts to determine the point of origin or cause of the fire. (TPD Report at 36) In these "extreme fire conditions in a confined area can produce major damage and significant fire patterns in only a few moments." (Id 34) Further, the conditions may produce irregular patterns and are often confused with other similar patterns. (*Id*.) "During full room involvement conditions, irregular patterns are produced which are often confused with similar patterns resulting from the use of ignitable liquid." (*Id*.) While there were several "clean burn" patterns, Mr. Cummings found those patterns did not indicate a point of origin for the fire. (TFD Report at 32-3).

Mr. Cummings also addressed depth of char and how it does not specifically correlate to an origin of fire. (*Id*. at 33) NFPA 921 section 6.2.4.4.3 specifically advises "[t]he investigator is cautioned that no specific time of burning can be determined based solely on depth of char. Mr. Cumming held, "[t]he use of char to make determinations about the fuels involved in a fire requires careful consideration of all of the other fire scenario variables." (*Id*.) Measurements should only be measured on "identical materials" with "consistent ventilation during the fire scenario" and using a proper measuring instrument. "It has been shown that a fine-pointed sharp object like a pocketknife is not

7

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR 016362

1  a good choice for depth of char measurements due to the inability to control consistency."

2  (*Id*.)

3      Ultimately, on this issue, Mr. Cummings found that due to the large area, full room

4  involvement, and the extensive damaged cause by the fire on several floors, a point of

5  origin could not be determined. (TFD Report at 32)

6      Mr. Holmes denied the possibility of flashover in the hotel corridor, (Holmes Depo

7  at 60) relied on the burn patterns *(Id*. At 55, 98), and depth of char in reaching his

8  conclusion. (*Id*. at 54-5) Holmes contended that the fire had more than one point of origin,

9  which generally indicated arson (Holmes Report at 10, Holmes Depo at 52) and relied on

10  Depth of Char down the hallway to determine origins of fire. (Holmes Depo at 54-5) Mr.

11  Holmes took his depth of char measurements using his pocketknife (*Id*. at 122) explaining

12  the knife was a good tool "the knife was a good utility to do that.... it goes in through the

13  carbon, the char, then as you hit firm wood, you feel it." (*Id*. at 57)

14      In his original report, Mr. Holmes found, "[I]n short, the deeper the char, the

15  longer the time of burning. That which burned longest in time must have been on fire

16  first." (Holmes Report p. 6). In his 2012 deposition, Mr. Holmes still ascribed to the

17  position that depth of char could be used to determine time of burn, "if it's close to the

18  ignition source, then it's going to be affected earlier. If it's further away, it's not going to

19  be affected as much." (Holmes Depo at 42)

20      Mr. Cummings finding, based on NFPA 921 methodology is in direct contrast to

21  Mr. Holmes processes and conclusions which are based on depth of char to show the

22  origin of fire and measured by using of an uncalibrated pocketknife.

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

8

TAYLOR 016363

1      Other possible causes

2          Though his evaluation, Mr. Cummings also considered other possible hypotheses

3   for causes of fires. Specifically, he notes, "[p]otential accidental sources of the fire

4   ignition in this incident could include an electrical malfunction or discarded smoking

5   materials." (TFD Report at 40) In consideration of accidental sources, Mr. Cummings

6   notes the higher percentage of people who smoked in 1970, the physical characteristics

7   of the hotel such as mounted ashtrays near the elevators and in guest rooms, and the test

8   burns using smoking materials. (*Id*.) Further, Mr. Cummings considered an electrical fire.

9   While one investigative report noted examination of the outlets in the hallway, Mr.

10  Cummings points out the same report indicates,

11      the fluorescent lighting assemblies in the ceiling area of the hallway suffered

12      damage due to intense heating and one (over the elevator lobby) had evidence

13      of an electric supply wiring short. There are documented fire incidents where

14      the cause was determined to be related to a failure of the fluorescent lighting

15      assembly components.

16  (Id. at 40-41). Mr. Cummings hypotheses a failure of a light ballast could ignite "the

17  plastic and wood covering the light assembly that then drops to the flooring below"

18  causing the fire to start. Further analysis would be required to test this hypothesis,

19  but this theory was not eliminated by Mr. Cummings.

20          Mr. Holmes determined in his original report and held through the 2012

21  deposition that the fire was manmade and must have been "malicious." (Holmes

22  Depo at 131; Holmes Report at 2,7-9) He qualified there were no other found

9

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016364

1  reasons to explain the fire and since there were two separate points of origin, arson

2  could be concluded. (*Holmes Depo at 52) However, as discussed infra, flashover

3  and full room involvement are possible explanations for the burn patterns and NFPA

4  921 does not permit the conclusion of arson simply because no other causes can be

5  found. (NFPA 921 at 18.6.5)

6  Negative corpus has typically been used in classifying fires as incendiary,

7  although the process has also been used to characterize fires classified as

8  accidental. This process is not consistent with the Scientific Method, is

9  inappropriate, and should not be used because it generates un-testable

10  hypotheses, and may result in incorrect determinations of the ignition source

11  and first fuel ignited.

12  (*Id.*)

13  In all of these respects, the opinions of TFA, NFPA 921 and the ARC Report were

14  in accord, and at odds to the opinion of Mr. Holmes.  The ARC Report explained that in

15  a compartment fire (such as in a hotel hallway) a recently-understood scientific

16  phenomenon called flashover could cause simultaneous ignition of multiple areas or

17  objects as the entire compartment reached the temperature necessary for ignition. (The

18  ARC Report is PCR Ex. 28)

19  *Mr. Holmes' Race-Based Opinion*. As part of the PCR proceedings, defense

20  counsel deposed Mr. Holmes on November 1, 2012. (Attachment 1) Mr. Holmes testified

21  that part of his body of knowledge of the causes of fire included the races of people who

22  set fires. Mr. Holmes explained that in late December 1970, he made a presentation to

10

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016365

the City of Tucson Board of Inquiry investigating the fire, a fact confirmed by the city records. (*See Preliminary Report of Pioneer Hotel Fire – No. 2*, Attachment 2) The purpose of Mr. Holmes' presentation was to explain the progress of his investigation, which was not yet completed, included the following exchange:

> Do you have an idea of what type of person might be involved? And so I gave them, I believe, it was seven conditions that would address the type of person. And the only two I really remember are the two I missed. And I had indicated I felt that the culprit was probably black and that he was probably 18. And I missed both of those because he was half black and half Mexican and he was 16. So those are the only two I really remember.

(*Holmes Deposition Transcript* at 82-83)

As of December 30, 1970, Mr. Holmes had not reached a final conclusion about the cause of the fire; "I had reached a preliminary determination that the fire was arson and the circumstances surrounding the fire, just the physical circumstances, gave me the race and the age." (*Id.* at 83) When asked by counsel, he elaborated on the basis for his racial opinion:

> [W]ell, in my experience up to this point in the fire service, I dealt with a lot of different people and a lot of different races. And I found certain characteristics that the different races use in the method they use fire. And blacks at that point, their background was the use of fire for beneficial purposes. In other words, they were used to clearing lands and doing cleanup work and things like that and fire was a tool. So it was just a tool for them.

(*Id.* at 83-84) Counsel continued:

> Q What did you hypothesize was the beneficial purpose here, assuming the fire had been set by a black person?

> A Well, when you use something for a beneficial purpose, it's something you're used to using. In other words, you' re comfortable with it. And if they get mad at somebody, the first thing they do is use something they're comfortable with, fire was one of them.

11

TAYLOR 016366

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

(*Id.* at 85)

> Q Any other factors which, in your experience, would indicate to you that the individual setting the fire was a black person?
>
> A No. Just the -- the physical surroundings and my experience in studying them and this type of thing.

(*Id.* at 87)

In January 1971, relying in part on Mr. Holmes' opinion, the Board of Inquiry issued a report concluding that the fire was caused by arson. (Attachment 3) The Board's findings were disseminated throughout the state.[1]

*Other Newly Revealed Facts*. Several other significant items were discovered in the files of this Office decades after the trial.

*The Truesdail Report*. The Truesdail Laboratory report dated February 16, 1971, showed that no accelerant was detected in fire debris. (PCR Ex. 57) The PCR alleged that the Report was never turned over to the defense, and defense counsel Howard Kashman provided an affidavit to that effect. (Kashman Aff., Page 3, para 18 (Apr. 23, 2012) PCR Ex. 59)

*Ex Parte Communication with Judge Hardy*. In the files of this Office, there is a recording and transcript of a phone call between prosecutor Horton Weiss and Judge Hardy who presided over the trial. (Pet. Point III at 21; PCR Ex. 60) Defense counsel was

---

[1] George McEvoy, *Probers Issue Report: Arsonist is Blamed in Pioneer Blaze*, ARIZ. DAILY STAR, Jan. 8, 1971 at 1; Mike Goodkind, *Tough New Code Likely: City Pledges Massive Effort to Find Hotel Blaze Arsonist*, TUCSON DAILY CITIZEN, Jan. 8, 1971, at 1; Bob Thomas, *Board of Inquiry Reveals Pioneer Blaze Was Arson*, ARIZ. REPUBLIC, Jan. 8, 1971, at 16.

TAYLOR 016367

not present, and now states he did not consent. (Kashman Aff., Page 3, para 17 (Apr. 23, 2012); PCR Ex. 59.) Given the contentious nature of the litigation in this case, normal litigation practice, and the lack of any advantage to Mr. Kashman in letting his adversary speak with the judge ex parte, this claim is virtually certain to be true. Accordingly, this recording and transcript are of an unauthorized ex parte communication between the prosecutor and the judge who presided over the trial.

The three issues discussed in the ex parte communication were discovery, jury selection, and Mr. Weiss's continued service as prosecutor. All three were decided adversely to Mr. Taylor, and were pursued, unsuccessfully, as issues on appeal. *State v. Taylor*, 112 Ariz. 68, 78-79 (1975). It appears, as claimed by Mr. Taylor, that he was tried by an all-white jury. Howard Armstrong, *All White Jury is Chosen to Hear Trial in Hotel Fire*, ARIZ. REPUBLIC, Feb. 7, 1972, at D-7.

*Ex Parte Communication with Dismissed Juror.* During trial, County Attorney investigator Rex Angeley spoke with a dismissed juror. (Pet. Point IV at 23; PCR Ex. 61) In a transcript amounting to 15 pages, Mr. Angeley informed the juror that he "know[s] so much more about it than what you people know," and "[i]f we could get in what evidence we have, there would be no doubt whatsoever." (*** 1)

They extensively discussed relationships between the jurors, and particularly the influence of the Judge Hardy's Judicial Assistant, "Judy," because, as the juror said, "Judge Hardy doesn't run that office, Judy does." (2)  Mr. Angeley reported that Mr. Weiss was concerned "that Judy is trying to influence the jury herself," and that "she is going to have so much influence on the jury that they're just going to bend over

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

13

TAYLOR 016368

backwards." (4)  For several pages, the two discuss whether Judy's perceived influence on the jury and favoritism toward the defense warranted seeking a mistrial; Angeley stated :I would hate in the worst way to see a mistrial, but if its this way, it would be better for a mistrial than it would [t] have her being he jury" (8). Mr. Angeley stated that "we would appreciate knowing . . . if the cards are stacked against us and . . . its just one person making the decisions." (10) "[M]y opinion," said Mr. Angeley, "is if the jury is being influenced by Judy, I think there should be a mistrial." (12)

*The 2013 Settlement*. Mr. Taylor's PCR filed in October 2012 was ultimately resolved by settlement. The State's position was outlined in a *Memorandum of Stipulated Finding on Post-Conviction Relief and Settlement Agreement* dated April 1, 2013. (Memorandum) The Mr. Taylor pleaded no contest to 28 counts of murder and was sentenced by Judge Richard Fields to time served. Mr. Taylor had served approximately 42 years in prison and became immediately eligible for release.

*The Absence of Evidence of Guilt*. The Memorandum noted that if there was a finding of newly discovered evidence, "the state of the evidence is such that the State would be unable to proceed with a retrial." *Id.* at 7. The State agrees that with the opinion of this Office in 2013. Because of the importance of the point, and its relevance to this disposition of this motion, the reason there was insufficient evidence to consider a retrial in 2013 (or now) is set out in some detail.

Of course, the testimony and other evidence from the original trial would have been admissible, even if live witnesses were unavailable. Ariz. R. Evid. 804(b)(1)(A) (hearsay exception for former testimony in a criminal case). The problem was that that

14

TAYLOR  016369

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

1    evidence was not sufficient to prove to any reasonable factfinder that Mr. Taylor

2    committed arson, or, indeed, that the fire was caused by arson at all.

3        The problem begins with the fact that contemporary experts--the TFD and ARC—

4    are unwilling to opine that the fire was caused by arson. Mr. Holmes' testimony that the

5    fire was caused by arson is available, based on live testimony or by reading in his former

6    testimony, but no reasonable prosecutor would call him, knowing his racial and scientific

7    views. Accordingly, a retrial would be without expert testimony that the fire was caused

8    by arson.

9        Expert testimony is not necessary to prove arson, if other facts and evidence

10    demonstrate the elements of the offense.  *Cf. State v. Taintor*, 25 Ariz. App. 20, 21 (App.

11    1975) (prosecution based on witness testimony with no mention of expert). In this case,

12    however, the decision in 2013 that it would have been difficult or impossible to prove

13    through nonexpert testimony was well-founded.

14        *Mr. Taylor's Presence When the Fire Was Discovered*. A piece of evidence

15    which appeared highly inculpatory, the State now submits, has a very different meaning

16    in context. Hotel custodian David Marion Johnson was cleaning the lobby just after

17    midnight on December 20, 1970, when he learned about the fire, apparently from

18    overhearing a call to the front desk. (R.T. 2/22/1972 (V19), at 119) He took the elevator

19    to the third floor. (*Id*. at 125) There he saw "a colored boy" (*Id*. at 127) whom he

20    identified as Mr. Taylor (*Id*. at 136) standing and looking at the fire with nothing in his

21    hands; Mr. Taylor told Mr. Johnson to get a fire extinguisher. (*Id*. at 128) Mr. Johnson

22    did, and used it to put out the fire on the stairway and the wall. (*Id*. at 128-29) Mr. Johnson

**TAYLOR  016370**

left to find additional extinguishers, and when he returned he saw Mr. Taylor attempting to deploy a hose from a fire cabinet: "the colored boy had the hose—the cabinet open and part of the hose out." (*Id*. at 133) That Mr. Taylor was at the scene where the first witness reported seeing actual flames is, on its face, a basis for strong suspicion at a minimum.

However, Mr. Taylor was seen in the hotel earlier in contexts which alter the implication of that evidence.  Before the fire, Mr. Taylor had been seen by Rodney Lee Dingle, a prosecution witness, in a public area near the hotel's ballroom. (R.T. 2/22/1972 (V19), at 59-64) Freda Lampton, also a prosecution witness, was a hotel employee working in the Spanish Lounge on the mezzanine floor which was being used as a cloakroom for the ballroom. (R.T. 3/16/1972 (V39), at 193-94)  Just after midnight, Mr. Taylor opened double-doors into the room where M.s Lampton was working and shouted: "There's a fire up there and smoke." (R.T. 3/16/1972 (V39), at 196) After the doors closed, Ms. Lampton smelled smoke wafting into the room from the hallway. (R.T. 3/16/1972 (V39), at 200, 228) Mr. Taylor ran up the nearby stairs, and Ms. Lampton reported the fire by phone to the front desk. (R.T. 3/16/1972 (V39), at 197, 198) The record makes clear that Ms. Lampton saw Mr. Taylor, and smelled the smoke, before Mr. Johnson saw Mr. Taylor on the third floor. Ms. Lampton saw Mr. Johnson when he came to get the additional fire extinguishers, and testified that occurred "way later" than her encounter with Mr. Taylor. (R.T. 3/16/1972 (V39), at 226-27)

What the record reflects, then, is that Mr. Taylor was in a public part of the hotel, where he was seen by Mr. Dingle, and then reported the fire to Ms. Lampton, who smelled smoke. Only after reporting the fire to Ms. Lampton was Mr. Taylor seen in the third-

16

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016371

floor guest area where the fire was underway. It is normal, not suspicious, for a person who smells smoke in a building to report it and investigate its source; indeed, hotel employees did the same thing.

*Witness Statements*. Two witnesses testified to inculpatory statements by Mr. Taylor. Neither had significant probative value by 2013. Bruce Foy Wallmark, who was in juvenile detention with Mr. Taylor in 1971, testified that Mr. Taylor said he had been in the hotel stealing wallets when the fire broke out on the fourth floor. (R.T. 2/25/1972 (V22), at 152-54) The fire was started by a lit book of matches being dropped on the floor. (*Id*. at 157-58)

While normally an admission of knowledge about how a suspicious fire started might be probative evidence, it is not in this case. In a written statement, and on cross-examination, Mr. Wallmark explained that Mr. Taylor knew the fire started on the fourth floor because the police told him how the fire started—accordingly, Mr. Wallmark's testimony was not a confession or admission either to starting the fire or witnessing the fire starting. (*Id*. at 165-66; 181-82; R.T. 2/28/1972 (V24), at 6-7)

Robert Jackson's testimony would also have been of little help. At trial, he stated that Mr. Taylor admitted starting the fire by playing a game with lighter fluid. (R.T. 3/15/1972 (V38), at 12-13, 22.) After the trial, Mr. Jackson recanted twice, and then twice retracted his retractions.[2] While Mr. Jackson is apparently deceased, his trial testimony

---

[2] In addition, his brother, Albert Jackson, swore under oath in 1972 (PCR Ex. 46) and in 2006 (PCR Ex. 40) that he witnessed Robert being threatened by Rex Angeley and other members of law enforcement to provide false testimony.  Without conceding the

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

17

TAYLOR  016372

1   could be read into the record at a new trial (Ariz. R. Evid. 804(b)(1)) but that testimony

2   could also be impeached with his retractions and prior convictions. Ariz. R. Evid. 806.

3       In addition, while the absence of evidence is not conclusive, no physical evidence

4   supported either claim. Police and firefighters found no can of lighter fluid or other

5   accelerant in the hotel, no evidence of accelerant at the hotel or in testing done by the

6   Truesdail Lab, and no property on Mr. Taylor's person consistent with the proceeds of

7   theft.

8       *Possession of Matches*. When Mr. Taylor was arrested and searched after being

9   interrogated for several hours, he had five books of matches in his possession. (R.T.

10  2/25/1972 (V22), at 99, 103, 107) The specific matches in those five books could not

11  have been the source of the fire, because there was no indication that any of them were

12  burned or used.  However, his possession of matches makes it possible for him to have

13  started the fire using some other matches, if in fact matches were used. The possession

14  of so many matches might be considered consistent with a problematic interest in fires.

15  However, Mr. Taylor testified that he was a smoker and was smoking during his TPD

16  interrogation (R.T. 3/7/1972 (V31), at 73), a fact confirmed by police witnesses. (R.T.

17  2/25/1972 (V22), at 36)

18      It is also a matter of common knowledge that smoking, and therefore carrying

19  matches, was much more typical then than it is now. For example, Mr. Dingle, a

20  prosecution witness who testified that Mr. Taylor was on the mezzanine and give him a

21  _____

22  truth of those claims, they also support the decision of this Office not to rely on the
    credibility of Robert Jackson's testimony in 2103.

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016373

cigarette, could not remember if he carried matches, a lighter, or both. (R.T. 2/22/1972 (V19), at 79) A hotel employee testified that the hotel furnished matches for guests in the rooms. (R.T. 3/3/1972 (V28), at 215) Possession of matches in a place where matches are universally available is not compelling evidence of guilt.

In any event, it is now impossible to determine how the fire started, whether accidentally or intentionally. Assuming the fire was set intentionally, it is now impossible to determine how it was set. Thus, whether it started accidentally or intentionally, there is also no way to determine whether matches were even involved. Possession of matches would have been of little help to the State in a 2013 retrial.

*False Statements*. When speaking to police witnesses and others, Mr. Taylor claimed to have seen other people in the upper floors of the hotel. (R.T. 2/25/1972 (V22), at 15 & 98); (R.T. 2/21/1972 (V21), at 97-99) These statements, Mr. Taylor admitted at trial, were false; he had not seen anyone running or fighting, and he had not seen who set the fire. (R.T. 3/7/1972 (V31), at 15-16, 174-75, 179) When asked why he said he had seen things that he had not, his explanations included: "I don't know" (*id*. at 16), and "to get police off my back" (Handwritten notes of Det. Scoopmire at 9, PCR Ex. 15)

To be sure, these untruths are of some probative value. *State v. Crain*, 250 Ariz. 387, 395 ¶25 (App. 2021). The jury was instructed, consistent with the law at the time, that:

> Evidence, if any, that the defendant on one or more occasions, other than from the witness stand, made false, contradictory or misleading statements concerning the charges against him which is now being tried may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but it is not sufficient of itself to prove guilt.

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR 016374

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

(R.T. 3/20/1972 (V42) at 130-31) *See State v. Vann*, 11 Ariz. App. 180, 182 (1970).

TPD Officer Adams testified that Mr. Taylor stated: "It is sure bad about all those people. It's terrible somebody - it's awful that somebody would set a fire like that." (R.T. 2/24/1972 (V21), at 18) This statement clearly suggests that Mr. Taylor believed that the fire had been caused by arson. This is evidence a jury could consider. But under the circumstances, a jury might not have found it surprising that a person might assume that a modern hotel could go up in flames only because of intentional action.

A leading U.S. Supreme Court case recognized that race is relevant to the social reality of police encounters. As part of an analysis of the totality of the circumstances regarding whether a reasonable person would have considered themselves to have been seized by law enforcement officers, the Court noted that the individual involved "was 22 years old and had not been graduated from high school" and was "a female and [an African American]." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). *See also State v. Jones*, 172 N.H. 774, 780, 235 A.3d 119, 126 (2020).

Here, too, given the context of the statements, it would not have been surprising that Mr. Taylor would have sought to divert attention from himself even if innocent. A tragic event occurred that morning, and a reasonable person would have anticipated that an investigation would ensue to see of someone should be held accountable.

Further, a jury in 2013 would have considered the relations and perceptions of the time. While many have worked and continue to work hard to improve relations between the police and the community, in the relevant period of U.S. history, there was "a

20

TAYLOR  016375

widespread perception among Negroes of the existence of police brutality and corruption and of a 'double standard' of justice and protection—one for Negroes and one for whites." *Report of the National Advisory Commission on Civil Disorders* 93 (1968). Given that the State's expert in this case actually did assume that the offense was committed by a Black person, a jury on retrial might well have found it reasonable for a young, innocent African American male at the time to fear wrongful accusation under the circumstances. Accordingly, this evidence is of limited probative value.

*Interest in Fire*. Mr. Taylor consistently denied to police interrogators that he had anything to do with the fire at the Pioneer Hotel. However, according to police witnesses, he admitted having some interest in fire, including that he had burned Christmas trees, garbage, and might set fire to an old house with no one in it. (R.T. 2/24/1972 (V21), at 135; R.T. 3/4/1972 (V29), at 122; PCR Ex. 12 (Handwritten Notes of Det. Scoopmire) & 15 (report of Det. Scoopmire).

At trial, Mr. Taylor did not entirely deny these discussions. He was asked: "Do you remember telling [the police] that you started several fires in trash dumps, garbage cans and you had also burned down an old tree or two? Do you remember telling him that?" Mr. Taylor ultimately answered:

> I - well, he had told me that he thought that I had set the fire but didn't mean to -- meant for any people to die of the fire, and I had told him that if I wanted to set a fire that I would set a garbage can on fire instead of a hotel on fire where people were living.

(R.T. 3/7/1972 (V31), at 176-77)

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016376

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

1   Assuming the statements were made precisely as reported by the police witnesses,

2   again, they could have been of some probative value at a retrial. However, in part because

3   the interrogations were not recorded, witness accounts of the statements do not reflect

4   any of the context of the conduct, and therefore are not necessarily admissions either to

5   crimes or to aberrant behavior endangering lives or property.

6   In fact, the jury at a 2013 retrial would have learned that burning of Christmas

7   Trees or garbage is far from uncommon. The Tucson Fire Department at one time

8   sponsored an annual Christmas tree burn. *Annual Tree-Burning Event to Be Held Next*

9   *Week*, TUCSON DAILY CITIZEN, Jan. 1, 1965, at 11. Although it ended formally several

10   years later (*No Tree Burnings Scheduled*, TUCSON DAILY CITIZEN, Jan. 1, 1968, at 2), it

11   remained part of the culture in Southern Arizona. For example, a humorous, fictional

12   *Tucson Citizen* interview with a Christmas tree reported that the tree would consider itself

13   lucky to wind up in a garbage truck headed for the dump—"otherwise there's always a

14   chance that some small boys will come along and drag me off some place for a bonfire."

15   Don Schellie, *Interview with a Has-Been*, TUCSON CITIZEN, Jan. 5, 1972, at 21.

16   Burning holiday trees and trash in garbage cans remains common. *See, e.g.,*

17   *Firewood*, ARIZ. DAILY STAR, Dec. 23, 2020 ("Because they are sap-heavy trees,

18   evergreens tend to burn hot and fast, making them ideal for bonfires. If you have a safe

19   place for an outdoor fire, like a fire pit, dry out your Christmas tree clippings to use for

20   kindling to get your fire roaring..... Trees should be dried out for a few months before

21   burning. Ashes from burned Christmas trees contain potassium and lime, which when

22   spread in the garden help plants thrive."); *How to Make a Burn Barrel*, WikiHow.com.

**TAYLOR  016377**

*Arson*. While incarcerated on this case in 1996, Mr. Taylor was found liable for a disciplinary violation involving arson. This involved Mr. Taylor burning a State-owned towel in front of Correction Officers. (Attachment 7) Because of differences in time and circumstances, this incident might well not have been admissible, and in any event would not have been of significant probative value.

In sum, this Office correctly determined in 2013 the available evidence was not reasonably likely to lead to a conviction. To be clear, this Office is unable to state that "clear and convincing evidence" establishes that Mr. Taylor "was convicted of an offense that" he "did not commit." Ariz. R. Crim P. 24.2(e)(1) However, based on the available evidence, admissible and inadmissible, no reasonable factfinder could find every element of the offense of arson or felony murder beyond a reasonable doubt.

<u>Argument</u>

**I.  Mr. Taylor's Conviction Should Have been Vacated Unconditionally**

Arizona law imposes on the State the responsibility to ensure that the convictions it obtains are lawful and just. The duty is operationalized by Ethical Rule 3.8 and Ariz. R. Crim P. 24.2(e), which provides:

> [T]he State may move the court to vacate the judgment at any time after the entry of judgment and sentence if:
>
> (1) clear and convincing evidence exists establishing that the defendant was convicted of an offense that the defendant did not commit; or
>
> (2) the conviction was based on an erroneous application of the law.

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

23

TAYLOR  016378

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

1   The relevant portions of both rules were adopted after the no-contest plea in this case.

2   The 2013 conviction was based on an erroneous application of law because the motion

3   for post-conviction relief should have been granted unconditionally, without requiring a

4   plea of no contest.  Taken as a whole, there clearly was newly discovered evidence which

5   undermined the reliability and integrity of the trial.

6   *A.  The Arson Evidence Was Newly Discovered*

7   This Office erred in 2013 in declining to agree to set aside the 1972 conviction

8   unconditionally.  The newly discovered evidence was sufficient to set aside the

9   conviction.  Under the circumstances of the case, it was probable that a new trial should

10   have been granted based solely on developments in arson science reflected in the ARC

11   Report.  The public policy of this State opposes convictions based on unreliable arson

12   evidence, as exemplified by Arizona HCR 2066 (2010), which was adopted unanimously

13   by both houses of our Legislature.  The Resolution noted that a number of people were

14   serving time in Arizona prisons for arson-related offenses, and "it is possible that some

15   of those persons convicted of arson in Arizona may have been convicted using antiquated

16   and unreliable techniques."  Accordingly, "the Legislature supports the judicial review of

17   those arson convictions obtained using evidence that is now known to be unreliable."

18   The appellate decisions involving newly discovered evidence are relatively few.

19   *See, e.g.,* \*\*\*.  A possible reason may be that when an individual does appear to have

20   been convicted based on outdated, unreliable arson science, prosecutors often agree that

21   there should be a new trial or a dismissal, and therefore there is no appeal.  In any event,

22

24

TAYLOR  016379

1   the media reports of new trial granted based on erroneous arson testimony are plentiful,

2   many with the consent of the prosecutor. *See, e.g.,* \*\*\*.

3       In addition to advances in arson science, the discovery that the arson expert's

4   testimony was tainted by racial bias, the State submits, was unquestionably newly

5   discovered evidence. All government actors in the criminal justice system are duty-bound

6   to eliminate racial bias from criminal proceedings. *Pena-Rodriguez v. Colorado*, 137 S.

7   Ct. 855, 867 (2017). In *Pena-Rodriguez*, the U.S. Supreme Court held that the

8   Constitution required the general prohibition on inquiry into jury deliberations to yield to

9   the principle of anti-discrimination. "The duty to confront racial animus in the justice

10  system is not the legislature's alone. Time and again, this Court has been called upon to

11  enforce the Constitution's guarantee against state-sponsored racial discrimination in the

12  jury system." *Id*. at 867. Arizona law, of course, is to the same effect: "it has ever been

13  one of the great responsibilities of supreme courts to protect the civil rights of the

14  American people, of whatever race or nationality, against encroachment." *Harrison v.*

15  *Laveen*, 67 Ariz. 337, 341 (1948). Finally, attorneys for the State of Arizona also equally

16  obligated by oath to uphold the U.S. Constitution, including the prohibition on denial of

17  equal protection of the laws. U.S. Const. Art. VI, Cl. 3; A.R.S. § 38-231.

18      The U.S. Supreme Court has made clear that race-based expert testimony violates

19  the Constitution. A recent line of cases involved the State of Texas, which employed an

20  expert in the penalty phases of capital cases. The opinions of this expert rested in part on

21  the theory that certain races were more likely to commit crimes. When a case tried in

22  1996 reached the U.S. Supreme Court in 2000, thirteen years before the no-contest plea

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

25

TAYLOR  016380

in this case, the State of Texas confessed error because the expert testified that a defendant's "Hispanic heritage 'was a factor weighing in the favor of future dangerousness.'" *Buck v. Davis*, 137 S. Ct. 759 (2017) (discussing *Saldano v. Texas*, 530 U.S. 1212 (2000)).

In *Buck v. Davis*, the same expert who testified in the *Saldano* case "stated that one of the factors pertinent in assessing a person's propensity for violence was his race, and that [the defendant] was statistically more likely to act violently because he is black." 137 S. Ct. at 767. The Court found reversible error even though the problematic testimony was introduced by the defendant, and there were many non-racial grounds for the expert's opinion. The Court explained: "[s]ome toxins can be deadly in small doses." *Id*. at 777. This Office agrees with the U.S. Supreme Court that racism in the criminal justice system is not a small, medium, or large issue when it is discovered, instead is a "grave constitutional trespass." *Vasquez v. Hillery*, 474 U.S. 254, 262 (1986) (discrimination in selection of grand jurors).

As Mr. Holmes was conducting his investigation, before reaching any final conclusion, he determined that the likely suspect would be a young, Black male. The problem is not merely that he has distasteful views.  The use of race as a predictor of arson dovetails with the other ways in which his methodology was unreliable. In addition, Mr. Taylor's name and photograph as the person arrested for the fire appeared in the media as early as December 21, 1970. *Boy at Hotel Fire Held*, Tucson Daily Citizen, Dec. 21, 1970, at 1.  Having learned, as he was forming opinions, that a prediction about the suspect proved true could only have reinforced any tentative judgments.

26

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016381

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

The use of racial reasoning in this case is at least as problematic as that in *Saldano* and *Buck* (except that this is not a capital case). First, after diligent research, the State is aware of no evidence supporting the idea that people of particular races are more likely to commit arson, or that race is an accepted or useful technique in arson investigation or fire cause determination.

Second, this is not a case where an expert's unusual or unfounded beliefs are unrelated to the subject matter of the expert's testimony. Instead, Mr. Holmes' erroneous racial analysis was compounded by the independent reasons to doubt his expertise and methodology, as set out in the ARC Report and the TFD Report.

Third, Mr. Holmes' testified extensively at trial, but unfounded racial theories were presented neither to the jury, nor to Judge Fields in the Memorandum or on the record at sentencing. Accordingly, at trial in 1972, the jury did not have the opportunity to discount or reject entirely the expert testimony based on Mr. Holmes' idiosyncratic racial views. For that reason, as well as improvements in fire science, the verdict cannot be regarded as a reliable finding of guilt.

However, this Office declined to agree unconditionally that there was newly discovered evidence. Instead, as stated in the Special Terms of the Plea Agreement dated April 3, 2013:

> The parties stipulate that the Court, pursuant to Rule 32.1 of the Arizona Rules of Criminal Procedure, may find that there is sufficient proof of newly discovered material evidence to grant Defendant a new trial. In return for this stipulation, Defendant agrees to immediately enter a plea of no contest to counts 2-29.

27

TAYLOR  016382

1    The plea provided that if Mr. Taylor failed to plead no-contest, then "the original

2    conviction and sentence [would] immediately be reinstated." *Id.* The Memorandum did

3    not address Mr. Holmes' racial opinions, and they were not addressed at the change of

4    plea hearing. (Transcript, Attachment 6)

5       *B. The Truesdail Report*

6       There were other newly discovered irregularities undermining confidence in the

7    fairness and accuracy of the trial.  In the State's view, the trial was significantly and

8    adversely affected by the absence of the Truesdail Report at trial. The defense arson

9    expert, Marshall Smyth, testified the fire was most consistent with the use of some

10   accelerant. (Smyth testified at R.T. 3/8/1972 (V32B); R.T. 3/9/1972 (V33); R.T.

11   3/10/1972 (V34); R.T. 3/11/1972 (V35); references to accelerant are throughout, e.g.,

12   R.T. 3/11/1972 (V35) at 6-8) Mr. Smyth has since repudiated the methods and opinions

13   he relied on at trial and would not now classify the fire as arson. (Affidavit of Marshall

14   L. Smyth, dated Nov. 3, 2011, PCR Ex. 27)

15      In addition, prosecution witness Robert Jackson testified Mr. Taylor admitted that

16   he had set the fire with lighter fluid. (R.T. 3/15/1972 (V38), at 12-13, 22) As explained

17   above, the State is now unable to stand by Mr. Jackson's testimony. However, at the time

18   of trial, Mr. Jackson's testimony was an important, perhaps essential, piece of evidence

19   before the jury.

20      Had the Truesdail Report been made available, Mr. Smyth's opinion would likely

21   not have relied on a contradictory accelerant theory. In addition, Jackson's testimony

22   would have been contradicted.

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

28

TAYLOR  016383

Under the law at the time of the prosecution and trial, the State was obligated to disclose the Report. As the Supreme Court stated two years before the trial:

> Had the police retained the items in question, run appropriate tests, the results of which substantiated defendant's contentions, and then concealed both the evidence and analysis thereof from his scrutiny, he would be placing himself within the purview of the authorities on suppression of evidence.

*State v. Maloney*, 105 Ariz. 348, 352 (1970). The Court held that the inadvertent failure to preserve material of no apparent evidentiary value was not error, but the principle was clear:

> Both prosecutors and the police, as public officers acting on behalf of the state, are sworn to uphold the law and are duty bound to protect the rights of the innocent as well as to prosecute the guilty. Their primary duty is not to convict, but to see that justice is done. Canon 5, Canons of Professional Ethics. A prosecutor who fails to reveal evidence that clearly would aid the accused's defense would seem to have lost sight of his proper objective.

*Maloney*, 105 Ariz. at 351 (quoting *State v. Fowler*, 101 Ariz. 561, 563 (1967)). The State of course continues to have these obligations. *See, e.g.,* Ariz. R. Crim. P. 15.1(b)(8).

Nevertheless, the State cannot concede that the defense was unaware of the Truesdail Report. There is a transcript of a recorded conversation between a member of the Tucson Fire Department, Capt. Lynn Gilmore, and Consulting Engineer Glen Miller, who were involved in the investigation on the part of the City of Tucson. (PCR Ex. 58) The transcript indicates that that the defense knew about the report; Mr. Miller is quoted at 4-5 as saying:

> Let's see – who was it called me the other day – it was the Court Appointed Defense Attorney – called me about three weeks ago – and he wanted a copy of my report –and I told him I would be happy to send him a copy of my report on instructions from Mr. Everett or why didn't he just go and talk to Mr. Everett. And I didn't hear anymore from anybody.

29

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016384

The record leaves open three possibilities. Perhaps the Truesdail Report was disclosed to the defense, and counsel overlooked or misunderstood it, or the defense knew about the existence of the Report but failed to seek it out. Given the high-quality representation provided by Mr. Kashman, these possibilities seem unlikely, but are supported by the statement of Mr. Miller.

Assuming that the defense neither received the Report nor knew of it, perhaps Mr. Weiss had the Report and never disclosed it. This conclusion is supported by the fact that the document was found by defense counsel in the County Attorney's files as it prepared the filing of the PCR. Militating against this conclusion is that the Report was consistent with the State's primary theory of the case, namely, that the fire was intentionally started without accelerants. In addition, it was inconsistent with the defense theory that the fire was started with accelerants. There would have been little reason for even an unscrupulous lawyer not to disclose it.

Another possibility is that Mr. Weiss never received a copy of the document, and therefore both the prosecution and defense were unaware of its existence. This possibility may be made more likely by the February 18, 1971, memorandum from Tucson City Manager Roger O'Mara to all City department heads, advising that they should "not divulge information and/or City records to anyone in connection..." to the hotel incident and to refer them to the City Attorney. (Attachment 4) This possibility is also consistent with assumption that, with respect to this issue, neither the prosecutor nor the defense attorney personally violated their professional obligations. However, but because the

TAYLOR 016385

TFD is part of the government, under *Maloney*, the results of its testing should have been disclosed to the defense.

It is likely impossible to resolve the question of precisely when the Truesdail Report came into the possession of this Office. At a minimum, however, the jury should have known about it, and its non-presentation at trial represents a significant failure of the adversary system. It undermines the ordinary presumption that conviction by a jury verdict represents a reliable determination of guilt.

### C. Ex Parte Communication with Judge Hardy

The ex parte communication between Horton Weiss and Judge Hardy is also alarming. Since at least 1956, Arizona law has prohibited ex parte communications between judges and attorneys: "[A judge] should not permit private interviews, arguments or communications designed to influence his judicial action, where interests to be affected thereby are not represented before him, except in cases where provision is made by law for ex parte application." Ariz. R. Sup. Ct. 45, Canon 17 (1956) (Adopted by Ariz. Sup. Ct. Admin. Order 56-01 (Oct. 1, 1956)) Arizona law continues to provide, with limited and specific exceptions, that "A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter." Ariz. Sup. Ct. R. 81, Arizona Code of Judicial Conduct, Rule 2.9. Arizona law demands "high standards of conduct so that the integrity and independence of the judiciary may be preserved." *Matter of Hendrix*, 145 Ariz. 345, 348 (1985). *See also* Ariz. Sup. Ct. Rule 81, Code of Judicial Conduct Rule 1.2 ("A judge shall act at all times in a manner that

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR 016386

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

1   promotes public confidence in the independence, integrity, and impartiality of the

2   judiciary, and shall avoid impropriety and the appearance of impropriety.")

3         The State submits that the ex parte communication constituted grave misconduct.

4   By participating in the ex parte communication, tolerating Mr. Weiss's misconduct and

5   engaging in it himself, Judge Hardy involved himself in a conspiracy of silence. The case

6   had been moved to Maricopa County because of concern about the fairness of a trial in

7   Pima County, so everyone was on notice of the importance of fairness and the appearance

8   of fairness in the proceedings. At another point in the trial, Judge Hardy held defense

9   counsel Kashman in contempt for allowing his client, contrary to the Court's order, to

10  speak to the press. *State v. Taylor*, 112 Ariz. 68, 78 (1975). Given these facts, where Mr.

11  Weiss was allowed to grossly violate the rules with the judge's participation, while Mr.

12  Kashman was held strictly to account, however sterling his reputation in general, no

13  reasonable observer could have confidence that Judge Hardy was neutral and fair in this

14  case.

15        In addition, there is strong reason to believe that Mr. Weiss's act of recording the

16  phone call was itself unethical. The Colorado Supreme Court disbarred a defense attorney

17  for surreptitiously recording an in-chambers conference in 1976, just four years after the

18  misconduct in this case. *People v. Selby*, 606 P.2d 45, 47 (Colo. 1979). A formal ABA

19  Ethics Opinion from 1974, citing authority dating to as early as 1961, deemed it unethical,

20  as a general matter, for attorneys to secretly record others. ABA Formal Op. 337 (Aug.

21  10, 1974) ("Informal Opinion No. C-480, issued in 1961, requires disclosure to the court

22  and opposing counsel before using a recording device in court."). It is unlikely that Judge

32

TAYLOR  016387

1   Hardy would have consented to the recording because it would have been evidence of his

2   own apparent violation of Canon 17.

3       *D.  Ex Parte Communication with Dismissed Juror*

4       The mid-trial contact with a dismissed juror was also improper. It is clear that

5   contact with a sitting juror during trial is improper and creates a presumption of prejudice.

6   *State v. Miller*, 178 Ariz. 555, 558-58 (1994) (quoting *Remmer v. United States*, 347 U.S.

7   227, 229 (1954)). In a decision from the U.S. Court of Appeals for the District of

8   Columbia Circuit authored by the distinguished jurist Harry Edwards and joined by

9   Antonin Scalia and Kenneth Starr, the Court held: "attorney contact with an excused

10  juror, during trial, is potentially harmful and similarly creates a rebuttable presumption

11  of prejudice." *Hobson v. Wilson*, 737 F.2d 1, 48 (D.C. Cir. 1984).

12      The Court explained the reasons for prohibiting and presuming prejudice based on

13  contact with excused jurors. One reason is that a former juror might communicate with

14  sitting jurors:

15      An excused juror could serve as a conduit of information into the jury room.
        Indeed, in the single case we have found involving a defendant's
16      communication with an excused juror, the excused juror telephoned a sitting
        juror to recount the conversation, who then repeated what was said to other
17      jurors. See *United States v. Boscia*, 573 F.2d 827 (3d Cir.), *cert. denied*, 436
        U.S. 911 (1978).

18  *Id*. at 48-49.  In *Miller*, the Arizona Supreme Court granted relief after a dismissed juror

19  communicated to a sitting juror what the dismissed juror's vote would have been. *Miller*,

20  178 Ariz. at 557.

21

22

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

33

TAYLOR  016388

*Hobson* also explained that a party communicating with an excused juror could obtain an unfair advantage:

> Contact between a party, his attorney, or an agent of either, and an excused juror, additionally offers parties the opportunity to learn information to which they ought not be privy. Perhaps most importantly, an excused juror might relay to parties or their counsel his or other jurors' impressions of the credibility of witnesses and the strength of evidence, thereby permitting counsel to address specific concerns with additional witnesses and different evidence. If such contacts were permitted, counsel undoubtedly would undertake detailed interrogations of excused jurors. This would enable counsel to benefit unfairly and unequally from access to information that the process quite properly denies, and thereby make a mockery of the underlying principles on which trial procedure is based.

*Id*. at 49.

The Court assumed that in the case of an excused juror, "rebuttal [of the presumption of prejudice] will be more easily accomplished, and the trial judge will find actual prejudice with less frequency." *Id*. at 48. Here, however, the State is unable to contend that the conversation between the County Attorney's Office and the dismissed juror was not prejudicial. Mr. Angeley told the dismissed juror (falsely) that there was conclusive but inadmissible evidence of guilt. There was extensive discussion of personalities and attitudes of particular jurors, which gave the State unfair and unequal insight into the jury's thinking. Mr. Angeley obtained information which he thought warranted a mistrial, but instead of reporting it to the Court, was able to hold it in reserve "if the cards or stacked against us." Based on contact with the juror, the State (but not the defense) was in a position to seek a mistrial if the case was going badly, or let it go to the jury if a conviction seemed likely.

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016389

Unfortunately, Mr. Weiss's misconduct in this case was not out of character. He has an extraordinary record of misconduct, including his own contempt proceedings. *Weiss v. Superior Ct. of Pima Cty.*, 12 Ariz. App. 527 (App. 1970), *vacated*, 106 Ariz. 577 (1971), *habeas corpus granted sub nom.*, *Weiss v. Burr*, 327 F. Supp. 1306 (D. Ariz. 1971), *rev'd*, 484 F.2d 973 (9th Cir. 1973), *cert. denied*, 414 U.S. 1161 (1974). In April, 1972, the Arizona Supreme Court reversed a robbery conviction because of Mr. Weiss's "most unprofessional and immature conduct." *State v. Moore*, 108 Ariz. 215, 222 (1972). The Arizona Supreme Court censured Mr. Weiss on the recommendation of the Arizona State Bar based on his misconduct in the *Moore* case. *See In re* Horton C. Weiss, Order No. SB 36 (Attachment 7). When convictions were affirmed, the appeal was often resolved on the basis that Mr. Weiss's misconduct was harmless error, not that his conduct was permissible. *See, e.g., State v. Thomas*, 110 Ariz. 120, 134 (1973) ("we deplore the conduct of Mr. Weiss"); *State v. Mercer*, 13 Ariz. App. 1, 4 (1970) ("The over-zealous tactics of Mr. Weiss are well known to this court and have been the subject of other appeals.")

Taken together, the picture of the trial that come into focus after examination of the files of this Office was a grim one, and the deposition of Mr. Holmes was equally grim. Mr. Holmes testimony was unreliable. Critical evidence was not presented the jury, and this Office had improper contact with the judge and jury. Because there was newly discovered evidence which raised the possibility that an innocent person had been convicted, this Office should have agreed unconditionally to a new trial.

TAYLOR 016390

## II. Acceptance of the 2013 Plea Agreement was Erroneous Because the Court did not have a Reasonable Opportunity to Evaluate the Evidence.

At the time of the plea and sentence, Judge Fields did not have a reasonable the opportunity to evaluate whether the plea agreement should be accepted or rejected under Ariz. R. Crim. P. 17.4(d). Had the toxic racial nature of Mr. Holmes' testimony been presented in full, Judge Fields might have concluded that the petition should have been granted unconditionally, and therefore that "the ends of justice and the protection of the public" warranted rejection of the plea agreement. *State v. Darelli*, 205 Ariz. 458, 462 (App. 2003) (quoting *Espinoza v. Martin*, 182 Ariz. 145, 147 (1995) (quoting *State v. Superior Court In & For Maricopa Cnty.*, 125 Ariz. 575, 577 (1980))).

The decision of this Office in 2013 not to explain the racial nature of Mr. Holmes' testimony was compounded by the Memorandum's reliance on that testimony. Neither in 2013 nor today would a reasonable prosecutor consider knowingly calling an expert with race-based theories of criminality in support of a contested claim. Yet, the Memorandum failed to indicate that Mr. Holmes' testimony had been discredited and would be unusable at a trial or other proceeding. Instead, it stated:

> The State's original trial expert, Cy Ho[l]mes, was also provided to the defense for a deposition. The expert still practices arson investigation and testifies in State and Federal Court in California. Cy Holmes maintains his original finding that the fire was intentionally set and is, in fact, arson. Mr. Holmes was questioned in detail recently by defendant's attorneys and testified that based on his experience at the time, as well as the experience gained in the field over the last 40 years, his opinion remains the same.

36

TAYLOR  016391

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

(Mem. at 8-9) The Memorandum was inadvertently but gravely misleading, in that it failed to note that Mr. Holmes' opinions, experience, and credibility had to be considered in light of his theories of arson, which included the race of supposed perpetrators.

The Memorandum failed to accurately reflect the record in other ways likely to have affected Judge Fields' decision to accept the plea. For example, the Memorandum's statement of facts begins with the discovery of Mr. Taylor on the third floor of the hotel, a guest area not normally frequented by the public, at a time when the fire was underway. (Mem. at 3-4) As described above, it is suspicious that a person was found in a non-public area at the very time a fire is discovered, but not in the context of this case where Mr. Taylor had been in a public area, reported the fire, and only then headed to the third floor.

[The Memorandum also erred in stating that no Arizona case had found changes in arson science to constitute newly discovered evidence. Girdler v. Dale]

Of course, the defense in this case agreed to the plea, indicating that the arrangement was acceptable. But what is at state here is not solely the interest of the defendant.  This motion is based on the State's interest in just and constitutionally valid judgments, obtained by fair and lawful means. This conviction could not have been obtained without the participation of two people, Horton Weiss and Cyrillis Holmes, who never should have been granted any responsibility for matters implicating the life, liberty, or property of citizens, and it should not stand.

Conclusion

37

TAYLOR 016392

The disposition of this case with no-contest pleas was an erroneous application of law in light of the newly discovered evidence and agreement that there is now insufficient evidence to retry the case. Additionally, without an accurate picture of the newly discovered evidence and other facts, Judge Fields was unable to accurately apply his judicial discretion in determining whether to accept the plea or reject it. Therefore, the State respectfully requests that this Court hold a hearing on this motion, and further requests the opportunity to address orally or in writing any matters which would be helpful to this Court.

WHEREFORE, for the foregoing reasons, the State moves that this Court hold a hearing, and at the conclusion thereof, vacate the convictions and dismiss the indictment with prejudice.

RESPECTFULLY SUBMITTED this 31st day of May, 2023.

LAURA CONOVER
PIMA COUNTY ATTORNEY

_____

Of Counsel:

Gabriel J. Chin
Rachelle Barr
Deputy County Attorneys

ORIGINAL of the foregoing
with the Clerk of the Court
this 31st day of May, 2023.

Pima County Superior Court

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

38

TAYLOR  016393

110 West Congress
Tucson, AZ 85701

COPY of the foregoing served
this 31st day of May, 2023, to:

Hon. Casey F. McGinley
Division 18

Lindsay Herf
Hope DeLap
Katie Puzauskas
Arizona Justice Project

Noel Fidel
Michael L. Piccaretta
Andy Silverman

Attorneys for Defendant

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

39

TAYLOR 016394

**List of Attachments**

Transcript of Deposition of Cyrillis Holmes dated Nov. 1, 2012 (Attachment 1)

Tucson City Council Preliminary Report on Pioneer Hotel Fire No. 2,

Meeting of Dec. 31, 1970 (Attachment 2)

Tucson City Council Board of Inquiry Report, Jan. 7, 1971 (Attachment 3)

Tucson City Manager Roger O'Mara Memo dated Feb. 18, 1971 (Attachment 4)

AZDCRR Inmate Disciplinary Report 96A01-0477 (Attachment 5)

Transcript of Plea and Sentencing dated Apr. 2, 2013 (Attachment 6)

*In re Horton Weiss*, SB-36 (Az. Sup. Ct. Oct. 22, 1973) (Attachment 7)

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016395

1

<u>Attachment 1</u>

2

Transcript of Deposition of Cyrillis Holmes dated Nov. 1, 2012

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016396

1

Attachment 2

2

Tucson City Council Preliminary Report on Pioneer Hotel Fire No. 2,

3

Meeting of Dec. 31, 1970

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

TAYLOR  016397

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Attachment 3

Tucson City Council Board of Inquiry Report, Jan. 7, 1971

TAYLOR  016398

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

Attachment 4

Tucson City Manager Roger O'Mara Memo dated Feb. 18, 1971

44

TAYLOR  016399

Attachment 5

AZDCRR Inmate Disciplinary Report 96A01-0477

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

45

TAYLOR  016400

Attachment 6

Transcript of Plea and Sentencing dated Apr. 2, 2013

LAURA CONOVER
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

46

TAYLOR  016401

Attachment 7

*In re Horton Weiss*, SB-36 (Az. Sup. Ct. Oct. 22, 1973)

**LAURA CONOVER**
PIMA COUNTY ATTORNEY
32 NORTH STONE, SUITE 800
TUCSON, ARIZONA 85701
(520) 724-5600

47

TAYLOR  016402