1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  Nina Alley,                    No. CV-15-00152-TUC-RM

10             Plaintiff,          **ORDER**

11  v.

12  County of Pima, et al.,

13             Defendants.

14

15        Pending before the Court are Defendant City of Tucson's Motion for Summary

16  Judgment (Doc. 332), Defendant Pima County's Motion for Summary Judgment (Doc.

17  351), and Plaintiff Nina Alley's ("Plaintiff" or "Taylor")[1] Motion for Partial Summary

18  Judgment (Doc. 349), Cross-Motion for Summary Judgment (Doc. 371), and Motion in

19  Limine re: Cyrillis Holmes (Doc. 397).[2]

20  **I.    Background[3]**

21        Unless otherwise stated, there is no genuine dispute concerning the following

22  facts.[4]  On December 19-20, 1970, a fire killed 28 people at the Pioneer Hotel in

23  _____

[1] Taylor's Guardian and Conservator, Nina Alley, has been substituted in place of Taylor
24  as the named plaintiff in this action.  (Doc. 624.)  The Court uses the term "Plaintiff"
herein to refer interchangeably to Taylor.
[2] Other pending motions will be resolved separately.  The Court finds that oral argument
25  is not necessary to resolve the pending summary judgment motions, which are
extensively briefed.
26  [3] The record citations herein refer to the docket and page numbers generated by the
Court's electronic filing system.  Where the same evidence appears multiple times on the
27  docket, the Court cites to only one location and not to duplicates.
[4] In response to numerous paragraphs of both Pima County's and the City of Tucson's
28  Statements of Facts, Plaintiff asserts a global objection that "many facts are not necessary
. . . or even relevant" and "many factual statements misstate the evidence . . . and provide

downtown Tucson, Arizona.  (Doc. 343 at ¶ 56; Doc. 365 at ¶ 56; Doc. 374 at ¶ 56; *see also* Doc. 338-1 at 52-53.)   On March 21, 1972, an all-white jury convicted Louis Taylor—who is part African-American and part Hispanic—of 28 counts of murder arising from the deaths.  (Doc. 340-9 at 10-12; *see also* Doc. 169 at ¶¶ 5, 15; Doc. 239 at ¶¶ 5, 15; Doc. 240 at ¶¶ 5, 15; Doc. 339-7 at 135.)   Taylor was sentenced to life imprisonment.   (Doc. 340-9 at 36-37.)   In 2012, Taylor filed a Petition for Post-Conviction Relief, and the Pima County Attorney's Office began a review of his case.  (Doc. 348-3; Doc. 341-4 at 2-15; *see also* Doc. 335 at ¶¶ 624, 631, 642; Doc. 367 at ¶¶ 624, 631, 642.)  Following the review, the Pima County Attorney offered Taylor a plea by which Taylor received a time-served sentence and was released from prison in exchange for pleading no-contest to the original 28 counts of murder.  (Doc. 348-10; Doc. 348-11.)   After his release, Plaintiff filed the above-entitled civil action, raising claims under 42 U.S.C. § 1983.

## A. Criminal Trial Proceedings

The Honorable Charles L. Hardy of the Maricopa County Superior Court presided over Taylor's trial, which began on January 31, 1971, and lasted nearly two months, with Public Defender Howard Kashman and Deputy Public Defender William Lane representing Taylor, and Deputy County Attorneys Horton Weiss and Carmine Brogna representing the prosecution.    (Doc. 337-7 at 52-70, 78.)[5]  The following is a condensed

---

inadmissible editorial and narrative on a document that speaks for itself."  (Doc. 367 at 2; Doc. 372 at 2.)  The Court discusses herein only the evidence that it considers relevant to the parties' summary judgment motions.  *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) ("objections for relevance are generally unnecessary on summary judgment because they are duplicative of the summary judgment standard itself" (internal quotation marks omitted)).   The Court relies on its own review of the underlying evidence rather than the parties' characterizations of that evidence.

[5]  Taylor was initially charged as a juvenile in Tucson, Arizona, but his case was transferred to the Pima County Superior Court and later, at Taylor's request, to the Maricopa County Superior Court.  (Doc. 336-3 at 165-167, 173; Doc. 341-3 at 20, 22, 26, 36-39.)  Prior to transferring Taylor for prosecution as an adult, the juvenile court held a multi-day evidentiary hearing and found probable cause that Taylor had committed arson and murder.  (Doc. 335-3 at 34-200; Doc. 335-4; Doc. 335-5; Doc. 335-6; Doc. 335-7; Doc. 335-8; Doc. 335-9 at 1-55; Doc. 341-3 at 36.)   The Arizona Court of Appeals affirmed, *In re Anonymous, Juv. Ct. No. 6358-4*, 484 P.2d 235 (Ariz. App. 1971), and the Arizona Supreme Court denied review (Doc. 341-3 at 40).  The Pima County Superior Court also held a multi-day probable cause hearing and found probable cause that Taylor

summary of the testimony presented during the trial.

On December 19, 1970, Taylor—who was sixteen years old at the time—woke up at around noon and then spent hours meandering in and around downtown Tucson.  (Doc. 339-7 at 84-116.)  He walked around his neighborhood, played some games of pool at a pool hall downtown, went into the Pioneer Hotel and observed someone setting up tables in the ballroom, played ping pong at a recreation center, visited a park, ate supper at his house, stopped by an acquaintance's house, and then returned downtown.  (*Id.* at 84-102.)  At around 5 p.m., an acquaintance named Frank Armenta was driving through downtown Tucson, saw Taylor walking, and stopped to talk.  (Doc. 338-6 at 273-74; Doc. 338-7 at 2-5; Doc. 339-7 at 103-108; Doc. 339-8 at 46.)  To "get rid of [Armenta]," Taylor stated that he was headed in to work at the Pioneer Hotel, even though Taylor had never been an employee or a guest of the hotel.  (Doc. 338-7 at 3; Doc. 339-7 at 77, 107-108; Doc. 339-8 at 46.)  After his encounter with Armenta, Taylor continued wandering in and near downtown, visiting acquaintances' houses, a bar, and a pool hall, and stopping by the Greyhound bus station to drink a coke and watch television.  (Doc. 339-7 at 108-116.)

At some point during the evening, Taylor ended up back at the Pioneer Hotel.  (Doc. 339-7 at 117.)  He entered the hotel through the parking lot and went to the ballroom, where he watched people dancing and drinking.  (*Id.* at 118-121.)  Approximately 300-400 employees of Hughes Aircraft were attending a Christmas party in the ballroom that evening.  (Doc. 335 at ¶¶ 37-38; Doc. 367 at ¶¶ 37-38; Doc. 338-7 at 17-18, 30; Doc. 339-3 at 82.)  After spending 15-20 minutes watching the Hughes party, Taylor went to the men's restroom and then sat on a bench near a cigarette vending machine.  (Doc. 339-7 at 121-123.)  Sometime between 11:00 and 11:45 p.m., while Taylor was sitting on the bench, a Hughes employee named Dingle approached him and

had committed arson and murder.  (Doc. 335-9 at 57-167; Doc. 335-10; Doc. 336-1; Doc. 336-2; Doc. 336-3 at 4-22; Doc. 341-3 at 42-45.)  Taylor was represented by Kashman throughout his criminal proceedings.  (*See* Doc. 341-1 at 185-191.)  The prosecution was initially represented by Deputy County Attorney Fred Belman and Chief Deputy Attorney David Dingeldine, and later represented by Weiss and Brogna.  (*See* Doc. 335 at ¶¶ 5, 20, 340, 372-373; *see, e.g.*, Doc. 335-2 at 2; 335-9 at 59; Doc. 336-3 at 26; Doc. 337-7 at 78, 187.)

asked where the cigarette vending machine was.  (Doc. 338-7 at 16, 22-23; Doc. 339-7 at 123-124.)  Taylor gave Dingle directions and, after Dingle purchased cigarettes, Taylor asked him for one.  (Doc. 338-7 at 23-24; Doc. 339-7 at 123-125.)  Dingle asked Taylor if he needed a light, and Taylor said no, indicating he had a book of matches.  (Doc. 338-7 at 24.)

Hotel guests first began to smell and see smoke at around midnight.  (*See, e.g.*, Doc. 338-1 at 190-193, 211, 240-242; 291-295; Doc. 339-4 at 180-181.)  Taylor testified that, after his encounter with Dingle, he observed two women who were checking coats for attendees of the Hughes party.  (Doc. 339-7 at 127-129.)  Taylor further testified that he observed a man tell one of the women there was a fire, that he saw the woman pick up a phone, and that he then followed the man to the third floor, where he smelled smoke and began pounding on doors to tell guests to evacuate.  (*Id.* at 134-137, 147-149.)  While pounding on doors, he saw flames in a staircase on the north side of the third-floor hallway.  (*Id.* at 149-150.)  Freda Lampton, who was working in coat check for the Hughes party that evening, confirmed that she had received a report of fire; however, she testified that Taylor was the individual who reported the fire to her.  (Doc. 340-6 at 15-21.)  Lampton called the hotel's front desk to relay the report of fire.  (*Id.* at 20-21.)

Robert Cooper, who was working the front desk that evening, received the first call reporting a fire at approximately 12:15 a.m.  (Doc. 338-2 at 243.)  Cooper informed bellman Andy Palm of the reported fire, and Palm went with custodian David Johnson to the third floor to investigate.  (Doc. 338-2 at 244-246; Doc. 338-7 at 71-72, 78-79; Doc. 339-1 at 198-199, 202-203, 206-207.)   After smelling smoke and seeing fire in the staircase, Palm went back downstairs and told Cooper to call the fire department.  (Doc. 338-2 at 249-250, 309; Doc. 339-1 at 207-211; Doc. 339-2 at 2.)  At 12:19 a.m., the Tucson Fire Department received three overlapping calls reporting the fire, including a call from the hotel.  (Doc. 338-2 at 253-254; Doc. 338-2 at 345-348; Doc. 338-3 at 3-4.)

When Palm returned to the lobby to tell Cooper to call the fire department, Johnson stayed on the third floor and encountered Taylor staring at the fire in the

stairwell.  (Doc. 338-7 at 84-87; Doc. 339-1 at 211.)  Taylor told Johnson to get a fire extinguisher.  (Doc. 338-7 at 87, 95-96; Doc. 339-7 at 151.)  Johnson retrieved an extinguisher and used it to put out some of the fire, then went downstairs to look for another extinguisher.  (Doc. 338-7 at 87-90; Doc. 339-7 at 151-153.)  Taylor stayed behind and attempted to use a hose from a fire hose cabinet but could not get it to function.  (Doc. 339-7 at 153-154.)  Beverage Manager Giles Scoggins helped Johnson find more extinguishers and accompanied him back to the third floor.  (Doc. 338-7 at 230, 232.)  At that time, Taylor was standing in the third-floor hallway near the fire hose cabinet.  (Doc. 338-7 at 92-93; Doc. 338-7 at 224-225, 233-234.)  Scoggins testified that Taylor told him the fire was started by "two colored boys with afro haircuts" who were fighting.  (Doc. 338-7 at 236.)  Taylor testified that he told Scoggins he had seen two boys running.  (Doc. 339-7 at 158.)  Taylor further testified that he had not, in fact, seen two boys running or fighting, nor had he seen anyone start the fire, and he was not sure why he lied to Scoggins.  (*Id.* at 158-159.)

Scoggins managed to get the fire hose to work and used it for a couple minutes before hearing an explosion and advising the group that they should leave.  (Doc. 338-7 at 236-238, 242-243; Doc. 339-7 at 159-161.)  Taylor testified that he remained on the third floor, pounding on doors and telling guests to get out, in English and Spanish.  (Doc. 339-7 at 161-163.)  A man approached him, and Taylor and the man used a fire extinguisher on the fire in the staircase.  (*Id.* at 163-166.)[6]  Taylor then went downstairs and outside the hotel, where he saw a police car arrive.  (*Id.* at 167-169.)

Tucson Police Department ("TPD") Officers Claus Bergman and William Briamonte were the first emergency responders to get to the hotel, arriving moments before the first fire truck.  (Doc. 340-4 at 125-126; Doc. 340-7 at 96-99.)  Taylor testified

---

[6]  Taylor may have been referring to janitor Glenn Idail, who testified that he went to the third floor and saw Scoggins and Johnson using a fire extinguisher but did not see anyone else on the third floor at the time.  (Doc. 339-2 at 54-55, 60, 68-69.)  After Scoggins and Johnson left, Idail stayed behind, and Taylor came around the corner to the stairwell with a fire extinguisher.  (Doc. 339-2 at 59-62, 71.)  Idail and Taylor used the extinguisher for a few moments, then Idail went back down to the mezzanine level.  (Doc. 339-2 at 62-64, 69.)

that Officer Bergman asked him to help, and that Taylor accompanied him back into the hotel, to the third floor.  (Doc. 339-7 at 170-172.)[7]  For approximately two to three hours, Taylor helped evacuate guests from the hotel, intermittently encountering Scoggins, who was also helping with the evacuation.  (*See, e.g.*, Doc. 338-8 at 3-8, 97-98; Doc. 339-2 at 189-194, 200-201; Doc. 339-3 at 7-14; Doc. 339-6 at 28-31, 36-37, 40-45; Doc. 339-7 at 161-163, 173-184.)

At approximately 2:10 a.m., Scoggins notified TPD Officer Louis Adams that he had found Taylor on the third floor trying to put out the fire, and that Taylor had told him he had observed two boys start the fire.  (Doc. 338-8 at 8-11, 130-132.)  Adams and Scoggins searched for Taylor inside and outside the hotel.  (Doc. 338-8 at 10-11, 18, 132-135.)  On the third floor, Taylor tapped Adams on the shoulder and told him that there were some boys on the upper floors who didn't belong there.  (Doc. 338-8 at 130, 135; Doc. 339-7 at 193-194.)  Scoggins told Adams that Taylor was the boy they were looking for.  (Doc. 338-8 at 18, 136.)  Adams asked or told Taylor to come outside with him, and the two went downstairs.  (Doc. 338-8 at 137; Doc. 339-7 at 194-195.)  En route, Taylor said: "I wanted to leave but the man asked me to help so I did.  It is sure bad about all those people.  It's terrible somebody—it's awful that somebody would set a fire like that." (Doc. 338-8 at 138.)

Outside the hotel, Adams spoke to a police sergeant who told Adams to take Taylor to the police station for a statement.  (Doc. 338-8 at 140-141.)  Adams and Taylor walked to Adam's police vehicle, and Taylor started to get in the back, but Adams told him he could sit up front.  (Doc. 338-8 at 142; Doc. 339-7 at 198-199; Doc. 339-8 at 2.)  Adams pat searched Taylor for weapons, then Taylor got in the front passenger seat of the car.  (Doc. 338-8 at 142-143; Doc. 339-8 at 2-3.)  The pair arrived at the police station at 2:44 a.m.  (Doc. 338-8 at 168-169.)  Adams left Taylor with other officers in the coffee

---

[7]  Bergman testified at the criminal trial that, after he entered the hotel, he saw Taylor standing on the third floor.  (Doc. 340-7 at 104.)  He confirmed that Taylor assisted him with evacuating guests.  (Doc. 340-7 at 110-119.)  During a deposition taken in the above-captioned civil case, Bergman testified that he first encountered Taylor outside the hotel, walking north on Stone Avenue.  (Doc. 343-15 at 62.)

1   room, went to speak to the desk sergeant, then returned and took Taylor to a briefing
2   room.   (Doc. 338-8 at 145-147.)   Over the next several hours, various officers and
3   detectives interrogated Taylor.   (*See, e.g.*, Doc. 338-8 at 147-155; Doc. 338-9 at 19-23,
4   103-105; Doc. 339-8 at 5-19.)   The interrogation was not recorded or transcribed.   (Doc.
5   338-9 at 79-80.)   Even though Taylor was a minor, his mother was not notified.   (Doc.
6   335-6 at 145-146, 165-166, 192; Doc. 336-4 at 17.)   Partway through the interrogation,
7   Taylor was read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).   (Doc.
8   338-8 at 150-152; Doc. 338-9 at 32-34; Doc. 339-8 at 8-9.)

9        At Taylor's trial, TPD officers testified that Taylor gave numerous conflicting
10  statements during his interrogation regarding why he had been at the Pioneer Hotel and
11  what he had observed when the fire began.   (*See, e.g.*, Doc. 338-8 at 149-154, 170-171,
12  215-217; Doc. 338-9 at 25-39, 106-108; Doc. 338-10 at 4.)   They further testified that
13  Taylor gave conflicting statements regarding whether he had seen individuals on the third
14  floor at the time the fire started, in addition to conflicting descriptions of individuals he
15  claimed to have seen.   (*See, e.g.*, Doc. 338-8 at 150, 217; Doc. 338-9 at 3-5, 27-28; 37-
16  38, 107-108; Doc. 338-10 at 5.)   During his trial testimony, Taylor admitted he lied at
17  times during the interrogation.   (Doc. 339-8 at 119.)[8]

18       Sometime between 8:30 and 9:30 a.m., Taylor was formally placed under arrest
19  for arson and transported to the Pima County Juvenile Court Center.   (Doc. 338-9 at 114-
20  116; Doc. 338-10 at 5-6; Doc. 339-8 at 21-22.)[9]   At the Juvenile Court Center, TPD
21  Detective David Smith searched Taylor and found several books of matches.   (Doc. 338-
22  10 at 9-14; Doc. 339-8 at 23.)

23       Two expert witnesses testified during Taylor's criminal trial, one for the
24  prosecution and one for the defense, and both testified that the Pioneer Hotel fire was

---

[8]   At a deposition taken in the above-captioned case, Taylor explained that he had been
interrogated for hours, was tired, and "just started telling them anything" because he
"wanted to get out of there."   (Doc. 341-2 at 74.)
[9]   Plaintiff disputes the time at which he was arrested, asserting that he was in custody as
soon as he was approached by Adams at the hotel.   (Doc. 367 at ¶ 1.)   Whether or not
Taylor was in custody earlier for purposes of *Miranda*, uncontroverted evidence shows
he was *formally* arrested the morning of December 20, 1970, after his interrogation.

arson.  (Doc. 338-5 at 45-48, 64; Doc. 340-3 at 42-43.)  The prosecution's expert witness, Cyrillis Holmes, testified that there were two simultaneous areas of origin on the fourth floor of the hotel, with a probable third simultaneous area of origin in the stairwell leading from the third to the fourth floor.  (Doc. 338-4 at 132-133, 144-146, 160-161; Doc. 338-5 at 45-46.)  The defense's expert witness, Marshall Smyth, testified that the fire started in one area on the fourth floor with the use of an accelerant.  (Doc. 339-8 at 170-171; Doc. 339-9 at 19-20; Doc. 339-10 at 155-156; Doc. 340-2 at 154; Doc. 340-3 at 42-43.)

The prosecution called several individuals, including Bruce Wallmark ("Wallmark") and Robert Jackson ("Robert"), who claimed to have spoken to Taylor about the trial while housed with him in the Juvenile Court Center.  Wallmark testified that Taylor told him that he and two others had been in the Pioneer Hotel the evening of the fire to steal wallets and money from rooms, and that the fire had started from a lit book of matches or a lighter that dropped on the carpet as they were running away from a hotel employee.  (Doc. 338-10 at 57-60, 64-65, 91-92.)[10]  After the defense rested, the prosecution successfully moved to reopen its case-in-chief to present testimony from Robert.  (Doc. 340-3 at 219-221.)  Robert testified that Taylor told him he had started the Pioneer Hotel fire by squirting lighter fluid on a wall and lighting it with a match.  (Doc. 340-3 at 222-224, 228-230; Doc. 340-4 at 7, 27.)   Taylor admitted during his trial testimony that he had come into contact with Wallmark and Robert at the Juvenile Court Center, but he denied telling Wallmark that he saw the fire start and denied telling anyone that he had started the fire.  (Doc. 339-8 at 27-32.)

**B.  Post-Trial Proceedings**

For over a decade after his convictions, Taylor unsuccessfully sought relief in state and federal court.   In April 1972, Taylor moved for a new trial based on newly discovered evidence of witness recantations.  (*See* Doc. 341-5 at 98-99, 101-102.)  On

---

[10]  Wallmark fled before the defense finished its cross-examination of him.  (Doc. 338-10 at 99-101.)  However, he was later apprehended, and the defense was able to conclude the cross-examination.  (Doc. 338-10 at 184-190.)

May 12, 1972, Robert made a recorded but unsworn statement averring that his trial testimony was false, and that Taylor had told him he did *not* start the Pioneer Hotel fire. (Doc. 347-8 at 6-7, 17.)  Robert stated that the only thing Taylor told him about the fire was that Taylor was at a party at the hotel when the fire broke out and that he helped people get out of the hotel.  (*Id.* at 3, 17-18.)  Robert further stated that TPD officers threatened him with criminal charges if he did not provide inculpatory testimony against Taylor; that Weiss and Pima County investigator Rex Angeley told him what to say on the stand; that Angeley knew he was lying during his testimony; and that Angeley later threatened him with criminal charges if he did not sign a statement affirming his trial testimony.  (*Id.* at 4-14, 27-28.)  The trial court held a hearing on May 18, 1972, during which Robert took the stand and affirmed his trial testimony.  (Doc. 340-9 at 118-119, 156.)  The trial court denied Taylor's motion for new trial.  (*Id.* at 193.)

On August 30, 1972, Robert's brother, Albert Jackson ("Albert"), signed a notarized affidavit in which he stated that officers from TPD and the Pima County Attorney's Office coerced Wallmark and Robert to testify against Taylor by threatening to imprison them.  (Doc. 347-7 at 1-3.) Albert stated that Angeley and TPD Detective Lawrence Hust threatened him and Robert with criminal charges, called them "n****r lovers," and said they would ensure they had a "n****r for a daddy" in prison.  (*Id.* at 2.) Taylor unsuccessfully moved for a new trial based on Albert's affidavit.  (Doc. 342-3 at 23-30.)

Taylor filed a direct appeal, raising numerous allegations of error, and the Arizona Supreme Court affirmed.  *Arizona v. Taylor*, 537 P.2d 938 (Ariz. 1975).  In relevant part, the Arizona Supreme Court rejected Taylor's claims (1) that the prosecution's witness lists, which contained the names of 250 to 650 people, denied Taylor due process; (2) that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963); (3) that Weiss's numerous objections denied Taylor a fair trial; (4) that there was insufficient evidence to support the jury's verdict; (5) that the trial court erred in permitting the prosecution's expert witness to testify regarding the origin and cause of the fire; (6) that police officers

violated *Miranda* when questioning Taylor; (7) that Taylor's statements to police officers were involuntary; (8) that the trial court abused its discretion in allowing the prosecution to re-open its case-in-chief to present Robert's testimony; and (9) that the trial court abused its discretion in denying Taylor's motion for a new trial. *Taylor*, 537 P.2d at 947-54. The United States Supreme Court denied Taylor's petition for a writ of certiorari. *Taylor v. Arizona*, 424 U.S. 921 (1976).

Taylor then filed a petition for a writ of habeas corpus in the United States District Court for the District of Arizona, arguing, in relevant part, that he was unconstitutionally interrogated on December 20, 1970, and that Weiss engaged in misconduct by (1) causing witnesses to commit perjury; (2) submitting overly lengthy witness lists; (3) violating *Brady* through incomplete disclosure; (4) raising numerous meritless objections and interruptions during trial; and (5) tampering with witness Robert and allowing his perjured testimony to stand. (Doc. 341-5 at 73-76.) The district court denied habeas relief. (*Id.* at 72-77.) The Ninth Circuit Court of Appeals vacated and remanded for an evidentiary hearing on the voluntariness of the statements Taylor made during his December 20, 1970 interrogation. *Taylor v. Cardwell*, 579 F.2d 1380 (9th Cir. 1978). On remand, the district court held an evidentiary hearing and ruled that Taylor's statements to law enforcement were voluntary. (Doc. 342-4 at 126-132.) The Ninth Circuit reversed, finding that Taylor had been seized before the police had obtained probable cause to arrest him, and that the statements Taylor made during his interrogation should have been excluded as the product of an illegal detention. (Doc. 341-5 at 79-81.) The United States Supreme Court granted certiorari, reversed, and remanded for the Ninth Circuit to review the district court's decision on whether Taylor's statements were voluntary under the Fifth Amendment. *Cardwell v. Taylor*, 461 U.S. 571 (1983) (per curiam). On remand, the Ninth Circuit affirmed the district court's finding that Taylor's statements were voluntary. (Doc. 342-4 at 134-140.)

On December 31, 1984, Taylor filed a state-court Petition for Post-Conviction Relief, arguing that the statements he made to law enforcement during his interrogation

on December 20, 1970, should have been suppressed as the fruit of an illegal detention. (Doc. 342-5 at 2-18.)  The trial court denied the Petition on May 1, 1985, and the Arizona Supreme Court denied review.  (Doc. 342-5 at 20, 22.)

### C. 2012-13 Post-Conviction Relief Proceedings

Taylor filed a second Petition for Post-Conviction Relief on October 23, 2012, arguing in relevant part: (1) that, in light of new developments in fire science, the Pioneer Hotel fire cannot be classified as arson; and (2) that Taylor's constitutional rights were violated by prosecutorial misconduct—including the suppression of a report by Truesdail Laboratories (the "Truesdail Report") finding no evidence of accelerants in debris samples taken from the hotel, an *ex parte* conversation between Weiss and the trial judge, contact between Angeley and a dismissed juror, abusively inflated witness lists, and Weiss's baseless objections during trial.  (Doc. 348-3.)  The Petition relied on a 2008 report by a group of fire experts known as the Arson Review Committee ("ARC Report"), which concluded that the Pioneer Hotel fire cannot be classified as arson. (Doc. 348-2.)  The ARC Report criticized Holmes's opinions regarding the origins of the fire, in part because Holmes relied on improper depth-of-char measurements made with an uncalibrated, sharp pocketknife.  (*Id.* at 11-12.)

Deputy Pima County Attorney Rick Unklesbay and arson prosecutor Malena Acosta reviewed Taylor's Petition for Post-Conviction Relief and, as part of that review, asked the Tucson Fire Department to conduct another investigation into the Pioneer Hotel fire.  (Doc. 335 at ¶¶ 624, 631, 642; Doc. 367 at ¶¶ 624, 631, 642.)  After completion of the investigation, Wayne Cummings of the Tucson Fire Department concluded that the cause of the Pioneer Hotel fire cannot be determined due to the lack of an exact point of origin determination, the lack of elimination of all accidental fire causes, and flashover conditions that occurred on the fourth floor of the hotel.  (Doc. 348-4.)

The parties deposed Smyth and Holmes in connection with the Petition for Post-Conviction Relief.  Smyth testified at his deposition on September 21, 2012, that his opinion regarding the cause of the Pioneer Hotel fire had changed, that he now felt the

cause of the fire should be identified as undetermined, and that there was no evidence the fire was incendiary. (Doc. 341-1 at 29-32.) He further testified that Holmes's opinions were unreliable because Holmes used an uncalibrated, sharp pocketknife to measure depth of char and because a portion of the fourth floor had reached flashover—a phenomenon not recognized at the time of Taylor's trial—which rendered depth-of-char measurements misleading. (*Id.* at 58-59, 64, 71-74.)

At a November 1, 2012 deposition, Holmes affirmed his prior opinions that the Pioneer Hotel fire was arson and that it had two areas of origin on the fourth floor, with a potential third area of origin on the stairwell between the third and fourth floors. (Doc. 340-10 at 54-55.) In addition, Holmes testified that when he was in Tucson during his investigation of the fire in 1970, he informed the city council, fire chief, police chief, and other interested parties of his opinions regarding the type of person he believed may have started the fire, specifically, that he felt the culprit "was probably black and that he was probably 18." (*Id.* at 83-85.) He testified that he believed the culprit was probably black because "blacks at that point, their background was the use of fire for beneficial purposes. In other words, they were used to clearing lands and doing cleanup work and things like that and fire was a tool. So it was just a tool for them. . . . And if they get mad at somebody, the first thing they do is use something they're comfortable with, fire was one of them." (*Id.* at 86-87.)

Unklesbay and Acosta aver in affidavits prepared for the above-captioned case that they continued to believe in Taylor's guilt after conducting their review of Taylor's Petition for Post-Conviction Relief. (Doc. 341-4 at 4, 13.) Nevertheless, the Pima County Attorney offered Taylor a no-contest plea in which Taylor would be convicted of the original 28 counts of murder and sentenced to time-served. (Doc. 348-10.) Taylor accepted the plea because he did not want to spend any more time in prison. (Doc. 341-2 at 223-224.)[11]

_____

[11] This fact comes from Taylor's testimony at a September 30, 2021 deposition taken in the above-captioned case. Taylor's testimony regarding his motivations for taking the plea is undisputed, although a reasonable juror could find based on the record evidence that Taylor had additional, strategic reasons for accepting the plea—e.g., uncertainty

1    On April 1, 2013, Unklesbay filed a memorandum setting forth the factual basis

2    for the no-contest plea.  (Doc. 344-2.)  The memorandum discussed Taylor's presence

3    near the fire shortly after it began, the inconsistent statements Taylor gave to law

4    enforcement, the matchbooks found on his person, the expert testimony of Holmes and

5    Smyth, the trial testimony of Wallmark and Jackson, Jackson's later recantation, the ARC

6    report, the Tucson Fire Department's report, and Holmes's deposition testimony

7    affirming his opinion that the fire was arson.  (*Id.* at 3-9.)  The memorandum stated that,

8    if "a review of the original evidence using new advances and techniques in fire

9    investigation" were found to constitute newly discovered evidence for purposes of post-

10   conviction relief, "the State would be unable to proceed with a retrial, and the convictions

11   would not stand."  (*Id.* at 9.)

12   The Honorable Richard S. Fields of the Pima County Superior Court held a change

13   of plea hearing on April 2, 2013.  (Doc. 348-11.)  During the hearing, Unklesbay stated

14   that, if the Court found that the ARC Report and Tucson Fire Department report

15   constituted newly discovered evidence, "the State would be unable to proceed to a new

16   trial given the passage of time, the destruction of evidence, and the death of many of the

17   witnesses who testified."  (*Id.* at 21.)  Based on the parties' stipulation, Judge Fields

18   found sufficient newly discovered evidence to grant a new trial, with the practical effect

19   of vacating Taylor's 1972 convictions.  (*Id.* at 5; Doc. 343 at ¶ 170; Doc. 374 at ¶ 170.)

20   Taylor then pled no contest to 28 counts of murder for a sentence of time-served, and he

21   was released from prison that same day, after approximately 42 years of incarceration.

22   (Doc. 348-10; Doc. 348-11 at 15-25; Doc. 335 at ¶¶ 705, 707; Doc. 367 at ¶¶ 705, 707.)

23   **D.  Civil Litigation**

24   Plaintiff initiated the above-entitled action in Pima County Superior Court, raising

25   claims under 42 U.S.C. § 1983 related to his 1972 convictions.  (Doc. 1.)  Defendant City

26   of Tucson removed the case to federal court, and Defendants moved for dismissal.  (*Id.*;

27

28   _____

regarding whether advancements in fire science constituted newly discovered evidence
meriting post-conviction relief.  (*See, e.g.*, Doc. 374 at ¶ 149.)

Docs. 5, 6, 54, 55.)  On March 16, 2017, this Court ruled that—due to his outstanding 2013 convictions—Plaintiff is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), from premising his § 1983 claims "on the alleged constitutional injuries of being wrongfully charged, convicted, and imprisoned" and that Plaintiff was precluded from seeking incarceration-based compensatory damages.  (Doc. 63 at 10-11, 19-20.)  The Court further held that the interplay between *Heck* and the statute of limitations sharply limited Plaintiff's claims.  (*Id.* at 13-17.)  Specifically, the Court found that the statute of limitations bars Plaintiff from premising his claims on allegations that he was arrested without probable cause or that he was unlawfully interrogated.  (*Id.* at 11-12.)  The Court found that neither *Heck* nor the statute of limitations bars Plaintiff from premising his claims on allegations that "Plaintiff's rights to due process and a constitutionally fair, racially unbiased trial were violated during his original trial proceedings by the non-disclosure of the Truesdail Report, the hiring of an expert who believed Plaintiff was guilty because 'black boys' are more likely to start fires, and the presentation of false testimony from two 'jailhouse snitches.'"  (*Id.* at 16.)  The Court certified for interlocutory appeal the issue of whether *Heck* bars Plaintiff from seeking incarceration-related damages, expressing concern that, if "the Pima County Attorney's Office required Plaintiff to accept a no-contest plea for the purpose of creating a *Heck* bar to § 1983 liability, . . . such conduct undermines the fairness and integrity of the justice system." (Doc. 81 at 10-11.)[12]

On interlocutory appeal, the Ninth Circuit Court of Appeals affirmed this Court's finding that *Heck* bars Plaintiff from seeking incarceration-related damages, holding that "[a] plaintiff in a § 1983 action may not recover incarceration-related damages for any period of incarceration supported by a valid, unchallenged conviction and sentence." *Taylor v. Pima Cnty.*, 913 F.3d 930, 936 (9th Cir. 2019).  The Honorable Mary M.

---

[12]  This Court also certified for interlocutory appeal the issue of whether Pima County is entitled to Eleventh Amendment immunity.  (Doc. 81 at 11.)  The Ninth Circuit declined to permit an interlocutory appeal of that issue under 28 U.S.C. § 1292 and found it lacked jurisdiction under the collateral-order doctrine of 28 U.S.C. § 1291.  *Taylor v. Pima Cnty.*, 913 F.3d 930, 933-34 (2019).

Schroeder dissented, finding that the "law is not" so "unjust" as to require "the admittedly unfair holding" that Taylor's 2013 plea "somehow validates or justifies the original sentence that deprived [him] of a meaningful life."  *Taylor v. Pima Cnty.*, 913 F.3d 930, 939 (9th Cir. 2019) (Schroeder, J., dissenting).   Plaintiff unsuccessfully petitioned the United States Supreme Court for a writ of certiorari.  (Docs. 98, 100.)

Plaintiff then moved for leave to amend his operative complaint to include a request for a declaratory judgment expunging his 2013 convictions "as unconstitutional, and thus invalid."  (Doc. 103; *see also* Doc. 169 at 26.)  The Court granted Plaintiff leave to file the now-operative Third Amended Complaint ("TAC"), determining that "Plaintiff's factual allegations concerning his 2013 post-conviction proceedings are sufficient to raise an inference that this case may be one of the 'unusual or extreme cases' in which expungement" is appropriate under *Shipp v. Todd*, 568 F.2d 133 (9th Cir. 1978) (per curiam).  (Doc.  167 at 8.)  The Court later granted the City of Tucson's Motion to Dismiss Counts Six and Seven of the TAC but denied Pima County's Motion to Dismiss the TAC's request for declaratory judgment.  (Doc. 227.)[13]

The remaining claims in this action are the 42 U.S.C. § 1983 claims alleged in Counts One through Five of Plaintiff's TAC, as well as Plaintiff's request for declaratory relief.  (Doc. 169 at 11-24.)  Count One raises a claim against the City of Tucson based on a custom and practice of racial discrimination.  (*Id.* at 11-16.)  Count Two raises a similar claim against Pima County (*id.* at 16-18), but Plaintiff has abandoned Count Two at the summary judgment stage (Doc. 367 ¶¶ 714, 716-717).  Count Three alleges that Pima County failed to properly train and supervise Deputy County Attorneys.  (Doc. 169 at 18-19.)  Count Four alleges that Pima County failed to terminate Weiss's employment based on a custom of deliberate indifference to prosecutorial misconduct.  (*Id.* at 19-20.)  Count Five raises a claim of civil conspiracy against Pima County and the City of Tucson, alleging that co-conspirators improperly arrested, charged, and prosecuted Plaintiff; deliberately withheld exculpatory evidence, and suborned false testimony from

---

[13]  Plaintiff later filed a Supplemental TAC (Doc. 251), but the Court granted Defendants' Joint Motion to Dismiss the Supplemental TAC (Doc. 300).

1   Wallmark and Jackson.  (*Id.* at 21-24.)  Plaintiff alleges that, as a result of the conduct

2   described in each of the above counts, he was wrongly charged in 1970 with multiple

3   counts of homicide, wrongly convicted of those crimes in 1972, and wrongly imprisoned

4   for 42 years.  (*Id.* at 15-17, 19-20, 24.)

5   **II.     Motions for Summary Judgment and Motions in Limine**

6          Pima County and the City of Tucson seek summary judgment in their favor on all

7   of Plaintiff's claims.  (Docs. 332, 351.)  Defendants argue that the statute of limitations

8   bars any claims premised on Plaintiff's arrest and interrogation; that Plaintiff's claims are

9   *Heck*-barred and barred by the doctrine of issue preclusion; that Plaintiff cannot establish

10  any underlying violations of his constitutional rights; and that Plaintiff cannot establish

11  municipal liability under 42 U.S.C. § 1983.  (Docs. 332, 351.)  Pima County further

12  argues that it is entitled to Eleventh Amendment and/or prosecutorial immunity, that the

13  policies and practices of the Pima County Attorney's Office relating to criminal

14  prosecution are the policies and practices of the State of Arizona rather than Pima

15  County; that Plaintiff's 2013 plea agreement was constitutional and cannot be expunged;

16  and that Plaintiff cannot prove any non-incarceration-based damages.  (Doc. 351 at 21,

17  25-28; *see also id.* at 18 n.6.)

18         Plaintiff seeks partial summary judgment on discrete issues, asking the Court to

19  rule that his 1972 and 2013 convictions are unconstitutional and void, that the Pioneer

20  Hotel fire was not arson, that he was arrested without probable cause, and that his

21  *Miranda* rights were violated.  (Docs. 349, 371.)  Plaintiff argues that his December 20,

22  1970 statements to law enforcement are inadmissible because the statements were

23  involuntary and obtained in violation of *Miranda*.  (Doc. 349 at 25-28.)  Plaintiff also

24  argues that the prosecution violated *Brady* and *Giglio v. United States*, 405 U.S. 150

25  (1972), during his 1972 criminal trial by withholding (1) the Truesdail Report; (2)

26  evidence of other arson suspects and other fires at the Pioneer Hotel; (3) evidence that

27  Holmes's opinions were informed by racism; (4) exculpatory testimony from Bergman;

28  and (5) non-prosecution deals with Robert and Wallmark.  (*Id.* at 1-12.)  Plaintiff argues

the effect of the prosecution's disclosure violations was exacerbated by other improper prosecutorial conduct, including the prosecution's *ex parte* contact with the trial judge and with dismissed jurors, Weiss's overly lengthy witness lists, and Weiss's numerous objections and interruptions during trial.  (*Id.* at 12-16.)  Plaintiff argues that the Court should dismiss Taylor's criminal charges due to prosecutorial misconduct and that the double jeopardy clause of the Arizona Constitution nullifies his 2013 plea agreement and bars further prosecution.  (*Id.* at 16-20.)  Alternatively, Plaintiff argues that this Court should expunge his 2013 convictions pursuant to *Shipp*, because Pima County forced Taylor to enter a no-contest plea even though it lacked sufficient evidence to convict him.  (*Id.* at 20-25.)

After the parties' summary judgment motions were fully briefed, the Court re-opened discovery for limited purposes and allowed the parties to submit supplemental summary judgment briefs.  (Doc. 444; Doc. 680; Doc. 775.)  Some of the parties' supplemental briefs are sealed and will be addressed in a separate, sealed Order.  In the publicly filed supplemental briefs, the parties address the September 15, 2023 deposition of former Deputy County Attorney Jack Chin and the September 26, 2023 deposition of current Pima County Attorney Laura Conover.  (Docs. 816, 833, 837.)  The depositions and supplemental briefs concern an additional review of Taylor's case that the Pima County Attorney undertook in 2021-2022.  (*See* Doc. 810-1; Doc. 810-2.)  Chin headed the review and drafted a motion to exonerate Taylor pursuant to Rule 24.2 of the Arizona Rules of Criminal Procedure.  (Doc. 810-2 at 19; Doc. 810-3.)  Conover initially agreed with the motion and planned to file it, but then changed her mind.  (Doc. 810-1 at 17-20; Doc. 810-2 at 19, 22.)  The parties dispute whether the depositions of Conover and Chin, and related evidence concerning the 2021-2022 review, support Plaintiff's claim for declaratory relief expunging his 2013 convictions.  (Docs. 816, 833, 837.)

### A. Motions in Limine

The parties filed Motions in Limine in conjunction with their Motions for Summary Judgment.  (Docs. 350, 377, 395, 396, 397.)  Pima County moved to exclude

the testimony of Plaintiff's expert witness Andrew Pacheco (Doc. 350), and Plaintiff moved to exclude the testimony of Robert and Holmes and to limit the testimony of Unklesbay and Acosta (Docs. 377, 395, 396, 397).  The Court resolved portions of the Motions and took other portions under advisement.  (Doc. 566, 567, 568, 569.)

The Court found the majority of Pacheco's opinions to be inadmissible but found that Pacheco could permissibly opine (1) "that any prosecutor's office with which he is familiar would immediately note and act upon a published appellate opinion criticizing a prosecutor by name"; (2) "that it is improper for a prosecutor to require a defendant to plead no contest when the prosecutor knows guilt cannot be proven beyond a reasonable doubt"; that former Pima County Attorney Barbara LaWall "improperly instructed Unklesbay regarding the scope of his review" of Taylor's 2012 Petition for Post-Conviction Relief; and (4) "that any experienced prosecutor would understand that an exonerated defendant poses a greater risk of financial exposure to the prosecutor's office than a convicted felon."  (Doc. 567 at 8.)

The Court found Robert's prior testimony admissible under Federal Rule of Evidence 804(b)(1).  (Doc. 566 at 4-5.)  The Court rejected Plaintiff's Sixth Amendment Confrontation Clause challenges to the testimony of Robert and Holmes.  (Doc. 566 at 5 n.5; Doc. 569 at 4.)  The Court found that the written report requirement of Federal Rule of Civil Procedure 26(a)(2)(b) is inapplicable to the testimony of Unklesbay, Acosta, and Holmes.  (Doc. 568 at 7-8; Doc. 569 at 4-5.)  The Court found that Unklesbay and Acosta may not opine that the Pioneer Hotel fire was arson, that Holmes is credible, or that the authors of the ARC report are not credible, but that they may testify to their personal assessment of Taylor's 2012 Petition for Post-Conviction Relief and how that assessment informed their decision to offer Taylor a no-contest plea.  (Doc. 568 at 8.)  Further, the Court found that Unklesbay and Acosta may testify as to whether or not they considered Pima County's financial interests in offering the no-contest plea.  (*Id.*)  The Court took under advisement the issues of whether Unklesbay and Acosta's affidavits should be rejected as shams, and whether Holmes's testimony that the Pioneer Hotel fire was arson

must be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Doc. 568 at 7; Doc. 569 at 5.)

The Court addresses below the parties' arguments regarding whether Unklesbay and Acosta's affidavits should be disregarded as shams. The Court declines to rule on whether Holmes's testimony is admissible under *Daubert* to support a finding that the Pioneer Hotel fire was arson, because the cause of the fire and Taylor's guilt or innocence are not directly at issue in this case, as explained further below. The Court also withdraws the portions of its prior Orders addressing the admissibility of Robert's testimony under Federal Rule of Evidence 804(b)(1) and addressing Plaintiff's Sixth Amendment Confrontation Clause challenges to the testimony of Robert and Holmes. Those rulings were unnecessary, as there will be no need for the parties to present the testimony of Robert and Holmes at trial for the purpose of proving that the Pioneer Hotel fire was arson or that Taylor started the fire.[14]

## B. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant

_____

[14] The parties may present the prior testimony of Robert and Holmes at the trial in the above-captioned matter to the extent the testimony is relevant to Plaintiff's claims in this case, but for that purpose, the parties need only offer the testimony to show that it was presented during Taylor's criminal trial; offering the testimony in the trial in this matter to prove the truth of the matters asserted therein will not be necessary. Plaintiff may argue that the testimony would have been inadmissible had his 2012 Petition for Post-Conviction Relief resulted in a new trial. However, to the extent Plaintiff is seeking damages based on new Sixth Amendment claims that are not alleged in his TAC, the Court precludes him from raising those new claims at the summary judgment stage. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (a plaintiff cannot raise an entirely new theory of liability at the summary judgment stage).

1   meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the

2   existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a

3   fact "that might affect the outcome of the suit under the governing law," and (2) that the

4   dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict

5   for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248-50 (1986);

6   *see also Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

7         At summary judgment, the judge's function is not "to weigh the evidence and

8   determine the truth of the matter but to determine whether there is a genuine issue for

9   trial." *Anderson*, 477 U.S. at 249.  In evaluating a motion for summary judgment, the

10  court must "draw all reasonable inferences from the evidence" in favor of the non-

11  movant.  *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).  If "the

12  evidence yields conflicting inferences, summary judgment is improper, and the action

13  must proceed to trial." *Id.*  "The court need consider only the cited materials, but it may

14  consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

15        At the summary judgment stage, the Court focuses on the admissibility of the

16  contents of evidence rather than the admissibility of the evidence's form.  *Sandoval v.*

17  *Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021).  "If the contents of a document

18  can be presented in a form that would be admissible at trial—for example, through live

19  testimony by the author of the document—the mere fact that the document itself might be

20  excludable hearsay provides no basis for refusing to consider it on summary judgment."

21  *Id.*

22        **C.  Claim for Declaratory Relief Expunging 2013 Convictions**

23        In *Shipp*, the Ninth Circuit reversed the dismissal of a case brought under 42

24  U.S.C. § 1983 in which the plaintiff sought to have his state conviction declared "invalid

25  on federal constitutional grounds" and expunged, holding that "federal courts have

26  inherent power to expunge criminal records when necessary to preserve basic legal

27  rights," although this power "should be reserved for unusual or extreme cases."  568 F.2d

28  at 133-34 & 134 n.1.  In granting Plaintiff leave to amend his operative complaint to

include a request for a declaratory judgment expunging his 2013 convictions, this Court found that the above-captioned case may be one of the "unusual or extreme cases" in which expungement under *Shipp* is appropriate, because Plaintiff's factual allegations concerning his 2013 post-conviction proceedings raise "a reasonable inference that the Pima County Attorney leveraged Plaintiff's incarceration on an existing sentence in order to coerce him into pleading no-contest to charges unprovable at a re-trial, potentially for the purpose of avoiding a civil damages judgment for wrongful conviction." (Doc. 227 at 6; *see also* Doc. 167 at 8.)

In his Motion for Partial Summary Judgment, Taylor argues that this Court should expunge his 2013 convictions under *Shipp* because the Pima County Attorney violated his due process rights by forcing him to plead no contest to charges it could not prove beyond a reasonable doubt at a retrial. (Doc. 349 at 20-25.)[15] Pima County argues that it is entitled to summary judgment in its favor on Plaintiff's claim for declaratory relief because there is no evidence that Taylor's 2013 plea agreement was involuntary or that the Pima County Attorney's Office extended the plea for purposes of shielding Pima County from civil liability. (Doc. 351 at 25-28; Doc. 373 at 12-15.)[16]

Pima County relies on the affidavits of Unklesbay and Acosta, who aver that after conducting a review of Taylor's 2012 Petition for Post-Conviction Relief, they continued to believe in Taylor's guilt and were prepared to retry him if necessary but instead offered him a no-contest plea in order to avoid the risk of a retrial while maintaining the integrity of the convictions. (Doc. 341-4 at 3-4, 6, 12-14.) The affidavits of Unklesbay and Acosta are contradicted by the memorandum that Unklesbay filed with the court in

---

[15] Plaintiff also argues that this Court should vacate his 2013 convictions because prosecutorial misconduct during his 1972 trial violated his constitutional rights. (Doc. 349 at 16-19.) However, this is not the theory on which Plaintiff obtained leave to amend his operative complaint, and the cases that Plaintiff relies on involved the dismissal of federal criminal charges in the underlying federal criminal case and thus are clearly distinguishable from the situation at issue here.

[16] Pima County also argues there is no evidence that it had a policy or practice of inducing unconstitutional plea agreements. (Doc. 351 at 28.) However, Plaintiff is not seeking damages based on the 2013 convictions pursuant to *Monell v. Department of Social Services of New York City*, 436 U.S. 658 (1978); rather, he is seeking expungement pursuant to *Shipp*, and Pima County has not shown that proof of a policy or practice is required or relevant under the *Shipp* inquiry.

support of Taylor's 2013 no-contest plea.   In that memorandum to Judge Fields, Unklesbay averred that, if a new trial were ordered, "the State would be unable to proceed with a retrial, and the convictions would not stand."  (Doc. 344-2 at 9.)  At Taylor's change-of-plea hearing, Unklesbay again averred to the court that the prosecution would be unable to proceed with a retrial.  (Doc. 348-11 at 21.)  Unklesbay now states in his affidavit that his prior statement to the court regarding the prosecution's inability to proceed with a retrial was "inartful."  (Doc. 341-4 at 8.)   However, if Unklesbay and Acosta could have, and were prepared to, retry Taylor in 2013, then Unklesbay's statement in the memorandum in support of the no-contest plea, and his similar statement to the court at the change-of-plea hearing, were not simply inartful but false.

The Court previously took under advisement the issue of whether Unklesbay and Acosta's affidavits should be rejected as shams due to the contradiction between the affidavits and the statement in the 2013 memorandum.  (Doc. 568 at 7.)  Under the sham affidavit rule, a party cannot create a genuine issue of material fact by submitting an affidavit that contradicts his or her prior deposition testimony.  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012).  To justify striking an affidavit under this rule, the inconsistency "between a party's deposition testimony and subsequent affidavit must be clear and unambiguous," and the district court must make a determination that the contradiction between the affidavit and former deposition testimony is actually a "sham." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009).  The sham affidavit rule "should be applied with caution," and the rule does not preclude a party from "elaborating upon, explaining or clarifying prior testimony."  *Id.* (internal quotation marks omitted).

There is a clear and unambiguous inconsistency between Unklesbay's statements in the 2013 memorandum in support of Taylor's no-contest plea and the statements in Unklesbay's affidavit.   However, because the 2013 memorandum was not a sworn statement, because Acosta did not submit the memorandum, and because Unklesbay

provides some explanation for the inconsistency, the Court does not find that the affidavits of Unklesbay and Acosta must be disregarded under the sham affidavit rule.

In light of the affidavits of Unklesbay and Acosta, the Court finds there is a material dispute of fact concerning whether the Pima County Attorney's Office could have and was prepared to retry Taylor if resolution of Taylor's 2012 Petition for Post-Conviction Relief had resulted in a new trial.  A reasonable jury could accept Unklesbay and Acosta's averments that they could have retried Taylor.  (Doc. 341-4 at 6, 8, 13-15.) But reasonable jury could instead find that Unklesbay meant what he said in 2013: that if a new trial had been ordered, the prosecution would have been unable to proceed, and Taylor's convictions would not have stood.  (Doc. 344-2 at 9.)

A reasonable jury could also reach differing inferences regarding why the prosecution would have been unable to proceed with a retrial.  Unklesbay averred at the change-of-plea hearing that the prosecution would have been unable to proceed "given the passage of time, the destruction of evidence, and the death of many of the witnesses who testified."  (Doc. 348-11 at 21.)  However, there is evidence from which a reasonable jury could find that the prosecution's difficulties in retrying the case would have extended far beyond the effects of the passage of time on the evidence.  Had a new trial been ordered, the trial court may have ruled—as this Court rules below—that the doctrine of issue preclusion did not bar Taylor from relitigating issues raised during his original criminal proceedings.  *See Campbell v. SZL Props., Ltd.*, 62 P.3d 966, 969-70 (Ariz. App. 2003) (vacated judgment lacks preclusive effect).  If the court so ruled, Taylor could have persuasively argued for the suppression of his December 20, 1970 statements to law enforcement and the preclusion of the testimony of Robert and Holmes.  Even if unsuccessful in precluding the testimony of Robert and Holmes, Taylor could have undermined that testimony using evidence that City and County officials coerced Robert and Wallmark into testifying by threatening them with criminal charges, evidence that Robert recanted his testimony, evidence of Holmes's racist profiling opinions, and evidence that Holmes's methodologies are unreliable and outdated.  Taylor could also

have presented evidence from Cummings, Smyth, and the authors of the ARC Report that the Pioneer Hotel fire cannot be classified as arson, as well as evidence in the form of the Truesdail Report that no accelerants were found in debris samples from the hotel.

Neither this Court nor the jury need definitively determine how the state court would have ruled on these evidentiary issues or what verdict a state court jury would have reached at a retrial.  The issue is not whether there is proof beyond a reasonable doubt that the Pioneer Hotel fire was arson or that Taylor is guilty.  The issue is whether the Pima County Attorney's Office believed it could have presented proof beyond a reasonable doubt at a new trial, and the bases for that belief.  A reasonable jury could find that, if a new trial had been ordered in Taylor's case, the prosecution knew it would have been unable to prove guilt beyond a reasonable doubt, not only due to the effects of the passage of time on the state of the evidence but due to new evidence that the Pioneer Hotel fire cannot be classified as arson and due to serious problems concerning the admissibility and credibility of key evidence presented during Taylor's 1972 trial.

A reasonable jury could also find that the Pima County Attorney's Office leveraged Taylor's existing incarceration in order to extract a no-contest plea from him, despite Taylor's protestations that he was innocent and had been wrongfully convicted, and despite evidence undermining the integrity of the 1972 convictions.  If Taylor had rejected the no-contest plea agreement, he would have had to have spent months or even years waiting in prison while the trial court resolved his Petition for Post-Conviction Relief.  The no-contest plea allowed him to instead obtain immediate release, and he has testified that he agreed to the plea solely because he did not want to spend any more time incarcerated.  (Doc. 341-2 at 223-224.)

Even when not motivated by financial concerns, requiring a wrongfully convicted defendant to plead no contest to the original charges in order to obtain release from prison undermines the fairness and integrity of the justice system.  The undersigned and other judges[17] have expressed deep concern regarding this practice, as has the American

---

[17]     (*See, e.g.*, Doc. 81 at 9-10); *Taylor v. Pima Cnty.*, 913 F.3d 930, 939 (9th Cir. 2019) (Schroeder, J., dissenting).

Bar Association.  On February 6, 2017, the American Bar Association issued a resolution stating that, when a prosecutor's office supports a defendant's motion to vacate a conviction based on doubts about the defendant's guilt or the lawfulness of the conviction, "the office should not condition its support for the motion" on "a no contest plea by the defendant to the original or any other charge."[18]  During the interlocutory appellate proceedings in this case, the American Bar Association submitted an amicus curiae brief in support of Plaintiff's Petition for Certiorari, stating that the practice of conditioning the release of a wrongfully convicted person on a new plea is contrary to "prosecutorial standards, rules, and resolutions," and "undermines public faith in, and the very the integrity of, our criminal justice system."  (Doc. 343-4 at 22.)

This prosecutorial practice is particularly egregious when motivated by financial interests.  This Court has previously expressed concern that *Heck* has unintentionally created a financial incentive for prosecutors to condition support for post-conviction relief and release from imprisonment on a defendant's agreement to plead no contest to the original charges.  (Doc. 81 at 9.)  Unklesbay and Acosta aver in their affidavits that they did not consider Pima County's civil liability when deciding to offer Taylor a no-contest plea.  (Doc. 341-4 at 6, 14.)  However, the record contains evidence from which a reasonable jury could reach the opposite conclusion.  First, given that Unklesbay and Acosta reviewed significant evidence undermining the integrity of Taylor's 1972 convictions, a reasonable jury could simply discount Unklesbay and Acosta's explanation that they offered Taylor a no-contest plea in order to maintain the integrity of those convictions.  The testimony of Pacheco also supports a finding that Unklesbay and Acosta reasonably must have known that an exonerated defendant poses a greater risk of financial exposure to the prosecutor's office than a defendant with outstanding criminal convictions.  (Doc. 350-3 at 20; *see also* Doc. 567 at 8.)

Furthermore, a reasonable jury could find that subsequent conduct by the Pima County Attorney's Office and Pima County's lawyers in this civil action indicate that the

---

[18]      *See*      https://www.americanbar.org/content/dam/aba/directories/policy/midyear-2017/2017-midyear-112b.pdf (lasted visited Jan. 19, 2024).

Pima County Attorney is currently—and has been since Taylor's 2012 Petition for Post-Conviction Relief—motivated by financial considerations in its handling of Taylor's case. In early 2021, the Conviction and Sentencing Integrity Unit of the Pima County Attorney's Office, led by former Deputy County Attorney Chin, began a review of Taylor's case. (Doc. 810-2 at 11, 20-21.) As a result of that review, Chin believed the charges against Taylor should have been dismissed, and he authored a motion to vacate Taylor's 2013 convictions. (*Id.* at 18-19; Doc. 810-3.) Chin testified at his September 15, 2023 deposition that Pima County Attorney Conover agreed with the motion and authorized him to file it. (Doc. 810-2 at 19, 22.)[19]

In approximately May of 2022, Conover began contacting stakeholders to advise them that the motion to exonerate would be filed. (Doc. 810-1 at 17, 34; Doc. 810-2 at 20.) On May 30, 2022, David Berkman, who had run the criminal division during the prior Pima County Attorney administration under Barbara LaWall,[20] sent an email to County Supervisor Rex Scott regarding Conover's plan to file a motion to exonerate Taylor's convictions, warning that if the convictions were to be set aside, Taylor would "be able to get damages which may cost the County a ton." (Doc. 575-7 at 2; *see also* Doc. 810-1 at 47.) Berkman advised that the "lawyer for Pima County needs to be directed to get involved." (Doc. 575-7 at 2.)

Around the same time, Conover had a telephone conversation with Nick Acedo, who represents Pima County in this civil action, and advised him that a motion to exonerate would likely be filed in Taylor's case. (Doc. 810-1 at 43.) Conover testified that Acedo's "volume and speech pattern increased dramatically," and "he seemed to be beside himself that this could possibly be happening and indicated that [Conover] couldn't undertake this because [she] was the county attorney, and it didn't align with what he wanted, and he referenced that he thought the state bar . . . would have

---

[19]  During her September 26, 2023 deposition, Conover disputed that she had unequivocally decided to file the motion, stating that she had agreed with the motion and had determined it would "likely" be filed. (Doc. 810-1 at 17.)
[20]  The Court takes judicial notice that LaWall was the Pima County Attorney at the time of Taylor's 2013 plea.

something to say about this." (*Id.*)  After speaking to Acedo, Conover changed her mind and decided not to file the motion to exonerate.  (*Id.* at 41-43; Doc. 810-2 at 22-25.) Conover testified that she had significant concerns regarding Taylor's 1972 trial and how his case was handled in 2013 but that, after a lengthy meeting with her team, she determined that her "hands were tied" due to Arizona's stringent post-conviction standards.  (Doc. 810-1 at 18-20, 25, 33.)  Taylor's case was the only case in which the Pima County Attorney did not follow Chin's recommendation to set aside a conviction. (Doc. 810-2 at 19.)

There are material disputes of fact concerning why Conover decided not to file a motion to exonerate Taylor.  A reasonable jury could conclude that her decision was based solely on her evaluation of the legal merits of the draft motion to exonerate. However, a reasonable jury could instead find that her decision was influenced by Pima County's financial considerations, given the testimony concerning her conversation with Acedo and the proximity in time between that conversation and her dramatic change in position regarding the motion to exonerate.  A reasonable jury could further find, particularly in light of Berkman's email, that if financial considerations led the Pima County Attorney to decline to exonerate Taylor in 2022, they also likely played a role in the Pima County Attorney's decision to condition support for Taylor's 2012 Petition for Post-Conviction Relief on Taylor accepting a no-contest plea to the original 28 counts of murder.

The Court finds as a matter of law that *Shipp* expungement is appropriate if the jury finds (1) that the prosecution in 2013 leveraged Taylor's existing incarceration in order to obtain a no-contest plea to charges that it knew could not be proven beyond a reasonable doubt at a retrial, and (2) that the prosecution did so for purposes of creating a *Heck* bar to civil liability.  Finding otherwise would be equivalent to concluding that the judiciary is impotent when faced with clever but unethical prosecutorial tactics that undermine the interests of justice.  Because there are material disputes of fact concerning whether *Shipp* expungement is appropriate, the Court denies summary judgment on

1    Taylor's claim for declaratory relief expunging his 2013 convictions.  If a jury makes
2    factual findings rendering *Shipp* expungement appropriate, the *Heck* bar in this case will
3    be lifted, and Taylor will no longer be precluded from seeking incarceration-based
4    damages.

5              **D.  Claims Regarding Actual Innocence and Taylor's 1972 Convictions**

6              Plaintiff asserts that he is innocent, and he asks the Court to find as a matter of law
7    that the Pioneer Hotel fire was not arson and that his 1972 convictions are
8    unconstitutional and void.  (Doc. 349 at 1-2, 11, 22-23, 31.)   However, it is not
9    appropriate to reach those issues.  Plaintiff's TAC asserts constitutional violations arising
10   from Taylor's original criminal proceedings and alleges that, as a result of Defendants'
11   conduct, he was wrongfully charged, convicted, and imprisoned.  (Doc. 169.)   As
12   discussed above, the issue of whether the prosecution could have proven guilt beyond a
13   reasonable doubt at a retrial in 2013 is relevant to Taylor's claim for declaratory relief.
14   Taylor's protestations of innocence may also be relevant to his damages.  However, the
15   prosecution and conviction of an innocent person is not in and of itself a constitutional
16   violation.  *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) (claim of actual innocence
17   based on newly discovered evidence does not "state a ground for federal habeas relief
18   absent an independent constitutional violation occurring in the underlying state criminal
19   proceeding").  Neither this Court nor the jury need definitively determine whether Taylor
20   is guilty or innocent, or whether the Pioneer Hotel fire was or was not arson, in order to
21   resolve the claims at issue in this lawsuit.

22             Furthermore, to the extent Plaintiff asks this Court to declare his 1972 convictions
23   unconstitutional and void, the Court notes that the 1972 convictions were vacated in
24   2013, and it would be premature for this Court to speculate on whether the 1972
25   convictions would be reinstated if a jury were to determine in the above-captioned case
26   that Taylor's 2013 convictions should be expunged under *Shipp*.  Taylor's 2013 plea
27   agreement provides that if the plea is vacated "by any court," then "the plea agreement
28   will become void," "the parties to the plea agreement shall return to the positions they

were in before executing the plea agreement," and "[a]ny charges that were dismissed because of the plea agreement will be automatically reinstated."  (Doc. 348-10 at 6-7.)  This language appears to be boilerplate language adopted from standard plea agreements, which are offered to resolve pending criminal charges.  Taylor's situation was unique in that the Pima County Attorney offered him the no-contest plea to resolve his Petition for Post-Conviction Relief rather than to resolve pending criminal charges.  It is entirely unclear how the boilerplate language of the plea agreement would apply in the event a jury determines that Taylor's 2013 convictions should be expunged under *Shipp*.  No charges were dismissed as a result of Taylor's no-contest plea, and therefore the agreement's provision regarding the reinstatement of dismissed charges appears to be inapplicable.  If a jury finds the 2013 convictions should be expunged and the Pima County Attorney wishes to enforce the plea agreement's provision stating that the parties will return to their pre-plea positions, then the Pima County Attorney would need to seek judicial relief in state court.

### E.  Eleventh Amendment and Prosecutorial Immunity

Pima County argues that it is entitled to Eleventh Amendment immunity and absolute prosecutorial immunity because Plaintiff's allegations against it involve prosecutorial actions and decisions taken on behalf of the State of Arizona.  (Doc. 351 at 18 n.6.)[21]  Pima County further argues that the policies and practices of the Pima County Attorney's Office related to criminal prosecutions are the policies and practices of the State of Arizona rather than Pima County, because the Pima County Attorney prosecutes criminal cases on behalf of the state.  (*Id.* at 21.)

This Court previously rejected Pima County's argument "that absolute prosecutorial immunity shields a municipality from liability . . . for claims alleging that the municipality's constitutionally deficient training, supervision, and hiring/retention of

---

[21]  Pima County also argues that it cannot be sued under 42 U.S.C. § 1983 because at the time Taylor's 1972 convictions became final, *Monroe v. Pape*, 365 U.S. 167 (1961), precluded § 1983 actions against local government entities.  (Doc. 351 at 20.)  However, Pima County concedes that this Court is bound by *Tosti v. City of Los Angeles*, 754 F.2d 1485, 1488 (9th Cir. 1985), which held that *Monell v. Dep't of Soc. Servs. of N.Y. Cty.*, 436 U.S. 658 (1978), applies retroactively.  (*Id.*)

prosecutors exhibited deliberate indifference to criminal defendants' constitutional rights." (Doc. 35 at 9-10.) Pima County's position that it is entitled to absolute prosecutorial immunity is contrary to longstanding Supreme Court precedent establishing that "unlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983." *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993); *see also Owen v. City of Independence*, 445 U.S. 622, 638, 650 (1980).

This Court also previously addressed Pima County's Eleventh Amendment immunity arguments and found that the Eleventh Amendment does not extend to counties. (Doc. 63 at 18.) The Court interpreted cases addressing counties' assertions of Eleventh Amendment immunity as standing for the proposition that a county cannot be held liable under § 1983 for the actions of state, rather than county, policymakers. (*Id.* at 18-19.) In the interlocutory appeal in this case, Judge Graber wrote a concurring opinion affirming that Pima "County is not entitled to Eleventh Amendment immunity" because it is not a state and has not asserted that it is an arm of the state. *Taylor*, 913 F.3d at 936-37 (Graber, J., concurring). Judge Graber recognized—as did this Court—that Pima County's arguments are relevant to whether Plaintiff can establish proof of municipal liability under *Monell v. Department of Social Services of New York City*, 436 U.S. 658 (1978). *See Taylor*, 913 F.3d at 937 (Graber, J. concurring).

Determining whether a county officer acts as a state or county official for purposes of *Monell* liability "is made on a function-by-function approach by analyzing under state law the organizational structure and control over" the official. *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013). The Pima County Attorney is elected by Pima county voters, Ariz. Const. Art. 12 § 3; is defined by statute as a county officer, A.R.S. § 11-401(a)(5); and is required to live in Pima County, A.R.S. § 11-404(6). The budget of the Pima County Attorney is set by the Pima County Board of Supervisors. A.R.S. § 11-201(A)(6). As this Court has already found, the county board of supervisors must consent pursuant to A.R.S. § 11-409 to the county attorney's appointment of deputy

county attorneys, and the board fixes the deputies' salaries.  (Doc. 63 at 18.)  The Pima County Attorney is defined by statute as "the public prosecutor of the county," although the same statute provides that the county attorney conducts prosecutions for public offenses "on behalf of the state."  A.R.S. § 11-532(A)(1).  The Arizona Attorney General does not have "day-to-day control over the operation of county attorneys' offices."  *Milke v. City of Phoenix*, No. CV-15-00462-PHX-ROS, 2016 WL 5339693, at *17 (D. Ariz. Jan. 8, 2016).

Because the Pima County Attorney prosecutes public offenses on behalf of the State of Arizona but acts as a county official in other functions, this Court must determine whether the actions challenged by Plaintiff fall within the Pima County Attorney's prosecutorial functions or within "administrative or other non-prosecutorial duties." *Ceballos v. Garcetti*, 361 F.3d 1168, 1183-84 (9th Cir. 2004), *rev'd on other grounds by Garcetti v. Ceballos*, 547 U.S. 410 (2006).  Other courts within this district have found that, in Arizona, county attorneys act as "local policymaker[s] when it comes to administrative policies such as direct supervision of other prosecutors and office policies, such as the disclosure of evidence."  *Milke*, 2016 WL 5339693, at *17; *Briggs v. Montgomery*, No. CV-18-02684-PHX-EJM, 2019 WL 2515950, at *17-19 (D. Ariz. June 8, 2019) (finding county attorney acted on behalf of county with respect to claims specific to county attorney's administrative role); *see also Gobel v. Maricopa Cnty.*, 867 F.2d 1201, 1208-09 (9th Cir. 1989), *abrogated on other grounds by Merritt v. Cnty. of Los Angeles*, 875 F.2d 765 (9th Cir. 1989) (recognizing county attorney may be final county policymaker under Arizona law); *City of Phoenix v. Yarnell*, 909 P.2d 377, 388 (Ariz. 1995) (recognizing that county attorneys and even deputy county attorneys may be final county policymakers with respect to decisions to pursue prosecutions and withhold *Brady* material); *Ceballos*, 361 F.3d at 1184 (recognizing personnel decisions as "squarely within" a county attorney's "administrative function").

Here, Plaintiff alleges that Pima County failed to properly train and supervise county prosecutors and exhibited deliberate indifference to the constitutional rights of

as collateral estoppel—to a state court judgment in a federal civil rights action. *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019). Under Arizona law, issue preclusion binds a party to a decision on an issue litigated in a prior case if: "(1) the issue was actually litigated in the previous proceeding, (2) the parties had a full and fair opportunity and motive to litigate the issue, (3) a valid and final decision on the merits was entered, [and] (4) resolution of the issue was essential to the decision." *Campbell*, 62 P.3d at 968.[23] "The party seeking to invoke preclusion must establish all its elements." *Crosby-Garbotz v. Fell ex rel. Pima Cnty.*, 434 P.3d 143, 148 (Ariz. 2019).

A vacated judgment is not a valid and final decision and thus does not have "any collateral estoppel effect." *Campbell*, 62 P.3d at 969-70. Accordingly, under Arizona law, the doctrine of issue preclusion does not preclude Plaintiff from relitigating issues decided against him during the state criminal proceedings arising from his now-vacated 1972 convictions. Defendants' reliance on the Ninth Circuit's non-precedential memorandum disposition in *Vargas* is inapposite, because *Vargas* applied California law on issue preclusion rather than Arizona law. *See* 857 Fed. App'x at 361.

Furthermore, under Arizona law, issue preclusion "does not apply where circumstances are different, based on new evidence." *Crosby-Garbotz*, 434 P.3d at 148. Plaintiff notes the Arizona Supreme Court was not aware at the time it evaluated Taylor's prosecutorial misconduct claim on direct appeal that the prosecution had engaged in *ex parte* communications with the trial judge and dismissed jurors, nor was the court aware that Weiss had suppressed the Truesdail Report, Bergman's exculpatory testimony, evidence of Robert's coerced and perjured testimony, and evidence of an alternative suspect named Donald Anthony. (Doc. 349 at 15-16.) Indeed, the Arizona Supreme Court and the District of Arizona rejected Taylor's *Brady* claim on direct appeal because Taylor relied on a "bare assumption that something was withheld," without specifically identifying any suppressed *Brady* material. *Taylor*, 537 P.2d at 948; (*see also* Doc. 341-5

---

[23] When issue preclusion is used offensively, there must also be common identity of the parties. *Campbell*, 62 P.3d at 968. Here, Defendants are invoking the doctrine of issue preclusion defensively and thus the common-identity element is not required. *See id.*

at 75.)  The new evidence supporting Plaintiff's claims provides further reason to decline to apply preclusive effect to the decisions made during the state-court proceedings related to Taylor's 1972 criminal trial.

Federal law determines the preclusive effect of a prior federal habeas decision in a 42 U.S.C. § 1983 lawsuit.  *Hawkins v. Risley*, 984 F.2d 321, 325 (9th Cir. 1993).  Federal courts have found that prior federal habeas proceedings arising from subsequently vacated criminal convictions have no preclusive effect in a § 1983 case.  *See Chandler v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:10-CV-470-H, 2011 WL 781183, at *2 (W.D. Ky. Mar. 1, 2011) ("a federal court's habeas rulings based upon discredited and vacated state proceedings" are not "worthy of preclusive effect"); *Glenn v. City of Hammond*, No. 2:18-CV-150-TLS-JEM, 2021 WL 4078063, at *9 (N.D. Ind. Sept. 7, 2021) (same).  This Court agrees that, given the nature of federal habeas proceedings, federal habeas rulings based upon vacated state proceedings do not have preclusive effect in a subsequent § 1983 lawsuit.

The Court denies Defendants' Motions for Summary Judgment to the extent Defendants argue that Plaintiff's claims are barred by the doctrine of issue preclusion.

## G. Municipal Liability Under 42 U.S.C. § 1983

Defendants argue that Plaintiff cannot prove any underlying constitutional violations and cannot make the required showings to support municipal liability under 42 U.S.C. § 1983.  (Doc. 332 at 4-25; Doc. 351 at 20-25.)  The Court addresses, first, the parties' arguments concerning underlying constitutional violations and then addresses the parties' arguments concerning municipal liability.

### 1.  Underlying Constitutional Claims

#### a.  Unlawful Arrest and Interrogation

Plaintiff argues that the Tucson Police Department violated his *Miranda* rights because he was arrested at the Pioneer Hotel and interrogated before being given *Miranda* warnings.  (Doc. 349 at 25-28.)  He asks this Court to rule as a matter of law that there was no probable cause for his arrest and that his *Miranda* rights were violated.

(Doc. 371 at 1.)  Plaintiff also argues that his statements were involuntary because he was held at gunpoint at the police station, as shown by the deposition testimony of Bergman. (Doc. 349 at 27-28; *see also* Doc. 343 at ¶ 52; Doc. 343-15 at 50-51.)  Defendants argue that Plaintiff's claims regarding his arrest and interrogation are time-barred, that Plaintiff's TAC does not allege *Miranda* violations or involuntary statements, and that Bergman's deposition testimony concerning Plaintiff being held at gunpoint is not credible and is contradicted by all other evidence in the record, including the trial testimony of Bergman and Taylor.  (Doc. 332 at 6; Doc. 364 at 5; Doc. 365 at ¶ 52; Doc. 373 at 4; Doc. 374 at ¶ 52; Doc. 383 at 4-5.)

This Court has already ruled that the statute of limitations bars claims premised on Taylor being arrested without probable cause or unlawfully interrogated.  (Doc. 63 at 11-12.)  Plaintiff appears to concede that he cannot recover damages related to his arrest. (Doc. 384 at 4.)   However, he argues that the issues concerning his arrest and interrogation are relevant to the overarching question of the constitutionality of his convictions, because his statements should have been precluded in 1972 and would have been precluded in a retrial if the Pima County Attorney had not coerced him into accepting a no-contest plea in 2013.  (*Id.*)

The Court agrees that evidence related to the timing of Taylor's arrest and the voluntariness of his statements to law enforcement may be relevant to whether the Pima County Attorney believed in 2013 that it had sufficient evidence to prove Taylor's guilt beyond a reasonable doubt at a retrial and, thus, relevant to the issue of *Shipp* expungement.  However, resolution of the *Shipp* expungement issue does not require this Court or the jury to reach definitive determinations regarding the voluntariness of Taylor's statements or whether they were obtained in violation of *Miranda*.  Accordingly, to the extent Plaintiff asks the Court to rule as a matter of law that his statements were involuntary or that his *Miranda* rights were violated, the Court declines to do so. Furthermore, the Court grants summary judgment in Defendants' favor to the extent that Plaintiff cannot obtain damages based on his arrest or interrogation.

### b.  Truesdail Report

On December 23, 1970, Tucson Fire Department Captain Lyn Gilmore and private investigator Glen Miller collected debris samples from the Pioneer Hotel.  (Doc. 348-3 at 25.)[24]  The samples were submitted to Truesdail Laboratories for analysis, and on February 16, 1971, the Technical Director of Truesdail Laboratories issued a report addressed to Miller stating that no evidence of accelerants had been detected in the debris samples.  (Doc. 343-6.)  Sometime before Taylor's trial, Miller and Gilmore spoke on the phone regarding the results of the analysis of the debris samples.  (Doc. 343-9.)[25]  Miller summarized the findings of the Truesdail Report and promised to send Gilmore a copy of the report.  (*Id.* at 3-5.)  Gilmore stated that "the County Attorney did want some indications so that he might know what to expect."  (*Id.* at 4.)  Miller indicated Taylor's defense attorney had called him seeking a copy of the report, but that Miller did not provide a copy to the defense attorney.  (*Id.* at 4-5.)  In an affidavit and at a deposition taken in the above-captioned case, Kashman averred that the Truesdail Report was never disclosed to the defense, and that it would have been critical to cross-examining Robert and informing Smyth's opinions.  (Doc. 341-1 at 201-203, 206-209, 263-264; Doc. 343-12 at 3.)

Plaintiff alleges that Defendants violated his constitutional rights by withholding the Truesdail Report.  (Doc. 169 at 7-9, 22-23.)  Defendants argue that there is insufficient evidence to demonstrate that the Tucson Fire Department or the prosecution possessed the Truesdail Report prior to Taylor's criminal trial; that the evidence shows Kashman was aware of the existence of the report prior to trial; and that Plaintiff cannot prove that the Truesdail Report was material.  (Doc. 364 at 6-16; Doc. 373 at 5-6.)  The City of Tucson also argues that Plaintiff should be precluded from asserting his *Brady* claim because he was aware of the Truesdail Report prior to his trial but failed to raise

---

[24]  This fact is taken from Taylor's 2012 Petition for Post-Conviction Relief and does not appear to be in dispute. (*See, e.g.*, Doc. 333 at ¶ 41; Doc. 372 ¶ 41.)

[25]  All parties rely on an undated transcript of this phone call in support of their summary judgment motions.  (*See* Doc. 333-3 at 182-87; Doc. 341-4 at 60-65; Doc. 343-9.) Accordingly, it appears that the admissibility of the contents of the transcript is undisputed.

any arguments concerning it in his prior state criminal and federal habeas proceedings. (Doc. 364 at 12-13.)

Plaintiff argues that a reasonable juror could infer Defendants possessed the Truesdail Report prior to Taylor's criminal trial because the report was ultimately found in the files of the Tucson Fire Department, Glen Miller promised prior to trial to send the report to the Tucson Fire Department, and Weiss inquired about the report prior to trial. (Doc. 384 at 5.)  Plaintiff further argues that *Brady* required disclosure of the report. (Doc. 371 at 8-16; Doc. 384 at 5-8.)  Finally, Plaintiff argues that his *Brady* arguments concerning the Truesdail Report are not precluded because he was unaware of the report when he filed his post-conviction and habeas proceedings.  (Doc. 384 at 8-9.)

In *Brady*, the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  Favorable exculpatory or impeachment evidence "is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotation marks omitted).  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial," meaning "a trial resulting in a verdict worthy of confidence."  *Id.* at 434.

Police officers and prosecutors alike have an obligation to disclose material, exculpatory evidence.  *Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1219 (9th Cir. 2015).  Furthermore, a "prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case."  *Kyles*, 514 U.S. at 437; *see also Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997) (en banc) ("prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf").  A prosecutor's obligations under *Brady* are "not excused by a defense

1    counsel's failure to exercise diligence with respect to suppressed evidence.  However,

2    defense counsel cannot lay a trap for prosecutors by failing to use evidence of which

3    defense counsel is reasonably aware."  *Amado v. Gonzalez*, 758 F.3d 1119, 1135 (9th Cir.

4    2014).

5            The transcript of the phone call between Miller and Gilmore shows that the

6    Tucson Fire Department was aware of the findings of the Truesdail Report prior to

7    Taylor's trial.  (Doc. 343-9 at 3-5.)  A reasonable jury could find that the Tucson Fire

8    Department also possessed a copy of the report prior to trial, as Miller promised during

9    the phone call to send a copy to Gilmore.[26]  Gilmore's knowledge is imputed to the

10   prosecution for purposes of *Brady*.  *See Kyles*, 514 U.S. at 437.[27]  Furthermore, a

11   reasonable jury could infer from the phone call between Miller and Gilmore that Weiss

12   was made aware of the contents of the Truesdail Report prior to trial, as Gilmore

13   indicated in the phone call that Weiss had inquired about the report's findings.

14           Defendants argue that Weiss complied with his *Brady* obligations by disclosing

15   the names of the author and recipient of the Truesdail Report in a witness list containing

16   hundreds of witness names.  (Doc. 364 at 11-12; *see also* Doc. 341-5 at 64-70.)  The

17   Court disagrees.  The record reflects that Weiss did not disclose the Truesdail Report or

18   any information concerning it, nor did he explain what relevant information was

19   possessed by the witnesses he disclosed.  Discerning from Weiss's expansive witness list

20   that the Truesdail Report found no evidence of accelerants in debris samples from the

21   Pioneer Hotel would have required significant investigatory efforts by defense counsel.

22

23   [26]  Taylor also identifies evidence indicating the Truesdail Report was ultimately found in
     the Tucson Fire Department's files (Doc. 343-10 at 2), although Defendants challenge the
24   admissibility of that evidence (Doc. 364 at 7-8).
     [27]  The Ninth Circuit has held that police officers' obligation to disclose material and
25   exculpatory evidence "follows logically from *Brady*'s rationale . . . [b]ecause police
     officers play an essential role in forming the prosecution's case."  *Carrillo*, 798 F.3d at
26   1220; *see also Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964)
     (finding police obligated to disclose *Brady* material); *United States v. Butler*, 567 F.2d
27   885, 891 (9th Cir. 1978) (same).  Here, the Tucson Fire Department officers investigating
     the Pioneer Hotel fire played an essential role in forming the prosecution's case, and the
28   evidence indicates they worked closely with the police and the prosecution.  Accordingly,
     based on the rationale of *Brady*, Tucson Fire Department officers were obligated at the
     time of Taylor's 1972 trial to disclose *Brady* material.

1    A prosecutor cannot "excuse his failure [to disclose *Brady* material] by arguing that

2    defense counsel could have found the information himself."  *Amado*, 758 F.3d at 1136.

3         For similar reasons, the Court finds that Kashman's knowledge that a report

4    possibly existed is insufficient to excuse the prosecution's disclosure obligations under

5    *Brady*.  Miller indicated in the phone call with Gilmore that Kashman had inquired about

6    the report, but he also indicated that he declined to provide the defense with a copy of the

7    report or any information about the report's contents.  (Doc. 343-9 at 4-5.)  There is no

8    evidence that Kashman was aware of the findings of the Truesdail Report prior to trial.

9    Kashman moved for the pretrial disclosure of "all evidence favorable to the defendant,"

10   including "[a]ny reports by fire or arson investigators that indicate the Pioneer Hotel fire .

11   . . was not man-caused."  (Doc. 341-4 at 67-69.)  The Court granted the motion, ordering

12   the prosecution to disclose any evidence favorable to Taylor "which might be material"

13   to guilt, including the specifically requested reports by fire or arson investigators.  (*Id.* at

14   74.)  Nevertheless, the prosecution did not disclose the Truesdail Report.  Finding under

15   these circumstances that Kashman had a duty to subpoena Truesdail Laboratories for a

16   copy of the Truesdail Report would impose a requirement of due diligence on defense

17   counsel that would flip a prosecutor's disclosure obligations.  *Amado*, 758 F.3d at 1136.

18   "[D]efense counsel may rely on the prosecutor's obligation to produce that which *Brady*

19   and *Giglio* require him to produce."  *Id.*

20        The Truesdail Report was favorable to the defense, as it undermined evidence that

21   the Pioneer Hotel fire was arson.  The report was material because it "could reasonably

22   be taken to put the whole case in such a different light as to undermine confidence in the

23   verdict."  *Kyles*, 514 U.S. at 435.  Had the defense possessed a copy of the report prior to

24   trial, it may have revised its strategy and argued that the Pioneer Hotel fire was not arson.

25   (*See* Doc. 341-1 at 202-03; Doc. 343-12 at 3-4; Doc. 346-3 at 3.)  Had Smyth seen the

26   report, he may have revised his opinions concerning the cause of the Pioneer Hotel fire,

27   as he now has done.  (*See* Doc. 341-1 at 29, 52, 203; Doc. 343-12 at 4.)  Furthermore, the

28   report would have been critical to cross-examination of Robert, who testified that Taylor

1  told him he started the fire using an accelerant.  (Doc. 340-3 at 229-230; Doc. 340-4 at 7,
2  27; Doc. 343-12 at 3.)

3      The Court denies Defendants' Motions for Summary Judgment to the extent
4  Defendants argue that Plaintiff cannot prove an underlying violation of his constitutional
5  rights under *Brady* based on the prosecution's failure to disclose the Truesdail Report.

6  ### c.  Holmes's Racist Profiling Opinions

7      In addition to alleging that Defendants violated Taylor's constitutional rights
8  under *Brady*, Plaintiff's TAC alleges that Defendants violated Taylor's constitutional
9  rights by hiring an expert who believed Taylor was guilty because "black boys" are more
10  likely to start fires.  (Doc. 169 at 8-9.)  In his Motion for Partial Summary Judgment,
11  Plaintiff argues that Defendants violated his constitutional rights by failing to disclose
12  Holmes's racist opinions to the defense.  (Doc. 349 at 11-12.)  Pima County argues that
13  Plaintiff cannot obtain relief on this theory because he failed to plead it in his TAC.
14  (Doc. 373 at 3-4, 8.)  Defendants also argue that the theory is meritless because there is
15  no evidence Holmes's opinion that the Pioneer Hotel fire was arson was based on
16  Taylor's race, and Defendants cannot be held liable for failing to disclose in 1972
17  deposition testimony that Holmes gave in 2012.  (Doc. 364 at 19-20, 23-24; Doc. 373 at
18  8-10.)  Plaintiff argues that the City was aware of Holmes's racist opinions before
19  Taylor's trial because Holmes told City officials the opinions.  (Doc. 384 at 11.)  He
20  further argues that Holmes's race-based opinions were material and favorable evidence
21  because they confirmed Holmes's conclusion that the Pioneer Hotel fire was arson, and
22  they would have been critical to impeaching Holmes.  (*Id.* at 13-14.)

23      Under Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain "a
24  short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.
25  R. Civ. P. 8(a)(2).  Rule 8 "does not require detailed factual allegations." *Ashcroft v.*
26  *Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  However, a
27  complaint must "give the defendant fair notice of what the claim is and the grounds upon
28  which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal

1   quotation and alteration marks omitted).

2          Here, Plaintiff's TAC raises claims under 42 U.S.C. § 1983 premised on an

3   alleged custom of racial discrimination by the City of Tucson that resulted in a violation

4   of his constitutional rights; claims against Pima County premised on failure to train and

5   supervise prosecutors and deliberate indifference to prosecutorial misconduct in

6   personnel decisions; and a claim against both Defendants alleging a conspiracy to violate

7   Plaintiff's constitutional rights.  (Doc. 169 at 11-24.)  The TAC makes clear that the

8   underlying constitutional violations at issue include failure to disclose exculpatory

9   evidence under *Brady* and hiring a racist expert witness.  (*Id.* at 7-9.)  Inherent in the

10  allegation that Defendants knowingly hired a racist expert is the allegation that

11  Defendants did not disclose the expert's racism to Taylor.  The Court finds that the TAC

12  is sufficient to put Defendants on notice of Plaintiff's theory that Defendants violated his

13  rights by failing to disclose Holmes's racism.

14         The Court further finds that Plaintiff has identified sufficient evidence to raise a

15  material issue of fact concerning this theory of liability.  At his November 1, 2013

16  deposition taken in connection with Taylor's 2012 Petition for Post-Conviction Relief,

17  Holmes testified that he met with city council members, the chief of police, and the fire

18  chief during the afternoon of December 30, 1970, before he had concluded his

19  investigation.  (Doc. 348-5 at 83-84.)  He told the group that he "felt that the culprit was

20  probably black and that he was probably 18."  (*Id.* at 83-84.)  By that time, Holmes had

21  "reached a preliminary determination that the fire was arson" and "the physical

22  circumstances" gave him "the race" because "blacks" were "comfortable with" fire and

23  would use it if they got "mad at somebody."  (*Id.* at 84-86.)  Although Plaintiff did not

24  learn of Holmes's racist profiling opinions until the 2012 deposition, a reasonable jury

25  could find that Defendants knew of them prior to Taylor's trial, as Holmes testified that

26  he told various city officials of the opinions on December 30, 1970, and the knowledge of

27  the city officials is imputed to the prosecution for purposes of *Brady*.  *See Kyles*, 514 U.S.

28  at 437.

- 41 -

Evidence of Holmes's racist profiling opinions is favorable and material under *Brady*, as it would have been critical to the defense's cross-examination of Holmes at trial. The racist opinions undermine Holmes's credibility in general and—contrary to Defendants' arguments—a reasonable jury could find the racist profiling opinions infected Holmes's opinions regarding the cause of the Pioneer Hotel fire. Holmes testified that he was not aware on December 30, 1970, that Taylor had been arrested for starting the Pioneer Hotel fire. (Doc. 338-5 at 73.) However, he reached racist opinions regarding who may have started the fire on the first day of his investigation, and a reasonable jury could find that his opinions regarding arson were influenced by his racist beliefs. Furthermore, Holmes's opinions regarding the fire's areas of origin shifted over time. Initially, Holmes concluded there were two areas of origin on the fourth floor of the hotel. (*See* Doc. 335-8 at 130-131, 170; Doc. 335-10 at 75-77.) However, at Taylor's trial, Holmes testified there was a probable third area of origin in the third-floor stairwell—precisely where Taylor had been observed by hotel employees shortly after the fire started. (Doc. 338-5 at 212.) A reasonable jury could find that Holmes's racist profiling theories influenced him to opine that there was a third area of origin at the location Taylor had been found.

The Court denies Defendants' Motions for Summary Judgment to the extent they argue Plaintiff cannot prove an underlying violation of his *Brady* rights premised on the prosecution's failure to disclose Holmes's racist profiling opinions.

### d. "Jailhouse Snitch" Testimony

In his TAC, Plaintiff alleges that Defendants violated his constitutional rights by procuring testimony from Robert and Wallmark that they knew or should have known was false. (Doc. 169 at 7-8, 23-24.) In his summary judgment briefs, Plaintiff argues that the prosecution coerced Robert into falsely testifying at Taylor's 1972 trial. (Doc. 349 at 6-8; Doc. 384 at 3-4.) He also argues that the prosecution violated his constitutional rights under *Giglio* by failing to disclose non-prosecution deals with Robert and Wallmark. (Doc. 349 at 8.) Defendants argue that Robert and Wallmark testified

voluntarily and truthfully, that Plaintiff's TAC does not raise any allegations concerning a *Giglio* violation premised on failure to disclose non-prosecution agreements with Robert and Wallmark, and that there is no evidence of any non-prosecution agreements. (Doc. 332 at 16-19; Doc. 364 at 2-4; Doc. 373 at 3-4, 6; Doc. 383 at 12.)

Inherent in the TAC's allegation that Defendants knowingly procured false testimony from Robert and Wallmark is the allegation that they did not disclose to the defense the circumstances by which they procured the false testimony.  Furthermore, the TAC alleges Weiss had a history of unethical and overzealous behavior similar to that exhibited in Taylor's case, including *Brady* and *Giglio* violations.  (Doc. 169 at 5-6.)  The Court finds that the TAC's allegations are sufficient to put Defendants on notice of Plaintiff's theory that Defendants failed to disclose the circumstances by which they procured false testimony from Robert and Wallmark.

The "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice."  *Giglio*, 405 U.S. at 153 (internal quotation marks omitted).  In his May 12, 1972 statement, Robert averred that his trial testimony was false, that Angeley knew it was false, and that TPD officers threatened him with criminal charges if he did not provide inculpatory testimony against Taylor.  (Doc. 347-8.)  In his August 30, 1972 affidavit, Robert's brother Albert averred that city and county officers coerced Wallmark and Robert to testify against Taylor by threatening them with criminal charges and imprisonment.  (Doc. 347-7.)  Defendants argue that the statements of Robert and Albert are inadmissible hearsay, and that the testimony of Robert and Wallmark confirm that both witnesses told the truth during Taylor's 1972 trial.  (*See* Doc. 365 at ¶¶ 137-141; Doc. 374 at ¶¶ 137-141.)

A district court may consider hearsay documents on summary judgment if the contents of the documents could be presented in admissible form at trial.  *Sandoval*, 985 F.3d at 665.  This Court's task in applying that rule is complicated by the fact that many of the relevant witnesses in this case are deceased.  The parties have indicated that both Robert and Albert Jackson are deceased.   However, Plaintiff could offer Robert's

1  recantation at the trial in this matter as a statement against interest under Federal Rule of
2  Evidence 804(b)(3)(A), as the recantation exposed Robert to criminal liability for
3  perjuring himself at Taylor's trial.[28]  Albert's statement may be admissible under the
4  residual exception of Rule 807.  To the extent Robert and Albert discuss statements made
5  to them by city and county officials, it appears the officials' statements would be
6  admissible as opposing party statements under Rule 801(d)(2).  Accordingly, based on
7  Robert's and Albert's statements, the Court finds there are material disputes of fact
8  concerning whether Defendants procured false testimony from Robert and Wallmark by
9  threatening them with criminal charges and imprisonment.

### e. Alternative Suspects

11  Plaintiff argues that Defendants violated his constitutional rights by failing to
12  disclose evidence of other suspects, including an October 9, 1970 letter from the Tucson
13  Fire Department discussing recent fires at the hotel, evidence of a known arsonist named
14  Donald Anthony, and evidence of an individual named Mario Corral who admitted he
15  had started the fire.  (Doc. 349 at 10-11.)  Pima County argues that Plaintiff failed to
16  plead these theories in his TAC.  (Doc. 373 at 3-4.)  Defendants also argue that Plaintiff's
17  claims regarding other suspects are unsubstantiated and refuted by undisputed evidence.
18  (Doc. 364 at 20-23; Doc. 383 at 10-12.)  Specifically, Defendants argue that Kashman
19  possessed the October 9, 1970 letter prior to trial and questioned Tucson Fire Department
20  Chief R.B. Slagel about it during the pretrial and trial proceedings.  (Doc. 364 at 23; Doc.
21  373 at 7-8.)  Defendants further contend that Anthony's name does not appear anywhere
22  in the thousands of pages of police reports and documentation related to the fire, and
23  there is no evidence he was a suspect in 1970.  (Doc. 332 at 21; Doc. 364 at 21-22.)
24  Defendants concede that police reports indicate Corral may have been with Taylor on the
25  night of the Pioneer Hotel fire, but Defendants argue the reports are not *Brady* material
26  because they implicate Taylor as a guilty party.  (Doc. 364 at 22.)  Defendants further
27  argue that Plaintiff fails to show that the defense was not provided with the police reports

28  _____
[28]  The Court notes that Robert expressed concern at numerous points during the
statement regarding his criminal exposure for perjury.  (*See, e.g.*, Doc. 347-8 at 39-41.)

during his criminal proceedings, and it is undisputed he possessed them by the time of the above-captioned case because he disclosed them in this matter.  (*Id.* at 22.)  Finally, Defendants argue that Taylor himself identified Corral as a suspect prior to trial and was free to tell his defense attorney about him.  (*Id.* at 22-23.)

In reply, Plaintiff argues that evidence regarding Anthony and Corral would have been in the City's control at the time of his trial and that it was material because it may have allowed Kashman to link the suspects to the prior fires at the Pioneer Hotel referenced in the October 9, 1970 letter and thereby convince the trial judge the letter was admissible.  (Doc. 384 at 12-13.)  He argues that City Fire Investigator William Martin admitted in a 60 Minutes interview that he was aware prior to Taylor's trial that Anthony was a suspect in other downtown Tucson arsons.  (Doc. 385 at 10.)  Plaintiff further argues that Corral's claim that he was with Taylor when the fire started does not render his admissions inculpatory because Corral is unreliable and his statements to police regarding Taylor would have carried little weight.  (Doc. 384 at 12-13.)

In his TAC, Plaintiff alleges that Anthony was a suspect in three fires that occurred shortly before December 1970 at the Pioneer Hotel but that he "was never questioned and there is no record that the possibility of his involvement" in the December 30, 1970 "fire was ever investigated."  (Doc. 169 at 3.)  The TAC does not allege that Defendants failed to disclose evidence that Anthony was a suspect in Taylor's case; in fact, its allegation that Defendants failed to investigate Anthony as a suspect is at odds with that allegation.  The TAC's reference to three prior fires appears to stem from the October 9, 1970 letter, but the TAC does not specifically mention the letter or allege a failure to disclose it.  The TAC does not mention Corral or allege that Defendants failed to disclose evidence that Corral was a suspect.

A plaintiff cannot add an entirely new theory of liability at the summary judgment stage, as doing so would prejudice the defendants, who rely on the complaint for "notice of the evidence [they] need[] to adduce in order to defend against the plaintiff's allegations."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000).  The

Court finds that the TAC's allegations are not sufficient to put Defendants on notice of Plaintiff's theory that Defendants violated his constitutional rights by failing to disclose evidence of other suspects.[29]

### f. Testimony of Claus Bergman

Plaintiff argues that Defendants violated his constitutional rights under *Brady* by suppressing Bergman's exculpatory testimony, including his testimony that Taylor was inside the Pioneer Hotel the night of the fire because Bergman directed him to go inside to help with the rescue efforts; that it was normal for Taylor, who smoked, to possess matches; that Bergman believed Taylor was innocent; and that Taylor was held at gun point at the police station. (Doc. 349 at 2-4, 8-10.) Pima County argues that the TAC does not allege that Defendants violated Plaintiff's constitutional rights under *Brady* by failing to disclose Bergman's testimony, and that Plaintiff cannot insert the issue into the case at the summary-judgment stage. (Doc. 373 at 3-4.) Defendants also argue that they cannot have violated *Brady* by failing to disclose testimony that Bergman gave in 2022, that Bergman's deposition was taken to preserve his testimony for trial and Plaintiff therefore should not be allowed to rely on the deposition testimony for purposes of summary judgment, and that Bergman's deposition testimony is incredible and a sham. (Doc. 364 at 19-20; Doc. 373 at 6-7; Doc. 386 at 17 & n.20.) Plaintiff contends that Defendants were aware of Bergman's exculpatory testimony prior to Taylor's 1972 trial, and he disputes the contention that the deposition testimony is a sham. (Doc. 384 at 9-11.)

The Court rejects the argument that Plaintiff should be precluded from relying on Bergman's deposition testimony for purposes of summary judgment because the deposition was a trial deposition. (Doc. 386 at 17 n.20.) While it is true that Plaintiff sought leave to preserve Bergman's testimony for trial (Doc. 303), this Court found good

---

[29] The Court also notes that the record of Taylor's trial proceedings indicates Kashman possessed the October 9, 1970 letter prior to trial (*see* Doc. 339-5 at 196-201); that Plaintiff has not identified any police reports or other documents showing that Anthony was investigated as an alternative suspect; and that police records indicate Taylor identified Corral in 1970 as a suspect, and Corral implicated Taylor as a guilty party (*see* Doc. 333-10 at 79-84).

cause to re-open discovery for the purpose of allowing Bergman's deposition, without limiting the purposes for which Plaintiff could use the deposition (Doc. 313). The Court also declines to disregard Bergman's deposition testimony as a sham. The sham affidavit rule applies when a party attempts to create a genuine issue of material fact by submitting an affidavit that contradicts his or her own prior testimony. *Yeager*, 693 F.3d at 1080. The rationale underlying the rule "is that a party ought not be allowed to manufacture a bogus dispute with *himself* to defeat summary judgment." *See Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009) (emphasis in original). The Court finds the sham affidavit rule does not apply to Plaintiff's use of Bergman's deposition testimony. *See id.* Furthermore, Bergman explains the differences between his deposition testimony and the testimony he gave during Taylor's criminal proceedings, namely, that he was threatened with firing and jail if he provided exculpatory testimony during the criminal proceedings. (*See* Doc. 343-15 at 22-23); *see Van Asdale*, 577 F.3d at 999 (sham affidavit rule does not preclude a party from "elaborating upon, explaining or clarifying prior testimony"). Accordingly, the Court finds that Plaintiff may rely on Bergman's deposition testimony in support of his existing claims, both at summary judgment and at trial.

However, Plaintiff cannot assert a new theory of liability that Defendants violated his constitutional rights by failing to disclose Bergman's exculpatory testimony prior to Taylor's 1972 trial. Plaintiff did not allege in his TAC that Defendants violated his constitutional rights by failing to disclose exculpatory testimony from Bergman. Plaintiff learned of Bergman's exculpatory testimony after the close of discovery in this case, and he did not move to amend his TAC to assert new claims based on the testimony. Defendants were not on notice of Plaintiff's *Brady* claim concerning Bergman's testimony prior to the summary judgment stage, and they did not have an opportunity to conduct discovery regarding it.

### g.  Other Prosecutorial Misconduct Claims

Plaintiff argues that Weiss engaged in improper trial conduct that increased the impact of the prosecution's *Brady* violations. (Doc. 349 at 12-16.) Specifically, Plaintiff

argues that Weiss disclosed inflated witness lists that prevented the defense from preparing for trial; that he made an excessive number of improper objections and interruptions during trial; that he engaged in *ex parte* communications with the trial judge; that his investigator Angeley engaged in *ex parte* contact with at least one and possibly two dismissed jurors; that he delayed presenting and arguing Robert's testimony to prevent the defense from adequately responding; and that he was racist. (*Id.* at 12-19.) Pima County disputes Plaintiff's factual contentions and argues that Plaintiff fails to identify any specific prejudice resulting from the alleged prosecutorial misconduct. (Doc. 373 at 11; *see also* Doc. 374 at ¶¶ 69-107.) Pima County further argues that Plaintiff did not raise these allegations of prosecutorial misconduct in his TAC. (Doc. 373 at 3-4.)

Plaintiff's TAC alleges that Weiss engaged in unethical and unconstitutional prosecutorial misconduct before, during, and after his 1972 trial. (Doc. 169 at 20.) The TAC asserts that Weiss was under pressure to ensure Taylor was convicted, and that he knew there was insufficient evidence if Taylor was given a fair trial. (*Id.* at 7.) The TAC alleges that Defendants violated *Brady* by failing to disclose the Truesdail Report, and that Defendants called Robert to testify near the end of the trial when the testimony would have a greater impact on the jury, despite knowing Robert's testimony was contradicted by the Truesdail Report. (*Id.* at 7-8.) The TAC further alleges that Weiss had a history of unethical and overzealous behavior, including committing *Brady* and *Giglio* violations, and making frequent, baseless interruptions. (*Id.* at 5-6.) Although the TAC does not specifically allege that the prosecution inflated its witness lists and engaged in *ex parte* communications with the trial judge or dismissed jurors, these allegations were known to Defendants because they were included in Taylor's 2012 Petition for Post-Conviction Relief, which is specifically mentioned in Taylor's TAC. (*See* Doc. 169 at 9; Doc. 348-3.) Under the circumstances, the Court finds that the TAC is sufficient to put Defendants on notice of Plaintiff's theory that Weiss's other prosecutorial misconduct increased the prejudice from his *Brady* violations.

As discussed above, there are material disputes of fact concerning whether Weiss violated Taylor's constitutional rights under *Brady*. Furthermore, a reasonable jury could find, based on the transcript of Taylor's 1972 trial and other record evidence, that Weiss committed prosecutorial misconduct by excessively objecting and interrupting during trial, delaying the presentation of and argument concerning Robert's testimony, inflating the prosecution's witness lists, and engaging in *ex parte* communications with the trial judge and a dismissed juror. (*See, e.g.*, Doc. 333-3 at 193-196; Doc. 333-4 at 1-7; Doc. 346-4; Doc. 347-1.) A reasonable juror could also find that Weiss's other challenged trial conduct increased the prejudicial effect of his disclosure violations. *See Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) ("the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair").

### h. Conspiracy

Defendants argue that Plaintiff has presented no evidence to demonstrate that Pima County and the City of Tucson had a unity of purpose or common design and understanding to violate Taylor's constitutional rights. (Doc. 351 at 25; Doc. 364 at 6; Doc. 383 at 13; Doc. 386 at 14-15.) Plaintiff argues that there is evidence that Weiss and TPD officers conspired to suppress Bergman's testimony, withhold the Truesdail Report and information about alternative suspect Anthony, and present false testimony from Robert and Wallmark. (Doc. 366 at 14-16; Doc. 384 at 4-5.)

"A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012) (internal quotation omitted). To prove a civil conspiracy, a plaintiff must show "an underlying constitutional violation," *id.*, and "an agreement or meeting of the minds to violate constitutional rights," *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (internal quotation marks omitted); *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (plaintiff must "show that the conspiring parties reached a unity of purpose or a common design and understanding, or

a meeting of the minds in an unlawful arrangement" (internal quotation marks omitted)). A plaintiff may prove an agreement or meeting of the minds through circumstantial evidence. *Mendocino*, 192 F.3d at 1301. "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Id.* at 1301-02 (internal quotation and alteration marks omitted).

Here, a reasonable jury could find that the City of Tucson and Pima County reached an agreement to violate Taylor's constitutional rights by suppressing the Truesdail Report and by procuring false testimony from jailhouse informants while failing to disclose the circumstances under which the testimony was procured. A reasonable jury could infer from the phone conversation between Miller and Gilmore that both the City of Tucson and Pima County knew of the Truesdail Report and conspired to suppress it. (*See* Doc. 343-9.) A reasonable jury could also infer from the statements of Robert and Albert Jackson that officials from both the City of Tucson and Pima County conspired to procure false testimony from Wallmark and Jackson and failed to disclose the circumstances by which they procured the testimony. (*See* Doc. 347-7; Doc. 347-8.)

### 2. Municipal Liability

A municipality may be liable under 42 U.S.C. § 1983 "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such a deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks omitted). "*Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). The municipality, "through its *deliberate* conduct," must be "the moving force" behind the constitutional injury at issue. *Bd. of Cnty. Comm'rs of Bryan Cnty. v Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

Because a municipality can be held responsible under § 1983 only where the

1    municipality itself causes the constitutional violation at issue, plaintiffs seeking to impose
2    § 1983 liability on local governments must show that the challenged acts were taken
3    "'pursuant to official municipal policy,'" *Connick*, 563 U.S. at 60 (quoting *Monell*, 436
4    U.S. at 691).   "Official municipal policy includes the decisions of a government's
5    lawmakers, the acts of its policymaking officials, and practices so persistent and
6    widespread as to practically have the force of law." *Id.* at 61.

7                                          **a.  Count One**

8             Count One of the TAC raises a claim against the City of Tucson based on a
9    custom and practice of racial discrimination.  (Doc. 169 at 11-16.)   In its Motion for
10   Summary Judgment, the City of Tucson argues that, even if Taylor could show that a
11   City of Tucson employee violated his constitutional rights in the 1970s, he still cannot
12   establish *Monell* liability because he has no evidence that the City of Tucson had a
13   racially discriminatory custom, policy, or practice that caused his alleged constitutional
14   deprivations.  (Doc. 332 at 22-25.)   In response, Plaintiff contends that there is sufficient
15   evidence that the City of Tucson had policies of racial discrimination at the time of
16   Taylor's arrest, relying upon: (1) the opinions of his police practices expert Dr. Tommy
17   Tunson; (2) an affidavit by attorney Rubin Salter, Jr.; (3) evidence that Holmes told his
18   racist profiling opinions to City of Tucson officials, who accepted the opinions; and (4)
19   the statements of Robert and Albert Jackson.  (Doc. 371 at 19-22.)   The City of Tucson
20   indicates it will move in limine to exclude the testimony of Salter and Tunson, and the
21   admission of hearsay documents, at trial.  (Doc. 383 at 3 n.2.)   The City of Tucson also
22   argues that, even if Plaintiff's evidence is assumed sufficient, for purposes of summary
23   judgment, to establish a policy of racial discrimination, the existence of a policy alone is
24   insufficient to establish *Monell* liability, and this case does not involve any of the
25   scenarios in which a municipality may be held liable for a single incident under *Monell*.
26   (*Id.* at 2-3.)

27           Assuming the admissibility at trial of the statements of Robert and Albert Jackson
28   and the testimony of Tunson and Salter, the Court finds there are material factual disputes

concerning whether the City of Tucson had a longstanding practice or custom of racial discrimination.  Tunson opines that the City of Tucson police and fire departments had informal policies of racial discrimination at the time of Taylor's arrest and prosecution, although the Court notes that Tunson's expert report consists of little more than summaries of evidence in this case accompanied by legal conclusions.  (*See* Doc. 343-14.)  Salter, an African-American lawyer who was employed by the Pima County Attorney from 1964-1966 and the U.S. Attorney from 1967-1969 before entering private practice, avers in an affidavit that he had frequent contact with TPD officers around the time of Taylor's arrest, and that "the City of Tucson Police Department engaged in pervasive racially discriminatory law enforcement practices."  (Doc. 372-2 at 3.)  As discussed above, Albert Jackson's August 30, 1972 statement indicates TPD officers used racially derogatory language when threatening Robert and Wallmark with imprisonment, and City of Tucson officials continued to employ Holmes after he informed them of his racist profiling opinions.  (*See* Doc. 340-10 at 84-87; Doc. 347-7.)  Finally, Bergman testified that Taylor was targeted as a suspect because he was "the wrong color."  (Doc. 343-15 at 26.)

A reasonable jury could find that the City of Tucson's persistent, widespread practice of racial discrimination was the moving force behind Taylor's alleged constitutional violations, including *Brady* violations arising from the failure to disclose Holmes's racism and the racist threats used to procure Robert and Wallmark's testimony.  Furthermore, Holmes's testimony supports a finding that City of Tucson officials with final policymaking authority were aware of Holmes's racist profiling opinions, continued to employ him, and did not disclose his racism to the defense.  Accordingly, the jury may find that action taken by the City of Tucson's authorized decisionmakers violated Taylor's due process rights to a fair trial and his rights under *Brady*.  *See Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 405 (municipal action is the moving force behind the plaintiff's injury if "the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law"); *see also Christie v. Iopa*, 176 F.3d 1231, 1235

(9th Cir. 1999) (single-incident liability under *Monell* can be established through proof that the person causing the constitutional violation had final policymaking authority).

Because there are material disputes of fact concerning whether the City of Tucson can be held liable under *Monell* for Plaintiff's alleged constitutional violations, the Court denies the City of Tucson's Motion for Summary Judgment with respect to Count One of the TAC.

### b.  Count Two

Count Two of the TAC raises a claim against Pima County based on a custom and practice of racial discrimination.  (Doc. 169 at 16-18.)  Plaintiff has abandoned Count Two.  (Doc. 367 ¶¶ 714, 716-717.)  Accordingly, the Court will grant summary judgment in Pima County's favor on Count Two.

### c.  Counts Three and Four

In Counts Three and Four of the TAC, Plaintiff alleges that Pima County failed to properly train and supervise deputy county attorneys, and that Pima County had a custom of deliberate indifference to prosecutorial misconduct, as shown by its continued employment of Weiss.  (Doc. 169 at 18-20.)  Pima County argues that it is entitled to summary judgment on Count Three of the TAC because there is no evidence Pima County had a constitutionally deficient training program, no evidence Pima County disregarded a known or obvious consequence of any deficiency in its training program, no evidence that any deficiency in training caused Taylor's alleged constitutional violations, and no evidence of a pattern of similar constitutional violations by untrained employees.  (Doc. 351 at 22.)  Pima County further argues it is entitled to summary judgment on Count Four of the TAC because there is no evidence it was deliberately indifferent to the risk that failing to terminate Weiss would result in constitutional violations similar to those alleged by Plaintiff.  (*Id.* at 22-23.)[30]

---

[30]  Pima County further argues that Pacheco's opinions are impermissible legal arguments; that Pima County had no authority to terminate Weiss's employment or train and supervise prosecutors in the Pima County Attorney's Office; that Plaintiff cannot prove Weiss violated his constitutional rights; that Plaintiff's claims are barred by this Court's *Heck* ruling; that Plaintiff's claimed constitutional violations and legal challenges to Weiss's conduct have been rejected by state and federal courts; and that Plaintiff did

1    Plaintiff argues that Weiss's prior misconduct and ethical violations were so

2  widespread and well-known that a reasonable jury could find that Pima County was

3  deliberately indifferent. (Doc. 366 at 3-4.) In support of this argument, Plaintiff relies on

4  Pacheco's testimony and appellate opinions criticizing Weiss. (*Id.* at 4-11.) Plaintiff

5  further argues that Pima County had no training program, that its failure to train and

6  supervise Weiss caused violations of Taylor's constitutional rights and deprived him of a

7  fair trial, and that Pima County's pattern of deliberate indifference to prosecutorial

8  misconduct under former Pima County Attorney LaWall's administration continued

9  through at least 2013. (*Id.* at 3, 11-14.) In reply, Pima County contends that appellate

10  decisions issued after Taylor's 1972 trial cannot prove Pima County was on notice of

11  Weiss's misconduct, that Weiss's alleged prior misconduct is not closely related to

12  Taylor's alleged constitutional violations, that Taylor has no evidence Pima County was

13  aware of any deficiency in training, and that Dingledine's undisputed good reputation

14  reflects an adequate training program. (Doc. 386 at 6-13.)

15    If a plaintiff seeks "to establish municipal liability on the theory that a facially

16  lawful municipal action" led to a municipal employee violating the plaintiff's rights, then

17  the plaintiff "must demonstrate that the municipal action was taken with deliberate

18  indifference" to the constitutional rights of individuals with whom municipal employees

19  come into contact. *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 407 (internal

20  quotation marks omitted). This deliberate indifference standard governs claims for

21  inadequate training and supervision, and inadequate personnel decisions. *See City of*

22

23  not raise all of his allegations of prosecutorial misconduct in his TAC. (Doc. 351 at 22-
    23; Doc. 386 at 4-6, 11-14.) The Court addressed the argument concerning Pacheco
24  when resolving Pima County's Motion in Limine to preclude Pacheco's opinions. (Doc.
    567 at 7-8.) The other arguments are addressed above. Specifically, the Court finds that
25  the Pima County Attorney acted as a county official with respect to the personnel and
    training decisions at issue; that issue preclusion is inapplicable; that the *Heck* bar will be
26  lifted if the jury finds expungement of Taylor's 2013 convictions appropriate; that the
    TAC sufficiently alleges *Brady* violations arising from evidence of Holmes's racist
27  beliefs and the circumstances by which Defendants procured the testimony of Robert and
    Wallmark, and sufficiently alleges that Weiss's other prosecutorial misconduct increased
28  the prejudice from the *Brady* violations; and that there are material factual disputes
    concerning whether Weiss violated Taylor's constitutional rights.

*Canton*, 489 U.S. at 388 (inadequate training); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989) (inadequate supervision); *Benavides v. Cnty. of Wilson*, 955 F.2d 968, 974-75 (5th Cir. 1992) (inadequate hiring).   "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Connick*, 563 U.S. at 61 (internal quotation and alteration marks omitted).

In addition to establishing deliberate indifference, a plaintiff seeking to hold a municipality liable under § 1983 for inadequate employee training must show that the constitutional injury that he suffered is "closely related" to an "identified deficiency" in the municipality's training program.  *City of Canton*, 489 U.S. at 388, 391.  Furthermore, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks omitted).  However, "in a narrow range of circumstances," the "unconstitutional consequences of failing to train" may be "so patently obvious" that a municipality "could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Id.* at 64.

A reasonable jury could find that Pima County was aware of Weiss's tendency to violate the constitutional rights of criminal defendants.  Prior to Taylor's trial, at least four appellate opinions criticized Weiss by name, and he had been sentenced to jail for criminal contempt of court.  *See Arizona v. Shook*, 404 P.2d 724, 727 (Ariz. App. 1965) (noting that Weiss "was severely admonished by the trial court on several occasions" for his frequent objections and "threatened with a jail sentence"); *Arizona v. Chaney*, 428 P.2d 1004, 1009 (Ariz. App. 1967) (finding that Weiss "was guilty of improper conduct" in that he "actively discouraged" police officers from discussing the case with defense counsel, which "is inconsistent with the role of a prosecuting attorney"); *Arizona v. Lenahan*, 471 P.2d 748, 750 (Ariz. App. 1970) (noting the trial court had "reprimanded Mr. Weiss for making insinuating comments and trying to take over the courtroom"); *Arizona v. Mercer*, 473 P.2d 803, 806 (1970) ("The over-zealous tactics of Mr. Weiss are

well known to this court and have been the subject of other appeals."); *Weiss v. Superior Ct. of Pima Cnty.*, 480 P.2d 3, 4-7 (Ariz. 1971) (discussing five criminal contempt convictions and a jail sentence stemming from Weiss's trial conduct, and rejecting Weiss's contention that insufficient evidence supported the contempt convictions). Shortly after Taylor's trial, the Arizona Supreme Court reversed and remanded a matter for a new trial based on "outrageous and improper" conduct by Mr. Weiss. *Arizona v. Moore*, 495 P.2d 445, 452 (Ariz. 1972). The "outrageous and improper" conduct at issue in *Moore* appears to have pre-dated Taylor's trial. It also appears that Weiss had been accused of *Brady* violations before or near the time of Taylor's trial. *See, e.g.*, *Arizona v. Skinner*, 515 P.2d 880, 892 (Ariz. 1973). Pacheco opines that any prosecutor's office with which he is familiar would immediately note and act upon a published appellate opinion criticizing a prosecutor by name. (Doc. 343-7 at 18-19; *see also* Doc. 567.) Furthermore, Salter avers that during his employment at the Pima County Attorney's Office, he knew Weiss to push ethical limits and sometimes exceed them. (Doc. 372-2 at 3.)

Based on Weiss's pattern of unconstitutional trial conduct and the lack of evidence of any training program for deputy county attorneys, a reasonable jury could find that Pima County was deliberately indifferent to the risk that its failure to train and supervise deputy county attorneys and to terminate Weiss's employment would result in the violation of criminal defendants' constitutional rights. A reasonable jury could also find that Taylor's alleged constitutional injuries were caused by Pima County's deliberate indifference. Accordingly, the Court denies Pima County's Motion for Summary Judgment with respect to Counts Four and Five of the TAC.

### d. Count Five

Count Five of the TAC raises a claim of civil conspiracy against Pima County and the City of Tucson, alleging that co-conspirators improperly arrested, charged, and prosecuted Plaintiff; deliberately withheld exculpatory evidence, and suborned false testimony from Robert and Wallmark. (Doc. 169 at 21-24.) Pima County argues that

1    Plaintiff must present evidence that Defendants had a policy or practice of conspiring to

2    violate criminal Defendants' constitutional rights in order to establish municipal liability

3    on his conspiracy claim, and that no such evidence exists.  (Doc. 351 at 24-25; Doc. 386

4    at 14.)  Plaintiff argues he need only establish an underlying *Monell* violation and a unity

5    of purpose to accomplish an unlawful goal, because conspiracy is not itself a

6    constitutional tort under § 1983.  (Doc. 366 at 15.)

7         Pima County relies in its Motion on *Baca v. Callahan*, No. CV–10–00885–PHX–

8    GMS, 2011 WL 3759480 (D. Ariz. Aug. 25, 2011) and *Gibson v. United States*, 781 F.2d

9    1334 (9th Cir. 1986), *abrogated on other grounds by United States v. Wong*, 575 U.S.

10   402 (2015), *Egbert v. Boule*, 596 U.S. 482 (2022).  (Doc. 351 at 24.)  In *Gibson*, the

11   plaintiff alleged a "long-lasting conspiracy" to violate their civil rights and named as

12   defendants the United States of America, the City of Los Angeles, and individual agents

13   of the Federal Bureau of Investigation and the Los Angeles Police Department.  781 F.2d

14   at 1337.  The Ninth Circuit upheld the district court's dismissal of the City of Los

15   Angeles, finding that the plaintiff "failed to attribute the alleged tortious acts of city

16   agents to an established city policy or procedure" and therefore did "not allege facts

17   sufficient to satisfy the *Monell* predicate for municipal liability."  *Id.* at 1337-38.  The

18   Ninth Circuit did not specifically hold that a § 1983 plaintiff asserting a conspiracy claim

19   against a municipality must establish a policy or practice of conspiring to violate

20   individuals' constitutional rights.  Similarly, in *Baca*, the district court dismissed a § 1983

21   conspiracy claim against a county based on the plaintiff's failure to allege sufficient facts

22   to establish municipal liability, but the court did not specifically hold that a § 1983

23   plaintiff asserting a conspiracy claim against a municipality must establish a policy or

24   practice of conspiring to violate individuals' constitutional rights.  *See* 2011 WL

25   3759480, at *4.  The non-binding cases cited by Pima County in its Reply likewise do not

26   adequately support its position that a § 1983 plaintiff asserting a conspiracy claim against

27   municipalities must establish a pattern or practice of conspiring to violate individuals'

28   constitutional rights.  (*See* Doc. 386 at 14.)

1    "Conspiracy is not itself a constitutional tort under § 1983." *Lacey*, 693 F.3d at
2    935.    Alleging a conspiracy may "enlarge the pool of responsible defendants by
3    demonstrating their causal connections" to an alleged constitutional violation, but a
4    conspiracy allegation "does not enlarge the nature of the claims asserted by the plaintiff,
5    as there must always be an underlying constitutional violation." *Id.*  Because conspiracy
6    is not itself a constitutional tort, the Court agrees with Plaintiff's position that a § 1983
7    plaintiff asserting a conspiracy claim against municipalities must establish *Monell*
8    liability with respect to the underlying constitutional violations at issue but need not
9    allege a pattern or practice of entering into conspiracies.

10       As discussed above, a reasonable jury could find that the City of Tucson and Pima
11   County reached an agreement to violate Taylor's constitutional rights by suppressing the
12   Truesdail Report and procuring false testimony from jailhouse informants.  A reasonable
13   jury could also find that the City of Tucson's pattern and practice of racial discrimination
14   and Pima County's deliberate indifference to criminal defendants' constitutional rights
15   were the moving forces behind these constitutional violations.  Proof of a pattern or
16   practice of conspiring to violate criminal defendants' constitutional rights is not required.
17   Accordingly, the Court denies Defendants' Motions for Summary Judgment with respect
18   to Count Five.

19       **IT IS ORDERED** that the under-advisement portion of Plaintiff's Motion in
20   Limine to Preclude the Testimony of Holmes (Doc. 397) is **denied** to the extent the Court
21   declines to rule on whether Holmes's testimony is admissible under *Daubert* for the
22   purpose of proving that the Pioneer Hotel fire was arson.

23       **IT IS FURTHER ORDERED withdrawing** as an unnecessary ruling the
24   following portion of the Court's Order on Plaintiff's Motion in Limine re: Prior
25   Testimony of Robert Jackson: Doc. 566 at 4:18 to 5:5, including footnotes.

26       **IT IS FURTHER ORDERED withdrawing** as an unnecessary ruling the
27   following portion of the Court's Order on Plaintiff's Motion in Limine re: Cyrillis
28   Holmes: Doc. 569 at 4:2-13.

1   **IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment
2   (Doc. 349) and Cross-Motion for Summary Judgment (Doc. 371) are **denied**.

3   **IT IS FURTHER ORDERED** that Defendants' Motions for Summary Judgment
4   (Docs. 332, 351) are **granted in part and denied in part**, as follows:

5   1.  Defendant City of Tucson's Motion for Summary Judgment (Doc. 332) is
6       **denied** to the extent it seeks dismissal of Counts One and Five of the Third
7       Amended Complaint.

8   2.  Defendant Pima County's Motion for Summary Judgment (Docs. 351) is
9       **granted** with respect to Count Two of the Third Amended Complaint but
10      **denied** with respect to Counts Three, Four, and Five.

11  3.  Counts One, Three, Four, and Five of the Third Amended Complaint
12      remain at issue in this case; however, Plaintiff cannot premise the claims on
13      underlying *Brady* violations arising from a failure to disclose evidence of
14      other suspects or a failure to disclose exculpatory testimony from Claus
15      Bergman.  Furthermore, Plaintiff cannot obtain damages based on the
16      alleged unlawfulness of his arrest and interrogation.

17  **IT IS FURTHER ORDERED** that the parties shall file a Joint Proposed Pretrial
18  order within **thirty (30) days** of the date this Order is filed.

19  **IT IS FURTHER ORDERED** that, on or before **February 16, 2024**, the parties
20  shall submit a stipulated description of the case and fifteen (15) stipulated juror
21  questionnaire questions.

22  . . . .
23  . . . .
24  . . . .
25  . . . .
26  . . . .
27  . . . .
28  . . . .

**IT IS FURTHER ORDERED** that motions in limine and *Daubert* motions are due on or before **March 4, 2024**.  Responses are due on or before **March 18, 2024**.  No replies shall be permitted absent leave of Court.

Dated this 19th day of January, 2024.

Honorable Rosemary Márquez
United States District Judge