MILLER, PITT, FELDMAN & McANALLY, P.C.
Stanley G. Feldman, SBN 000838
Peter Timoleon Limperis, SBN 019175
Timothy P. Stackhouse, SBN 30609
One S. Church Ave., Ste. 1000
Tucson, AZ 85701-1620
(520) 792-3836
sfeldman@mpfmlaw.com
plimperis@mpfmlaw.com
tstackhouse@mpfmlaw.com
me@mpfmlaw.com

THE LEADER LAW FIRM, P.C.
John P. Leader, SBN 012511
405 W. Cool Dr. Ste. 107
Tucson, AZ  85705
(520) 575-9040
john@leaderlawaz.com

Attorneys for Plaintiff

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nina Alley, as Guardian and Conservator for and on behalf of Louis Taylor, a single man,<br><br>Plaintiff,<br><br>vs.<br><br>Pima County, a body politic; The City of Tucson, a body politic,<br><br>Defendants. | No.  15-cv-00152-TUC-RM<br><br>**RESPONSE TO CITY OF TUCSON'S MOTION IN _LIMINE_ NO. 5 RE: DR. THOMAS TUNSON**<br><br>**Judge Márquez** |

The City's motion is replete with various Rule 702 case citations but lacks any

applicable or correct analysis that could even suggest Dr. Thomas Tunson's opinions

should be precluded in any way. Rule 702 Fed. R. Evid. doesn't preclude any of those opinions, and Tunson was properly disclosed.

The motion has no merit and should be denied.

**MEMORANDUM OF POINTS AND AUTHORITIES**

POINT 1

TUNSON'S TESTIMONY MEETS RULE 702 AND DAUBERT'S REQUIREMENTS

The City disclosed no expert witness in response to Tunson although it had every opportunity to do so.  Apparently, the City could not find a qualified expert to contest Tunson's opinions.  The Court should not let the City parlay its inability to procure an expert into precluding Tunson.

Without providing a single case authority, the City argues that Tunson's testimony would be "unfairly prejudicial." (Doc. 957 at 6).  The mere fact that the City doesn't like his opinions isn't enough. As numerous appellate courts have noted, evidence isn't "unfairly prejudicial" simply because it is adverse to the opponent. *E.g., State v. Schurz*, 176 Ariz. 46, 52 (Ariz. 1993); *United States v. Rodriguez-Estrada*, 877 F.2d 153, 156 (1st Cir. 1989) ("By design, all evidence is meant to be prejudicial; it is only *unfair* prejudice which must be avoided.").  Any evidence one party admits will likely be "adverse" to his opponent, and Rule 403 does not bar such evidence.

""Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Advisory Committee Note, such as emotion, sympathy or horror."

1    The City offers no legal authority or argument suggesting any of Dr. Tunson's
2    testimony would be "unfairly" prejudicial.

3       And even if any of Tunson's opinions were unfairly prejudicial, Rule 403 acts
4    as a bar only if the danger of unfair prejudice substantially outweighs probative value.
5    The City glosses over these important legal points.

6
7       Based on the Court's prior rulings, Taylor expects the Court will to some degree
8    limit Tunson's testimony.  But the City seeks to preclude his testimony in its entirety,
9    and that is an unreasonably broad request.  The fact that the City lacks an expert doesn't
10   mean Taylor shouldn't have one.

11      The Court must be guided by Rule 702 and *Daubert*, and Tunson's opinions
12   satisfy same. Rule 702's first requirement is that the witness be qualified.  As reflected
13   in his attached CV, Tunson has 10 years' experience as a Chief of Police for four
14   different police departments, ranging from 26 to 105 sworn officers. In addition to
15   testifying, Dr. Tunson spends considerable time educating state and local police
16   officers, including on racial sensitivity issues.
17

18      From 1977-1993, Dr. Tunson was a line level police officer.  He is a retired U.S.
19   Army Lieut. Col. and a veteran of Operation Desert Storm.  From 2017 to present, Dr.
20   Tunson has been a full-time instructor teaching criminal justice.  He has also served as
21   an instructor at California Southern University in the University of Phoenix.  Dr.
22   Tunson is extremely qualified on police practices. (Report and CV, attached as Exhibit
23   1)

24
25      Rule 702(a) requires that the expert's testimony help the trier of fact help
     determine a fact in issue. The Court has ruled that the jury may consider Taylor's

conspiracy count, and Tunson's testimony is relevant to it. (Doc. 869 at 51-52).  Most jurors, however, will not understand the inner workings between prosecutors and police.  Taylor alleges the prosecution presented certain false "snitch" testimony to the 1972 jury, and it is important for the jury to know how the prosecution was able to use police officers to contact the witnesses, coerce them, and make them available to the prosecution.   The jury may well not understand this and Tunson will help them understand.  This is an important "police practice" issue.

The jury must understand how the prosecution and police department work together in a trial setting, including the role of the PCAO's investigator, Rex Angeley. What does it mean to have a "case officer" sitting in court the entire trial assisting the prosecution?

According to Claus Bergman, who is no longer available to testify, during trial both the PCAO investigator, Angeley, and prosecutor Horton Weiss knew that Bergman had significantly exculpatory evidence to provide on Taylor's behalf and the two jointly threatened him with criminal charges and firing if he told the truth.  It is critical that the jury understand the working relationship between prosecutor and police to understand the significance of Bergman's testimony.

Dr. Tunson will address whether the City officials had a policy of racial discrimination that contributed to violating Taylor's constitutional rights.  Even if the Court does not allow Tunson to give that ultimate opinion, it would help the jury to hear the evidence it needs to decide if the City had such racist policies.

On that subject, both Claus Bergman and Lawrence Hust have acknowledged that at the time of Taylor's arrest and prosecution, Tucson police officers used the "n-

word" when referring to black suspects or defendants. Hust acknowledged that when officers did so, nothing was done, that is, it was tolerated. Dr. Tunson should be allowed to explain the significance of this testimony, as a former police chief in metropolitan areas. Bergman went further and testified that specific officers involved in Taylor's prosecution used the "n-word" when referring to Taylor. Albert Jackson has provided an affidavit stating that Hust, Angeley and prosecutor Weiss freely used the "n-word" when coercing Robert Jackson.

Rule 702(b) requires that the testimony be based on sufficient facts or data. While Dr. Tunson's report does not contain an actual list of materials reviewed, Rule 26(a)(2)(B) does not require that. And it is clear from the wording of Tunson's report that he read and relied upon all materials significant to this case.[1]

Rule 702(c) requires that the testimony be the product of reliable principles and methods. The City does not specifically allege any flaws in Dr. Tunson's methodology. He reviewed voluminous records related to Taylor's arrest and prosecution and then, based on his extensive experience, formulated opinions.

Rule 702(d) requires that the expert reliably applied his methodology to the facts. Again, there is no argument that Tunson failed to do this.

---

[1] That includes but is not limited to: Plaintiff's disclosure exhibits 1, 3, 65, 67, 77, 220, 268, 309, 313, 322-325, 331-335, 416-418, 419-32, 436-437, 473-580, 661, 664-686, ABA Amicus, various motions and responses and replies, Bergman deposition and exhibits, Croft videos, Kashman, Taylor and other depositions, disclosures, Holmes deposition, 3rd Supplemental Complaint, City disclosures, Truesdail report, TFD cause and origin report, various articles, 2012 peition for post-conviction relief, and various photos.

The City correctly states that Taylor listed Dr. Tunson as an expert witness on "law enforcement … who will address the conduct of the Tucson Police Department and the Tucson Fire Department." (City MIL No. 5 at 1:26-27). The City does not contest Tunson's qualifications as a former police chief to testify on these subjects, nor could they, given the qualifications set forth in his report. (*See* Exhibit 1 at 1.) But then the City's motion goes off the rails.

The City proceeds to recite a long litany of Rule 702 cases involving standard and abstract language as to what expert witnesses can and cannot do, without specifying the context in which testimony is to be expected. That content is rather important in this case.

Taylor must present evidence regarding the facts and the way the Tucson Police Department and Tucson Fire Department were complicit in the unconstitutional way the 1971 prosecution was conducted. Taylor must show the jury what was done in these proceedings, how and why they violated proper prosecutorial methods, why they were important in Taylor's case, and the result obtained in his case.

Such examples of improprieties and violations of standard police and prosecutorial procedures include the way the contents of the Truesdail Report were handled, how and why the failure to notify the defense violated proper police and prosecutorial procedures, and why those procedures exist. How else is the jury to understand why police and prosecutors are obligated to give the defense exculpatory evidence. Tunson's testimony will also explain the pragmatic danger of snitch testimony, particularly when the snitch is rewarded for such testimony; and why and how suppression of evidence useful for cross-examination of a snitch violates proper

police conduct; and why such standards exist.  These are all issues in this case.  Such testimony necessarily encompasses mentioning such things as the *Brady* doctrine, the Fifth and Sixth Amendments, and the Due Process clause of the Fourteenth Amendment.  Rule 704(a) Fed. R. Evid. states that expert opinion is not prohibited even if it embraces ultimate opinion.

The testimony described above does not even go to the ultimate issue but only to matters the jury will need to understand to determine, using the court's instructions, that the constitution was violated in 1972 and again in 2013.  Expert testimony like this is permissible.  *Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018) (a case quite similar to Taylor's); *see also Jiminez v. City of Chicago*, 732 F.3d 710, 712 (7th Cir. 2013).

Defendant's motion then proceeds with a further litany of what Tunson shouldn't do.

Tunson's testimony will concern that which was disclosed.  He is an expert on police and prosecution practices and will testify to what they were, what they are, what was violated and why, and what importance such violations have in a case such as this.  In *Mellen*, this court reaffirmed the admissibility of such testimony.

The City does not address that kind of testimony but instead seeks to prohibit Tunson from testifying because he might violate standards of Rule 702.  But Taylor has no intention of asking Tunson to invade the province of the jury, to testify about the credibility of witnesses, or to resolve evidentiary conflicts.  Nor will he tell the jurors which inferences to draw from the evidence, resolve doubtful questions of law, or attempt to instruct the jury on the law.  He will, of course, mention *Brady* violations,

but *Brady* is not a doubtful question of law. Nor is the danger inherent in snitch testimony unknown in the law. *See Mellen,* 900 F.3d at 1095. Taylor has no intention of asking for Tunson's "legal conclusion, i.e., an opinion on an ultimate issue of law." (City MIL No. 5 at 3). Tunson is an expert on police and prosecution standards and practices, and that's what his testimony will be about.

Finally, the City rather bizarrely complains of Tunson's "complete lack of any personal engagement with the record of this case." (City MIL No. 5 at 5). Taylor is not sure what that means. If the City is critical of Tunson's review of the record, it can save that for cross-examination. Moreover, very few of the witnesses in this case have any personal engagement with the case, which involved an occurrence in 1970, a trial in 1971-72, and a coerced plea deal in 2013. No doubt the City will find some weaknesses in Tunson's testimony, but these are subjects of cross-examination. An expert witness does not need to rely on every bit of evidence and can be cross-examined if he or she fails to consider something the opponent thinks is important.

## CONCLUSION

Tunson is a qualified witness on police and prosecution conduct, was properly disclosed, and will testify on that subject. The motion to exclude all his testimony should be denied.

Dated April 1, 2024.

MILLER, PITT, FELDMAN & MCANALLY, P.C.

By: */s/ Peter Timoleon Limperis*
        Stanley G. Feldman
        Peter Timoleon Limperis
        Timothy P. Stackhouse
        *Attorneys for Plaintiff*

THE LEADER LAW FIRM, P.C.

By: */s/John P. Leader*
John P. Leader
*Attorneys for Plaintiff*

I hereby certify that on April 1, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECR System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECR registrants:

Daniel P. Struck
Nicholas D. Acedo
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
*Attorneys for Defendant Pima County*

Michelle Saavedra
Dennis McLaughlin
Principal Assistant City Attorneys for
Michael G. Rankin
CITY OF TUCSON
PO Box 27210
Tucson, AZ 85726-7210
*Attorneys for Defendant City of Tucson*

# Plaintiff's Exhibit 1

*Alley v. Pima County and the City of Tucson*
*CV-15-00152-TUC-RM*

**Louis Taylor Case**
**July 26, 2021**

Taylor v. City of Tucson & County of Pima, Arizona

Pioneer Hotel Fire: December 20, 1970, Tucson, Arizona

Re: Expert Opinion

**Assignment**

I was hired by Evidence Solution Incorporated to be a law enforcement expert witness for Leader Law Firm**.** I was retained by Mr. Taylor's counsel to evaluate the conduct of the Tucson Police Department and Tucson City Fire Investigators. I have reviewed the conduct for any violations of Mr. Taylor's due process and other constitutional rights.

**Qualifications: Tommy W. Tunson**

Chief Tunson has 32 years in law enforcement including more than 10 years of experience as a police chief and has worked every aspect of policing. Lt. Colonel Tunson is a retired Army officer with more than 33 years of military service. Professor Tommy W. Tunson has been a Criminal Justice instructor for the University of Phoenix, California Southern University, and Bakersfield College. Currently, he is a Professor of Criminal Justice at Bakersfield College and an Executive Consultant on Organizational Leadership, Bridging the Racial Divide and enhancing Police-Community Strategic Partnerships. Dr. Tunson holds a Doctor of Business Administration, Juris Doctor, Master's Public Administration, and Bachelor of Science degrees.

1. As a law enforcement executive leader for 32 years, Chief Tunson understands court procedural operations, evidence submission, and testimonial procedures.
2. Dr. Tunson, education, training, and experience in court testimony has been established at all levels of court proceedings. He understands evaluating facts and maintaining a reasonable and objective position on data and facts.
3. Dr. Tunson understands methodology in research, establishing both quantitative and qualitative analysis of data. He is an expert in racial social justice concepts, as an African American scholar, Police Chief, Army Officer, and College Professor. Dr. Tunson is the author of "Transformational Policing Model (TPM) Bridging the Racial Divide", a 21st Policing Strategy.
4. Chief Tunson has years of experience as a police detective in evidence collection, constitutional law procedures, and ferreting out salient facts leading to the relevant case issues. Law Enforcement experience included investigation of homicides and other serious felony crimes. Law Enforcement training included Crime Scene Investigation, evidence collection and maintaining a chain of evidence, interview and interrogation techniques.

1

**Were City policies and practices at the time of this incident racially discriminatory? (Yes)**
In reviewing and analyzing the massive information in this case, there are sufficient facts to substantiate an abridgement of Mr. Taylor's rights.  The ruse of asking Louis to accompany them to the police station was egregious because Louis thought he was going there as a witness, when in fact he was the focus of the investigation thereby invoking a Miranda Admonition. The racial epithets and careless investigation into this serious crime was unconscionable.

TPD detectives and officers were convinced Louis was the suspect and the validation of their beliefs is because Louis was Black. It was not because of solid evidence but based on insufficiency of evidence. Misleading and incorrect expert witness testimony, non-reliable Informants, improper police interrogation and interview procedures, concealing of critical evidence (Truesdail Report), Failure to interview a key possible suspect (Donald Anthony), retaliation against Officer Bergman, continued agreements between city and county agencies to violate Louis rights under the umbrella of criminal investigations. Key police and fire reports were viewed, factual data revealed inequitable and bias policies indicating racial discrimination in dealing with Blacks.

Note: It should be noted my opinions reflect reviewing & examining the reports and documents submitted in this case.

## Statements and Actions illustrating racial bias in the case

Mr. Bergman was a Tucson police officer who first responded to the Pioneer fire. After being helped by Louis Taylor in evacuating people, Mr. Bergman proceeded to the police station. While at station, Bergman passed Louis, they exchanged greetings, but the detectives with him snatched him and did not allow Bergman to talk to him. Did not approve of Bergman complimenting Louis on helping Bergman rescue people at the Bergman used the words interrogation, not witness interview, this indicates any statements made by Louis would be under duress.

Other contributing factors to death was the decision by hotel personnel to fight the fire. It was estimated by Bergman, 20-30 minutes passed before fire and police authorities were notified. He believed in the fire escape routes were open, if a sprinkler system was installed, if fire department has a high-rise building ladders and safety equipment, and previous fire inspection deficiencies were corrected, the loss of life would have been substantially reduced.

In a subsequent interview with (news station) Interviewer asked him "Why'd they finger Louis?" Bergman responded, "I think, they thought, it had to be an Arson, and somebody had to be arrested to shift the blame." Interviewer: "Why Louis?  Bergman: "Louis was there, he was handy, and I hate to say this about Tucson, but Tucson still has its problems, even after all these years, he was probably the wrong color."

2

The ordering of Bergman not to talk to the defense, the obtaining of Holmes as an arson expert, and the reliability of Scroggins and Johnson in discussing the case with investigators gave the clear appearance of impropriety. By not submitting the Truesdail report key exculpatory evidence was omitted. By the prosecution interrupting the examination of Bergman, tainted the trial and prevented key testimony from being revealed. This conduct along with retaliatory actions of the District Attorney and the Tucson Police gave the appearance of a conspiracy to convict Louis at all costs.

## Det. Hust use of the "N" word.

**Affidavit of Albert Jackson, brother of key prosecution witness. (Sept. 18, 1972)**
Robert returned to Tucson and was arrested by Hust. Appears Robert and Bruce went to TPD, and both were taken into custody. Hust DA Investigator Rex contacted Albert and asked him to accompany him as the County Attorney wanted to speak to him. While at TPD, Hust stated he was going to file one hell of a lot of charges against Robert, Bruce, and Albert and wanted each to count with the "Nigger Taylor: Hust called us all a bunch of Nigger lovers and if we liked niggers so much, he would put all of us inside the walls and would see that all of us had a nigger for a daddy. He told us that a nigger punk was in trouble in in prison as the white cons hated a white boy that was a nigger's punk and the white cons killed nigger punks.

Another fact indicating racial bias against Louis was another potential suspect, investigative lead, Donald Anthony, a known arsonist to TPD was not contacted on the day of the fire and left the city the day after the Pioneer Hotel fire. Anthony who is white, was known to have set fires/arson in the area for about two weeks in December. This is an egregious error by the prosecution and TPD. This was known to Bergman, and he was silenced by the TPD command staff.

**Fire Expert Cy Holmes Testimony**
Cyrillis Holmes, Fire Expert made the statement that "Black Boys" like to start fires. This statement was not amplified to show the hostile environment Louis was in during his interrogation. See 60 Minutes interview for complete racist remarks by Cy Holmes.

Louis Taylor was wrongfully convicted, and subsequent evidence has proved this. The original conviction was primarily based on Pima County's fire expert testimony Cy Holmes who statements were tainted with racism and inaccurate statements. Holmes stated the fire was caused by *Arson and an accelerant* had been used to start the fire.

As correctly stated in Taylor's postconviction petition (pp. 30-35), the Pioneer Fire was a flashover fire and the post-flashover damage was so substantial it invalidated the opinions of both Cy Holmes' and Marshall Smyth.

This assertion by the City/County's fire expert was refuted by a concealed fire expert's report, the "Truesdail Report" This critical document was suppressed and hidden from the defense violating the due process clause of the Fourteenth Amendment). This concealment of key exculpatory evidence was ***troubling prosecutorial decisions*** according to the U.S. Supreme

3

Court. The facts point to an agreement by the Prosecutor and the TPD investigators not to reveal this key evidence to the defense. The result is Louis Taylor was convicted.

**Omission of investigating Donald Anthony**
Another fact is there were by all accounts, two other suspects who were never questioned or contacted. A known Arsonist, Donald Anthony was seen in the area around the hotel but never questioned. Anthony was white and departed Tucson a day after the fire and Detective Smith said he did not know about Anthony during the investigation. Another subject was noted as being suspicious in the hotel wondering in the hallways. He was not contacted either and it is speculated he was also white.

In 2002, Tucson Fire Dep't employee Bill Martin stated that on December 15 or 16, 1971, he interviewed 21-year-old Donald Anthony, a known arsonist, related to recent suspected arson fires in Pima County.  Martin admitted that when they went to interview Anthony after the fire, "he [Anthony] had left the state."

Martin stated that he believed Anthony was a "vanity" fire setter whose motivation was to gain attention.  Lewis Beck, college professor was a Pioneer hotel guest (room 609) who was interviewed – he told police about a mysterious man with a bullhorn interfering with the rescue efforts.

**Mr. Rubin Salter**
Mr. Salter**,** was an African American criminal defense lawyer and worked with Horton Weiss, will testify the City Police Department had policies of racial discrimination against Blacks. He spent most of his career thereafter doing criminal defense and will testify that the City Police Department had policies of racial discrimination against Blacks."

**Was there evidence of a conspiracy and collusion between the City and County to prosecute Louis, resulting in the deprivation of Taylor's federal due process rights? (YES)**

**Known close relationship between prosecutors and police**
I understand the standard working relationships between all agencies during a criminal investigation and trial. However, agreeing to convict a young man through various deprivation of his due process rights, exceeds the scope of good working relationships between agencies. This is obvious misconduct by all parties.

The tag-team marathon interrogation of a 16-year-old exceeds all reasonable expectations of fairness. From the initial contact at the Pioneer by the following officers:

At 0158 hours on 20 Dec. 70, **Sgt. Krieger** was advised by **Officer Adams,** he had a possible suspect at the station. A bellman, Johnson first observed Louis on the third floor looking up at flames on 4th floor. Johnson was using a fire extinguisher and when it ran out, he went to Mezzanine to find additional. It was there he encountered Beverage Manager, Scroggins, located additional fire extinguishers and accompanied him to the third floor. Scroggins saw Louis who

4

said, "I saw two colored boys with African hair-do, and they were fighting and started the fire. Scroggins abandoned fighting the fire and departed the hotel.

Scroggins walked toward police headquarters and contacted officers (4) and informed them he saw a black youth present at the early stages of the fire at the hotel around the corner. Two officers returned to the hotel with Scroggins and searched for the black youth. Louis was spotted by Scroggins on the third-floor roof area. Louis who was wearing a thick jacket, approached Officer Adams and told him several boys were on the 7th and 8th floors running around and do not belong. They proceeded from third floor to the 7th and was met by Scroggins, who looked at Louis and said, "that's the boy was are looking for."


**Detective Angeley involvement**
Angeley was contacted by Rosetti, who advised him Louis Taylor was at the police station "reference" the Pioneer Hotel. He further stated Louis was seen by two employees of the hotel to be at the scene. Louis was advised to leave hotel since he had not business there. Instead, he remained on the third-floor swimming pool area at the Hughes Aircraft Christmas party.

Louis was interviewed by Det. Gassaway, Det. Murcheck and Angeley. The stories were inconsistent and Murcheck asked to draw a diagram and pinpoint where fire was started. The location was at the top of the stairs on the third floor.

Scroggins and Johnson were the first on the scene and stated Louis Taylor was at the scene of the fire. According to **Angeley,** Louis admitted to being at the origin of the fire when it started. He further stated he has known Louis Taylor for 3-years and that he is capable of starting this fire.

Angeley interviewed Louis at the station for two hours and admitted not mirandizing. Louis at station with Angeley from about 0400 to 1200 without juvenile authorities or parents being notified. During questioning Louis told him he saw who started fire and Angeley did not document this statement, as Louis had not credibility due to the numerous inconsistent statements. (Description of the suspect was believed to be Mexican according to Louis).

Later testimony by Angeley to Weiss, stated he knew Louis 6-7 years, but early he stated under oath 3-years. Louis statement to Angeley identified a Mexican and White boy on the third floor and believed the Mexican boy started the fire. Louis asked to call his mother, attempted to do so and negative contact with her. When asked by prosecution Weiss, if Louis was given his rights, Cashman objected but was continuously overruled by the judge. The focus was how long Angeley knew Louis versus if he was mirandized. Upon finally answering Angeley stated he believed Louis understood his rights, yet they were never given to him by Angeley.

When asked if he knew why Louis was being questioned, he only stated Sgt. Kreiger told him Louis was in the interview room. (Angeley, was very evasive about whether Louis was given Miranda) He also knew from previous contacts, Louis was under 18, a juvenile.

Angeley in addition, could not recall if Louis, he knew was a minor, asked for his mother. Again, no documented evidence or transcript of the interview. He also did not notify juvenile

5

authorities; Louis was being detained. Angeley did not believe Louis wanted legal counsel, and stated he believed Louis could lie his way out of the situation.

Angeley directed asked Louis if he started the fire, Louis said not, yet no report was written by him. The interview was not recorded. Diagram mentioned again and according to Angeley was still in existence, only one diagram. Question not answered. Louis asked for a lie detector test and Scoopmire arrived to escort Louis to the examination room.

Sergeant McGuire ordered Louis to be arrested. Angeley was present during the arrest. (Det. Dave Smith?) Angeley prepared a two-page report on interviewing Louis? Angeley unable to locate notes from this serious case?

**Detective Gassaway, 20 Dec 70, 0300, report.**

Called to the Pioneer Hotel by Moore who advised Louis Taylor had been at the scene of the of fire two hours before it was reported. That Louis told Mr. Scoggins, hotel manager he saw two male negroes running away from the fire while he, Louis was attempting to assist in fighting the fire on the third floor. Louis asked by Gassaway to accompany him to detective bureau and in the presence of Detective Murchek asked him what he knew about the fire. (No Miranda) Louis began talking.

He stated in presence of Murchek, Gassaway said he advised Louis of his Miranda rights via the card (copy?) According to Gassaway, Louis said he understood, waived his rights and agreed to speak to them. During questioning, Louis mentioned he did not want to "fink" on anyone but believed the two Mexican guys started the fire and one had a gun in his waistband.

Gassaway told Louis he believed he started the fire and Louis, said, "I did not kill those people." When Louis was contacted by Sgt. Gassaway, it was in the council room at city hall and then escorted to Detective bureau. After talking to Scoggins, in another room, Gassaway returned to Louis and gave him his rights. (documents) Clearly Louis was now a suspect and not a witness. Apparently, Gassaway had a rights card and read in court. (No signed rights cards at this time?) Louis did not ask for legal counsel but did ask for juvenile authorities. Louis questioned by Gassaway, Murtek, and Angeley, one after another from 0100 until 1200. According to Gassaway, Louis was not told he was a suspect in a homicide during questioning.

**Detective Murchek, 21 Dec 70, 0340 hours, interview Louis with Det. Gassaway.**

In interviewing Louis, no parent present, no Miranda documented, and immediately started questioning Louis. Louis stated he went to hotel to visit a friend, Tatum, who stopped working at hotel in June 1968. He then changed story that he was actually going there to visit a friend and inquire about the party. Louis visited the party moving from party area to swimming pool area. Louis went to 3rd floor hearing about smoke, the bellman used a fire extinguisher on the third floor and Louis grabbed a house and proceeded to the fire. Enroute another "white" male took the water hose from him. The hose was not functioning.

The detective has Louis draw a diagram of where he was standing while trying to turn on fire hose in relation to fire. Louis said he was about 10 feet away and could feel the heat. Louis

6

according to detective was confused about his location and changed his diagram description a few times. It was at this point, Detective Gassaway advised Louis of his rights (What rights? How were rights given? Did detective read them, recited from memory? Were the admonishment to Louis recorded?) Due to Louis changing his story about why he was at the hotel and his alleged belligerent and profane language, he was taken by Officer Scoopmire to polygraph examination room. (Police officer not a certified polygraph examiner conducted the test?) (Statements indicate fire started on the 3rd floor)

In reading and analyzing the facts in the case, *probable cause* was not sufficiently explained or articulated by the detectives who interviewed Louis. The police reports did not articulate any reasonable activity by Louis to infer he was committing or committed any criminal activity. This egregious mistake was followed by subsequent custodial interrogation by the police of Louis, a 16-year-old juvenile.

His parent (Mother) was not present during the interrogation and Louis was not free to leave as indicated by the Detectives. Clearly, this is a Miranda admonition violation of his Fifth Amendment against self-incrimination. This also violated the due process clause of the Fourteenth Amendment. No documents were located to evidence a Miranda warning had been given and being a juvenile, a special admonition should have been clearly articulated to Louis, yet it was not.

As a clear violation of both the Fifth and Fourteenth Amendment to the U.S. Constitution, any statements made by Louis are tainted as "fruits of the poisonous tree and are inadmissible." The interrogators knew and relied on the lack of a parent and lawyer during questioning would yield the results they wanted as indicated by Mr. Bergman. Detective Murchek and Det. Gassaway were the interrogating detectives.

**Hiring of Cy Holmes**

Origin of the subject fire is concluded to be located at the floor level at two separate and distinct location in the north-south hallway of the fourth-floor level in the hotel, one location being in the southerly end of the fourth-floor hallway between rooms 3 and 4, the other being toward the northerly end between rooms 14 and 16. There is no physical way of positively determining which one of the origins was ignited first. (*Determining which was the original start of ignition can better determine cause of subsequent injuries where time, distance, and location of hotel guests were located*)

The cause of the subject fire is concluded to be an act of arson, constituting the willful and malicious act of exposing a **flaming object** or **flaming material** to the **vertical wall covering,** *(type of material?)* probably at or near floor level in the hallway at two separate and distinct locations. *(Evidence of arson, charring etc.)* Holmes, prosecution expert testified the fire was an arson without the complete arson lab report.

The opinions and conclusions of Holmes were inaccurate and based on the **physical evidence observed in** and about the **fire scene.** It was not until the opinions and conclusions outline herein were reached where notes were compared, and the similarities of the conclusions became

7

apparent. The second circumstantial and weak evidence to convict Louis was the testimony of Robert Jackson, an unreliable non-tested informant. Robert Jackson testified Louis started the fire with light fluid and matches. The Truesdail Report scientifically refutes Jackson's testimony. The report also discredits the veracity and truth of Cy Holmes expert opinion.

In paraphrasing, Investigator Holmes stated, the **investigation was limited in scope** in determining of the **origin** and **cause** of the fire. Only those preliminary tests necessary for this determination and cause were conducted. **Additional tests can** be made regarding **ignition, spread, and toxic** gases from the fire to the hotel.


**Intentional Concealment of the Truesdail Report**

**Truesdail Lab Report- Feb. 16, 1971. Review of Pioneer Hotel Fire, Tucson, 12-20-70 Lab no.17002.**

In or about September 1971, Captain Gilmore from TFD called Glenn Miller, Fire Expert with Truesdail. Gilmore on behalf of the prosecutor Weiss, wanted to know what the testing showed. He wanted to know what to expect. Trial was postponed and after repeated requests from the Defense, the report was never disclosed to the defense by the prosecution. The report was not obtained until 2004, some 34-years after the fire. This was at the request of Marshall Smyth, Defense Fire expert.

**Conversations between Gilmore and Miller**

The concealment of the Truesdail Report was an error of the highest caliber. The prosecution was aware of the findings as a result of the conversations between Gilmore and Miller. Gilmore expressed the discontent of the results with Miller after advising Weiss. The prosecution was clearly annoyed at the findings because to reveal it would jeopardize their case. Again this discovery, the Truesdail Report would have substantially impacted the case outcome of Louis Taylor.

Gilmore asked Miller if he "thought anybody else (expert) has any radically different conclusions." No, then Gilmore stated, the County Attorney wanted some indications so that he might know what to expect, that if you, Miller are subpoenaed by the defense, he would want some idea. I'm satisfied that no one else has found anything that would be contrary to our findings.

Miller contacted Captain Gilmore of Tucson Fire Department on the findings of the Truesdail report and told him with the evidence submitted, no volatile-flammable compounds were detected in any of the samples submitted. Gilmore asked for a copy of the report, Miller commented, "It's too bad it didn't turn out otherwise." "Yes, it is replied, Gilmore.

Miller told Gilmore, Defense Attorney called him about 3-weeks ago and asked for a copy of my report and I told him I would be happy to send him a copy on instructions from Mr. Everett. The language of "I certainly don't have to tell you something like that because of our relationship and the way we were working on it and I'm very sorry you didn't get a copy of the report. We

8

received the report of the 19th and dispatch copies to Mr. Everett on the 25th and your copy should have gone out at the time, but I'll get it out today.

Gilmore thanked him. There was a brief discussion where Miller mentioned the Uniform Code will be changing because of this fire to require Sprinklers in buildings like the Pioneer.

**Scientific findings of Truesdail Report:**

Analyses were made for the **presence of volatile materials** such as kerosene, gasoline, naphtha, methyl alcohol, ethyl alcohol, isopropyl alcohol, and nitromethane. Analyses were made by means of gas chromatography, using a flame ionization detector, which is especially sensitive to materials of this type**.** None of the samples showed evidence of traces of the above-named compounds.

Traces of very low molecular weight compounds were found in all the samples. These were estimated to be on the order of 10 micrograms per liter of gas in the sample containers. However, this type of compound is always present in charred matter and has no significance in this case**.** Note: This lab report was concealed during the trial from the defense).

**No volatile flammable compounds** such as kerosene, gasoline, naphtha, methyl alcohol, isopropyl alcohol or nitromethane were detected in any of the six samples submitted. Therefore, no arson was scientifically determined, thus, Louis Taylor should not have been convicted of Felony Murder, since the underlying felony was arson.

**Affidavit of Marshall L. Smyth, 11/3/2011 (Defense)**

This is a compelling document provides fire expert analysis from Smyth and Holmes. This affidavit provides substantial review regarding the cause of the Pioneer fire. An affirmative statement was made about the investigation of fires during this time period. "Fire behavior was not scientifically studied at the time of Louis Taylor's trial in 1972, and no authoritative science-based or peer-reviewed publications on the subject of forensic fie investigation existed in 1972. Report continues, The NFPA and the research and science on which it is based, has invalidated the conclusions both Mr. Holmes and Mr. Smyth reached at the time of Mr. Taylor's trial.

**Report Conclusion:**

The foregoing information (affidavit) establishes beyond a reasonable doubt that the 1972 trial testimony of C.W. Holmes and Marshall L. Smyth that the fire in the Pioneer Hotel was caused by "an act of Aron" (an incendiary fire per NFPA 921) is not supported by today's Science of Fire Investigation. Furthermore, application of the Fire Science of today demonstrates that the cause of the fire should be identified as "UNDETERMINED." This evidence was not substantiated by science and should not have been allowed into the jury instructions.

**Locating Informant Robert Jackson, Albert Jackson, and Bruce Wallmark**

9

Det. Hust of the Tucson Police Department, accompanied by Prosecutor Weiss, and Prosecutor Investigator Rex, visited Albert and Robert Jackson, and Bruce Wallmark at the.
The message was unless Robert, Bruce, or Albert testified to Weiss Louis Taylor was going to beat the case. Robert and Bruce agreed to testify against Taylor only if no charges were filed against Albert. Threats continued by prosecutor against Robert to include stopping him and talking to him threatening he better not change his story.

Albert maintained his statements against Louis were based on being threatened with homosexual attacks in prison. Once in prison, Albert reminded by old cons that Hust and Weis are watching him.

In Robert Jackson's statement he said Louis told him he found a can of lighter fluid and was playing with lighter fluid and matches. Allegedly tossed lighter fluid on wall and started a small fire and when he thought someone was coming fled the area without putting out the fire. Despite the affidavit of Robert Jackson saying his statements were true and voluntary without promise of reward, threat or duress. Yet, he was threatened with criminal charges if he did not testify against Louis.

**Suppression of Bergman evidence**

Mr. Bergman described responding to the scene to assist with evacuations. He noticed the exit doors locked, closed, and chained. The intent was to prevent others from entering to commit crime. The city of Tucson approved this unsafe practice which was probably a causal factor in the deaths in this case. Another contributory factor was the refurbishing of the hotel, and the threading of their fire equipment did not match the threading at the hotel's standpipe.

Many deaths were attributed to smoke inhalation and heart conditions due to fire rescue not being able to reach them. He saw Louis rescuing someone from fire and asked Louis to return inside with him to provide additional help. "I was bringing people to Louis, and he would escort them to safety." Louis also helped Bergman who was weak at the time from dehydration and heat burns.

Retaliation against Bergman was constant. He was warned about conducting TV interviews which really upset a lot of people on the department, telling him, "Are trying to blow the case? He stated a Commander and Deputy Chief told him to keep his mouth shut. This is not standard procedure for a police department command staff. A police officer investigating or assisting with an investigation is bound to follow as many leads as possible in order to find a suspect.

The retaliation to Bergman was pervasive, he was treated as a hostile witness by the prosecution, and he is a police officer! Prosecution interrupted through numerous objections to keep Bergman from testifying. The appearance was Bergman was helping a black kid during one of the most tragic events in Tucson history.

Bergman did not believe Louis set the fire and commented on how old everything was and needed substantial repair. An example is how fast the carpet burned and melted. It was also

10

mentioned someone forged Bergman's signature during the booking to state Bergman arrested, transported, and booked Louis. This was false, Bergman stated he did not book Louis.

**1983 Civil Rights Violations of Louis Taylor by City and County Agencies**.  **Insufficient facts amounting to probable cause for detention, movement, or arrest.**

Louis had assisted Bergman evacuate people during the fire. He then waited by the front door when Bergman became overcome by smoke inhalation. **O**f**ficer Adams and Officer Carstensen** asked Louis to walk with them outside and he complied. While walking Louis commented, "it's awful somebody would set a fire like that." Adams walked to command post, short distance away and advised Sgt. Alfred Lingham, he found the individual to whom the manager (Scroggins) referred. Adams told Lingham, the individual (Louis) was agreeable to making a statement.

 Lingham radioed the station and advised Adams had a subject who wanted to make a statement. Adams walked Louis to his police car a block away and Louis volunteered to ride in the car to the station. He was told my Adams he could ride in the front seat that he was not under arrest. However, Adams, told him for officer safety he had to pat him down before getting into the police car. Again, a search and Louis was not free to go.

There was not probable cause by the officers to contact Louis at the hotel other than the manager stating he was suspicious hanging around the hotel. The clear inference is Louis was black and had no business in the hotel according to the manage. Asking Louis to make a statement is tantamount to them believing he was a suspect. Louis believed he was a witness especially since he helped rescue people.

**Officers Adams and Cartensen** arrived at police station with Louis. They entered the coffee room and Sgt. Rossetti who had prior contact with Louis recognized from previous contacts. In the room were 3-5 other police officers to include Rossetti. Louis was asked how he had occasion to be at the Pioneer Hotel? Clearly a question believing Louis was a suspect and he was not mirandized at this point.

Louis answered that he went to hotel looking for his friend, Tatum. The answer was not sufficient, Louis was escorted to main floor briefing room from coffee room. The questioning continued. (At this point clearly, Louis was the object of the investigation, a party of interest, a suspect and should have been mirandized) The discussion centered on a Mexican and Caucasian boys seen by Louis running in the hotel. Adam interjected and said that was not the original statement by Louis. Now the inconsistencies started, Louis was a scared 16-year-old black kid surrounded by white police officers in 1970!

Adams stopped the interview/interrogation and read the departmental rights card. No copy of this card has ever been produced. When asked if he would answer the questions, Louis was response was, "sure" and Adams inferred he understood his rights. Again, Louis clearly thought he was a witness and not a suspect. It appears Adams did the questioning, Cartensen and Rossetti were present in the main floor briefing room.

11

It is difficult to determine the statements made by Louis before Adams read a rights cards, to which there is no documented proof. If Louis made statements that incriminated him, it was made before the Miranda admonition. Those statements were inadmissible.

Next to interview this scared boy was County investigator, "Rex". After Rex, Det. Murchek and Sgt. Gassaway, Tucson PD, interviewed Louis. Still no mother, attorney or juvenile case worker.

**545: Inv. Angeley** (County DA investigator) was contacted by Rosetti, who advised him Louis Taylor was at the police station "reference" the Pioneer Hotel. He further stated Louis was seen by two employees of the hotel to be at the scene. Louis was advised to leave hotel since he had not business there. Instead, he remained on the third-floor swimming pool area at the Hughes Aircraft Christmas party.

Louis was interviewed by Det. Gassaway, Det. Murcheck and Det. Angeley. The stories were inconsistent and Murcheck asked to draw a diagram and pinpoint where fire was started. The location was at the top of the stairs on the third floor.

Scroggins and Johnson were the first on the scene and stated Louis Taylor was at the scene of the fire. According to Inv. **Angeley,** Louis admitted to being at the origin of the fire when it started. He further stated he has known Louis Taylor for 3-years and that he is capable of starting this fire.

Angeley interviewed Louis at the station for two hours and admitted not mirandizing. Louis at station with Angeley from about 0400 to 1200 without juvenile authorities or parents being notified. During questioning Louis told him he saw who started fire and Angeley did not document this statement, as Louis had not credibility due to the numerous inconsistent statements. (Description of the suspect was believed to be Mexican according to Louis).

Later testimony by Angeley to Weiss, stated he knew Louis 6-7 years, but early he stated under oath 3-years. Louis statement to Angeley identified a Mexican and White boy on the third floor and believed the Mexican boy started the fire. Louis asked to call his mother, attempted to do so and negative contact with her. When asked by prosecution Weiss, if Louis was given his rights, Cashman objected but was continuously overruled by the judge. The focus was how long Angeley knew Louis versus if he was mirandized. Upon finally answering Angeley stated he believed Louis understood his rights, yet they were never given to him by Angeley.

When asked if he knew why Louis was being questioned, he only stated Sgt. Kreiger told him Louis was in the interview room. (Angeley, was very evasive about whether Louis was given Miranda) He also knew from previous contacts, Louis was under 18, a juvenile.

Angeley in addition, could not recall if Louis, he knew was a minor, asked for his mother. Again, no documented evidence or transcript of the interview. He also did not notify juvenile authorities; Louis was being detained. Angeley did not believe Louis wanted legal counsel, and stated he believed Louis could lie his way out of the situation.

Angeley directed asked Louis if he started the fire, Louis said not, yet no report was written by him. The interview was not recorded. Diagram mentioned again and according to Angeley was

12

still in existence, only one diagram. Question not answered. Louis asked for a lie detector test and Scoopmire arrived to escort Louis to the examination room.

Sergeant McGuire ordered Louis to be arrested. Angeley was present during the arrest. (Det. Dave Smith?) Angeley prepared a two-page report on interviewing Louis? Angeley unable to locate notes from this serious case?

In reading and analyzing the facts in the case, *probable cause* was not sufficiently explained or articulated by the detectives who interviewed Louis. The police reports did not articulate any reasonable activity by Louis to infer he was committing or committed any criminal activity. This egregious mistake was followed by subsequent custodial interrogation by the police of Louis, a 16-year-old juvenile.

His parent (Mother) was not present during the interrogation and Louis was not free to leave as indicated by the Detectives. Clearly, this is a Miranda admonition violation of his Fifth Amendment against self-incrimination. This also violated the due process clause of the Fourteenth Amendment. No documents were located to evidence a Miranda warning had be given and being a juvenile, a special admonition should have been clearly articulated to Louis, yet it was not.

As a clear violation of both the Fifth and Fourteenth Amendment to the U.S. Constitution, any statements made by Louis are tainted as "fruits of the poisonous tree and are inadmissible." The interrogators knew and relied on the lack of a parent and lawyer during questioning would yield the results they wanted as indicated by Mr. Bergman. Detective Murchek and Det. Gassaway were the interrogating detectives.

(Note: Officer Biggs stated after he and Officer Zylstra ended tour of duty and were headed home in their private vehicle when they say smoke coming from Pioneer Hotel and proceeded to the scene and contacted Sgt. Fugate. Officer Zylstra stated after debriefing (roll call) proceeded to the Pioneer Hotel and upon arrival began saw fire engines at the location. He did state Fire Department was poorly equipped and not ready to handle a fire of this size. (Contributing factor to deaths) Zylstra also stated after talking with several individuals at the scene he was unable to determine where the fire started or who may have caused it. There is a difference of recollection from Biggs and Zylstra on how they ended up at the hotel. Interview language of **Officer Holloway, DPS**, only described to Lt. Birmingham about who saw two black youths one going in and out of the hotel with a funny hat, on slim built and young.

### Exhibit 16: Detective Smith, 20 Dec 70

Detective Smith contacted Louis as a party of interest. When booking Louis at the juvenile center, his property consisted of 5-packs of matches from different hotels and stores. Detective Smith continued questioning Louis, no mention of Miranda or waiver. Conversations about "Mexican" starting fire to hide robbing the rooms was alleged.

Upon leaving juvenile center, Det. Smith drove to Louis home on 11th street and contacted Mary Louise Taylor, 16-year-old sister of Louis who said mother was not home. Det. Smith advised sister to let mother know, Louis was being detained by TPD.

13

Inconsistent statements, hostile or anger temperament of a juvenile did not substantial detention, arrest, or placing Louis at the scene on or near the time the fire started.

**Voluntariness of Louis Taylor statements**

Interrogations by Murcheck, Gassaway, and Scoopmire appeared to be coercion, under duress, and without legal representation until Mr. Cashman arrived at the police station. By that time Louis had been talking to the officers. Enticing Louis to draw a diagram could be deemed an admission depending on the intent of the detective. Again, Louis was alone and scared.

**Detective Gassaway, 20 Dec 70, 0300, report.**

Called to the Pioneer Hotel by Moore who advised Louis Taylor had been at the scene of the of fire two hours before it was reported. That Louis told Mr. Scoggins, hotel manager he saw two male negroes running away from the fire while he, Louis was attempting to assist in fighting the fire on the third floor. Louis asked by Gassaway to accompany him to detective bureau and in the presence of Detective Murchek asked him what he knew about the fire. (No Miranda) Louis began talking.

He stated in presence of Murchek, Gassaway said he advised Louis of his Miranda rights via the card (copy?) According to Gassaway, Louis said he understood, waived his rights and agreed to speak to them. During questioning, Louis mentioned he did not want to "fink" on anyone but believed the two Mexican guys started the fire and one had a gun in his waistband.

Gassaway told Louis he believed he started the fire and Louis, said, "I did not kill those people." When Louis was contacted by Sgt. Gassaway, it was in the council room at city hall and then escorted to Detective bureau. After talking to Scoggins, in another room, Gassaway returned to Louis and gave him his rights. (documents) Clearly Louis was now a suspect and not a witness. Apparently, Gassaway had a rights card and read in court. (No signed rights cards at this time?) Louis did not ask for legal counsel but did ask for juvenile authorities. Louis questioned by Gassaway, Murtek, and Angeley, one after another from 0100 until 1200. According to Gassaway, Louis was not told he was a suspect in a homicide during questioning.

**Detective Murchek, 21 Dec 70, 0340 hours, interview Louis with Det. Gassaway.**

In interviewing Louis, no parent present, no Miranda documented, and immediately started questioning Louis. Louis stated he went to hotel to visit a friend, Tatum, who stopped working at hotel in June 1968. He then changed story that he was actually going there to visit a friend and inquire about the party. Louis visited the party moving from party area to swimming pool area. Louis went to 3rd floor hearing about smoke, the bellman used a fire extinguisher on the third floor and Louis grabbed a house and proceeded to the fire. Enroute another "white" male took the water hose from him. The hose was not functioning.

The detective has Louis draw a diagram of where he was standing while trying to turn on fire hose in relation to fire. Louis said he was about 10 feet away and could feel the heat. Louis according to detective was confused about his location and changed his diagram description a few times. It was at this point, Detective Gassaway advised Louis of his rights (What rights? How were rights given? Did detective read them, recited from memory? Were the admonishment

14

TAYLOR 014701

to Louis recorded?) Due to Louis changing his story about why he was at the hotel and his alleged belligerent and profane language, he was taken by Officer Scoopmire to polygraph examination room. (Police officer not a certified polygraph examiner conducted the test?) (Statements indicate fire started on the 3rd floor)

**Exhibit 15: Polygraph of Louis: 21 Dec 70, 0715, by Douglas Scoopmire**

Report identified Louis as epileptic and tired. Louis had been under the care of a psychiatrist for seizures. Last seizures were about 5-months prior to this day. Admitted to starting fires as a younger kid. Louis was tired and became hostile after hours of questioning and changed his story several times. He denied lighting a fire at the hotel and was only there scoping it out because of the Christmas party. Poly stated Louis spent most of time near swimming pool. (Before fire)

Mr. Palm, bellman, arrived to work about 2230 and he took elevator to 3rd and 4th floor. Noticed stairway leading from 3rd to 4th floor full engulfed. When questioned, Mr. Palm said he did not remember seeing a negro teenage male entering the lobby of the hotel while he was on duty prior to the fire, nor did he see any negro male of the 3td floor when he and MR. Johnson got off the elevator.

Louis was aware of the Hughes Aircraft Christmas party at the hotel and went there to obtain some free food and drinks, due to being hungry. He put on a bus boy uniform to blend it with crowd. Louis told different stories to police as to why he was at the hotel but was actually a loner and did not go to meet others.

Louis was seen buying cigarettes on mezzanine level and this is where he was first seen at the hotel. *(By whom?)* Howard Cashman was the public defender who represented Louis Taylor. Louis was taken to police station (ostensibly) as a witness, but after an ***all-night*** interrogation, he was taken to juvenile hall locked up and *charged with trespass (where and why, probable cause statement?).* Mr. Cashman went to juvenile hall and two detectives were insisting on talking to Louis because of the deaths from the fire.

Police transported Louis to PD as a witness to the fire and he was not cuffed. At some point Louis said, "Why would anybody start a fire like that?" Police felt this was an admission. The atmosphere changed, he was taken from the council chambers where there had been a free exchange of discussion to a detective's interrogation room and questioned all night *(how many hours?).* 0100 to 0800 in report. Questioned by numerous police and fire personnel *(how many?).* The interrogation was not recorded! No written notes??

Louis asked for a lawyer, they never gave him one during interrogation *(5th and 14th violations)* In addition, Louis's mother was never contacted, and no efforts were documented the police tried. Arizona and federal statute required parent notification and or a juvenile probation officer. Initially statements were suppressed but later allowed in.

Cashman asked if Louis made any incriminating statements and he said not, inconsistent statements are not culpable of wrongdoing. Inconsistent statements (16-year-old).

**Court TV and Dateline Videos**

15

With technology advancing, court TV interviewed Howard Cashman the public defender for Louis Taylor. Mr. Cashman performed an invaluable service by representing a black kid who was targeted for this crime. Words cannot express the gratitude society owes Mr. Cashman.

Howard Cashman was the public defender who represented Louis Taylor. Louis was taken to police station (ostensibly) as a witness, but after an ***all-night*** interrogation, he was taken to juvenile hall locked up and charged with trespass *(where and why, probable cause statement?)*. Mr. Cashman went to juvenile hall and two detectives were insisting on talking to Louis because of the deaths from the fire.

Louis was aware of the Hughes Aircraft Christmas party at the hotel and went there to obtain some free food and drinks, due to being hungry. He put on a bus boy uniform to blend it with crowd. Louis told different stories to police as to why he was at the hotel but was actually a loner and did not go to meet others.

Louis was seen buying cigarettes on mezzanine level and this is where he was first seen at the hotel.

During the process it was argued back and forth whether or not Louis was going to be tried as a juvenile or adult. Curious his ***criminal background as a Juvenile was admitted*** *(Juvenile?)*. It was clear to Cashman, Louis would not be tried as a juvenile, despite testing which showed he was barely reading at normal levels. (Capacity to understand the impact of being tried as an adult versus juvenile) *(Need those tests?)*. Louis mental capacity did not appear to meet the standard of knowing the impact of this decision, according to Mr. Cashman.

It was determined after this hearing Louis would be tried as an adult. He was then transferred to Maricopa County Jail. State law prohibited this, and some local friends of Cashman posted bond for Louis. It was at this time 28 counts of first-degree murder arson were mentioned together.

Key in the process is disclosure rules were not part of legal proceedings, so the county attorney did not provide and documents to Cashman to prepare for the trial. It was two years of stone walling, the trial began in January of 1972, two years after the initial charge in December of 1970.

Police transported Louis to PD as a witness to the fire and he was not cuffed. At some point Louis said, "Why would anybody start a fire like that?" Police felt this was an admission. The atmosphere changed, he was taken from the council chambers where there had been a free exchange of discussion to a detective's interrogation room and questioned all night *(how many hours?).* 0100 to 0800 in report. Questioned by numerous police and fire personnel *(how many?).*

**The interrogation was not recorded! No written notes??**

Louis asked for a lawyer, they never gave him one during interrogation *(5th and 14th violations)* In addition, Louis's mother was never contacted, and no efforts were documented the police tried. Arizona and federal statute required parent notification and or a juvenile probation officer. Initially statements were suppressed but later allowed in.

16

TAYLOR 014703

Cashman asked if Louis made any incriminating statements and he said not, inconsistent statements are not culpable of wrongdoing. Inconsistent statements (16-year-old).

**Post-conviction, 1972 Acts of Conspiracy**

Prosecution offered Louis a plea deal that if he plead no contest, he would be released from prison, after 40 years Louis succumbed to the psychological pressure of being incarcerated and plead.

**In summary, it is my opinion that:**

1) The City of Tucson police and fire departments had informal unwritten policies of racial discrimination at the time of Taylor's arrest, prosecution and trial, as documented by several key documents in this case:  a) Bergman admitting Taylor was "fingered" (arrested) because he was the wrong color; b) Martin ignoring an obvious arson suspect because he was White; c) Hust calling Taylor a "nigger" and by calling Robert Jackson, Albert Jackson and Bruce Wallmark "nigger lovers," and; d) the City hiring an expert who determined the fire was arson because black boys start fires

2) As a direct result these policies, Taylor was contacted, detained, and eventually arrested without sufficient probable cause because he was black.

3) The City police and fire departments conspired and agreed with the prosecutor to violate Taylor's constitutional rights. This was evidenced by wrongful arrest of Taylor, intentionally concealing the Truesdail report, Willful withholding of evidence of about Donald Anthony and coercing Robert Jackson to give false testimony;

4) City Fire Investigator Cummings determined in 2013 the fire could not be classified as an Arson. Therefore, the City Police and Fire Departments should have moved the County Attorney to terminate the prosecution due to insufficient evidence.

Sincerely,

TOMMY W. TUNSON, D.B.A.

17