1  MILLER, PITT, FELDMAN & McANALLY, P.C.
   Stanley G. Feldman, SBN 000838
2  Peter Timoleon Limperis, SBN 019175
   Timothy P. Stackhouse, SBN 30609
3  One S. Church Ave., Ste. 1000
   Tucson, AZ 85701-1620
4  (520) 792-3836
5  sfeldman@mpfmlaw.com
   plimperis@mpfmlaw.com
6  tstackhouse@mpfmlaw.com
   me@mpfmlaw.com
7
   THE LEADER LAW FIRM, P.C.
8  John P. Leader, SBN 012511
9  405 W. Cool Dr. Ste. 107
   Tucson, AZ  85705
10 (520) 575-9040
   john@leaderlawaz.com
11
   Attorneys for Plaintiff
12
              **IN THE UNITED STATES DISTRICT COURT**
13               **FOR THE DISTRICT OF ARIZONA**
14
   Nina Alley, as Guardian and
15 Conservator for and on behalf of         No.  **15-cv-00152-TUC-RM**
   Louis Taylor, a single man,
16                                          **PLAINTIFF'S REPLY RE:**
                  Plaintiff,                **EQUITABLE ESTOPPEL**
17
   vs.
18                                          **Judge Márquez**
   Pima County, a body politic; The City
19 of Tucson, a body politic,
20
                  Defendants.
21
22                   **INTRODUCTION**
23     Plaintiff's motion asking the Court to use its undisputed and significant
24 discretion to apply equitable estoppel barring the Defendants' use of the *Heck* bar
25

should be granted principally because of the egregious misconduct attributable not only to the Defendants but also to the County's lawyer Nick Acedo.[1] Defendants' accusatory response seriously misstates material facts and the record itself. Moreover, the untrue accusations and angry tone about Louis Taylor's lawyers is directed at, among others, distinguished volunteer lawyers who act to serve the interests of justice in the State of Arizona. One may disagree with their views, but they are entitled to respect.

The Motion should be granted, and the Court should either immediately equitably estop Defendants from asserting the *Heck* bar or enter an order that Taylor has adequately raised estoppel and that the Court will consider equitable estoppel, based on trial evidence.

Additionally, and as discussed in more detail below, the Defendants' response includes an affidavit from County Counsel that alleges that Laura Conover lied at her deposition. This new affidavit disputes, as Conover testified, that when she and Acedo spoke in late May 2022, Acedo mentioned the Arizona State Bar, leaving Conover with the impression that a bar complaint would be filed if she proceeded with moving to dismiss Taylor's charges.

Finally, Taylor has consulted with ethics counsel and will very soon file a report with this Court, addressing whether this and other conduct by counsel for the County may have violated Arizona's rules of ethics. Taylor believes this report will bear directly on the issue of misconduct and equitable estoppel.

---

[1] Plaintiff's counsel recognizes the Court's long-standing proviso directing the lawyers to avoid direct criticism of opposing counsel, but unfortunately it is impossible to do so here given that the misconduct of Mr. Acedo is fundamental to the request for the application of equitable estoppel. That notwithstanding, Plaintiff's counsel will endeavor not to improperly resort to the tactics employed by the Defendants in their Response.

As the Court has previously requested with other pleadings, Plaintiff will separately file a redacted version of this Reply without an under seal designation.

## MEMORANDUM OF POINTS AND AUTHORITIES

### POINT 1

### DEFENDANTS DO NOT DISPUTE THE COURT HAS SIGNIFICANT DISCRETION REGARDING EQUITABLE ESTOPPEL

Defendants do not dispute that federal courts can apply equitable estoppel to fashion relief, nor do they dispute that federal appeal courts afford district courts significant discretion regarding equitable estoppel. Defendants assert the Court should not apply it, but concede equitable estoppel is available to the Court.

Defendants argue it is unclear whether Taylor relies on federal or state equitable estoppel law. Taylor relies on federal equitable estoppel law, as the numerous authorities cited in his motion demonstrate. For example, in *Jablon v. U.S.*, 657 F.2d 1064 (9th Cir. 1981), the court described equitable estoppel, based on the Black's Law Dictionary (5th ed. 1980):

Black's Law Dictionary (5th ed. 1980) defines "equitable estoppel" as:

> "The doctrine by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he otherwise would have had...." p. 483 (Emphasis added.)

That is exactly the relief Taylor seeks here - an order precluding the Defendants, based on the County's acts/conduct (including conduct of its attorney) from asserting a right the Defendants otherwise would have had.  *Jablon* goes on to recognize that "[e]quitable estoppel has been used to prohibit the government from asserting a theory which would undermine the plaintiff's cause of action..." 657 F.2d at 1068. *Jablon*

1  clarifies that, as here, equitable estoppel involves "attempting to bar the government

2  from raising a defense to an independent cause of action which he is asserting." 657

3  F.2d at 1068.

4      "Misconduct" has been defined as a dereliction from duty, injurious to another,

5  on the part of one employed in a professional capacity, as an attorney at law, (*Stage v.*

6  *Stevens*, 1 Denio [N. Y.] 267,) or a public officer, (*State v. Leach*, 60 Me. 58 (1872).

7

8      Defendants' response is ripe with factual distortions.   Taylor disputes all

9  characterizations of the facts argued by Defendants.   The Court can draw its own

10  inferences from the real evidence.   More importantly, Defendants' response and the

11  affidavit submitted by Acedo accuse Mrs. Conover of perjury - denying that Acedo

12  said anything about the State Bar during their May 2022 phone call.

13                          POINT 2

14  THE COURT CAN AND SHOULD INVOKE EQUITABLE ESTOPPEL
15            WITHOUT TAYLOR AMENDING HIS COMPLAINT

16      Defendants argue that Taylor amending his complaint is a "necessary predicate"

17  to proceeding, citing *Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 120 (9th Cir.

18  1980).  That is incorrect.

19      As discussed in Taylor's motion, district courts may invoke equitable estoppel

20  *sua sponte.*  The *Conerly* case does not apply because it involves Rule 9's heightened

21  pleading standard for fraud claims.

22

23      Although unnecessary here, the Court can treat Taylor's motion as a motion to

24  amend and grant it.  Defendants want Rule 15 briefing to force yet more delay.

25

POINT 3

*RUMERY* SUPPORTS EQUITABLE ESTOPPEL

Defendants cite *Newton v. Rumery*, 480 U.S. 386, 392–97 (1987) in their Response (Doc. 1143 at n. 1). *Rumery* is important to Taylor's claim that estoppel (and previously expungement) is appropriate based on the County leveraging Taylor's incarceration to extract the no contest-plea and create a *Heck* bar in 2013—which Defendant's response ignores, focusing only on the 2022 misconduct that Taylor also alleges should equitably estop Defendants from asserting the *Heck* bar.

In offering the plea in exchange for immediate release from prison, versus Taylor remaining incarcerated for years while the County litigated Taylor's petition "all the way to the Supreme Court," the County effectively offered a release-dismissal agreement. Under *Rumery,* such agreements are "enforceable only if (1) it was entered into voluntarily; and (2) its enforcement is in the public interest." *Lynch v. Alhambra*, 880 F.2d 1122, 1126-28 (9th Cir. 1989) (emphasis added). Otherwise, they are invalid.

*Rumery*'s rationale applies even though Taylor was not offered a release dismissal agreement, because Taylor's "no contest" pleas were the functional equivalent of a release dismissal agreement. During the PCR proceedings, the County admitted that they lacked evidence to convict Taylor if a new trial was granted, and former Pima County Attorney LaWall later acknowledged to the ABA that the County "would have to dismiss" Taylor's charges if a new trial were granted. (*See* Doc. 343, Ex. 3.)

Notably absent from the County during the 2013 PCR proceedings was the recognition that in 2010 the Arizona Legislature declared that it "supports the judicial

review of those arson convictions obtained using evidence that is now known to be unreliable," specifically identifying NFPA 921 as the proper standard for reviewing arson cases. H.C.R. 2066.

Since early in this litigation, the Court has expressed concern that Taylor was coerced, and that the County insisted on the "no contest" pleas solely to protect its financial interests:

> Plaintiff argues that policy concerns warrant reconsideration of the Court's holding that he is barred from obtaining incarceration-based compensatory damages. In support of this argument, Plaintiff contends that he went to the Pioneer Hotel in December 1970 in order to help guests escape from the fire at the hotel; he was profiled, targeted, and arrested based on his race; he has maintained his innocence for over 45 years; and he suspects that Pima County required him to plead no contest in 2013 in order to protect its own financial interests. The Court shares Plaintiff's concern that *Heck* and its progeny may have unintentionally created a financial incentive for prosecutors to require convicted.

(Doc. 81 at 9).

Although the County has denied acting to protect its financial interests in 2013, there is now compelling evidence in the record that that is *exactly* what the County did. The Court's January 19, 2024 summary judgment ruling (Doc. 869) discusses the May 30, 2022 email from David Berkman, who, as the Court correctly recognized, "had run the criminal division during the prior Pima County Attorney administration under Barbara Lawall." (Doc. 869 at 26). The Court further recognized that Berkman's email addresses Laura Conover's intent to exonerate Taylor and that if the convictions were set aside, Taylor would "be able to get damages which may cost the County a ton." *Id.* It is hardly debatable that the County's 2022 conduct (preventing Conover from filing

1   the motion to dismiss and then hiding critical evidence from her) was financially

2   motivated.

3       And, the Court has also ruled that this 2022 evidence is relevant to whether the

4   County acted to protect its financial interests in 2013:

5

6       A reasonable jury could further find, particularly in light of Berkman's
        email, that if financial considerations led the Pima County Attorney to
        decline to exonerate Taylor in 2022, they also likely played a role in the
7       Pima County Attorney's decision to condition support for Taylor's 2012
        Petition for Post-Conviction Relief on Taylor accepting a no-contest plea
8       to the original 28 counts of murder.

9   (Doc. 869 at 27). So, equitable estoppel is appropriate based not only on the 2022

10  misconduct by the County and its counsel, and also appropriate under *Rumery* for the

11  same reasons the Court ruled would justify expungement (leveraging bad convictions

12  when PCAO knew it could not retry Taylor and requiring "no contest" pleas for the

13  purpose of creating a *Heck* bar).

14

15      Most importantly, Taylor had been incarcerated for over forty-two years when

16  Pima County prosecutors offered to release Taylor. This Court long ago recognized the

17  inequities of Taylor's situation:

18      At the time of the agreement, the parties' bargaining positions were
        inherently unequal. If Plaintiff agreed to plead no contest to 28 counts of
19      murder, he would be rewarded with immediate release from confinement
        after having served 42 years. If he refused, he would continue to be
20      imprisoned for months or years awaiting full adjudication of his petition
        for post-conviction relief. Plaintiff, understandably, chose immediate
21      freedom.

22
        It's not clear that he understood the true price he was paying for that
23      freedom: a *Heck* bar precluding him from attacking the validity of his
        42-year imprisonment. If the Pima County Attorney's Office required
24      Plaintiff to accept a no-contest plea for the purpose of creating a *Heck*
        bar to § 1983 liability, the Court is concerned that such conduct
25      undermines the fairness and integrity of the justice system.

7

(Doc. 81 a 10).

Nor did Taylor's counsel draft the plea agreement. The prior County Attorney did, and it included a "hammer clause" specifically designed to discourage Taylor from collaterally attacking the convictions. Under the plea agreement, if Taylor successfully did challenge the convictions, the County reserved the right to reimprison and recharge Taylor - *for crimes it simultaneously acknowledged it could not prove beyond a reasonable doubt*. The agreement in *Rumery* did not violate public policy because the agreement "spared the [victim of alleged aggravated sexual assault] the public scrutiny and embarrassment she would have endured if she had had to testify in either" the criminal or potential civil case. *Id.* at 398. That was a "significant consideration in the prosecutor's decision." *Id.*

Here, as the Court recognized in its June 6, 2017 order, it would undermine the fairness and integrity of the justice system if the County offered the no contest pleas for the purpose of creating a *Heck* bar. Thus, the Court has already found that *if* the County offered the "no contest" pleas for the purpose of creating a *Heck* bar, that would violate public policy and the public interest - key factors under *Rumery*.

And how can it be in the public interest for the County to tolerate, let alone continue relying upon, an arson expert who was a depraved self-admitted racist? How can it be in the public interest to support a conviction with "snitch" testimony that has now been proven false? (Doc. 349-22 at 10). The public interest is served by ensuring that "the judiciary is [not] impotent when faced with clever but unethical prosecutorial tactics that undermine the interests of justice." (Doc. 869 at 27:25-27). The Supreme Court in *Rumery* agreed "that in some cases there may be a substantial basis for" the

concern that release-dismissal agreements "tempt prosecutors to. . . leave unremedied deprivations of constitutional rights." *Id.* at 394

Taylor was offered freedom after forty plus years of incarceration in exchange for a no-contest plea that effectively acted as a release of liability, akin to the agreements in *Rumery* and *Roberts*. In 2013, Pima County prosecutors endeavored to ensure that Taylor would not receive remediation for the deprivations and harms he endured for so long. Section 1983 was created for the very purpose of remediating such harms, and the "high purposes of this unique remedy make it appropriate to accord the statute a sweep as broad as its language." *Wilson v. Garcia*, 471 U.S. 261, 272 (1985) (quotation and citation omitted). That is precisely why Defendants should be equitably estopped from utilizing the coercive release agreement they offered Taylor in 2013.

Defendants should be equitably estopped from asserting the *Heck* bar if (1) the prosecution in 2013 leveraged Taylor's existing incarceration to obtain a no-contest plea to charges that it knew could not be proven beyond a reasonable doubt at a retrial, and (2) that the prosecution did so for purposes of creating a *Heck* bar to civil liability. To allow the *Heck* bar to stand would render the federal judiciary impotent "to redress flagrant denials of federally guaranteed rights... [through] civil liability under 42 U.S.C. § 1983." *United States v. McLeod*, 385 F.2d 734, 747 (5th Cir. 1967).

POINT 4

DEFENDANTS HAVE "UNCLEAN HANDS," NOT PLAINTIFF

Defendants' Response discusses the related equitable doctrine of "unclean hands" (Doc. 1143 at 1) and Taylor agrees the Court should consider this. It is unclear whether the Court would apply state or federal "unclean hands" authorities.

"Unclean hands" applies when an individual's misconduct has immediate and necessary relation to the relief that individual seeks. *Henderson v. United States*, 574 U.S. 958, n. 1 (2014). *See also JG v. Douglas County School Dist.*, 552 F.3d 786, 795 (9th Cir. 2008), citing 1 Dan B. Dobbs, Law of Remedies § 2.4(2), at 96 (2d ed.1993) (discussing "unclean hands," under which a party's remedy against her opponent may be denied if the opponent's misconduct has actually harmed the party or has at least put the defendant in substantial risk of harm from that misconduct); *see also Keystone Driller Co. v. General Excavator Co.*, 290 U.S., 240, 245 (1933). It can be either an affirmative defense or used by the plaintiff to invalidate an affirmative defense. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002).

Arizona state courts have likewise long recognized that under "unclean hands," the relevant inquiry is whether the offending parties misconduct succeeded in harming the other:

> the test of whether a man comes into a court of equity with clean hands, which is admittedly the basis for the exercise of its jurisdiction in such cases, is not the intention of the party, but whether his intended fraud actually succeeded in harming another.

*MacRae v. MacRae*, 37 Ariz. 307 (1930). In *Weiner v. Romley*, 94 Ariz. 40, 42 (Ariz. 1963), Justice Lockwood long ago observed that equity and unclean hands will apply when the misconduct it issue is willful.

As Judge Bury previously noted, what matters is that the offending party dirtied his hands "in acquiring the right he now asserts ..." *Slep-Tone Entm't Corp. v. Granito*, 2013 U.S. Dist. LEXIS 102800 (D. Ariz. Jul 22, 2013), citing *Republic Molding Corporation v. B.W. Photo Utilities*, 319 F.2d 347, 349 (9th Cir.1963).

A district court's application of "unclean hands," like application of equitable estoppel, is reviewed for abuse of discretion.   *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956 (9th Cir. 2015), citing *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 986 (9th Cir.2010), *Wash. Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 478 (9th Cir. 1969).

Finally, substantial portions of Defendants' Response allege supposed misconduct and unclean hands by Taylor.  Dignity will not be served by further responding to that unsupported nonsense.[2]

### POINT 5

### TAYLOR NEED NOT PROVE HIS CRIMINAL CASE WOULD HAVE BEEN DISMISSED

Taylor's criminal charges likely would have been dismissed absent misconduct. Defendants incorrectly respond that Taylor must prove this to obtain equitable relief (Doc. 1143 at 2 ("Taylor cannot prove that the state court would have granted Chin's motion to vacate")).

Neither equitable estoppel nor "unclean hands" authorities require Taylor to prove that his criminal charges would have been dismissed without the misconduct. Taylor need only prove that he was harmed. *See*, *e.g.*, *MacRae*, *Weiner*. Taylor was harmed by all the County's misconduct.  Regardless of whether the state court criminal charges would have been dismissed, the County, including through its lawyer, deprived Taylor of that opportunity and prospect by improperly influencing Conover.  It is

---

[2] Stanley Feldman's Declaration is attached as Ex. 1 and is referenced later in this Reply as it relates to the contacts with Jack Chin. Should the Court wish to also read why the Defendants' suggestion there was anything untoward regarding contacts with Nina Trasoff are equally absurd, those are also addressed in ¶¶ 11-15.

1   undisputed by Conover and Chin that Acedo's phone call *influenced* Conover – both

2   say this and there is no believable evidence to the contrary (despite Mr. Acedo's two

3   conflicting affidavits).  Jurors may or may not deem this call a "threat."  Regardless,

4   even Conover admits that because of the call, she "paused" and did not file the motion.

5   ██████████████████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████████████

9   ██████████████████████████████████████████████████████████████

10   ██████████████   Obviously, Taylor was harmed, and the County benefited. ████

11   ██████████████████████████████████████████████████████████████

12   ██████████████████████████████

13          Regardless, it is likely that Taylor would have ultimately prevailed on his PCR

14   in 2013, but that it would have required years more incarceration.[3] First, the Arizona

15   Legislature, in a unanimous resolution from both houses, declared that arson

16   convictions based on antiquated methods should be reviewed applying the new fire

17   science. *State v. King*, 250 Ariz. 433 (App. 2021) does not hold otherwise. Indeed, rather

18   than holding that new advances in science are *not* new evidence, it recognizes that

19   under long-standing precedent new science *is* new evidence. *King* cites *State v. Bilke*,

20   162 Ariz. 51, 53, 781 P.2d 28, 30 (1989), where the Arizona Supreme Court held that a

21   new PTSD diagnosis constituted newly discovered evidence because PTSD "was not

22

23

24   _____

25   [3] Taylor's inability to state exactly what would have happened in 2013 is not an admission that the PCR would not have been granted. It's simply a recognition that he lacks the supernatural ability to peer into alternate realities and determine would what have occurred had things happened differently than they actually did.

a recognized mental condition at the time of [defendant's] trial." In contrast, in *King* the condition defendant was later diagnosed with "was recognized and diagnosed by medical science for hundreds if not thousands of years prior to [defendant's] trial, and the disorder had been raised as a defense by defendants accused of similar crimes for decades." *King*, 250 Ariz. at 439-40.

Even if there were any doubt in 2013 whether NFPA 921 constituted new evidence, there can be no doubt now. While Arizona courts are yet to address the issue, other jurisdictions have addressed the issue (including prior to 2013) and found that NFPA 921 and other advances in fire-science warrant post-conviction relief based on newly discovered evidence. *E.g.*, *Lee v. Glunt*, 667 F.3d 397, 407 (3d Cir. 2012); *Commonwealth v. Young*, 304 A.3d 759 (Pa. Super. Ct. 2023); *Bunch v. State*, 964 N.E.2d 274, 289 (Ind. Ct. App. 2012); *Commonwealth v. Rosario*, 477 Mass. 69, 80, 74 N.E.3d 599, 609 (2017); *Souliotes v. Hedgpeth*, No. 1:06-cv-00667 AWI MJS HC, 2012 U.S. Dist. LEXIS 93806, at *9 (E.D. Cal. July 5, 2012); *Ex parte Graf*, No. AP-77,003, 2013 Tex. Crim. App. Unpub. LEXIS 403, at *1 (Crim. App. Mar. 27, 2013)

The advances in fire science on which Taylor relied, as the legislature recognized, were not known, or used in 1972, while the methods used to determine the fire was arson in 1972 have been rejected by modern science. It is new evidence, and the County should have recognized that and simply vacated Taylor's conviction, rather than promising to litigate his PCR for years to leverage the no-contest plea and protect the County's financial interests.

. . .

1

## POINT 6

2

THE COUNTY AND ITS ATTORNEYS COMMITTED MISCONDUCT

3

4

"There is no single test for detecting the presence of affirmative misconduct; each case must be decided on its own particular facts and circumstances." *In re Howell*, 120 B.R. 137 (B.A.P. 9th Cir. 1990), citing *Watkins v. United States Army*, 875 F.2d 699, 707 (9th Cir. 1989) (en banc).  When required by "justice and fair play," "equitable estoppel will be applied against the government . . ." *Id.* at 706. The County denies that its actions violate that principle.

5

6

7

8

9

The Court has already concluded that the County committed discovery misconduct by failing to disclose Chin's report and the 24.2 motion that if the County acted to protect its financial interests in 2013, it would threaten the integrity of the justice system.  But the misconduct goes far beyond that.

10

11

12

13

Taylor asserts that in 2013, the County forced him to plead no contest, leveraging the prior unconstitutional convictions to protect its financial interests.  The Court was previously poised to submit these issues to the jury and should still do so, albeit not for purposes of expungement, but for equitable estoppel.  A jury could well find these facts to be true, which would warrant equitable relief from this Court.

14

15

16

17

18

The American Bar Association publicly excoriated the County for its 2013 handling of Taylor's petition.  Both Rick Unklesbay (at the April 2, 2013 hearing) and Barbara LaWall (in her October 2016 email to the ABA) admitted they could not retry Taylor, i.e., that proof beyond a reasonable doubt was lacking.  That reality, the ABA said, required dismissal of Taylor's charges.  It wasn't until mid-2021, long after Struck Love got involved, that Unklesbay pivoted, claiming proof beyond a reasonable doubt existed.  The County never listed LaWall as a witness.

19

20

21

22

23

24

25

14

1    Additional acts by the County since mid-2020 further demonstrate a pattern of

2    misconduct.  Before the 2020 primary election, a member of the prior County Attorney

3    administration filed a bar complaint against Conover.  As Conover testified, that

4    complaint "was thoroughly investigated and summarily closed within 48 hours." (Doc.

5    810-1 at 44).  Then, within weeks of Conover winning the Democratic primary (early

6    August 2020) the outgoing administration unilaterally determined Conover had a

7    conflict regarding Taylor, using that as an excuse to hire Struck Love.  Conover herself

8    has described this purported conflict determination as a "bizarre misapprehension" that

9    she had ever represented Taylor.  (Doc. 810-1 at 56). There was no conflict.  And the

10   only authority to address the issue—Prof. Bruce Greene of Fordham University—

11   concluded she had no conflict.[4]  David Berkman's more recent bar complaint was

12   resolved without any finding (to Taylor's knowledge) that Conover had a conflict

13   relating to him. And notably, the County never determined that Conover had a conflict

14   or that there was a lack of harmony; the decision was made by the PCAO and the

15   motion to withdraw was signed only by the County's risk manager (which said nothing

16   of Conover's conflict). The PCAO now believes that there is, and never was, a conflict.

17       A litigation contract was signed with the Struck Love firm in early September

18   2020.  Remarkably, no one told Conover she had been conflicted off.[5]  As Jack Chin

19   recounted at his deposition, he had begun evaluating both Taylor's civil and criminal

20   matters, at Conover's direction, in early 2021.  As part of that, he contacted Nancy

21   Davis, the former Deputy County Attorney in the civil matter, to find out "where we

22   were at" in the civil case. (Doc. 810-2 at 11).  Davis responded, "the Pima County

---

[4] Green is the Chair of Law at Fordham and a nationally known ethics expert. https://www.fordham.edu/school-of-law/faculty/directory/full-time/bruce-green/

[5] It was only mentioned in passing, and the case only identified as "Taylor," in an email sent during the transition process, and Conover did not understand it to mean that she was already conflicted off and the case was taken over by outside counsel.

1   Attorney's Office is off the case." Chin responded, "Really?" Davis then confirmed.

2   (*Id.*). This anecdote illustrates the underhanded way the County has handled the entire

3   Taylor matter. The former administration didn't even give Mrs. Conover the courtesy

4   of telling her outside counsel had been hired. Conover and Chin had to figure it out

5   for themselves.

6         In early 2021 news reports, prominent Arizona public officials commented that

7   the PCAO's conflict determination—which LaWall described as "routine"[6]—and

8   hiring of outside counsel was unprecedented. In a newspaper article dated March 8,

9   2021, former Maricopa County Attorney Rick Romley described the move as "quite

10  unusual" and "smacking of politics." Former Arizona Atty. Gen. Terry Goddard

11  commented that the move was "undermining the election … in a fairly profound way."

12        Contrary to Defendants' assertion that the conflict was due to Conover's

13  campaign statements favorable to Taylor, it was based on the false notion that Conover

14  had represented Taylor by doing a little research for a parole hearing in law school.

15  She never did any such research, and even if she had, it would not have created a

16  conflict under ER 1.11(c)(1) (requiring personal and substantial participation).

17        If the PCAO's conflict determination were based on Conover's campaign

18  statements, it would be a violation of her First Amendment Rights. *See, e.g.,*

19  *Republican Party v. White*, 536 U.S. 765, 788 (2002) ("Minnesota Supreme Court's

20  canon of judicial conduct prohibiting candidates for judicial election from announcing

21  their views on disputed legal and political issues violates the First Amendment.");

_____

[6] Given that it had been decades since someone was elected County Attorney without having previously worked for the office, it is difficult to understand how the conflict check could have been "routine."

_Wood v. Georgia_, 370 U.S. 375, 395 (1962) ("The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance."). _Dellinger v. Lincoln Cty._, 266 N.C. App. 275, 288, 832 S.E.2d 172, 183 (2019) ("Labeling an elected official as biased based upon communications made before taking office curtails public involvement and threatens free speech."). By restricting the free speech of a political candidate before she even took office, the PCAO only further violated public policy under _Rumery_.

Around late April-early May 2022, Chin completed his criminal investigation, concluding Taylor's charges should be dismissed. Both Chin and Conover concluded Taylor did not get a fair trial in 1972 and that his charges should have been dismissed in 2013.  The ABA agreed. This is further evidence that Taylor's "no contest" plea agreement was the functional equivalent of a _Rumery_ release dismissal agreement (because Taylor's charges should have been dismissed, due to the admitted lack of proof beyond reasonable doubt).  Chin and Conover's conclusions were based in part on new evidence, that is, the racial biases of Cy Holmes that were uncovered in 2012 and never disclosed to any court.[7]  Remarkably, there is more.

Stakeholders were contacted in late May, including Nick Acedo.  Conover has described the heated late May phone call with Mr. Acedo in which he intimated a bar complaint would be filed.  According to Nina Trasoff, Conover later stated she was excited to exonerate Taylor but couldn't because she was threatened by Phoenix lawyers. Chin confirmed that the phone call and a series of communications with

---

[7] Taylor submits that under ERs 3.8 and 3.10, the County Attorney may have had ethical responsibilities in 2012 and 2013 to report these matters to the Superior Court.

Acedo were the "singular fact" responsible for Conover not filing the Rule 24.2 Motion.

While the content of the phone call was described by Conover, the County has successfully kept the remaining communications secret by claiming attorney-client privilege (despite also claiming there is no attorney-client relationship between the County's attorneys and Conover). Those include a letter from Acedo to Conover the morning of the CSIU's meeting where they changed course, which Conover promptly forwarded to her ethics counsel asking for "a bit of help." (Doc. 810-5). The Court should either draw a negative inference from the withheld communications between Acedo and Conover, her counsel, or the PCAO, or order they be produced.

After sitting silent more than six months after Conover's deposition was completed, Nick Acedo provided an affidavit to this Court dated May 3, 2024, as exhibit 7 to the Response.  The affidavit concluded with, "I declare under penalty of perjury that the foregoing is true and correct."  The next day, May 4, 2024, Mr. Acedo submitted a different affidavit retracting twelve paragraphs (numbers 2-14) from the prior affidavit, which was sworn to be "true and correct."

The replacement affidavit asserts that: (1) he never mentioned the State bar during the conversation; (2) he never became agitated nor "beside himself," and; (3) that the phone call was "cordial and professional."[8]  Inescapably, Nick Acedo alleges that his client constituent Conover committed perjury at her deposition and that she also lied to Nina Trasoff (or Trasoff lied about what Conover told her).

---

[8] The "beside himself" and "cordial and professional" references were excluded from the first affidavit.

The County, through an affidavit written by its retained counsel, is alleging that a high-ranking County Officer – Conover – testified untruthfully under oath at her deposition. This raises seemingly serious ethical issues that may directly impact the request to apply equitable estoppel.

Conover has been unclear about whether the call influenced her. She first acknowledged (when asked about Chin's testimony on the subject), that she "paused" filing the motion to dismiss because of communications with the Struck Love firm. (Doc. 810-1 at 41). Conover then confirmed that Chin's testimony was "correct" and a contributing factor to why she "paused." (Doc. 810-1 at 41-42). Then, in response to Acedo's questions, Conover said the phone did not influence her decision. (Doc. 810-1 at 67). But both Chin and Trasoff say that the call and other communications influenced Conover and prevented her from filing the motion. A reasonable jury could thus find influence.

The contents of the Berkman email to Lesher and supervisor Scott speak for themselves and illustrate that the County was acting solely to protect its financial interests (both in 2022 and probably in 2013), regardless of truth and regardless of innocence.



ER 3.8 imposes special duties on prosecutors when they possess evidence that a defendant is not guilty (*see*, specifically, sub. (g)(h) & (i)).  Under ER 3.10, a lawyer who knows of credible and material evidence creating a reasonable likelihood a convicted defendant is innocent, must disclose that evidence to the court.  The 24.2 motion Conover was going to file would have fulfilled her ethical 3.8 and 3.10 duties as to the new racial bias evidence regarding Holmes.

Arizona ER 8.4(a) states:

> *It is professional misconduct for a lawyer to:*
> *(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;*

If a civil lawyer encourages a prosecutor to refrain from exonerating someone who is eligible for exoneration, that would be encouraging the prosecutor to violate Rules 3.8 and 3.10.

The County's lawyer's May 2022 comments about the State Bar may have been ethical violations and that these comments reasonably caused Conover to believe a bar complaint would be filed against her if she proceeded. ██████████████

████████████████████████████████████████████████████████

████████████████████████ Finally, County counsel alleging that a high-ranking County official gave false statements under oath, appears to raise serious ethical concerns.

Making matters worse, the County and its lawyer argue that *Taylor* has committed litigation misconduct.  For example, they argue that Taylor tried to "secretly" settle the case (Doc. 1143 at 3).  First, Jack Chin called Stanley Feldman. Ex. 1, Feldman Declaration.   Second, as Prof. Chin testified, the outgoing administration had hidden the fact that outside counsel had been retained.  Had the outgoing administration extended the minimal courtesy of telling Conover outside counsel had been retained, there would have been no dialogue between Chin and Feldman on the civil case.  This is another unfounded argument by Defendants.

Feldman had never met or talked to Chin before the January 2021 phone call. *Id.* at ¶ 2. Chin asked Feldman about the possibility of settling. *Id.* at ¶ 4. There were no offers to settle anything by either side and both stated they had no authority to make any such offers. *Id.* at ¶ 5-6.  Feldman did not know that Pima County had even hired other counsel to exclusively represent it until he saw a copy of the Court's order that it

1   had been removed from the case. *Id.* at ¶ 8. Any suggestion that Feldman had tried to

2   "persuade Chin to settle the matter" is unfounded. *Id.* at ¶ 11.

3   There is abundant, overwhelming, and devastating evidence of misconduct by

4   both the County and Nick Acedo. If ever there were litigation facts warranting judicial

5   intervention and equitable relief, this is the case.

6
    Based on the uncontested evidence in the record, the Court should find now, as

7   a matter of law, that the County and its lawyers engaged in misconduct that warrants

8
    barring either defendant from asserting the *Heck* bar.  Justice demands no less.

9
    Alternatively, the Court should let the jury decide if misconduct occurred.

10

11  The County argues (Doc. 1143 at 13) that Chin and Conover's testimony does

12  not support the misconduct arguments.  At p. 8, they state, "Taylor's attorneys try to

13  discover why Chin betrayed them."[9]  These are some of the Response's most meritless

14  arguments (there were many contenders, to be sure).  Taylor looks forward to Chin and

15  Conover's trial testimony.  For the reasons stated in Taylor's supplemental summary

16  judgment briefing, it will undoubtedly support the already existing testimony strongly

17  supporting that misconduct occurred.

18  <u>POINT 7</u>

19  THE *HECK* BAR IS AN AFFIRMATIVE DEFENSE

20  The Response disputes that the *Heck* bar is an affirmative defense: "Defendants

21  disagree that *Heck* is an affirmative defense." (Doc. 1143 at 21).  Yet in the same

22

23

24  [9] In arguing this, Defendants entirely misstate the content of the letters between Chin and Feldman. For example,
    Defendants describe the February 3, 2021 letter to Chin as "scathing," and "*demanding* to know 'what is going
25  on' and calling *Chin's* decision 'ridiculous.'" (Doc. 1143 at 5) (emphasis added). In reality, the letter was
    professional and cordial, and merely stated, "[a]ll of this leads me to wonder what is going on," while questioning
    the prior administrations—not Chin's—"ridiculous" conflict decision. (Doc. 163-2 at 3-4).

breath, footnote 11, they acknowledge that "in *Hebrard*, the Ninth Circuit agreed 'that *Heck* is an affirmative defense that may be waived or forfeited.'" Defendants dispute that *Heck* is an affirmative defense under Ninth Circuit law while simultaneously quoting the relevant language proving the *Heck* bar is an affirmative defense.

Defendants' reliance on language from *Heck* stating that the plaintiff must prove a favorable termination is misplaced. Taylor is seeking damages based on his 1972 conviction, not the 2013 plea. It is undisputed that the unconstitutional 1972 conviction was vacated, and therefore the *Heck* bar does not apply. Under *Jackson v. Barnes*, 749 F.3d 755 (9th Cir. 2014), *Heck* bars Taylor's claim for incarceration-based damages only as a matter of causation. The 2013 conviction is akin to a superseding or intervening cause, which the defendant bears the burden of proving. *See Stroud v. Dorr-Oliver, Inc.*, 112 Ariz. 403, 410 (1975). If Defendants are estopped from introducing evidence of the 2013 conviction, or from otherwise asserting that it was the sole cause of Taylor's 42 years of incarceration, they cannot assert that *Heck* bars Taylor from recovering damages for the 42 years of incarceration resulting from the vacated 1972 conviction.

POINT 8

THERE IS NO PREJUDICE TO DEFENDANTS

Defendants complain that Taylor's equitable estoppel motion is untimely and that they need additional discovery. These arguments, like many others in the Response lack anything resembling merit.

The timing of Taylor's motion was dictated in large part by Defendant's 11th hour maneuvering regarding *Shipp* expungement. The Defendants could have filed

their "mandamus" petition in June 2021, when this Court declined to certify *Shipp* expungement for interlocutory appeal. Defendants instead waited more than two years, until the eve of trial, to file the petition. A cynic might suspect the Defendants waited until just before trial in the hopes of delaying trial. Even though the petition was denied, it led to this Court reconsider its position on *Shipp*. Taylor was prepared to try the case based on *Shipp* expungement. Once the court indicated it might reconsider *Shipp* expungement, Taylor naturally elected to focus on his previously preserved equitable remedies.

Equitable estoppel involves no new evidence. Taylor's claims are based entirely on evidence currently in the record, much of which the Court considered in the summary judgment proceedings.

## CONCLUSION

The application of equitable estoppel barring the affirmative *Heck* defense to preclude damages is compellingly rooted in the cited legal authority, facts showing defendant's unclean hands, the Court's discretionary power, and a commitment to justice.

This incredibly unique case stands out as a profound blight on the Old Pueblo. Louis Taylor has endured decades of suffering, his life marred by a quest for justice, still unfulfilled. The overwhelming evidence of the Defendants' egregious misconduct is not only substantial but often shocking and all but demands the application of equitable estoppel to uphold common principles of fairness and integrity within our judicial system and to address a wrong that has plagued this community since before many now involved were even born.

1    Taylor expects to provide the Court with a report from ethics counsel very soon.

2    The Motion should be granted.

3    Dated May 10, 2024.

4                                    MILLER, PITT, FELDMAN & MCANALLY, P.C.

5                                    By: /s/ Peter Timoleon Limperis
6                                         Stanley G. Feldman
                                          Peter Timoleon Limperis
7                                         Timothy P. Stackhouse
                                          Attorneys for Plaintiff
8

9                                    THE LEADER LAW FIRM, P.C.

10                                   By: /s/John P. Leader
                                          John P. Leader
11                                        Attorneys for Plaintiff

12        I hereby certify that on May 10, 2024, I electronically transmitted the attached
     document to the Clerk's Office using the CM/ECR System for filing and transmittal of
13   a Notice of Electronic Filing to the following CM/ECR registrants:

14   Daniel P. Struck
     Nicholas D. Acedo
15   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
16   3100 West Ray Road, Suite 300
     Chandler, AZ 85226
17   Attorneys for Defendant Pima County

18   Michelle Saavedra
     Dennis McLaughlin
19   Principal Assistant City Attorneys for
     Michael G. Rankin
20   CITY OF TUCSON
21   PO Box 27210
     Tucson, AZ 85726-7210
22   Attorneys for Defendant City of Tucson

23

24

25

# Plaintiff's Exhibit 1

*Alley v. Pima County and the City of Tucson*
*CV-15-00152-TUC-RM*

## DECLARATION OF STANLEY G. FELDMAN

I declare the following to be true to the best of my information and belief:

1.      Former-Deputy Attorney Jack Chin called me on January 21, 2021, and informed me that Pima County Attorney Laura Conover appointed him as Chief of the Conviction and Sentencing Integrity Unit of the Pima County Attorney's Office.

2.      I had never met or talked to Mr. Chin before this time.

3.      Mr. Chin told me he wanted to discuss his office's review of Louis Taylor's conviction.  Mr. Chin asked whether I could provide him with information about Mr. Taylor's civil case.

4.      I did not bring up the question of settlement.  Towards the end of our conversation, Mr. Chin asked me what I thought about the possibility of settling Mr. Taylor's civil claims against Pima County and asked what figure I had in mind.

5.      I responded that, at that time, I believed the case should be settled for four million dollars or more.  However, I informed Mr. Chin that that was not a settlement offer, and that I did not have the authority to make a settlement demand.

6.      Mr. Chin informed me that he also did not have authority to make an offer to settle, so no offer to settle was made by either of us.

7.      Although two former Pima County Attorney's filed a motion to withdraw and that was granted in early 2021, there was no indication nor did anyone from the Pima County Attorney's Office tell me that County Attorney Conover and

her entire office had been supplanted as counsel for Pima County in this case, thus, I was not aware that Pima County had hired outside counsel to represent it in Mr. Taylor's civil case completely in place (as opposed to co-counsel) of the duly elected County Attorney.

8.      I would not have spoken to Mr. Chin about the civil case had I been aware that Pima County Attorney Laura Conover and her staff, including Mr. Chin, did not represent Pima County.

9.      Due to concealment, I was still not aware on January 25 and 26, 2021, that Pima County had hired outside counsel to exclusively represent it in the Taylor matter.

10.     Over the course of those two days, I sent Mr. Chin several public documents and forwarded him a status summary of where the civil case stood at that time, including a description of pending motions.  I provided this information to Mr. Chin as a courtesy in response to his request for information about the civil case, *not* to "persuade Chin to settle the matter." (Doc. 1143 at 5:10-11).  That contention is unfounded since Mr. Chin had informed me just several days before that he did not have the authority to settle the case on Pima County's behalf and we were not engaged in negotiations.

11.     Defendants' description of my contacts with Nina Trasoff are also incorrect. Attached is a copy of her Declaration.

12.   That is correct so far as I can recall. I can certainly say that it correctly describes what happened from the very beginning when Nina came to my house to tell me what Conover was going to do to exonerate Louis. This was shortly after Mrs. Conover was sworn into office.  As her Declaration states she came with this message and with Mrs. Conover's knowledge.

13.   Paragraph 22 of her Declaration concerns contacts with Nina Trasoff in 2022.

14.   I called her because of emails we had found indicating Nina had been sent a copy of the press release stating Mrs. Conover would file a motion to exonerate Mr. Taylor.

15.   We did not threaten Nina with "an unauthorized subpoena" as is stated on page 5 of the Response. We simply told her that we needed to find out the facts and if she would prefer, we would obtain and serve a subpoena. She told us she would rather just tell us what happened rather than be subpoenaed to come to Court or deposition.

Stanley Feldman
May 10, 2024

3