1   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
    Daniel P. Struck, Bar #012377
2   Nicholas D. Acedo, Bar #021644
    Jacob B. Lee, Bar #030371
3   3100 West Ray Road, Suite 300
    Chandler, Arizona  85226
4   Telephone:  (480) 420-1600
    dstruck@strucklove.com
5   nacedo@strucklove.com
    jlee@strucklove.com
6
7   *Attorneys for Defendant Pima County*

8                  **UNITED STATES DISTRICT COURT**

9                     **DISTRICT OF ARIZONA**

10  Nina Alley,                              NO. CV-15-00152-TUC-RM

11                          Plaintiff,       **DEFENDANTS' JOINT**
                                             **RESPONSE TO PLAINTIFF'S**
12            v.                             **MEMORANDUM RE:**
                                             **EQUITABLE ESTOPPEL**
13  County of Pima, et al.,

14                          Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

<u>Page</u>

3   I.    Background.................................................................................................2

4   A.    Taylor Refuses Available State Post-Conviction Relief and Instead
        Attempts to Collaterally Attack His 2013 Convictions in This Civil
5       Action, Notwithstanding a Potential *Heck* Bar .....................................2

6   B.    Defendants Timely and Successfully Argue that Taylor's 2013
        Convictions Serve as a *Heck* Bar .........................................................3
7

8   C.    Taylor's Civil Attorneys Seize a Political Opportunity and Secretly
        Urge the New Pima County Attorney to Settle the Civil Case..............3

9   D.    Taylor's Criminal Attorneys Seize the Same Political Opportunity and
        Secretly Assist and Influence CSIU's Review of Taylor's Convictions
10      .................................................................................................................6

11  E.    While Taylor's Criminal Attorneys Are Seeking to Vacate the 2013
        Convictions in State Court, Taylor's Civil Attorneys Convince this
12      Court to Add the Expungement Claim ..................................................7

13  F.    █████████████████████████████████
        ███████████████████████████████████
14      ████████████████████████████████████.....7

15  G.    Conover Reveals That She Is Considering Vacating Taylor's 2013
        Convictions and Then Announces She Is Not Taking Any Action.......8
16

17  H.    Taylor's Attorneys Try to Discover Why Chin Betrayed Them ...........8

18  I.    Taylor's Civil Attorneys Falsely Accuse Pima County's Counsel of
        Ethical and Criminal Violations and Threatening Conover in an
        Attempt to Extort a Settlement .............................................................9
19

20  J.    It Is Revealed That Taylor's Civil Attorneys Improperly Contacted
        Trasoff and Threatened Her With an Unauthorized Subpoena If She
        Did Not Turn Over the Draft Op Ed ...................................................10
21

22  K.    Conover Quickly Refutes Taylor's Accusation That She Was
        Threatened.............................................................................................11

23  L.    Despite Conover's Denials and No Evidence, Taylor's Civil Lawyers
        Begin a Public Campaign of Falsely Accusing Pima County and Its
24      Counsel of Threatening Her.................................................................12

25  M.    Chin and Conover Disprove Taylor's Claim that Conover Was
        Threatened or Influenced in Her Decision...........................................13
26

27  II.   The Court Should Deny Taylor's Motion Because It Is Legally Baseless ....16

28  A.    The Doctrine of Equitable Estoppel Does Not Apply .........................16

B.   Defendants Did Not Waive or Forfeit the *Heck* Bar............................20

III.   The Court Should Deny Taylor's Motion Because It Is Factually Baseless..22

A.   Neither Pima County Nor Its Counsel Threatened Conover or Influenced her Decision to Not Take Action on Taylor's Criminal Convictions ............................................................................................22

1.   The May 27, 2022 Telephone Call .............................................23

2.   Nina Trasoff's March 9, 2023 Declaration.................................24

3.   David Berkman's May 30, 2022 Email ......................................25

4.   Pima County and Its Counsel Did Nothing Improper ...............26

5.   Taylor Cannot Prove that the State Court Would Have Granted Chin's Motion to Vacate.............................................................28

B.   Pima County Did Not Hide Evidence From Conover .........................30

IV.   The Court Should Deny Taylor's Motion Because It Is Untimely ................34

V.   If The Court Does Not Deny Taylor's Motion on the Present Record, It Should Afford Defendants an Opportunity to Conduct Discovery................34

VI.   Conclusion......................................................................................................35

ii

The *Heck* bar in this civil action is the result of a series of deliberate decisions by Louis Taylor and his attorneys.  They have come to regret those decisions, realizing that they grossly overestimated this Court's authority.  After convincing the Court that it could and should exercise its equitable authority to expunge Taylor's 2013 convictions, they abandoned that support when called to answer to the Ninth Circuit.  They now ask this Court to overextend its authority once again by (again) doing something no court has ever done before—"equitably estop" Defendants from "asserting the *Heck* bar," a bar that the Ninth Circuit has already enshrined as a matter of law.  Taylor's request should be denied.

First, the doctrine of equitable estoppel does not apply.  Taylor does not allege that Defendants made an affirmative misrepresentation to him or have taken an inconsistent position in this litigation, which he relied on to his detriment.  Second, Taylor has not and cannot prove by clear and convincing evidence that the allegations of misconduct underlying his request are true.  To the contrary, those allegations have been proven false.  Taylor has also not proven by clear and convincing evidence that he relied on Defendants' alleged conduct or was injured as a result.  Equitable estoppel cannot rest on speculation or conjecture.  And finally, Taylor's request is inexcusably untimely.

Perhaps more egregious than proposing a theory that lacks any good faith basis in either the law or fact is Taylor's hypocrisy in asserting that Pima County's counsel have engaged in misconduct.  Taylor's attorneys accuse them of interfering with the Pima County Attorney's review of his convictions—false—but it is *they* who tried to manipulate that review and influence its outcome.  Taylor's attorneys also accuse them of making threats and hiding evidence—false—but it is *they* who attempted to strongarm PCAO and extort a settlement, kept evidence from the Pima County Attorney, withheld critical information from the Court, coerced a witness, and engaged in a smear campaign against counsel.

Their hands are not just unclean; they are filthy.  Their allegations are projection.  Taylor and his attorneys should not only be "estopped" from asserting estoppel, but the Court should take a close look at *their* conduct and determine whether it warrants dismissal of Taylor's claims.  At a minimum, the Court should award Defendants' their fees.

1

1  **I.    Background.**

2      **A.    Taylor Refuses Available State Post-Conviction Relief and Instead
3         Attempts to Collaterally Attack His 2013 Convictions in This Civil
         Action, Notwithstanding a Potential *Heck* Bar.**

4        In 2013, Louis Taylor took a gamble.  Instead of allowing the state court to adjudicate

5  his 2012 petition for post-conviction relief, he knowingly, intelligently, and voluntarily

6  waived his right to challenge his 1972 convictions and accepted the no-contest plea.  (Dkt.

7  6-2 at 8–9, 38–46.)  His criminal attorneys, including Stanley Feldman, Noel Fidel, Michael

8  Piccarreta, Andy Silverman, and the Arizona Justice Project, concurred in the propriety and

9  entry of the plea, attesting it was in Taylor's "best interests."  (*Id*. at 3, 10, 48.)  And for

10 good reason: it relieved Taylor of having to *prove* his constitutional claims and authorized

11 his immediate release from prison.  It also left the door open to sue for civil damages.[1]

12       But no good deed goes unpunished.  Despite Taylor's and his attorneys' affirmations

13 supporting the propriety of the plea, Taylor's attorneys began attacking the plea *the day*

14 *after* Taylor was released from prison.  Feldman and Fidel questioned PCAO's motives,

15 suggesting that PCAO "leverage[d]" Taylor's then-life sentence to coerce him into

16 accepting the plea.  (Dkt. 886 at 7; Dkt. 896, Ex. 23.)  Of course, if they truly believed that

17 the plea agreement was unlawful, they had an avenue for recourse—a petition for post-

18 conviction relief pursuant to Arizona Rule of Criminal Procedure 33.1 (formerly Rule 32.1).

19 But instead of pursuing that available remedy and potentially vacating Taylor's 2013

20 convictions, they forfeited it, and, on January 30, 2015, Taylor filed this § 1983 civil action

21 seeking civil damages.  (Dkt. 1-3.)  Taylor is represented in this civil action by Feldman,

22 Peter Limperis, Timothy Stackhouse, and John Leader.  (Dkt. 1-3; Dkt. 40; Dkt. 105.)

23

24 _____
[1] The plea agreement did not expressly foreclose Taylor from attempting to file a
25 § 1983 lawsuit (Dkt. 6-2 at 2–10) and, in fact, it was not until the Ninth Circuit's decision
in *Lyall v. City of Los Angeles*, 807 F3d 1178 (9th Cir. 2015)—two years after the plea—
that it became clear that *Heck* applied, and not until the Ninth Circuit's decision in *Taylor*
26 *v. County of Pima*, 913 F.3d 930 (9th Cir. 2019)—six years after the plea—that it became
clear that Taylor could not recover incarceration-based damages. Moreover, PCAO could
27 have insisted that Taylor sign a release-dismissal agreement (dismissal of criminal charges
in exchange for a release of civil claims), which is neither inherently coercive nor per se
28 unconstitutional, *Town of Newton v. Rumery*, 480 U.S. 386, 392–97 (1987), but it didn't.

2

Hence, the gamble. Taylor and his attorneys rejected available post-conviction remedies not once, but twice, and did so for the chance to recover a large damages award in this civil action. For them, *everything* is riding on the *Heck* bar. As illustrated below, the potential consequence of their high-stakes decision has caused *them* to engage in questionable, if not improper, conduct, including levying the baseless, false, and defamatory attacks on Pima County and its counsel alleged in their Motion.

**B.    Defendants Timely and Successfully Argue that Taylor's 2013 Convictions Serve as a *Heck* Bar.**

In lieu of an answer to Taylor's § 1983 complaint, Defendants moved to dismiss Taylor's lawsuit, arguing that, under *Heck v. Humphrey*, 512 U.S. 477 (1994), his 2013 convictions barred his claims. (Dkt. 5, 6.) On June 1, 2016, this Court ruled that Taylor "is *Heck*-barred from challenging his 2013 convictions in this action" (Dkt. 48), and on March 16, 2017, it ruled that Taylor's 2013 convictions barred him from recovering incarceration-based damages (Dkt. 63). On January 17, 2019, the Ninth Circuit affirmed those rulings, *Taylor v. Cnty. of Pima*, 913 F.3d 930, 935 (9th Cir. 2019), and the Supreme Court denied Taylor's petition for writ of certiorari on March 23, 2020, 140 S. Ct. 2508 (2020).

**C.    Taylor's Civil Attorneys Seize a Political Opportunity and Secretly Urge the New Pima County Attorney to Settle the Civil Case.**

The *Heck* bar ruling was a major set-back for Taylor's quest for civil damages. But the prolonged litigation surrounding the *Heck* bar—which stayed these proceedings from June 2017 to April 2020 (Dkt. 81, 102)—opened a fortuitous door for Taylor. Pima County Attorney Barbara LaWall decided not to run for reelection in 2020. Criminal defense attorney Laura Conover decided to run for office. (Dkt. 838, ¶¶ 8, 10–11.) Conover wanted to "try some new systems of justice" instead of "continuing in the same direction." (*Id*.)

During her 2020 campaign, Conover made several public statements supporting Taylor and adverse to Pima County: (*) "The criminal justice system makes mistakes, and the office I'm running for has seen its fair share, including the way it mishandled Louis's exoneration and further harmed him."; (*) "Prison destroyed Louis, his health, his mind, his future."; (*) "I still pray for Louis."; (*) "He should have been compensated, in my humble

3

opinion.  The case caused outrage in me at an early age and has stayed with me."; (*) "I have always understood that there was a serious conflict in arresting him, in charging him, in trying the child as an adult, in convicting him, in denying him parole decade after decade, and then in refusing to make him whole. This case has haunted me and fueled me."; (*) "Louis was 16, and he did not get a fair trial.  And he became the 30th victim, in my humble view of the evidence."  (Dkt. 886-9 at 5–20.)  If she won the election, Conover "certainly expected" to review Taylor's criminal prosecution.  (Dkt. 838, ¶ 13.)

Taylor's attorneys seized this opportunity.  Feldman formally endorsed Conover for Pima County Attorney and several of Taylor's criminal attorneys, including Fidel, Piccarreta, Silverman, and Jefferson Keenan (from the Arizona Justice Project), contributed to her campaign.  (Ex. 1.)

When Conover won the Democratic primary election in August 2020, which cemented her victory in the general election because she ran unopposed, PCAO determined that Conover had a conflict of interest.  As a result, Pima County, which had been represented by two Deputy Pima County Attorneys in PCAO's Civil Division (Dkt. 6), retained outside counsel (undersigned) to represent it in this civil action (Dkt. 154).  The two Deputy Pima County Attorneys withdrew as counsel in December 2020 (Dkt. 160, 161), leaving only outside counsel as counsel for Pima County.

After Conover began her tenure as Pima County Attorney on January 1, 2021, she asked Jack Chin to "to learn about" Taylor's civil case.  (Dkt. 838, ¶ 19.)  Chin was a former law school professor at the University of Arizona; Conover had been one of his students.  (*Id*., ¶¶ 2, 7.)  When Conover won the election, she appointed Chin, who was then a law professor at the University of California, Davis, to be her Senior Counsel and the Chief of the Conviction and Sentencing Integrity Unit ("CSIU").  (*Id*., ¶¶ 1, 14–16.)  Chin had almost no experience prosecuting non-white-collar crimes, next to no familiarity with § 1983 litigation, "minimal trial experience" (he never tried a murder or arson case), no specialized training, knowledge, or experience in/with arson investigations, and spent his career assisting criminal defendants.  (*Id*., ¶¶ 3–6, 19.)

4

On January 21, 2021, Chin reached out to Feldman, whom he knew "from before"—Chin "had a student clerk for him." (Dkt. 764-1 at 12; Dkt. 838, ¶ 20; Ex. 2.) Feldman attempted to broker a settlement of this civil action with Chin, knowing that neither Conover nor Chin represented Pima County and without informing Pima County's actual—only—counsel, outside counsel. (Dkt. 160, 161, 163; Dkt. 163-2 at 2; Dkt. 838, ¶¶ 20–21.) Feldman told Chin that he was "glad to know [Chin was] the person to talk to and negotiate with," and he explained in "detail" why he believed the case should settle.[2] (Dkt. 163, 163-2; at 2; Dkt. 838, ¶¶ 20–21.)

On January 25 and 26, 2021, Taylor's civil attorneys (Feldman, Leader, and Limperis) sent Chin multiple emails, arguing their case, and attempting to persuade Chin to settle the matter. (Dkt. 764-1 at 2–11; Dkt. 838, ¶ 22; Ex. 3, 15475–76; *see also* Dkt. 163-2 at 3.) None of those communications were known by Pima County or its counsel.[3] Sometime over the last weekend of January 2021, Chin discontinued negotiations with Taylor's civil attorneys after learning that Pima County was represented by outside counsel. (Dkt. 163-2 at 3; Dkt. 838, ¶ 23.) That drew the ire of Feldman, who sent Chin a scathing letter on February 3, 2021, demanding to know "what is going on" and calling Chin's decision "ridiculous" and part of an effort to "cover up the sins of the past." (Dkt. 163-2 at 3–4; Dkt. 838, ¶ 23.) On February 4, 2021, Feldman emailed Chin again, upset that Chin was "simply wasting [his] time" and "frustrated by the unprofessional way this was handled." (Ex. 4.) Nonetheless, Feldman continued to secretly correspond with Conover and Chin regarding this civil matter and urged their intervention, despite the fact that they were not counsel for Pima County. (Ex. 3, 15465 [January 22, 2021], 15465 [February 10, 2021], 15412 [February 22, 2021], 15486 [March 17, 2021]; 69466 [February 23, 2021].)

---

[2] This telephone conversation and Feldman's and Chin's negotiations did not become known to Pima County's counsel until February 5, 2021, when Taylor disclosed it in a Settlement Memo. (Dkt. 163, 163-2.) Taylor's civil attorneys argued to this Court that their communications were justified because Conover "is counsel for the County" in this civil lawsuit. (Dkt. 168 at 4–6.) They have since conceded she is not. (Dkt. 1131 at 3.)

[3] Pima County did not discover these email communications until January 2023, when they were revealed by PCAO in response to a public records request.

5

**D.    Taylor's Criminal Attorneys Seize the Same Political Opportunity and Secretly Assist and Influence CSIU's Review of Taylor's Convictions.**

After Conover won the election, "people in the [Arizona] Justice Project" also began reaching out "with cases that they wanted looked at." (Dkt. 838, ¶ 24.)  Taylor's criminal attorneys "knew that [Conover was] coming in, and wanted to pitch [his] case … as something that [CSIU] should take on." (Dkt. 838, ¶ 24; PC 069456.)  After Chin discontinued work on Taylor's civil case, Taylor's criminal attorneys got "in touch with [Chin]." (Dkt. 838, ¶ 25.)  Chin was very familiar with Taylor's criminal attorneys.  Silverman was a "longtime faculty member of the University of Arizona" at the same time Chin worked there, and the two are "close colleagues" and "personal friends. (*Id.*, ¶ 26.)  Chin had previously discussed Taylor's criminal case with Silverman "years and years" before Chin worked in the CSIU. (*Id.*)  Chin also sent attorney referrals to Piccarreta and "had [Piccarreta] in to speak to [his] students," and encouraged individuals seeking review of their convictions to contact the Arizona Justice Project ("AJP") and the Innocence Clinic at the University of Arizona, which Silverman was part of. (*Id.*, ¶¶ 27–28.)

At Taylor's attorneys' request, Chin embarked on a 17-month investigation into Taylor's criminal prosecution, from January 2021 to May 2022, assisted mostly by law students. (Dkt. 838, ¶ 29.)  During his investigation, Chin spoke, met, and/or communicated with Taylor's criminal attorneys extensively, including Silverman and AJP attorneys Lindsay Herf and Katie Puzauskas. (Dkt. 838, ¶ 31; Ex. 5.)  Communications between Silverman and Chin in May, June, and July 2021 specifically concerned "plea negotiations in Taylor criminal matter." (Ex. 5, 15461, 15464.)  Silverman, Herf, and Puzauskas also sent Chin a memo outlining the same arguments they had raised in their 2012 petition for post-conviction relief and urged Chin to vacate Taylor's convictions pursuant to Arizona Rule of Criminal Procedure 24.2. (Dkt. 838-4.)  Chin did not discuss Taylor's prosecution with LaWall or the Deputy Pima County Attorneys who reviewed Taylor's criminal case in 2012-2013. (Dkt. 838, ¶ 33.)  Counsel for Defendants did not know about Chin's investigation or Taylor's attorney's extensive communications with Chin. (*Id.*)

**E.**    **While Taylor's Criminal Attorneys Are Seeking to Vacate the 2013 Convictions in State Court, Taylor's Civil Attorneys Convince this Court to Add the Expungement Claim.**

While Taylor's criminal attorneys were actively pursuing a vacatur of Taylor's 2013 convictions in state court with Chin (CSIU), Taylor's civil attorneys were seeking to amend their complaint in this civil action to add a claim for declaratory relief "expunging" Taylor's 2013 convictions.   (Dkt. 103, 110.)   In support of that request, Taylor's attorneys strenuously argued to this Court that they had "no available state court remedy."[4]   (Dkt. 110, 126, 137.)   Relying on that assertion, on February 17, 2021, this Court granted Taylor's request to amend his complaint and added the expungement claim.   (Dkt. 167 at 8.)   At no time did Taylor tell this Court or Defendants that he was, in fact, pursuing state court relief. And so, from that moment, until April 19, 2024 (Dkt. 1115)—more than three years—the Court and the parties vigorously litigated the expungement issue under false pretenses.   It was Taylor's attorneys' insurance policy if Chin did not do what they expected him to do.

**F.**    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[4] Taylor admitted that it was "his fault" that he did not timely file a Rule 33.1 petition for post-conviction relief from his 2013 convictions. (Dkt. 137.)

[5] ████████████████████████████████████████

1

2

3

4

5

### G.    Conover Reveals That She Is Considering Vacating Taylor's 2013 Convictions and Then Announces She Is Not Taking Any Action.

Eight days later, on May 27, 2022, Conover called several "stakeholders" and informed them that CSIU was "likely" filing a motion to vacate Taylor's 2013 convictions. (Dkt. 838, ¶ 54.)  Chin called Herf on that day and told her that PCAO "intended to file a motion to vacate Louis Taylor's 2013 convictions the following week." (Dkt. 609-2 at 113, ¶ 2.)  He also outlined for her some of the arguments that were included in his draft motion. (*Id.*, ¶ 3.)  On June 2, 2022, the media reported that Conover was "considering" filing a motion to vacate Taylor's 2013 convictions.  (Dkt. 626-1 at 153–154.)  But on August 3, 2022, Conover issued a press release stating: "CSIU's review of the Taylor criminal case is complete and did not find any new evidence of innocence.  Therefore, no further action will be taken in the Taylor criminal case." (Dkt. 626-1 at 157–158.)

### H.    Taylor's Attorneys Try to Discover Why Chin Betrayed Them.

On August 4, 2022, Taylor's civil attorneys sent a public records request to PCAO requesting: any "draft or final memorandum or other communication by Jack Chin or between anyone in the Pima County Attorney's Office or the CSIU" regarding CSIU's 2022 review of his convictions; any "draft or final press releases regarding Louis Taylor, including, but not limited to, a draft press release from the April through June 2022 time period"; and any non-privileged communications between the Pima County Attorney and Pima County's counsel.  (Dkt. 626-1 at 194.)  Unlike Defendants, they were obviously aware that Chin had drafted a motion and that a press release "from the April through June 2022 time period" existed.  PCAO, through its outside counsel, rolled out responsive documents, but redacted portions of or withheld documents because of confidentiality and/or privilege, including "CSIU Files" and "CSIU Records." (Dkt. 575-10 at 10; Dkt.

8

1    626-1 at 199–200, 205–207.)

2        On January 31, 2023, PCAO released a cache of internal documents and

3    correspondence (emails and text messages) to Taylor's civil attorneys and Pima County's

4    counsel.  The documents referenced the existence of a "report" and "motion" drafted by

5    Chin, but PCAO did not release either the report or the motion.  (*See*, *e.g.*, Dkt. 575-5 at 2,

6    12 [entry 740].)  The documents also showed that Nina Trasoff assisted with drafting a press

7    release on approximately May 28, 2022.  (Dkt. 575-6 at 14.)

8    **I.    Taylor's Civil Attorneys Falsely Accuse Pima County's Counsel of
        Ethical and Criminal Violations and Threatening Conover in an Attempt
9       to Extort a Settlement.**

10       On February 10, 2023, Taylor's civil attorney—Stanley Feldman—emailed Pima

11   County's counsel, accusing them of withholding "Chin's report/motion." (Dkt. 609-2 at 5–

12   8.)  Feldman further accused Pima County's counsel of "obstruct[ing] justice" and violating

13   "ethics and principles governing prosecutorial officers." (*Id.*)

14       On February 21, 2023, Taylor's civil attorney—John Leader—sent Pima County's

15   counsel an email that stated:

16           We are about to make some disclosures that will significantly
             change the complexion of this case and which will probably
17           create a mess for the County, the County Attorney and
             potentially your firm. … Call me if you want to discuss.  If not,
18           we will proceed with the disclosures.

19   (Dkt. 609-2 at 105.)  Pima County's counsel called Leader and, during that call, Leader

20   stated that he had information that Pima County had threatened Conover, but he would not

21   reveal the basis or source of his accusation.  (Dkt. 609 at 10–11.)  The point of the call was

22   to pressure Pima County into settling the case to avoid the purported disclosure.  (*Id.*)

23   Because the allegation was false, Pima County's counsel ended the call.  (*Id.*)

24       Later that day, Taylor's civil attorneys supplemented their disclosures.  (Dkt. 575-

25   21.)  They added to the proposed testimony of Conover and Chin that they "may testify that

26   the County's retained civil lawyers threatened—directly or indirectly—Conover and

27   possibly [Chin], the exact nature of which is not currently known." (*Id.* at 3–6.)  Taylor

28   also disclosed a May 28, 2022 email from Conover's work email address to her private

email address.  (Dkt. 575-4; Dkt. 609-1 at 234 [Doc. # 760].)  The subject line of the email reads: "draft op ed Pioneer Fire."  (Dkt. 575-4 at 2.)  It appears to be a draft press release that Conover prepared if she decided to move to vacate Taylor's convictions.  (*Id*.)  The email had not been released by PCAO in conjunction with Taylor's public records request.

On February 22, 2023, Pima County's counsel responded to Feldman's February 10, 2023 email, telling him that counsel did not have "Chin's report/motion," that they have never seen "Chin's report/motion," and that they have never "threatened" Conover or Chin.  (Dkt. 609-2 at 2.)  "That accusation is absolutely false."  (*Id*.)

## J.     It Is Revealed That Taylor's Civil Attorneys Improperly Contacted Trasoff and Threatened Her With an Unauthorized Subpoena If She Did Not Turn Over the Draft Op Ed.

Meanwhile, PCAO launched an investigation into how Taylor's civil attorneys secured a copy of Conover's personal email and the draft op ed.  PCAO discovered that Trasoff had given them both items, even though the draft op ed was a "confidential" record prepared by Conover "while acting within her prosecutorial authority," and Trasoff had been serving as an "assistant to Conover, acting as a prosecutor and while owing a duty of confidentiality."  (Dkt. 626-2 at 89–91; *see also* Dkt. 609-1 at 111–112, ¶¶ 3–7.)

Apparently, after seeing Trasoff's name in the January 31, 2023 cache of released documents, Taylor's civil attorney—Peter Limperis—"called" Trasoff sometime in "early" February and asked her "about [her] work on the Louis Taylor case for PCAO."  (*Id*.) Limperis and Feldman then went to Trasoff's house on February 7, 2023.  (Dkt. 575-14 at 4, ¶ 24; Dkt. 609-1 at 112, ¶ 8.)  Trasoff is "in her late 70s."  (Dkt. 838, ¶ 104.)  Limperis and Feldman asked Trasoff if she would give them a copy of the draft op ed.  (Dkt. 575 at 4, ¶ 26.)  Limperis "asked [Trasoff] to cooperate with hi[m] in lieu of issuing a subpoena." (Dkt. 609-1 at 112, ¶ 8.)  Significantly, discovery was closed in this case at that time (Dkt. 248), and therefore there was no authority to serve Trasoff with a subpoena.  Despite knowing that her work for Conover was "confidential" and that she was "never authorized to release any records or other work product," Trasoff turned over the draft op ed.  (Dkt. 575-14 at 4, ¶¶ 26–27; Dkt. 609-1 at 112, ¶¶ 6, 8.)  PCAO was not aware that Limperis and

10

1    Feldman had contacted Trasoff or went to her home.

2       After these circumstances were revealed in a February 28, 2023 affidavit from

3 Trasoff, Taylor's civil attorneys obtained a subsequent declaration from her, dated March

4 9, 2023.[6] (Dkt. 575-14.) In Paragraph 31 of that declaration, Trasoff allegedly avowed that

5 Conover told her that "she had not gone forward with the [draft op ed], which had been

6 scheduled for May 28, because Phoenix lawyers had threatened bar discipline and possible

7 disbarment if she went forward with the plan to exonerate Mr. Taylor."[7] (*Id.*, ¶ 31.)

8      **K.**     **Conover Quickly Refutes Taylor's Accusation That She Was**
9            **Threatened.**

      Trasoff's affidavit and declaration were reported in the media, including by an outlet

10 represented by Taylor's civil attorneys.[8] In response, Conover refuted Taylor's claim that

11 her decision to not take action in Taylor's criminal case was the result of threats by Pima

12 County. In a February 27, 2023 statement, Conover explained that her August 3 decision

13 was based on "Arizona law":

14

15         The Pioneer Fire decision … involved robust debate among the
        Senior Leadership Council here at PCAO. I prepared draft
16         comments for the decision to go either way. Arizona law only
        allows me to consider newly discovered evidence that might
17         come to light after 2013, the last time a judgment was entered
        in this case. To date, this has not occurred.

18 (Dkt. 609-2 at 62.) In a March 18, 2023 statement, Conover said that her decision was not

19 influenced by anyone:

20

21       [6] Taylor's civil attorneys apparently provided the draft op ed to David Berkman, a
former PCAO employee, who then used it as a basis to argue in his special action against
22 Conover that CSIU's 2021-2022
investigation. (Dkt. 609-1 at 31–32.) *See Berkman v. Conover*, C20215593 (Pima Cnty.
Sup. Ct.). Conover's outside counsel in that special action secured Trasoff's February 28,
23 2023 affidavit to rebut Berkman's waiver claim. Taylor's civil attorneys obtained Trasoff's
March 9, 2023 declaration to support their motion to depose Conover and Chin in Taylor's
24 special action against Conover arising out of their August 4, 2022 public records request.
*See Taylor v. Pima County, et al.*, C20224158 (Pima Cnty. Sup. Ct.).

25       [7] Trasoff also avowed that she told Feldman "sometime in 2021" that Conover had
planned to exonerate Taylor (Dkt. 575-14 at 3, ¶¶ 11–14), which is further evidence that
26 Taylor's civil attorneys knew that Taylor had post-conviction remedies available to him
while at the same time telling this Court that he did not.

27       [8]   *See*   https://www.kold.com/2023/03/15/new-court-documents-reveal-county-
28 attorney-was-pressured-not-exonerate-louis-taylor/.

1
2
3
4
5

> High-level prosecutorial decisions made by county attorneys and district attorneys across the nation often draw strong and sometimes fierce opinions. In performing my duties as prosecutor, I've proven my willingness and availability to listen to diverse feedback. However, I've also proven that I make decisions based on facts and the law. While I carefully consider the opinions of my senior leadership team and the opinions of interested members of the community, the ultimate decisions I make are my own.

6
7
8
9
10
11
12

(Dkt. 575-15 at 4.)  In a March 23, 2023 filing in Taylor's special action, Conover referred to Taylor's civil attorneys' allegation that Pima County threatened her as "baseless[]."  (Dkt. 609-2 at 87.)  And in an April 12, 2023 filing in Berkman's special action, she noted that she "cannot substantively dispute the asserted contents of the conversation [with Trasoff] without violating her required confidentiality[.]"  (Dkt. 609-1 at 142.)  She also accused Taylor's civil attorneys of "priz[ing] confidential information from Trasoff by exploiting their personal relationship."  (*Id*. at 143.)

13
14

**L.**    **Despite Conover's Denials and No Evidence, Taylor's Civil Lawyers Begin a Public Campaign of Falsely Accusing Pima County and Its Counsel of Threatening Her.**

15
16
17
18
19
20

On April 13, 2023, Taylor filed a Motion to Reopen Discovery in this civil action, accusing Pima County of "misconduct" and requesting disclosure of Chin's draft motion to vacate and to take the depositions of both Conover and Chin.  (Dkt. 575.)  In addition to relying on Paragraph 31 of Trasoff's March 9, 2023 declaration, Taylor attached a May 30, 2022 email from Berkman to Pima County Board of Supervisor Rex Scott and Pima County Administrator Jan Lesher that said:

21
22
23
24

> Conover is going to file a motion to set aside the Taylor Pioneer fire case.  Right now, Taylor is not entitled to damages. If the conviction is set aside he will be able to get damages which may cost the County a ton.  She has been conflicted off the federal case. This will impact that case. She has a real conflict. … The lawyer for Pima County needs to be directed to get involved. Her position is in direct conflict to Pima County.

25
26

> If someone wants to review the case it needs to be an impartial agency.  She has already said he should be compensated, is innocent, and she worked as his lawyer. Insane conflict.

27
28

> The Board needs to take a position.  This is outrageous if Acedo makes a stink, perhaps the judge will conflict her off.  She also has failed to alert victims, who now have a lawyer.

12

> Perhaps the Board can embarrass her to do the right thing.  The Board can't let this go.

(Dkt. 575 at 5–6; Dkt. 575-7.)  Taylor also attached what appears to be a cell phone screen shot of Lesher's response email, which stated:

> Supervisor Scott, I have been working with our outside counsel who represents the county on the civil case over the weekend. We will be placing an item on the executive session agenda for June 7 to brief the board.

(Dkt. 575 at 6; Dkt. 575-8.)  Neither of these documents were produced by PCAO in conjunction with its January 31, 2023 public records release, and it appears that Taylor's attorneys secured them from Berkman himself.

The Court granted Taylor's request to reopen discovery, finding the draft motion to vacate relevant to the expungement claim, ordered PCAO to disclose Chin's draft motion, and allowed the parties to depose Chin and Conover.  (Dkt. 680.)  In reopening discovery, the Court stated that "there is no indication that Plaintiff new or had reason to know, prior to January 31, 2023, that Chin had drafted a report recommending exoneration or that the PCAO had drafted a motion to exonerate." (*Id*. at 7.)  As noted above, that is not correct. Taylor's criminal attorneys knew that Chin had been conducting an investigation, assisted him in that investigation, and, on May 27, 2022, knew that Chin had prepared a motion and was set on filing it.  Taylor's civil attorneys obviously knew all of this as well, if not on or before May 27, 2022 (from Herf or Taylor's other criminal attorneys), then by August 4, 2022, when they expressly requested a copy of the draft motion (and Trasoff's draft op ed) in a public records request.  (Dkt. 626-1 at 194.)

**M.   Chin and Conover Disprove Taylor's Claim that Conover Was Threatened or Influenced in Her Decision.**

The sworn testimony of Chin and Conover was devastating to Taylor's "misconduct" theory.  It revealed the following.  Conover did not personally participate in the review of Taylor's criminal prosecution.  (Dkt. 838, ¶ 30.)  Instead, she "gave [Chin] the keys to the car and let him do his thing" and presumed that Chin had a valid basis to proceed with a motion to vacate.  (*Id*., ¶ 36.)  Conover did not review all the transcripts or evidence in the

13

prosecution file and was simply "relying on the factual [and] legal accuracy of assertions" that Chin made to her. (*Id*., ¶¶ 36, 89.) Her prior knowledge of the case derived from "media recordings, 60 Minutes interviews," and "parties making statements about what had happened"—hearsay. (*Id*., ¶¶ 86–87.) Conover "trust[ed] that whatever was in that motion had been verified by someone." (*Id*., ¶ 52.)

Chin prepared the draft motion to vacate and, sometime in May 2022, sent it to Conover and members of her Senior Leadership Team for their "final evaluation." (*Id*., ¶¶ 37, 51.) Although she did not verify its legal or factual contents, Conover thought it was "persuasive"; however, it was "still under discussion" and in "draft form." (*Id*., ¶¶ 52–53.) Nonetheless, because it was "likely" that the draft motion would be filed sometime the week of May 30, 2022 (Memorial Day was on Monday, May 30, 2022), Conover began contacting stakeholders on Friday, May 27, 2022. (*Id*., ¶ 54.) But she and her Senior Leadership Team were still in the "process of finalizing the document" and "had meetings set up" that weekend "to go over and discuss the motion." (*Id*., ¶ 55; Dkt. 575-5 at 3, 8.)

Conover and her Senior Leadership Team met on Monday, May 30, 2022, to discuss "editing" the draft but it turned into "a very intensive meeting about the [applicable] standards … and the limitation we were under in Arizona law." (Dkt. 838, ¶¶ 57–58.) It was a "robust debate" about "whether [the draft Rule 24.2 motion] really, in effect, was rehashing what had happened in 2013 as if we had all been there in 2013 and the realization that … Arizona law does not allow us to do that." (*Id*.) Chin wanted to "test the parameters of" Rule 24.2, despite there being no Arizona law supporting his view. (*Id*., ¶¶ 59–62.) Other members of Conover's Senior Leadership Team disagreed with Chin and firmly believed that the draft motion was not authorized by Arizona law. (*Id*., ¶¶ 63, 69.)

After that May 30, 2022 meeting, Conover "wasn't affirmatively moving forward on [contacting stakeholders] anymore." (*Id*., ¶ 64.) The discussion that took place at that meeting resulted in a "pause" in proceeding with the draft Rule 24.2 motion because the likelihood of filing it "downturned significantly." (*Id*.) Later that week, on Thursday, June 2, 2022, Conover's Chief Deputy, Chief Civil Deputy, and ethics counsel met with Pima

County's counsel, who asked CSIU to "review … certain documents" filed in this civil case. (*Id.*, ¶ 55; *see also* Dkt. 576-6 at 8, entry 718 & at 12, entry 740.)  Conover agreed to do so. (Dkt. 838, ¶ 65.)  Although reviewing those civil documents resulted in an overlapping filing "pause," it was of no consequence because Conover had already paused the filing on May 30, 2022, which resulted in an "indefinite" pause.  (*Id.*, ¶ 66.)  Conover ultimately decided not to file the draft motion because, under prevailing Arizona law, she could not simply "relitigate [Taylor's 2012 petition] with [her] current philosophies and undo [the LaWall administration's determination] in 2013," and Chin's draft motion did not present anything that properly qualified under Rule 24.2(e).  (*Id.*, ¶ 68.)  Conover's Chief Deputy, Chief Civil Deputy, and Chief Deputy of Criminal Appeals all agreed with her decision. (*Id.*, ¶ 70.)  Even Chin "could not overcome the concerns raised."  (*Id.*, ¶ 67.)

Conover's testimony was consistent with an internal email she sent to all PCAO employees on August 3, 2022, the same day she made her public announcement:  "After a complete review lasting well over a year, we have concluded that the case does not meet the strictures of Arizona Rule of Criminal Procedure Rule 24.2 that would warrant a filing of a Motion to Vacate Judgment." (Dkt. 609-2 at 95.)[9]

Regarding Taylor's allegation that Pima County and/or its counsel threatened or influenced her decision, Conover denied them unequivocally.  (Dkt. 838, ¶¶ 100–102.) Chin also testified that he was not aware of "any attempts by the county board of supervisors to influence in any way Laura Conover's decisions … in the criminal matter regarding Louis Taylor," or of any threat by Pima County's counsel.  (*Id.*, ¶¶ 92, 97–99.)

---

[9] This email was included in PCAO's January 31, 2023 public records release. Therefore, Taylor's civil attorneys had it at the time they filed the Motion to Reopen Discovery. Although Conover publicly announced she would not be taking any action on Taylor's criminal convictions on August 3, 2022, she testified that she made the decision at the "end of June or beginning of July" 2022. (Dkt. 838, ¶ 72.) Internal correspondence corroborate her testimony. (Dkt. 575-6 at 2–7; Ex. 6.) The public announcement was delayed because of internal, administrative delays.  (Dkt. 838, ¶ 72.)

1   **II.   The Court Should Deny Taylor's Motion Because It Is Legally Baseless.**

2       **A.   The Doctrine of Equitable Estoppel Does Not Apply.**

3       Taylor asks this Court to "equitably estop" Defendants "from asserting the *Heck* bar"

4   "due to misconduct" by Pima County and its counsel.  (Dkt. 1112 at 2, 4, 5, 15, 16, 17.)  He

5   alleges that they: (1) "improperly interfer[ed] with [Conover's 2022] investigation"; and (2)

6   "hid critical new evidence from Conover."  (*Id*. at 5, 10.)  Taylor claims that, "but for" this

7   alleged misconduct, Conover would have "dismissed" his 2013 convictions, thereby

8   "vitiating the *Heck* bar," and because Pima County and its counsel "prevented" her from

9   doing that, this Court should lift the *Heck* bar out of "equity."  (*Id*. at 5, 14–15.)

10      Despite referencing equitable estoppel (or some variation) at least 18 times in his

11  Motion and seeking extraordinary relief under that doctrine, Taylor does not explain what

12  it is or set forth its elements.  It is not even clear if Taylor is invoking state law or federal

13  law.[10]  His intentional obfuscation is reason enough to deny his Motion.  If he can't illustrate

14  what it is or how it applies, he shouldn't be entitled to any relief.

15      Nonetheless, the doctrine clearly does not apply.  Under Arizona law, "[e]quitable

16  estoppel involves, generally speaking, an affirmative misrepresentation of a present fact or

17  state of facts and detrimental reliance by another thereon."  *Arnold & Assocs., Inc. v. Misys*

18  *Healthcare Sys., a div. of Misys, PLC*, 275 F. Supp. 2d 1013, 1023 (D. Ariz. 2003) (quoting

19  *Tiffany, Inc. v. W.M.K. Transit Mix, Inc.*, 493 P.2d 1220, 1224 (Ariz. 1972)).  "The three

20  elements of equitable estoppel are traditionally stated as: (1) the party to be estopped

21  [Defendants] commits acts inconsistent with a position it later adopts; (2) reliance by the

22  other party [Taylor]; and (3) injury to the latter [Taylor] resulting from the former's

23  [Defendants'] repudiation of its prior conduct."  *Frank Lloyd Wright Found. v. Kroeter*, 697

24  F. Supp. 2d 1118, 1128 (D. Ariz. 2010) (quoting *Valencia Energy Co. v. Ariz. Dep't of*

---

26      [10] At one point, Taylor references the "federal doctrine of equitable estoppel" (Dkt.

27  1112 at 3:12), but many of the cases he cites applied state law. *See, e.g.*, *Henry Law Firm v. Cuker Interactive, LLC*, 950 F.3d 528, 537 (8th Cir. 2020); *Taylor Corporation v. XL Ins. Am., Inc.*, 2024 WL 453826, at *5 (D. Minn. Feb. 6, 2024); *Wayman v. Amoco Oil Co.*, 923

28  F. Supp. 1322, 1366–70 (D. Kan. 1996).

1    *Revenue*, 959 P.2d 1256, 1267–68 (Ariz. 1998)). "However, 'equitable estoppel is a shield,

2    not a sword; … it is available only as a defense by the party who has relied when the

3    misrepresenting party seeks to enforce some claim against him.  It is not a basis for a cause

4    of action for damages against the misrepresenting party.'" *Arnold*, 275 F. Supp. 2d at 1023

5    (quoting *Tiffany*, 493 P.2d at 1224).

6       The elements under federal equitable estoppel are similar:  "(1) The party to be

7    estopped [Defendants] must know the facts; (2) he must intend that his conduct shall be

8    acted on or must so act that the party asserting the estoppel [Taylor] has a right to believe it

9    is so intended; (3) the latter [Taylor] must be ignorant of the true facts; and (4) he [Taylor]

10    must rely on the former's [Defendants'] conduct to his injury." *Hampton v. Paramount*

11    *Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960).

12       Taylor's allegations do not fit in either box.  He does not allege that Defendants took

13    an inconsistent position or affirmatively misrepresented a set of facts, nor does he allege

14    that he detrimentally relied on any alleged conduct by Defendants.  His allegations are that

15    Defendants interfered with *Conover's* investigation and caused *her* not to take any action

16    on his convictions.  Although he claims that *he* was injured because Conover did not take

17    action, his allegations do not satisfy any of the "necessary" estoppel elements. *Traynor v.*

18    *Winnebago Indus., Inc.*, 2005 WL 8160998, at *4 (D. Ariz. Aug. 3, 2005).  Taylor is

19    obviously disappointed that Conover/Chin did not do what he expected them to do (lift the

20    *Heck* bar), but even assuming his allegations are true (which they are not), the doctrine of

21    equitable estoppel does not equip the Court to give him what he wants (lift the *Heck* bar).

22       Taylor essentially admits as much.  (*See* Dkt. 112 at 17 ["Equity does not wait upon

23    precedent."].)  Instead, he resorts to platitudes and non-descript string citations.  But even

24    a cursory review of the cases he cites reveals that they do not confer upon the Court the

25    authority he asks it to exercise or award the relief he requests.  For example, under the

26    heading, "A Party May Not Benefit From Its Own Misconduct," Taylor states:

27

28

> District courts have broad equitable relief powers. *S.E.C. v.*
> *Colello*, 139 F.3d 674, 676 (9th Cir. 1998). The federal doctrine
> of equitable estoppel applies to actions brought in federal courts

at law and equity. *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 232-233 (1959); *Heckler v. Community Health Servs.*, 467 U.S. 51 (1984); *Cange v. Stotler and Co., Inc.*, 826 F.2d 581, 585 (7th Cir. 1987).

These cases are inapposite.  In *S.E.C. v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998), the Ninth Circuit held that a federal court's "inherent equitable authority to issue a variety of 'ancillary relief' measures *in actions brought by the SEC to enforce the federal securities laws*" extended to "third parties" and, therefore, it permitted the SEC to sue a "nominal defendant" to recover fraud proceeds.  (Emphasis added, citation omitted).

In *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232–33 (1959), the court held that the Federal Employers' Liability Act did not preclude a claim by the plaintiff that the defendant was "estopped from raising [a statute-of-limitations defense] because it had induced the delay by representing to [plaintiff] that he had [more time] in which to sue." *See id.* ("The principle is that where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage.") (citation omitted).

In *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 58–66 (1984), the court held that the federal government was not estopped from recovering Medicaid funds from an unauthorized beneficiary because the beneficiary could not establish that she reasonably relied on the government's conduct to her detriment.  *See id.* at 59 ("[T]he party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse[,] and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.") (internal quotations and citation omitted).

In *Cange v. Stotler & Company*, 826 F.2d 581, 585–88 (7th Cir. 1987), the Seventh Circuit held that a plaintiff could argue that the defendant was equitably estopped from asserting a statute-of-limitations defense because the defendant's agent "lull[ed] plaintiff into not filing suit."  *See id.* at 587 ("[T]he cases are legion that a promise to pay a claim

18

will estop a defendant from asserting the applicable statute of limitations of the plaintiff relied in good faith on defendant's promise in forbearing suit.") (citation omitted).

None of these cases resemble the allegations levied by Taylor. Taylor also attempts to compare his allegations to those in *Estate of Amaro v. City of Oakland*, 653 F.3d 808 (9th Cir. 2011). But the first paragraph of that decision demonstrates that it has no application:

> This interlocutory appeal requires us to resolve only the following question certified by the district court: whether the doctrine of equitable estoppel should apply where a plaintiff believes she has a 42 U.S.C. § 1983 claim but is dissuaded from bringing the claim by affirmative misrepresentations and stonewalling by the police. We hold that the equitable doctrine does apply in such a context and affirm the district court's holding on that legal question.

*Id.* at 809. Taylor does not allege that Defendants "dissuaded" him from bringing his civil lawsuit "by affirmative misrepresentations."

Taylor's reliance on *Collins v. Gee West Seattle LLC*, 631 F.3d 1001 (9th Cir. 2011), and the general proposition that "a party should not be allowed to benefit from its own wrongdoing," are also unavailing. Although *Amaro* cited *Collins* for that proposition, it is not stated as a legal proposition in *Collins*; rather, the court in *Collins* was merely reciting the plaintiffs' assertion. *See* 631 F.3d at 1004. Nonetheless, the court in *Collins* did not reach the equitable-estoppel argument, thereby leaving no basis to compare it with Taylor's allegations. Taylor cites two other cases in the same paragraph, but they too are inapposite. *See In re Santos*, 112 B.R. 1001, 1007 (B.A.P. 9th Cir. 1990) ("Equitable estoppel requires reasonable reliance on a defendant's words or conduct in forebearing suit within the applicable limitations period."); *Haft v. Dart Grp. Corp.*, 877 F. Supp. 896, 903 (D. Del. 1995) (granting extension of time to exercise stock options based on California law).

Elsewhere in his Motion (Dkt. 1112 at 15), Taylor cites cases for similar "wrongdoing" propositions. But those cases, like *Amaro*, involved "circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period." *Bomba v. W. L. Belvidere, Inc.*, 579 F.2d 1067,

1070 (7th Cir. 1978); *see also Theriot v. Captain James Sprinkle, Inc.*, 30 F.3d 136, *3 (7th Cir. 1994) ("Equitable estoppel suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing.").  Again, Taylor does not allege that he was duped into delaying his complaint.

Taylor next invokes *in pari delicto*, claiming it "bars a party who has participated in wrongdoing from recovering damages resulting from the wrongdoing."  (Dkt. 1112 at 4.) But here again, Taylor does not explain the contours of that doctrine or how it has any application to this case.  *See ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1040 (9th Cir. 2016) ("Under the In Pari Delicto doctrine, *a plaintiff* who has participated in wrongdoing cannot recover when he suffers injury as a result of the wrongdoing.") (internal quotations and citation omitted) (emphasis added); *Kardoh v. United States*, 572 F.3d 697, 700 (9th Cir. 2009) ("The general rule, in its full Latin glory, is '*in pari delicto potior est conditio defendentis*,' or 'in case of equal fault the condition of the party defending is the better one.'  The D.C. Circuit restated the doctrine to be that neither party to an illegal contract will be aided by the court, whether to enforce it or set it aside.") (internal quotations and citation omitted).  The doctrine of *in pari delicto* does not add any context or color to Taylor's equitable estoppel claim.

Because the doctrine of equitable estoppel applies only if a party detrimentally relied on an inconsistent position or affirmative misrepresentation, circumstances Taylor does not allege, his Motion should be denied.

### B.    Defendants Did Not Waive or Forfeit the *Heck* Bar.

Not only has Taylor failed to show that equitable estoppel could apply, but he does not cite any case/court that has equitably estopped a defendant from asserting the *Heck* bar. To account for that admitted (dispositive) deficiency (Dkt. 1112 at 15:8-9), Taylor pivots and claims that "the *Heck* bar is an affirmative defense that can be waived or forfeited and that has happened here."  (*Id*. at 4.)  For the proposition that *Heck* is an affirmative defense, Taylor cites *Hebrard v. Nofziger*, 90 F.4th 1000 (9th Cir. 2024), which, in turn, cited *Washington v. Los Angeles County Sheriff's Department*, 833 F.3d 1048 (9th Cir. 2016).

As a preliminary matter, Defendants disagree that *Heck* is an affirmative defense. *See Heck*, 512 U.S. at 483, 486–87 (holding that "a § 1983 plaintiff must prove" favorable termination of a conviction before a claim challenging that conviction is "cognizable"); *see also McDonough v. Smith*, 588 U.S. 109, 115 (2019) (holding that *Heck*'s favorable-termination requirement is necessary to bring "a complete and present cause of action").[11]

Nonetheless, Defendants did not waive or forfeit a *Heck* defense. "A finding of waiver requires evidence of a party's actions that evince his intentional relinquishment of a known right." *Hebrard*, 90 F.4th at 1006. A forfeiture occurs when the defendant "fail[s] to raise an argument in a timely fashion." *Id.* Here, Defendants raised *Heck* in their *first* responsive pleading. (Dkt. 5, 6.) They did not intentionally relinquish or fail to raise the *Heck* defense. Moreover, the Ninth Circuit affirmed the existence of the *Heck* bar before any of the conduct alleged in Taylor's Motion allegedly occurred. *See Taylor*, 913 F.3d at 935. The *Heck* bar cannot be waived/forfeited as a matter of law. *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012).

Like his equitable estoppel argument, Taylor cites no case/court that has ever ruled that a Defendant has or can waive or forfeit a *Heck* bar due to misconduct analogous to the allegations in Taylor's Motion. He claims that the Seventh Circuit in *Carr v. O'Leary*, 167 F.3d 1124 (7th Cir. 1999), "upheld an order prohibiting a government defendant from asserting the *Heck* bar" (Dkt. 1112 at 14–15), but the court there found a waiver because the State was "remarkably careless in failing to assert a *Heck* defense," raising it for the first time seven years after the complaint was filed and after summary judgment on liability had been granted for the plaintiff. Defendants have not waived or forfeited the *Heck* defense.

_____

[11] Defendants acknowledge that in *Washington*, the Ninth Circuit held that "compliance with *Heck most closely resembles* the mandatory administrative exhaustion of PLRA claims, which constitutes an affirmative defense and not a pleading requirement[,]" and [t]herefore, as with affirmative defenses, a court may properly dismiss a *Heck*-barred claim under Rule 12(b)(6) if there exists an "obvious bar to securing relief on the face of the complaint." 833 F.3d at 1056 (emphasis added). Defendants further acknowledge that, in *Hebrard*, the Ninth Circuit agreed "that *Heck* is an affirmative defense that may be waived or forfeited." But both cases were focused on the propriety of dismissals under the Prison Litigation Reform Act, 28 U.S.C. § 1915. Nonetheless, Defendants maintain that *Washington* and *Hebrard* are inconsistent with *Heck*.

**III.    The Court Should Deny Taylor's Motion Because It Is Factually Baseless.**

The Court can and should deny Taylor's Motion on the aforementioned legal grounds.  But an alternative ground for denial is Taylor's utter failure to *prove* his factual allegations.  "The doctrine of equitable estoppel … must be proven by the party seeking to invoke it … by 'clear, convincing, and satisfactory evidence."  *Cent. Arizona Water Conservation Dist. v. United States*, 32 F. Supp. 2d 1117, 1138 (D. Ariz. 1998) (quoting *Cedar Creek Oil & Gas Co. v. Fidelity Gas Co.*, 249 F.2d 277, 281 (9th Cir. 1957)).  "[T]he acts relied upon to create it must be absolute and unequivocal."  *Knight v. Rice*, 321 P.2d 1037, 1038 (Ariz. 1958).  "Estoppel is never based on speculation."  *Weiner v. Romley*, 381 P.2d 581, 584 (Ariz. 1963); *see also Huseman v. Icicle Seafoods, Inc.*, 471 F.3d 1116, 1123 (9th Cir. 2006) (rejecting equitable estoppel claim based on "speculative characterization" and "pure conjecture").  As discussed below, the factual allegations underlying Taylor's "misconduct" claims are baseless.  In fact, they have been proven to be false, yet Taylor's attorneys continue to defame Pima County and its counsel out of sheer desperation to remove the *Heck* bar and undo their ill-advised decision in 2013 to forfeit post-conviction remedies and prematurely pursue this civil lawsuit.

**A.    Neither Pima County Nor Its Counsel Threatened Conover or Influenced her Decision to Not Take Action on Taylor's Criminal Convictions.**

Taylor's Motion is littered with references to "misconduct," "wrongdoing," and "improper[]" "interference" and "influence."  (Dkt. 1112 at 2, 5, 8, 9, 11, 13, 14, 15, 16.)  All of it is based on a May 27, 2022 telephone call between Conover and Pima County's counsel.  (*Id*. at 5–10.)  Taylor claims that, during that phone call, Pima County's counsel threatened Conover with Bar discipline if she went forward with filing the draft motion to vacate Taylor's 2013 convictions, and that she did not file the motion because of that threat.  (*Id*.)  Taylor further claims that this alleged misconduct is supported by: (1) Conover's deposition testimony characterizing their phone call; (2) Trasoff's March 9, 2023 declaration; and (3) Berkman's May 30, 2022 email.  Taylor's allegations are false.  None of this evidence supports Taylor's claim, and, in fact, the evidence refutes it.

1

### 1.     The May 27, 2022 Telephone Call.

Conover testified that when she called and told Pima County's counsel that "it was looking likely" that she would be filing a motion to vacate:

> His volume and speech pattern increased dramatically. He was agitated. He was zealously advocating for his cause. He said— he seemed to be beside himself that this could possibly be happening and indicated that I couldn't undertake this because I was the county attorney, and it didn't align with what he wanted, and he referenced that he thought the state bar would have—would have something to say about this.

(Dkt. 838-2 at 162–164, 256.)   Conover clarified that counsel was "passion[ate]" not "agitated," and that he was not "yelling."   (*Id*. at 164–165.)   She also acknowledged that counsel was "out to dinner" with his family at the time of the call and that he was possibly having to speak loudly because he was in a "public, loud space."   (*Id*. at 254, 258.)

As a threshold matter, counsel disagrees with Conover's characterization of the telephone call.   Counsel has attached to this Response as Exhibit 7 his recollection of the call.   Counsel was calm and respectful and did not say the things that Conover said that he said or make any threats.   (Ex. 7, ¶¶ 5–11.)   Nonetheless, even assuming Conover's characterization is accurate (it is not) and that counsel "referenced that he thought the state bar … would have something to say about this" (he did not), it does not support Taylor's claim that counsel threatened Conover with Bar discipline—or at all.   In fact, Conover testified that counsel did not threaten her or consider the alleged reference to the State Bar to be a threat.

When asked if she "remember[ed] any more specifically what he said about the state bar," Conover testified: "No, just a reference to the state bar. … I don't remember the exact words."   (Dkt. 838-2 at 164, 168.)   She confirmed, however, that counsel "did not reference a bar complaint" or a "bar charge," did not tell her that he "was going to file a bar complaint" or "contact the state bar," and "never told [her] that [he] or Pima County would be taking any action."   (*Id*. at 259–260, 262–263.)   When asked how she "perceive[d]" the "comment about the state bar," Conover testified: "I thought he was zealously advocating."   (*Id*. at 164.)   When asked how she felt after the call, Conover testified: "I thought he was doing

23

his job." (*Id*. at 165.)  When asked if the statement "cause[d] her any apprehension," Conover testified: "I probably spent the rest of the evening laughing." (*Id*. at 169.)  When asked if she was "confident" that she could—ethically—engage in a review of Taylor's criminal convictions, Conover testified: "Absolutely," because she had retained an ethics opinion from "the nation's leading expert on conflicts." (*Id*. at 51, 231.)

When asked, "Did I specifically threaten you during that phone call?" Conover testified: "No … I did not take it that way." (*Id*. at 259.)  She said it again:

> Q.  So you just testified that I did not threaten you, is that correct, I did not threaten you during our May 27th phone call?
>
> A.  Correct.

(*Id*. at 262.)  When asked if she felt "threatened," Conover answered: "I didn't.  I didn't. … I didn't - - it didn't land with me." (*Id*.)  When asked if she "ever communicate[d] to anyone after that conversation that you felt threatened by that call," Conover answered: "not that I felt threatened." (*Id*. at 170.)  Finally, she testified that, in her view, counsel was simply "vigorously representing" Pima County, which she "absolutely" appreciated," and "it was nothing more than just two very different styles of communication." (*Id*. at 261–262.)

Conover's sworn testimony proves that Taylor's accusation that counsel threatened her is false. (*See also* Dkt. 609-2 at 87; Ex. 7.)

## 2.    Nina Trasoff's March 9, 2023 Declaration.

Four months after Conover's testimony, Taylor's civil attorneys went to Trasoff's home, threatened to serve her with a subpoena, and then extracted her March 9, 2023 declaration. (Dkt. 575-14; Dkt. 609-1 at 112.)  As noted above, Paragraph 31 avows that "Phoenix lawyers had threatened bar discipline and possible disbarment if she went forward with the plan to exonerate Mr. Taylor." (Dkt. 575-14 at 5, ¶ 31.)  On its face, Trasoff does not say who these "lawyers" are, describing them only as being from "Phoenix." (*Id*.)  Pima County's counsel is located in Chander, Arizona. (Ex. 7, ¶ 14.)  Thus, Taylor's suggestion that Trasoff was referring to Pima County's counsel is not supported by her declaration.

More importantly, this hearsay statement was directly and definitively refuted by

Conover at her deposition:

> Q.  And did you tell that to Ms. Trasoff?
>
> A.  To the absolute best of my knowledge, I did not tell her that.
>
> Q.  Do you have any idea what she's talking about?
>
> A.  The reason why I'm so firm about it is because, I am exactly her children's age, there's a maternal aspect to the relationship, and she gets concerned about my job at times, and I - - so I wouldn't even given her this kind of negative news, because it would be so upsetting to her.  So that - - and that - - that informs my memory.

(Dkt. 838-2 at 263–264.)  Conover also did not know who Trasoff was referring to.  (*Id.*) Significantly, despite requesting to depose Conover about Trasoff's declaration (Dkt. 575 at 8), Taylor's civil attorneys did not ask Conover about that avowal.  (*Id.* at 171–178.)  This testimony was elicited by Pima County's counsel.  (*Id.* at 262–264.)  This suggests that Taylor's civil attorneys—who prepared the declaration—knew that Conover would refute it (or that it was false).[12]  Why else did they not ask her about it when they had the opportunity to bolster their claim?  Regardless, the allegation *was* refuted by Conover herself.[13]  That is all that matters.  Trasoff's declaration does not support Taylor's claim.

### 3.    David Berkman's May 30, 2022 Email.

Berkman, a citizen of Pima County, emailed a Supervisor of the Board, expressing concern about Conover's potential involvement in Taylor's criminal matter.  (Dkt. 575-7.) Believing Conover's potential motion to vacate Taylor's criminal convictions created a

---

[12] Trasoff's avowal that the draft op ed was scheduled to be released on May 28, 2022, is also peculiar. (Dkt. 575-14 at 5, ¶ 31.) That date is a Saturday, on the Memorial Day holiday weekend, and before both Conover and Chin proposed to file the draft motion to vacate (the following week). This is further evidence that Taylor's civil attorneys injected an avowal that was convenient for their narrative but untrue.

[13] Conover also testified that she did not tell Trasoff that she was "excited by [the] fact that the review had shown that the fire was not arson and that Mr. Taylor had been improperly convicted of arson and the felony murders of the people in the hotel," as avowed in Paragraph 30 of Trasoff's declaration. (Dkt. 832-2 at 177–178.) And when asked whether she thought it was appropriate for Feldman and Limperis to approach Trasoff and solicit her declaration, Conover testified: "I am dismayed that a woman in her late 70s was approached in her own home, knowing that she had no attorney present, by more than one person, knowing she had already sworn out an affidavit under oath, to see if she would do a second, relying on a lifetime relationship." (*Id.* at 264.)

conflict of interest for her (since Pima County is her client by statute and a vacatur would have been potentially adverse to Pima County's interests in this civil matter), he stated that "[t]he lawyer for Pima County needs to be directed to get involved," and suggested the lawyer "make[] a stink" in the criminal case and ask the judge to "conflict her off." (*Id.*) He also stated, "[p]erhaps the Board can embarrass her to do the right thing." (*Id.*)

Nothing in this email requests that the Board of Supervisors or Pima County's counsel threaten Conover. Moreover, Taylor has produced no evidence that Pima County or its counsel acted on or took any direction from Berkman, despite *his* civil attorneys apparently working with him for the past year in conjunction with Taylor's and Berkman's special actions, including securing this email and Lesher's response from him. Berkman's email is also dated May 30, 2022, *three days after* Conover's telephone call with Pima County's counsel, and Lesher's response states that she had *already* "been working with our outside counsel who represents the county on the civil case over the weekend. We will be placing an item on the executive session agenda for June 7 to brief the board." (Dkt. 575-8.) That Executive Session meeting never took place. Taylor's assertion that "the County instructed [Pima County's counsel] to interfere" at the behest of Berkman is also false (and unsupported). In fact, Pima County's counsel have deliberately refused to engage with Berkman about this civil matter (or any other matter regarding Pima County or Conover), ignoring emails and telephone calls, precisely because of his coordination with Taylor's civil attorneys and antagonism toward Conover.[14] (Ex. 7, ¶ 13.) Berkman's email does not support Taylor's claim.

### 4. Pima County and Its Counsel Did Nothing Improper.

Just as there was no threat, Taylor's general claims that Pima County and/or its counsel "improperly" intervened or influenced Conover's decision are baseless. At most, the record shows that, upon learning that Conover was considering filing a motion to vacate, Pima County asked her to review documents filed in this civil action before making a final

---

[14] Berkman has been an outspoken critic of Conover and filed several Bar complaints against her. (Dkt. 838-1 at 131; Dkt. 838-2 at 260–261.)

26

decision *and Conover agreed to review those documents*. (*See* Dkt. 576-6 at 8, entry 718; Dkt. 576-6 at 12, entry 740; Dkt. 575-11 at 2; Ex. 8.) What is improper about that? Taylor's attorneys had been corresponding with Chin, meeting with Chin, sending information to Chin, and urging Chin to vacate Taylor's convictions for over a year before Pima County and its counsel even discovered Chin had undertaken a review of Taylor's criminal convictions.

Nor would it have been improper for Pima County to express their views about Taylor's criminal convictions, express to its attorney (Conover) that her involvement in Taylor's criminal prosecution presented a perceived conflict of interest, or express a concern to its attorney (Conover) that certain conduct would be adverse to her client's (Pima County's) interests, as Berkman suggested. Chin wholeheartedly agreed. He testified: "I don't see anything wrong with them expressing that view and asking the prosecutor to comply with that view."; "The County is entitled to assert its position."; "[I]t's appropriate" for the County "to express their views" about "the consequences for the county of criminal litigation"; it is not improper for someone to tell a prosecutor that they disagree with their interpretation of the facts or the law; and it is not improper for a client to express to their attorney that what their attorney is doing could adversely affect the client. (Dkt. 838, ¶ 94.) Conover also had no issues about it.[15] (Dkt. 838-2 at 164.)

Nonetheless, Taylor's claims of "improper" "misconduct" are irrelevant. Conover— the Pima County Attorney—testified that her decision was *not* influenced by Pima County or its counsel. When asked if her May 27, 2022 phone call with Pima County's counsel "influence[d] in any way [her] decision to not take action on Louis Taylor's motion to vacate," Conover testified: "No, it did not." (*Id*. at 261.) She made this point again:

> Q. Your decision not to take action on the motion to vacate, was that influenced at all by anything other than your internal and own decision that you could not file it under Arizona law?

---

[15] Compare Berkman's email with the recent emails sent by a representative of AJP to the City of Tucson's Council and Pima County's Board of Supervisors, pleading with them to "stop the defense of this civil suit and settle with Mr. Taylor" and "immediately instruct your lawyers to give up their wrongful defenses of this case." (Ex. 9.)

\* \* \*

A.  That is stated correctly.  I - - I had no other influences.

(*Id*. at 321.)  As discussed above, Conover made the decision that she did based on Arizona law.  (Dkt. 575-15 at 4; Dkt. 609-2 at 62, 95; Dkt. 838, ¶¶ 58, 63, 67–70.)  Thus, Taylor's accusations that Pima County and/or its counsel interfered are baseless.

Taylor argues that only the County Attorney "represents the State" in criminal prosecutions and has "legal say" on whether to pursue them.  (Dkt. 1112 at 6.)  Here, Conover had the final say and exercised her authority accordingly.  Taylor also contends that, if "any Board member … influenced the Pima County Attorney in a criminal matter," it constitutes a violation of A.R.S. § 11-223.  But Taylor makes no attempt to connect any of the dots—"supervisor," "corruptly," "perform an act," "unauthorized by law"—much less *prove* a violation.  Nonetheless, as discussed above, the Pima County Attorney—who is responsible for enforcing § 11-223, *see Cochise Cnty. ex rel. Riley v. Good*, 453 P.2d 544, 545 (Ariz. App. 1969)—testified that she was *not* influenced by Pima County or its counsel.

### 5. Taylor Cannot Prove that the State Court Would Have Granted Chin's Motion to Vacate.

Taylor's purported injury is that the alleged misconduct "prevent[ed] [Conover] from obtaining the dismissal of Taylor's criminal charges."  (Dkt. 1112 at 14–15.)  This too is speculative and premised on false assertions.  First, it is simply not true that "the entire CSIU team concluded that Taylor did not have a fair trial in 1972 and that he should have been exonerated in 2013."  (*Compare* Dkt. 1112 at 6:23-24; *with* Dkt. 838, ¶ 71 [SOF]; Dkt. 838, ¶ 1 [CSOF].)  Nor is it true that Conover had "unequivocally decided to file a motion seeking dismissal of Taylor's criminal charges."  (*Compare* Dkt. 112 at 7:4-18; *with* Dkt. 838, ¶ 20 [CSOF].)  Even if she had (she did not), she ultimately decided not to file the motion because it was not authorized under Arizona law, a realization she and her Senior Leadership Team came to *after* she called stakeholders on May 27, 2022.  (Dkt. 838, ¶¶ 57–64, 68–70 [SOF]; Dkt. 838, ¶ 22 [CSOF].)

If Conover had filed the Rule 24.2 motion on the grounds stated therein—pursuant

28

to Rule 24.2(e)(2) ("the conviction was based on an erroneous application of the law") (Dkt. 838, ¶ 38)—it most certainly would have been denied, even if unopposed by Taylor.[16] Even where a prosecutor recommends dismissal, a state trial court has "discretion to deny the state's motion pursuant to Rule 24.2(e)." *State v. Leeman*, 2022 WL 1043745, at *6 (Ariz. App. Apr. 7, 2022) (mem. decision) (quoting *State v. Johnson*, 594 P.2d 514, 519 (Ariz. 1979)). Indeed, a state court had previously rejected an unopposed Rule 24.2(e)(2) motion filed by Conover (with the assistance of Chin), ruling that the motion was "completely and inexcusably misplaced," "provide[d] absolutely nothing to explain, clarify, or even identify what it believes was the 'erroneous application of the law,'" "without merit or support," "lacks reason, logic, and most importantly, any legal authority whatsoever," "ha[d] absolutely no legal support in law or in the record," and was "devoid of any procedural mechanisms or rule of law to support the request for relief"; noting the "absolute lack of any legal precedent supporting this Court granting the relief sought" and that "the State and the Defendant essentially urge this Court to turn a blind eye to" the procedural history of the case; and "direct[ing] all counsel to read Rule 42, Rules of Supreme Court of Arizona, and specifically ER 3.1." (Ex. 10; Dkt. 838-1 at 177.)

A similar fate would have greeted Chin's draft Rule 24.2(e)(2) motion. Defendants agree with Conover and her Senior Leadership Team that the draft motion to vacate did not articulate an "erroneous application of the law" (which is why it was not filed). The draft motion was unpersuasive, to say the least. (Dkt. 838, ¶¶ 49–50.) The state court would have snuffed it out quickly. Regarding Chin's belief that the ARC Report constituted newly discovered evidence, that argument would have been easily disposed of under *State v. King*, 480 P.3d 1250, 1256–57, ¶¶ 23–30 (Ariz. App. 2021) (holding that scientific advancements do not constitute newly discovered evidence), a case that Chin testified he could not recall if he came across it. (Dkt. 838-1 at 173.) The Court need not decide what the outcome would have been. It is enough, as Taylor admits, that he cannot show that the draft motion

---

[16] Taylor's victims would have intervened and opposed. (Ex. 11.)

*would* have been granted.  (*See* Dkt. 1112 at 14 ["The Court can and should take judicial notice that the motion would *probably* have been granted."], emphasis added.)  Thus, he has not proven any injury by clear and convincing evidence.

**B.**









**IV.    The Court Should Deny Taylor's Motion Because It Is Untimely.**

Taylor has known the allegations underlying his Motion since at least August 2022 (Declaration claims), and January 2023 (interference claims).  Yet, he did not seek leave to amend his Third Amended Complaint, which is a necessary predicate to an equitable estoppel claim.  *See Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 120 (9th Cir. 1980) ("[T]he plaintiff must plead with particularity the facts which give rise to the claim of fraudulent concealment."); *Knight*, 321 P.2d at 1038 ("[T]he party relying [on equitable estoppel] must plead the same …").[20]  Nor did he seek leave to move for summary judgment on equitable estoppel and waiver/forfeiture grounds.  Instead, just 11 days before trial, when it was evident that the Court would be dismissing the expungement claim, Taylor lofted the idea of equitable estoppel, and he filed his Motion just six days before trial.  (Dkt. 1112.)  Taylor has both waived and forfeited these claims.

**V.    If The Court Does Not Deny Taylor's Motion on the Present Record, It Should Afford Defendants an Opportunity to Conduct Discovery.**

Defendants were provided only two weeks to provide a response to Taylor's allegations.  Defendants had no opportunity to conduct any discovery into Taylor's equitable estoppel allegations.  He claims that "[m]ost if not all the evidence needed to invoke equitable estoppel is already in the record," but other than the depositions of Conover and Chin, it is all "evidence" that Taylor has secured outside the confines of this case (through public records request) or manufactured himself, all after the close of discovery in this case.[21]  To the extent the Motion is not summarily denied based on the present record and the legal authorities cited by Defendants, it certainly should not be granted without first allowing further discovery by Defendants.  Trasoff should be deposed to test the contents of and circumstances underlying her March 9, 2023 declaration.

---

[20] These binding cases trump Taylor's extra-jurisdictional cases that have allowed a court to sua sponte raise equitable estoppel.

[21] Even the depositions of Chin and Conover were not taken with an eye towards Taylor's equitable estoppel arguments, at least not from Defendants' perspective. The purpose of those depositions were to discover the circumstances surrounding Conover's decision not to take action on Taylor's convictions.

Berkman should be deposed to determine the extent of his communications and correspondence with Taylor's counsel and members of the Pima County Board of Supervisors. Taylor's attorneys—Feldman, Limperis, Leader, Herf, and Piccarreta— should be deposed to determine: (1) the circumstances surrounding Trasoff's declaration; and (2) their communications with Chin and others at PCAO about the Sealed Declaration and draft motion to vacate. Members of Conover's Senior Leadership Team who were involved in the draft motion to vacate should be deposed to corroborate the reasons Conover took the action that she did and their opinions about the draft motion.

The Court should authorize subpoenas requesting documents in all these witnesses' possession relating to Taylor's claims, including those portions of the CSIU file that were not ordered to be produced. Defendants should also be permitted an opportunity to retain an expert(s) to refute Taylor's allegations of misconduct. If the Court is going to entertain Taylor's belated Motion, it should only do so after giving Defendants an equal opportunity to defend against the claims. Discovery should then be followed by another round of briefing and, if the Court cannot decide the issues on the papers, it should hold an evidentiary hearing. Equitable estoppel is not an issue for the jury. *See Millennium Auto Sales LLC v. Pac. Specialty Ins. Co.*, 2022 WL 1569079, at *6 (D. Ariz. May 18, 2022) ("[E]xcept for any issues which may be common to the parties' legal claims, any equitable estoppel defense presents issues to be resolved by the court.").

**VI.    Conclusion.**

For these reasons, Taylor's Motion should be denied. Defendants further request the Court impose any sanctions against Taylor and/or his attorneys that it deems appropriate. At a minimum, the Court should award Defendants their attorneys' fees and costs incurred in preparing this Response pursuant to 28 U.S.C. § 1927 and this Court's inherent authority.

/ / /

/ / /

DATED this 17th day of May, 2024.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By ___/s/ Nicholas D. Acedo_____
　　　Daniel P. Struck
　　　Nicholas D. Acedo
　　　Jacob B. Lee
　　　3100 West Ray Road, Suite 300
　　　Chandler, Arizona 85226

　　　*Attorneys for Defendant Pima County*

MICHAEL G. RANKIN,
City Attorney

By ___/s/Dennis P. McLaughlin (w/permission)
　　　Michelle R. Saavedra
　　　Dennis P. McLaughlin
　　　Principal Assistant City Attorney
　　　PO Box 27210
　　　Tucson, Arizona 85726-7210

　　　*Attorneys for Defendant City of Tucson*

36

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| John P. Leader | john@leaderlawaz.com |
| Peter T. Limperis | plimperis@mpfmlaw.com |
| Stanley G. Feldman | sfeldman@mpfmlaw.com |
| Timothy P. Stackhouse | tstackhouse@hmpmlaw.com |
| Michelle R. Saavedra | michelle.saavedra@tucsonaz.gov |
| Dennis P. McLaughlin | Dennis.McLaughlin@tucsonaz.gov |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

/s/ Nicholas D. Acedo