STRUCK LOVE ACEDO, PLC
Daniel P. Struck, Bar #012377
Nicholas D. Acedo, Bar #021644
Jacob B. Lee, Bar #030371
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
dstruck@strucklove.com
nacedo@strucklove.com
jlee@strucklove.com

*Attorneys for Defendant Pima County*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Louis Taylor,<br><br>                                    Plaintiff,<br><br>          v.<br><br>County of Pima, et al.,<br><br>                                    Defendants. | No. CV-15-00152-TUC-RM<br><br>**DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT RE: BRUCE WALLMARK AND ROBERT JACKSON ALLEGATIONS** |

Pursuant to LRCiv 56.1, Defendants Pima County and City of Tucson submit this Statement of Facts ("DSOF") in support of their Renewed Motion for Summary Judgment Re: Bruce Wallmark and Robert Jackson Allegations.[1]

1. During Wallmark's direct examination, Taylor's attorney asked Wallmark if Det. Hust ever told him what to say; Wallmark responded:

> A.  No, no. No.  He never - - he never instructed me to say something specifically.  It was me.  It was all me.  Only wrong that was done here, it's all on me.

(Exhibit 1, R.T. 7/31/25, at 29.)

2. During his cross examination, Wallmark denied the accusation that Defendants intimidated or coerced him into providing his statement and testifying; rather, Wallmark did so for "selfish reasons."  (*Id*. at 104, 106-107, 114.)

---

[1] In presenting what Wallmark testified to in the state court proceeding, Defendants are not admitting or agreeing that Wallmark's 1972 testimony was in fact false.

3.      Regarding his August 1971 statement, Wallmark testified that he "just made it up as [he] went." (*Id*. at 33.)

4.      Wallmark also testified that he "pick[ed] up what" "the adults in the room" "were talking about," but clarified that there was "not anything nefarious on the adults' part. They were just having their conversations." (*Id*. at 50, 143.)

5.      Wallmark further testified that nobody told him what to say prior to his testimony; he was simply asked "[j]ust to read" his August 1971 statement and "articulate that." (*Id*. at 43-44.)

6.      Wallmark testified that he was not promised anything in exchange for his statement or testimony, and that he did not enter into any sort of non-prosecution agreement. (*Id*. at 37, 134.)

7.      When Taylor's attorney asked Wallmark if Det. Hust "wanted to have you assist them to recruit others to perhaps testify against Mr. Taylor," Wallmark testified:

> A.  I don't know if that was - - those were the words used.  The gist of it was they wanted to know if I knew anybody else who could help.  Or who had been there or who I thought might have talked to Louis.  So, I told them who.

(*Id*. at 37-38.)

8.      When Taylor's attorney asked Wallmark if he gave information to Lawrence Estrada "that might be of assistance to him if he wanted to cooperate," Wallmark testified, "yeah," but "[t]hat was all on me.  I was the only one there lying at that point." (*Id*. at 40-41.)

9.      When Taylor's attorney asked Wallmark if anyone knew that his statement was false before he testified, Wallmark said no:

> Q.  [A]nd did you at any time tell them that that was all a complete lie?
>
> A.  Not at that time, no.

(*Id*. at 44.)

10.      When Taylor's attorney asked Wallmark if anyone knew that his testimony was false after he concluded his direct examination, Wallmark said no:

Q. Did you tell anyone that you had lied?

A. Not at that point, no.

(*Id*. at 53.)

11.    Wallmark testified that, after he absconded from trial and fled back to Tucson, he told his "best friend" Jackson about his testimony and asked Jackson to corroborate his testimony, and Jackson agreed to help Wallmark by volunteering to provide false testimony that Wallmark "masterminded":

A. [W]hen I told [Jackson] what had been transpiring, he offered to help me.  He said: If you need any help, bro, just let me know.  And I told him, well, here's what I'm doing, here's what I've been doing, here's what's going on.  And just kind of briefed him on the whole scenario, what had been going on.

*        *        *

Q. And did you discuss, you know, what you had said in court?

A. Yes.

Q. And Bobby offered to help you?

A. He did.

Q. How was he going to help you?

A. By just supporting was I was saying.

*        *        *

Q. And did you learn that he had been stopped by the police?

A. I did.

Q.  And did you learn that he then told them that he had conversations with Louis Taylor?

A. I did.

Q. And you are smiling.

A. I'm sorry.

Q. What did you learn?

A.  I just learned that he was basically now trying to tell the police that he knew the things that - - not only what I knew but, in typical Bobby style, was going to outdo me, and sort of enhanced all that and added to it, elaborated a lot more,

3

whatever you want to call it.  Made it his own, so to speak.

\*    \*    \*

Q.  Now, before Bobby left you, did you go over what was going on at the trial and what you did and what you said?

A.  Basically, yeah.

Q.  Did he indicate to you that he was going to not - - that he was going to back you up on this and help you out?

A.  He did.

\*    \*    \*

Q.  Okay.  And you are now saying today, fifty years plus, after the trial in this matter, that you told Bobby to lie for you.

A.  Bobby - -

Q.  To help you.

A.  No.  Bobby told me that he had my back and would back me up on it.  And then I told him what to lie about.

Q.  So - -

A.  There's a difference there between me - - just remember, I'm trying to find people to lie for me, and Bobby being my best friend at the time and knowing the circumstances and me telling him what was going on.  He volunteered to help me.  Then, then, I gave him the information."

\*    \*    \*

Q.  Well, why did you need help from Bobby Jackson?

A.  I wanted him to back up my story.

\*    \*    \*

Q.  Okay.  So, you get to Tucson on the evening of the 25th.  You are there the 26th.  And when are you picked up? …

A.  I believe I - - the night I left, I was out for the next day.  I don't remember - - I can't recall if I was out all of the next day and got picked up that day, or if I was out overnight and got picked up the next day.

Q.  Okay.  Fine.  So, is that the time during which you and Bobby Jackson got together and cooked up a story for Bobby to tell the police?

A.  No, I think we had spoke before that, too. …  I can't recall

4

if I was on the streets free, running loose, when Bobby and I had our first conversations about that.

        *      *      *

Q. And you said that you told Bobby Jackson everything about what to say in the Louis Taylor trial because he didn't know anything about it at all. So, you sort of masterminded his testimony.

A. Unfortunately, that's kind of true. I kind of - - yeah. Sadly, I did kind of do that.

Q. And he did that for you because why?

A. Just 'cause he's my best friend. I probably would have done the same thing for him at that time.

        *      *      *

Q. So, what did you tell Bobby Jackson to say?

A. I told him everything that I had testified or was going to testify to, had testified to, whatever the case was. And - - and then he just kind of - - like I said earlier, if you knew him, you'd know his style. He sort of made it his own and ran with it from there and just made up a bunch of more stuff. But he knew nothing about it before I told him what I know."

(*Id*. at 54-57, 109, 111-113, 118, 121-122.)

12.    Wallmark later received a letter from Jackson while in prison that said, "Hey, bro. I might be coming to prison. I hope you've got my back like I had yours." (*Id*. at 57.)

13.    At the conclusion of his direct examination, Taylor's attorney asked Wallmark if there was "anything else that [he] would like to put on the record now to tell the Judge about this[.]" (*Id*. at 64.)

14.    Wallmark took the opportunity to apologize to Det. Hust and the prosecution:

A. I mean, if I could put anything on the record, I don't know what - - what he does now or where he's at, but just, in order of the way I've wronged him, I feel that I - - I owe Larry Hust an apology for taking him down that rabbit hole with me. And then, after that, I believe I owe the prosecution, at that time, an apology.

(*Id*. at 64-65.)

15.    During his closing argument, Taylor's attorney acknowledged to the court that they could no longer argue that Wallmark and Jackson were coerced into falsely

testifying:

> [MR FIDEL:]  You know, the Court mentioned the other day that our position has evolved on this, and indeed it does, indeed it has.  We were certainly suspicious, I guess I should say of coaching and handling of Wallmark and Jackson from the outset.
>
> Mr. Wallmark says:  It was on me.
>
> This is part of his testimony.
>
> He was asked - - this is direct examination. … "Did he tell you what to say, or was it you listening to questions and conversations?  "No, no no.  He never - - he never instructed me to say something specifically.  It was me.  It was all me. … To the extent that we found or argued coercion based on what he was telling us before, it may have been a kind of mirror image.  You know we were gleaning what we wanted to hear from what we were hearing, rather than gleaning what to say from what was heard.
>
> So, coercion, no, he has taken that out of this picture. …

(Exhibit 2, R.T. 8/8/25 at 51-53.)

16.    On November 6, 2025, the state criminal court denied Taylor's petition for post-conviction relief.  (Dkt. 1202 at 15-40.)

17.    The state criminal court ruled:

> Contrary to what he had said in his 2022 interview and declaration, Wallmark denied being coached, coerced, or otherwise influenced on what to testify. …  When called to testify under oath, in public, Wallmark gave a different history of the case – one where he, and he alone, decided to fabricate his testimony and that the police and prosecutors took no part in his deception.

(*Id*. at 35.)

18.    The state criminal court also ruled that: Wallmark's 1972 testimony was not material; Wallmark's 2025 testimony significantly departed from his 2022 interview and declaration; Wallmark's 2025 recantation was not credible and did not undermine Taylor's convictions; Wallmark's 2025 testimony "does not substantially undermine Jackson's [1972] testimony in any meaningful way"; and, even considering Wallmark's 2025 testimony, Taylor failed to prove by clear and convincing evidence that no reasonable factfinder would find him guilty beyond a reasonable doubt.  (Dkt. 1202 at 28-40.)

DATED this 23rd day of February, 2026.

STRUCK LOVE ACEDO, PLC


By ___/s/ Nicholas D. Acedo_____
Daniel P. Struck
Nicholas D. Acedo
Jacob B. Lee
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Defendant Pima County*


ROI LUSK,
City Attorney


By ___/s/Dennis P. McLaughlin(w/permission)
Michelle R. Saavedra
Dennis P. McLaughlin
Principal Assistant City Attorney
PO Box 27210
Tucson, Arizona 85726-7210

*Attorneys for Defendant City of Tucson*

7

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

John P. Leader          john@leaderlawaz.com
Peter T. Limperis       plimperis@mpfmlaw.com
Stanley G. Feldman      sfeldman@mpfmlaw.com
Max W. Larnerd          mlarnerd@mpfmlaw.com
Michelle R. Saavedra    michelle.saavedra@tucsonaz.gov
Dennis P. McLaughlin    Dennis.McLaughlin@tucsonaz.gov

                        /s/ B. Bull

8