**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nina Alley, | No. CV-15-00152-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| County of Pima, et al., | |
| Defendants. | |

Pending before the Court is Defendants' Renewed Motion for Summary Judgment re: Bruce Wallmark and Robert Jackson Allegations.  (Doc. 1213.)  The Motion is fully briefed.  (Docs. 1216, 1219.)  For the following reasons, the Motion will be denied.

**I.      Background**

During the night of December 19-20, 1970, a fire killed 28 people at the Pioneer Hotel in downtown Tucson, Arizona.  (Doc. 343 at 11 ¶ 56; Doc. 365 at 30 ¶ 56; Doc. 374 at 21 ¶ 56; *see also* Doc. 338-1 at 52-53.)[1]  In 1972, Plaintiff Louis Taylor[2] was convicted of 28 counts of murder arising from the deaths, and sentenced to life imprisonment.  (Doc. 340-9 at 10-12, 36-37.)  During Taylor's criminal trial, the prosecution called several individuals, including Bruce Wallmark ("Wallmark") and Robert Jackson ("Robert"), who claimed to have spoken to Taylor about the trial while housed with him in juvenile

---

[1] All record citations herein refer to the page numbers generated by the Court's electronic filing system.
[2] Taylor's Guardian and Conservator, Nina Alley, has been substituted in place of Taylor as the named plaintiff in this action.  (Doc. 624.)  The Court uses the term "Plaintiff" herein to refer interchangeably to Taylor.

detention. Wallmark testified that Taylor told him that he and two others had been in the Pioneer Hotel the evening of the fire to steal wallets and money from rooms, and that the fire had started from a lit book of matches or a lighter that dropped on the carpet as they were running away from a hotel employee. (Doc. 338-10 at 57-60, 64-65, 91-92.) Wallmark fled before the defense had finished its cross-examination of him, but he was later apprehended, and the cross-examination was concluded. (*Id.* at 99-101, 184-190.) After the defense rested, the prosecution successfully moved to reopen its case-in-chief to present testimony from Robert. (Doc. 340-3 at 219-221.) Robert testified that Taylor told him he had started the Pioneer Hotel fire by squirting lighter fluid on a wall and lighting it with a match. (*Id.* at 222-224, 228-230; Doc. 340-4 at 7, 27.) Taylor admitted during his trial testimony that he had come into contact with Wallmark and Robert in juvenile detention, but he denied telling Wallmark that he saw the fire start, and he denied telling anyone that he had started the fire. (Doc. 339-8 at 27-32.)

In April 1972, Taylor moved for a new trial based on newly discovered evidence of witness recantations. (*See* Doc. 341-5 at 98-99, 101-102.) On May 12, 1972, Robert made a recorded but unsworn statement averring that his trial testimony was false, and that Taylor had told him he did *not* start the Pioneer Hotel fire. (Doc. 347-8 at 2-7, 17.) Robert stated that the only thing Taylor told him about the fire was that Taylor was at a party at the hotel when the fire broke out and that he helped people get out of the hotel. (*Id.* at 3, 17-18.) Robert further stated that City of Tucson Police Department ("TPD") officers threatened him with criminal charges if he did not provide inculpatory testimony against Taylor; that Deputy County Attorney Horton Weiss and Pima County investigator Rex Angeley told him what to say on the stand; that Angeley knew he was lying during his testimony; and that Angeley later threatened him with criminal charges if he did not sign a statement affirming his trial testimony. (*Id.* at 4-14, 27-28.) The trial court held a hearing on May 18, 1972, during which Robert took the stand and affirmed his trial testimony. (Doc. 340-9 at 118-119, 156.) The trial court denied Taylor's motion for new trial. (*Id.* at 193.)

On August 30, 1972, Robert's brother, Albert Jackson ("Albert"), signed a notarized

affidavit in which he stated that officers from TPD and the Pima County Attorney's Office coerced Wallmark and Robert to testify against Taylor by threatening to imprison them. (Doc. 347-7 at 1-3.) Albert stated that Angeley and TPD Detective Lawrence Hust threatened him and Robert with criminal charges, called them "n****r lovers," and said they would ensure they had a "n****r for a daddy" in prison. (*Id.* at 2.) Taylor unsuccessfully moved for a new trial based on Albert's affidavit. (Doc. 342-3 at 23-30.)

On April 2, 2013, Taylor pled no contest to 28 counts of murder in exchange for a sentence of time served, as part of a stipulated resolution of post-conviction relief proceedings. (Doc. 348-3; Doc. 348-10; Doc. 348-11; Doc. 335 at 71 ¶¶ 705, 707; Doc. 367 at 72 ¶¶ 705, 707.) He was released from prison that same day, after approximately 42 years of incarceration. (Doc. 335 at 71 ¶ 707; Doc. 367 at 72 ¶ 707.) Plaintiff then initiated this action, raising claims under 42 U.S.C. § 1983 relating to his 1972 convictions. (Doc. 1.)

The currently operative pleading is Plaintiff's Third Amended Complaint, and the remaining claims are the § 1983 claims alleged in Count One and Counts Three through Five. (Doc. 169; *see also* Doc. 227 at 10; Doc. 869 at 59.) Count One raises a claim against the City of Tucson based on a custom and practice of racial discrimination. (Doc. 169 at 11-16.) Count Three alleges that Pima County failed to properly train and supervise Deputy County Attorneys. (*Id.* at 18-19.) Count Four alleges that Pima County failed to terminate Weiss's employment based on a custom of deliberate indifference to prosecutorial misconduct. (*Id.* at 19-20.) Count Five raises a claim of civil conspiracy against Pima County and the City of Tucson, alleging that co-conspirators improperly arrested, charged, and prosecuted Plaintiff; deliberately withheld exculpatory evidence, and suborned false testimony from Wallmark and Jackson. (*Id.* at 21-24.)

The parties previously moved for summary judgment. (Docs. 332, 349, 351, 371.) In the Court's Order resolving the parties' prior summary judgment motions, the Court found in relevant part that there are material disputes of fact concerning whether Defendants procured false testimony from Wallmark and Robert by threatening them with

criminal charges and imprisonment. (Doc. 869 at 42-44.) The Court further found that the allegations of Plaintiff's Third Amended Complaint "are sufficient to put Defendants on notice of Plaintiff's theory that Defendants failed to disclose the circumstances by which they procured false testimony from Robert and Wallmark." (*Id.* at 43.)

On May 19, 2022, Plaintiff submitted for filing under seal a declaration in which Wallmark recanted his testimony from Taylor's 1972 trial. (Doc. 406; Doc. 417.) On July 31, 2025, Wallmark testified during a state-court post-conviction evidentiary hearing. (Doc. 1214-1.) During the evidentiary hearing, Wallmark repudiated his 1972 trial testimony, and he averred that he met Taylor in juvenile detention but never spoke to him about the Pioneer Hotel fire or Taylor's actions on the night of the fire. (*Id.* at 9-11, 25, 36-39, 90-91.) After being released from juvenile detention and joining the Marine Corps, Wallmark was arrested by TPD Detective Hust and taken into custody for an alleged burglary which Wallmark had not committed. (*Id.* at 13-15, 67-68, 92-93.) Detective Hust asked Wallmark for information about the Pioneer Hotel fire and "cued [Wallmark] on what he was looking for," but "never instructed [Wallmark] to say something specifically." (*Id.* at 17-19.) Wallmark had no information about Taylor's guilt or innocence, but he gave a false statement because he feared losing his position with the Marine Corps and going to jail. (*Id.* at 18-19, 92-97.) Officers indicated that Wallmark was going to be charged and prosecuted for burglary, which was on Wallmark's mind when he spoke to them. (*Id.* at 26-27.) Wallmark was able to glean information from the questions that the officers asked him, conversations he had with them, and conversations he overheard them having. (*Id.* at 24, 39-40, 111.) For example, Wallmark stated that Taylor told him the fire started on the fourth floor because the officers asked Wallmark if Taylor was ever on the fourth floor. (*Id.* at 22-23.) Wallmark did not enter a formal non-prosecution agreement, and he was never promised anything specific for his testimony, but he ultimately was never prosecuted for burglary. (*Id.* at 27, 124.)

Before Wallmark testified in Taylor's trial, officers repeatedly showed him the statement he'd made to them, and they told him to remember it and articulate it to the jury.

(*Id.* at 33-34.)  Wallmark did not "at that time" tell the officers that the statement was a lie. (*Id.* at 34.)  After his first day of testimony, the prosecutor in Taylor's case spoke to Wallmark about his next day of testimony, and then that night Wallmark fled and went to Tucson.  (*Id.* at 42-44.)  In Tucson, he spoke to his then-best friend Robert and told him that he'd lied on the witness stand.  (*Id.* at 44.)  Wallmark was concerned that he was in a lot of trouble after running away from the trial.  (*Id.* at 99-100.)  Robert did not have any incriminating information about Taylor, but he offered to help Wallmark, and Wallmark filled him in on the scenario and told him what to lie about.  (*Id.* at 44-45, 99.)  Robert then falsely testified against Taylor.  (*Id.* at 46-47.)

## II.     Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and (2) that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248-50 (1986); *see also Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

At summary judgment, the judge's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  In evaluating a motion for summary judgment, the court must "draw all reasonable inferences from the evidence" in favor of the non-movant.  *O'Connor*

*v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).  If "the evidence yields conflicting inferences, summary judgment is improper, and the action must proceed to trial."  *Id.*  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

### III.    Discussion

Defendants argue that Wallmark's July 31, 2025 testimony during the state post-conviction evidentiary hearing definitively repudiates Taylor's allegations that Detective Hust and Deputy County Attorney Weiss threatened and coerced Wallmark and Robert into testifying falsely at Taylor's 1972 criminal trial.  (Doc. 1213.)  Defendants contend that Plaintiff cannot articulate any underlying constitutional claim, nor can he establish *Monell* liability against the City of Tucson or Pima County.  (*Id.* at 7-8.)  In response, Plaintiff argues that Wallmark's recent testimony at most undercuts only a portion of the civil conspiracy claim in Count Five of Plaintiff's Third Amended Complaint, and that genuine disputes of material fact continue to exist regarding whether Wallmark and Robert were threatened or coerced to testify against Taylor or offered a benefit for doing so, and whether Hust or Weiss knew that their testimony was false.  (Doc. 1216.)

The Court finds that the evidence yields conflicting inferences, rendering summary judgment inappropriate.  It will be up to the jury to evaluate Wallmark's credibility. Furthermore, Wallmark's July 31, 2025 testimony is consistent with his 2022 declaration in that a reasonable juror could find that Detective Hust and City of Tucson officers arrested Wallmark and threatened him with false burglary charges in order to coerce him into testifying against Taylor.  A reasonable juror could also find that officers intentionally fed Wallmark information that they wanted him to testify to, through leading questions and conversations held with and in front of him, and that the officers and the prosecution knew or should have known that Wallmark's testimony was false.

As this Court previously determined (Doc. 869 at 43-44), a juror could also reasonably determine from the 1972 affidavits of Robert and his brother, Albert (Docs. 347-7, 347-8), that city and county officers used similar tactics to procure Robert's

testimony.[3]  Wallmark's 2025 testimony that Robert testified against Taylor in order to help Wallmark out does not preclude the possibility, supported by Robert and Albert's affidavits, that officers threatened Robert with criminal charges.  Furthermore, a juror could determine, based on the affidavits and the prosecution's knowledge of the contents of the Truesdail Report finding no evidence of accelerants, that city and county officers knew Robert's testimony against Taylor was false.

Because Defendants have failed to establish the absence of genuine issues of material fact, the Court will deny their Renewed Motion for Summary Judgment.

**IT IS ORDERED** that Defendants' Renewed Motion for Summary Judgment (Doc. 1213) is **denied**.

Dated this 29th day of June, 2026.

_____
Honorable Rosemary Márquez
United States District Judge

---

[3] The Court previously denied Defendant City of Tucson's Motion in Limine to preclude the affidavits of Robert and Albert.  (Doc. 1136 at 21-24.)  To the extent Defendants argue in their Reply in support of their Renewed Motion for Summary Judgment that Albert's affidavit is inadmissible (Doc. 1219 at 5-7), the Court notes that it is improper to embed an untimely request for reconsideration into a reply.